No. _____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

COMMONWEALTH OF VIRGINIA, THE VETERANS OF FOREIGN
WARS OF THE UNITED STATES, IRAQ AND AFGHANISTAN
VETERANS OF AMERICA, JAMES RUDISILL, KASSIDY PERKINS,
PAUL YOON, ELIZABETH YOON, TOBY DORAN, KENNETH
BRATLAND, and MCKENNA BRATLAND,

*Petitioners*,

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent*.

_____

**PETITION FOR REVIEW**

_____

MARY GRACE METCALFE
TROUTMAN PEPPER LOCKE LLP
875 THIRD AVENUE,
NEW YORK, NY 10022
(212) 704-6029

TIMOTHY L. MCHUGH
JEFF P. JOHNSON
MCKAYLA J. RITER
1001 HAXALL POINT
RICHMOND, VA 23219
(804) 697-1365
(804) 697-1480
(804) 697-1486

JASON S. MIYARES
  *Attorney General*

KEVIN M. GALLAGHER
  *Principal Deputy Solicitor
General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 371-0200 – Facsimile

*Counsel for the Commonwealth of
Virginia*

MISHA TSEYTLIN
111 SOUTH WACKER DRIVE
SUITE 4100
CHICAGO, IL 60606
(312) 759-5947

NATALIA A. JACOBO*
11682 EL CAMINO REAL
SUITE 400
SAN DIEGO, CA 92130
(213) 928-9821

*Counsel for James Rudisill,
Kassidy Perkins, Paul Yoon,
Elizabeth Yoon, Toby Doran,
Kenneth Bratland, and McKenna
Bratland*

August 14, 2025

LUKE A. SCHAMEL
YETTER COLEMAN LLP
811 MAIN STREET, SUITE 4100
HOUSTON, TEXAS 77002
(713) 632-8000

*Counsel for the Veterans of
Foreign Wars of the United States*

TODD C. TORAL*
JENNER & BLOCK LLP
2029 CENTURY PARK EAST
SUITE 1450
LOS ANGELES, CA 90067-2901
(213) 239-2294

STEVEN J. ARANGO*
1099 NEW YORK AVENUE, NW
SUITE 900
WASHINGTON, DC 20001-4412
(202) 637-6348

*Counsel for Iraq and Afghanistan
Veterans of America*

*Applications for admission
pending

## I.    INTRODUCTION

Since World War II, the federal government has provided veterans and their families with significant education benefits through federal GI Bills.  Today, veterans whose service entitles them to education benefits under both of the principal GI Bills (the Montgomery GI Bill and the Post-9/11 GI Bill) may use a total of 48 months of benefits.

For years, the Department of Veterans Affairs ("VA") has denied veterans rightfully earned education entitlements under a cramped reading of the two GI Bills.  Last year, the Supreme Court corrected that error in *Rudisill v. McDonough*, 601 U.S. 294 (2024), holding that "[v]eterans who separately accrue benefits under both [GI Bills] are entitled to both benefits." *Id.* at 314.  But the VA continues to deny veterans education benefits to which they are entitled—now by taking an unduly cramped reading of *Rudisill* itself.

As explained in *Rudisill*, the plain language of the GI Bills has always compelled the VA to honor the full 48 months of education benefits that veterans were promised.  But for years VA rules have denied benefits to veterans who are entitled to them.  Those rules are unlawful and should be set aside.

1

## II.    STATEMENT OF THE CASE

Congress provides generous education benefits to military servicemembers. In addition to 36 months of traditional GI Bill benefits, known as Montgomery benefits, *see* 38 U.S.C. § 3001 *et seq.*, veterans who served after September 11, 2001, may also qualify for up to 36 months of enhanced education benefits under the Post-9/11 Veterans Educational Assistance Act of 2008, 122 Stat. 2357, 38 U.S.C. § 3301 *et seq.* Veterans may combine benefits from both programs, up to a 48-months aggregate cap. *See* 38 U.S.C. §§ 3312(a), 3695. And although "servicemembers cannot receive disbursements from both entitlement programs at the same time, nor may they receive any combination of benefits for longer than 48 months," "[o]utside of those limitations, their service 'entitle[s]' them to the benefits that they have earned, and the VA 'shall pay' them these benefits." *Rudisill*, 601 U.S. at 302.

The Montgomery and Post-9/11 GI Bills provide independent entitlements to benefits. This was first decided in *BO v. Wilkie*, 31 Vet. App. 321 (2019), which rejected the VA's attempt to limit veterans from getting their full entitlements under both GI Bills. There, the U.S. Court of Appeals for Veterans Claims ("Veterans Court") held that a "veteran

2

such as BO [should] receive full benefits under both programs subject to an aggregate cap on all such benefits." *Id.* at 328. Ultimately, the Supreme Court agreed with *BO*'s result, holding that the "statute is clear" that "[v]eterans who separately accrue benefits under both the Montgomery and Post-9/11 GI Bills are entitled to both benefits." *Rudisill*, 601 U.S. at 314. As the Court explained, under the law, "what matters is that [a veteran's] lengthy service conferred two separate entitlements." *Id.* at 306.

Between the Veterans Court's decision in *BO* and the Supreme Court's decision in *Rudisill*, however, the VA issued internal "interim" rules of general applicability that had the effect of requiring VA employees to deny veterans their education benefits available under *BO*. These unpublished "interim" rules directed VA employees to deny such claims and mark them as a "BO v. Wilkie Claim" in the VA's internal processing system. Exs. 1 (Sept. 2019, as updated through at least Oct. 2019), 2 (Oct. 2019, as updated through at least Jun. 2020), 3 (Nov. 2019, as updated through at least Apr. 2020). These "interim" rules remained in effect until June 2024, *see Procedural Advisory: Changes to Original Claims Processing After* Rudisill v. McDonough *Decision*, U.S. Dep't of

3

Veterans Affs. (Jun. 13, 2024), https://perma.cc/HA53-JLMJ (rescinding Sept. 2019 "interim" advisory, while publicly announcing for the first time rules for implementing either *BO* or *Rudisill*).  As a result, thousands of veterans (and their dependents) were wrongfully denied benefits for more than five years.

After the Supreme Court rejected the VA's attempt to wrongfully deny veterans the full 48 months of benefits to which they were entitled under the plain and clear statutory text, *see Rudisill*, 601 U.S. at 314, the VA replaced its unpublished "interim" rules.  The newly issued rules are enshrined in the public claims processing manual M22-4 "Education Procedures," specifically Part 3, Chapter 3, Subchapter 2, Section 3.10, and Part 4, Chapter 13, Subchapter 10 (hereinafter, the "2024 Education Directives").[1]  A copy of the 2024 Education Directives is attached as Exhibit 4.

The 2024 Education Directives, which must be followed by claims examiners in evaluating claims for education benefits from veterans and their family members, prescribe how the VA will deny or grant veterans'

---

[1] As explained below, the 2024 Education Directives also include the attachments and materials explicitly incorporated into them by the VA. Ex. 4.

education benefits, allegedly in compliance with the *Rudisill* decision. But the 2024 Education Directives flatly defy *Rudisill* by requiring the VA to deny benefits to veterans who have served long enough to accrue Post-9/11 and Montgomery benefits but do not have a break in service. They also prevent veterans from transferring those benefits to their children, who should have been able to use those benefits under *BO*, and prohibit the retroactive award of benefits for those denied benefits under the previous "interim" rules.

Applying the 2024 Education Directives, the VA denied James Rudisill, Paul Yoon, Elizabeth Yoon, and Kassidy Perkins their rightfully earned education benefits. The VA also threatens to now deny Toby Doran, Kenneth Bratland, and McKenna Bratland their rightfully earned education benefits (extending the harm initially done by the previous "interim" rules' unlawful withholding of those benefits)[2] by

---

[2] These systemic denials were contrary to the VA's representations during the *Rudisill* litigation that it was "in the process of implementing" the *BO* decision. *See*, *e.g.*, Respondent-Appellant's Opp. to Claimant-Appellee's Emergency Mot. for Expedited Schedule, *Rudisill v. Wilkie,* Fed Cir. No. 20-1637, at 8 n.4 (Apr. 7, 2020) ("[T]he VA is in the process of implementing the [*BO*] decision of the Veterans Court across the agency."). The systemic denials also violated the Veterans Court order

refusing delimiting date extensions to dependents who were prevented from using their benefits by the VA and by failing to provide for the retroactive award of benefits unlawfully withheld. In turn, those wrongful denials have increased the Commonwealth of Virginia's burdens and costs in caring for its veterans, including Virginia residents in the same circumstances as Petitioners James Rudisill, Paul Yoon, Elizabeth Yoon, Kassidy Perkins, Toby Doran, Kenneth Bratland, McKenna Bratland, and members of the Veterans of Foreign Wars of the United States ("VFW") and Iraq and Afghanistan Veterans of America ("IAVA").

The 2024 Education Directives are incompatible with the plain text of the GI Bills, as interpreted by the Supreme Court in *Rudisill*. Namely, they unlawfully deny benefits to veterans who chose to serve their country continuously without a break in service—nonsensically denying benefits to many of this country's longest serving veterans—and arbitrarily distinguish between veterans, requiring certain veterans to

---

denying the VA's request to stay the precedential effect of *BO*. *BO v. Wilkie*, 16-4134, 2020 WL 62631 (Vet. App. Jan. 7, 2020); *see Tobler v. Derwinski*, 2 Vet. App. 8, 11 (1991) (requiring VA to apply Veterans Court decisions absent a stay).

relinquish benefits based on when their periods of service began. In so doing, the 2024 Education Directives directly contradict the Supreme Court's explicit explanation that the benefits "analysis does not focus on [a veteran's] periods of service"; "[r]ather, what matters is that his lengthy service conferred two separate entitlements." *Rudisill*, 601 U.S. at 306. Similarly, the Court rejected the VA's interpretation that Sections 3222 and 3227 require servicemembers to elect to relinquish benefits, holding that because "nothing in § 3327, § 3322, or anywhere else purports to alter [their] entitlement[s,]" a veteran whose lengthy service entitles him to benefits under both GI Bills "may use his benefits, in any order, up to § 3695's 48-month aggregate-benefits cap." *Id*. at 310, 314.

The 2024 Education Directives also arbitrarily deny certain veterans' dependents an extension of the date by which restored benefits must be used and fail to provide for the retroactive award of benefits unlawfully withheld. The 2024 Education Directives thus compound legal errors of the VA's own making in its prior application of the GI Bills, continue to ignore the plain text of the statute, and defy the Supreme Court's clear holding in *Rudisill*. Accordingly, they are arbitrary and

7

capricious, exceed the VA's statutory authority, unlawfully withhold mandatory educational entitlements, and are otherwise not in accordance with law.

Under 38 U.S.C. § 502 (and necessarily 5 U.S.C. § 706), Federal Rule of Appellate Procedure 15(a), and Federal Circuit Rule 15(f), Petitioners ask this Court to review (and ultimately set aside or vacate) the 2024 Education Directives. The 2024 Education Directives are rules under 5 U.S.C. § 552(a)(1) and thus are reviewable as final agency action. *See Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 981 F.3d 1360, 1382 (Fed. Cir. 2020) (hereinafter "*NOVA*").

## III.  JURISDICTION

This Court has jurisdiction under 38 U.S.C. § 502. Section 502 vests this Court with jurisdiction to review VA actions "to which section 552(a)(1) . . . of title 5 . . . refers." 38 U.S.C. § 502. Among other actions, section 552(a)(1) refers to "interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). This Court has already held that a VA manual's instructions may be reviewed as "interpretations of general applicability" under § 552(a)(1). *NOVA*, 981 F.3d at 1375–76.

8

Here, the 2024 Education Directives are rules of general applicability under which the VA has wrongfully denied veterans' educational entitlements. *See*, *e.g.*, Opinion, *Perkins v. Collins*, No. 24-6515, at 14 (Vet. App. May 16, 2025) (overturning VA's denial of benefits and reasoning that the VA "again seeks to thwart the efforts of a veteran with lengthy service to receive all the benefits to which she is due"); Order at 2, *Yoon v. Collins*, No. 25-1839 (Fed. Cir. June 26, 2025) ("The Department of Veterans Affairs, however, granted the Yoons only two months of benefits—the remaining portion of the 36-months of benefits under only the Montgomery GI Bill—because the Department understood that benefits under the Post-9/11 GI Bill require a break in service, which Mr. Yoon does not have."). Thus, this Court has jurisdiction to review the 2024 Education Directives.

## IV.  TIMELINESS

This petition is timely because it is within the six-year statute of limitations for facial challenges to final rules. 28 U.S.C. § 2401(a); Fed. Cir. R. 15(f)(1); *NOVA*, 981 F.3d at 1384–86. The VA issued internal "interim" rules of general applicability that had the effect of requiring VA employees to deny veterans their education benefits available under *BO*

9

beginning in September 2019. *See supra*. These "interim" rules remained in effect until 2024, when the VA promulgated the 2024 Education Directives. *See Procedural Advisory: Changes to Original Claims Processing After* Rudisill v. McDonough *Decision*, U.S. Dep't of Veterans Affs. (Jun. 13, 2024), https://perma.cc/HA53-JLMJ (rescinding Sept. 2019 "interim" advisory, while publicly announcing for the first time rules for implementing either *BO* or *Rudisill*). This petition, therefore, is filed within the statute of limitations.

## V.    PARTIES ADVERSELY AFFECTED

Petitioners the Commonwealth of Virginia, the VFW, IAVA, James Rudisill, Paul Yoon, Elizabeth Yoon, Kassidy Perkins, Toby Doran, Ken Bratland, and McKenna Bratland are adversely affected by the 2024 Education Directives. All have standing to bring this challenge.

The Commonwealth of Virginia is adversely affected by the 2024 Education Directives. The Commonwealth is home to approximately 700,000 veterans, many of whom rely on federal benefits. The Commonwealth has veterans support programs of its own and allocates tens of millions of dollars annually to its Department of Veterans Services to administer these programs. *See* Va. Dep't of Veterans Servs.,

Commissioner's 2024 Annual Report (Dec. 1,2024), at 61, *available at* https://tinyurl.com/ys9y8r4p.  But the federal GI Bills account for the "vast majority of spending on veteran education benefits."  Jennie W. Wenger & Jason M. Ward, *The Role of Education Benefits in Supporting Veterans as They Transition to Civilian Life*, RAND Corporation (Jan. 10, 2022), *available at* https://tinyurl.com/5z5cdv7h.  The 2024 Education Directives perpetuate the VA's unlawful denial of these federal benefits, which harms Virginia's veterans programs.

For example, family members of wrongly-denied veterans will likely continue turning to the Virginia Military Survivors and Dependents Education Program ("VMSDEP") for benefits that the federal government has unlawfully withheld.  That program covers undergraduate and graduate-school tuition for the dependents of veterans who have been disabled, have been missing or killed in action, or are prisoners of war.  The nature of the federal and state programs would typically make dual-enrollment for GI-Bill benefits and VMSDEP benefits redundant.  But if the VA maintains its policy of wrongfully denying benefits to veterans, then numerous eligible dependents would likely instead continue turning to VMSDEP and stretch the

Commonwealth's resources for the program.[3]  Over 30,000 Virginians received veteran education benefits under the Post-9/11 GI Bill in fiscal year 2023, whereas in 2024 only 8,000 Virginians received VMSDEP benefits.  The Commonwealth's programs were not designed to fill the breach opened by the VA's refusal to provide the full federal benefits to which veterans and their family members are entitled under the 2024 Education Directives' erroneous interpretation of the statutes.

The VFW is a nonprofit veterans service organization.  It was established in 1899 and, together with its Auxiliary, represents more than 1.4 million members.  The VFW was formed by veterans who, after returning home from war in the late 1800s wounded or sick, found that they were left to care for themselves.  These veterans responded by founding local organizations to secure rights and benefits for their military service.  Many of these veterans and the organizations they formed then banded together to become what is now known as the VFW.

---

[3] For example, the VMSDEP program provides benefits to dependent children up to the age of 29, whereas the GI Bills only provide benefits to age 26.  As noted in more detail below, the VA has arbitrarily denied dependent children access to benefits that they were wrongfully denied before they turned 27 and aged out of GI Bill eligibility.  As a result, dependent children 27–29 years old will likely resort to VMSDEP funding to cover expenses that should have been covered by the GI Bills.

Although the VFW's role has expanded over the past 126 years, its core purposes of advocating for veterans and ensuring that they and their families receive the benefits they earned remain unchanged. The VFW's mission and vision statements focus on serving those who have served and advocating to ensure that they receive their earned entitlements:

> Our Mission:  To foster camaraderie among United States veterans of overseas conflicts.  To serve our veterans, the military and our communities.  To advocate on behalf of all veterans.

> Our Vision:  Ensure that veterans are respected for their service, always receive their earned entitlements, and are recognized for the sacrifices they and their loved ones have made on behalf of this great country.

*About Us*, Veterans of Foreign Wars, https://www.vfw.org/about-us (accessed Aug. 12, 2025).

The VFW helped establish the VA and create both the World War II GI Bill and the Post-9/11 GI Bill.  Many of its members qualify for benefits under both the Montgomery and the Post-9/11 GI Bill.  To be a member, you must meet two requirements.  First, you must be currently serving in the Armed Forces of the United States or have previously served and received either an Honorable or General (under honorable conditions) discharge.  Second, you must have served in a war, campaign, or expedition on foreign soil or in hostile waters.  Many members, by

13

meeting this membership criteria, necessarily qualify for benefits under both the Montgomery and Post-9/11 GI Bills.

The interpretation of these two GI Bills and the provision of education benefits to veterans under them are therefore vitally important to the VFW and its mission.  The interpretation of these veterans' benefits laws impacts many of the VFW's members and the VFW's past and future efforts to ensure that veterans receive respect for their service, always get the entitlements they have earned, and are recognized for the sacrifices they and their loved ones have made.

The VFW has standing to bring this suit on behalf of its members.  *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Mil.-Veterans Advoc. Inc. v. Sec'y of Veterans Affs.*, 63 F.4th 935, 943–44 (Fed. Cir. 2023).  VFW members would otherwise have standing to sue here in their own right because many thousands of them are harmed or will be harmed by the 2024 Education Directives that incorrectly interpret and arbitrarily and capriciously limit or apply the veterans' benefits laws here.  In fact, one of the other petitioners, Mr. Rudisill, is a VFW member.  The 2024 Education Directives wrongly deny or limit VFW members' earned entitlements, contrary to law and

14

Supreme Court precedent, as discussed above and below. Protecting these members' entitlement to benefits is squarely within the VFW's mission and purpose. And neither the claims asserted nor the relief sought here require that individual VFW members participate because this petition raises purely legal questions that do not require individualized proof to resolve.

IAVA is a nonprofit and nonpartisan organization dedicated to improving the lives of Iraq and Afghanistan veterans and their families. It is the first and largest national veterans service organization dedicated exclusively to current and former volunteer service members. Its membership comprises more than 425,000 active veterans and civilian supporters across all 50 states. Many of IAVA's members qualify for benefits under both the Montgomery and the Post-9/11 GI Bill.

From its founding in 2004, IAVA has worked vigorously to support and expand veterans' benefits and to protect the GI Bills. In fact, in 2007 and 2008, IAVA was a leading voice among veterans service organizations in the media and in Congress in support of the Post-9/11 GI Bill then under debate. IAVA's research at the time—which IAVA published among Congressional staffers and the public—indicated that,

if enacted, the Post-9/11 GI Bill's enhanced education benefits would provide a critical boost to the military's flagging recruitment efforts. Together with other veterans service organizations and allies in Congress, IAVA helped drive the bipartisan consensus that propelled the Post-9/11 GI Bill into law.

As one of the instigating forces behind passage of the Post-9/11 GI Bill, and as the voice of more than 3 million post-9/11 veterans, IAVA has a unique interest in the scope and application of education benefits stemming from the GI Bills—the central issue in this case.  How these laws are interpreted affects a significant number of IAVA members and could jeopardize the entitlements they have earned serving our country. As it has always done, IAVA will continue its efforts to ensure that all veterans receive their hard-earned entitlements, respect for their service, and recognition for the sacrifices they and their families have made for every American.

IAVA has standing to bring this suit on behalf of its members.  *See, e.g.*, *Hunt*, 432 U.S. at 343; *Mil.-Veterans Advoc. Inc.*, 63 F.4th at 943–44.  IAVA members would otherwise have standing to sue here because thousands of them are harmed or will be harmed by the 2024 Education

16

Directives that incorrectly interpret and arbitrarily and capriciously limit or apply the veterans' benefits laws here. In fact, one of the other petitioners, Mr. Rudisill, is an IAVA member. The 2024 Education Directives wrongly deny or limit IAVA members' earned entitlements, contrary to law and Supreme Court precedent, as discussed above and below. Protecting these members' entitlement to benefits is squarely within the IAVA's mission and purpose as it has continuously demonstrated throughout its existence. And neither the claims asserted nor the relief sought here require that individual IAVA members participate because this petition raises purely legal questions that do not require individualized proof to resolve.

James Rudisill is a former enlisted soldier and U.S. Army captain residing in the Commonwealth of Virginia. He is a member of both the VFW and the IAVA. He earned entitlements to Montgomery and Post-9/11 benefits by honorably serving nearly eight years in three periods of military service. Despite the Supreme Court agreeing with his plain-text interpretation of the statutory provisions, the VA on remand has not fully restored his education benefits, and under the same pre-*Rudisill* interpretation that was rejected by the Supreme Court, continues to deny

17

him the Montgomery benefits to which he is entitled. *See Rudisill v. Collins*, No. 25-2578 (Vet. App.).

The 2024 Education Directives prohibit further relief for Mr. Rudisill (and others like him) because they require veterans who earned Post-9/11 benefits before August 1, 2011, to have two or more periods of service separated by a break, and they require veterans who have used some of their Montgomery benefits to relinquish their remaining Montgomery benefits rather than allowing them to use their full entitlements, in the order of their choosing, up to 48 months as *Rudisill* requires. *See* Ex. 4, Subchapter 10, Part B.3.

Kassidy Perkins is a U.S. Air Force veteran residing in the Commonwealth of Virginia. She earned her entitlements to education benefits by honorably serving her country for six continuous years after August 1, 2011. The VA denied her benefits because she did not have a break in service after August 1, 2011. The Veterans Court held that the *Rudisill* decision controlled and that a veteran's length of service determines her entitlement to education benefits. *See Perkins*, No. 24-6515, at 9–11, 19. The 2024 Education Directives' requirement of two periods of service separated by a break in service and their use of August

18

1, 2011, as the date for determining eligibility are contrary to the clear text of the statute. *Id.* at 16–18.

Although Ms. Perkins prevailed before the Veterans Court, the VA has filed a notice of appeal in her case, delaying the requirement that relief be implemented in her case.[4]  Thus, the 2024 Education Directives prohibit relief for Ms. Perkins (and others like her) because they state that veterans whose service began on or after August 1, 2011 cannot establish eligibility to both Montgomery and Post-9/11 benefits. *See* Ex. 4, Subchapter 10, Part B.4.

Paul Yoon is a retired U.S. Army Lieutenant Colonel residing in the Commonwealth of Virginia.  He earned entitlements to Montgomery and Post-9/11 benefits by continuously serving from 1998 to 2021.  After initially splitting his Post-9/11 benefits between his two daughters, Hannah and Elizabeth Yoon, he allocated a total of 14 months to Elizabeth after she was accepted to law school.  The VA, however,

---

[4] "[W]hen a party appeals to the Federal Circuit[,] in the absence of any other action, [from] a precedential decision, (1) the decision binds VA for all further adjudications at the Agency; but (2) until final it does not require implementation with respect to the named appellant." *Rudisill v. McDonough*, 34 Vet. App. 176, 184 (2021) (applying *Tobler*, 2 Vet. App. 8).

initially determined that, like Ms. Perkins, his continuous service does not qualify him for both Montgomery and Post-9/11 benefits. After Mr. Yoon, alongside other petitioners, challenged the VA's determination on an emergency basis, the VA attempted to moot his suit by issuing another determination—this time in keeping with the applicable law—and dismissing his pending Board appeal on the basis of the new determination. Consistent with the manner in which the VA administers education benefits, Ms. Yoon has received a "Detailed Education Payment Decision" from the regional office dated August 5, 2025, setting forth her "Education Benefit Eligibility" and containing "Evidence and Findings" for the semester. *See, e.g.*, 38 U.S.C. §§ 3313(l)(B)(3) (requirement to verify enrollment status monthly to continue receiving benefits), 3319(f)(2) (permitting transferor to alter transfers of benefits at any time, triggering new benefits decision(s)). Ms. Yoon expects to receive similar Detailed Education Payment Decisions on a semester-by-semester basis.

The VA, however, continues to maintain a manual that prohibits affording Mr. Yoon the full benefits to which he is entitled. Because Ms. Yoon still has two semesters' worth of benefits remaining that the VA has

20

not adjudicated—and because Mr. Yoon retains the ability to re-transfer any amounts of his remaining Post-9/11 entitlement to his other daughter and/or wife—the existing 2024 Education Directives, if applied by the regional offices that they bind, would again result in a denial as soon as next semester. The 2024 Education Directives prohibit Mr. Yoon (and others like him) from receiving the requested education benefits because they require veterans with one qualifying period of service (before August 1, 2011) who used Montgomery benefits before their Post-9/11 benefits to relinquish their remaining Montgomery benefits. *See* Ex. 4, Subchapter 10, Part B.2.

Elizabeth Yoon is the daughter of Lt. Col. Yoon (Ret.) and resides in the Commonwealth of Virginia. She began law school in August 2024. Mr. Yoon transferred 14 months of Post-9/11 benefits for his daughter to pursue a legal education. Because the VA initially denied her father his full benefits, Ms. Yoon was obligated to rely on alternative funding during the 2024–25 school year. Her appeal to the Board regarding the amount of benefits which her father was entitled to transfer to her, filed in 2024, was only just docketed and remains pending. While the Detailed Education Payment Decisions letter dated August 5, 2025, indicates that

21

Ms. Yoon is eligible for benefits for this coming semester, Ms. Yoon expects to receive further decisions from the regional office on a semester-by-semester basis.

Ms. Yoon's receipt of benefits is in danger for the same reasons applicable to Mr. Yoon. As with her father, the 2024 Education Directives prohibit relief for Ms. Yoon (and others like her) because they require veterans with one qualifying period of service (before August 1, 2011) who used Montgomery benefits before their Post 9/11 benefits to relinquish their remaining Montgomery benefits. *See* Ex. 4, Subchapter 10, Part B.2.

Toby Doran is a retired U.S. Air Force Colonel residing in the state of Oregon. He earned entitlements to Montgomery and Post-9/11 benefits by serving for more than 27 years, and he transferred his unused benefits to his son. Because the VA unlawfully and improperly applied the Montgomery and Post-9/11 GI Bills in a way that limited the benefits Mr. Doran and his family received, Mr. Doran paid significant amounts of money out of pocket to support his son's education when their family should have been able to rely on his benefits. Despite untold thousands of veterans and their families having incurred educational expenses

22

which should have been covered by their entitlements but were not granted because of the internal "interim" rules and the 2024 Education Directives, the VA has not taken appropriate steps to afford recovery to those harmed by the improper and unlawful application of the GI Bills, notwithstanding the VA's recently "conced[ing]" before this Court that veterans and their family members "'may be reimbursed for statutorily required education benefits that were unlawfully withheld.'"  Order at 2, *Yoon*, No. 25-1839.

The 2024 Education Directives prohibit relief for Mr. Doran (and others like him) because they do not provide for the retroactive award of benefits unlawfully and improperly withheld and instead force veterans and their families to pay out of pocket for expenses that Congress intended the GI Bills to cover.  *See* Ex. 4, Subchapter 10, Part C.  Indeed, the 2024 Education Directives only provide for forward-looking additional benefits (which the VA has since provided to Mr. Doran in an attempt to moot his Board appeal and petition before the Veterans Court) and do not consider a retroactive award of benefits.  It is arbitrary and capricious for the VA to promulgate the 2024 Education Directives

23

without considering how to make whole those veterans whose benefits had been unlawfully withheld.

Kenneth Bratland is a retired U.S. Air Force Colonel residing in the state of Arizona. He earned entitlements to Montgomery and Post-9/11 benefits by serving for more than 34 years and transferred his unused benefits equally to his son and daughter. Because the VA applied the internal "interim" rules to improperly limit the transfer of benefits to his children in 2021, Mr. Bratland paid significant amounts out of pocket to support his daughter's education when their family should have been able to rely on his benefits. He would transfer a portion of his remaining benefits to his daughter if the 2024 Education Directives did not now affirmatively deny delimiting date extensions to children of veterans (who ordinarily are unable to use Post-9/11 benefits after they turn 26, *see* 38 U.S.C. § 3319(h)(5)(A)).

This failure to extend the delimiting date for dependent children is particularly arbitrary considering that the statute expressly permits exceptions to the same in "emergency situations" and the VA has otherwise extended the separate delimiting dates applicable to veterans and spouses. *See id.* § 3319(h)(5)(C); *see also id.* §§ 3301(2), 3601(2)

24

(definitions). Mr. Bratland also challenges the VA's failure to consider and promulgate rules providing for the retroactive award of benefits unlawfully withheld and for which he was forced to pay out of pocket.

The 2024 Education Directives provide no mechanism for retroactive relief and explicitly prohibit relief to Mr. Bratland (and others like him), whose daughter turns 26 next year, by refusing any delimiting date extensions to children while automatically providing them to veterans and spouses. *See* Ex. 4, Subchapter 10, Part B.6 (Note 2: "Children are not eligible for Delimiting Date extensions."); *see also* https://perma.cc/MY7Q-VDWM. It is arbitrary and capricious for the VA to promulgate the 2024 Education Directives without considering how to make whole those veterans whose benefits were unlawfully withheld.

McKenna Bratland is the daughter of Mr. Bratland and resides in the state of Arizona. Ms. Bratland sought to use the benefits that her father had transferred to her in 2021 while a student at the University of Arizona, at which time the VA improperly limited her benefits through application of the internal "interim" rules. Ms. Bratland exhausted the limited benefits provided by the internal "interim" rules and thereafter had to rely on other funding for her education. Had she correctly been

25

provided with the full amount of benefits she should have received in 2021—as provided by the GI Bills, *BO*, and now *Rudisill*—she would have used them then.  Ms. Bratland has a continuing need for Post-9/11 benefits to finish her education, which was interrupted due to long-term medical complications resulting from COVID-19, but that possibility is foreclosed by the VA's refusal to provide delimiting date extensions to veterans' children.  Because the 2024 Education Directives affirmatively and arbitrarily refuse such delimiting date extensions, while providing such extensions to all other impacted individuals, Ms. Bratland may not realistically be able to utilize any Post-9/11 benefits transferred to her before she turns 26 next year.  Again, this is arbitrary considering that the statute expressly permits exceptions to the 26-year limitation in "emergency situations" that the VA may define.  *See* 38 U.S.C. § 3319(h)(5)(C); *see also id.* §§ 3301(2), 3601(2) (definitions).

The 2024 Education Directives continue the harm begun with the internal "interim" rules to Ms. Bratland (and others like her) and prohibit relief for her because they do not extend the delimiting date for her as they do for veterans and spouses.  *See* Ex. 4, Subchapter 10, Part B.6; *see also* Worksheet, Rudisill DD Extension Job Aid v.4.2, at Note 2 (Jan. 16,

2025). Indeed, the directives only provide for forward-looking additional benefits and do not consider a retroactive award of benefits. It is arbitrary and capricious for the VA to promulgate the 2024 Education Directives without considering how to make whole those veterans whose benefits had been unlawfully withheld.

## VI.   FINAL RULES THAT REQUIRE THIS COURT'S REVIEW

Petitioners request review of two final rules found in M22-4 manual Part 3, Chapter 3, Subchapter 2, Section 3.10 "Elections" (hereinafter Section 3:10) and Part 4, Chapter 13, Subchapter 10 "Rudisill v. McDonough Claims Processing" (hereinafter Subchapter 10), inclusive of their accompanying charts and attachments. Both Section 3:10 and Subchapter 10 conflict with the plain text of the relevant statutory provisions, as the Supreme Court explained when it reviewed the statutory framework in *Rudisill*. These rules advance an erroneous interpretation of *Rudisill* under which the VA has wrongfully denied veterans' education entitlements. The rules also allow veterans to extend the date by which they must use unlawfully withheld benefits but deny veterans' dependents who wish to use those benefits the same opportunity. Moreover, they fail to provide for the retroactive award of

27

benefits unlawfully withheld under the "interim" rules.  Because these rules are contrary to Congress' express statutory framework to provide education benefits to veterans, they are unlawful under 38 U.S.C. § 502 and 5 U.S.C. § 706.

In *Rudisill*, the Court *explicitly foreclosed* the non-statutory rules promulgated in Section 3:10 and Subchapter 10—and hardly could have done so more clearly.  601 U.S. at 306.  The Court specifically explained that "[n]otably, our analysis does not focus on [Rudisill's] periods of service"; "[r]ather, what matters is . . . his lengthy service [.]" *Id*.  Section 3:10 and Subchapter 10's interpretations of *Rudisill* cannot be squared with *Rudisill*'s clear reasoning.  To the contrary, *Rudisill* requires the VA to honor a veteran's education entitlements regardless of whether they served continuously or had a break in their service.

Incredibly, Section 3:10 and Subchapter 10 would deny benefits even to Mr. Rudisill himself because they erroneously direct claims examiners to deny benefits to veterans who—like Mr. Rudisill—had different periods of service.  For example, Section 3:10 states that the "bar to duplication based on a single period of service beginning on or after August 1, 2011 . . . remains unchanged" after *Rudisill*.  Section

28

3:10(i), Note 2. Subchapter 10 repeatedly states that *Rudisill*'s holding affects only veterans with multiple periods of service, by which the manual means veterans that have a break in their service. *See*, *e.g.*, Ex. 4, Subchapter 10(A) ("The issue decided in [*Rudisill*] pertains to individuals with multiple periods of active-duty service . . . .") (cleaned up); *id.* at (B) ("The new *Rudisill* interpretation changes how multiple periods of qualifying military service impacts benefits earned.") (cleaned up); *id.* ("Service periods that began on or after August 1, 2011 . . . cannot be used to establish both [Montgomery and Post-9/11 GI Bill] benefits.") (cleaned up). That is incorrect.

The VA's claim that the statute bars duplication based on a single period of uninterrupted service is contrary to the statute's plain text. Section 3322(a) simply says that a veteran who has both Montgomery and Post-9/11 benefits "may not receive assistance under two or more such programs concurrently." 38 U.S.C. § 3322(a). It bars "duplicative receipt of benefits," *Rudisill*, 601 U.S. at 308, as in 38 U.S.C. § 3322(e), (f), (g), which the Supreme Court recognized. No statutory provision permits the VA to limit a veteran's education benefits based on whether a veteran happens to have a break in his or her service.

29

In fact, the Supreme Court expressly rejected any contrary suggestion in *Rudisill* itself. The Court held that a veteran whose length of service qualifies him for entitlements under both GI Bills is "separately entitled to each of [the] two educational benefits." *Rudisill*, 601 U.S. at 295. Therefore, absent a statutorily imposed limit, the VA is "statutorily obligated to pay" 48 months of combined benefits. *Id*. Whatever other limits may apply, a veteran's benefits are not contingent on having separation between distinct "periods of service," because, as the Supreme Court explained in *Rudisill*, it was Rudisill's "lengthy service" that "conferred" on him "two separate entitlements." *Id*. at 306.

Section 3:10 and Subchapter 10 also arbitrarily deny veterans' dependents the ability to use benefits that were unlawfully withheld under the internal "interim" rules. Those rules conflicted with the plain text of the GI Bills, violated the Veterans Court's orders to implement its precedential decision pending appeal, *BO*, 2020 WL 62631, at *3, and contradicted the VA's representations to this Court that it was *implementing BO*. Although the 2024 Education Directives allow veterans to have more time to use their education entitlements for the period that the VA unlawfully denied those entitlements, they do not

30

provide the same opportunity to certain veterans' dependents.  There is no statutory or rational basis for the VA to conclude that veterans who transferred their benefits and the dependents who would use them should not all have the same opportunity.

Section 3:10 and Subchapter 10 are arbitrary and capricious, exceed the VA's statutory authority, and are not in accordance with law, and therefore should be set aside.

## VII.  CONCLUSION

The 2024 Education Directives unlawfully deny veterans and their families the education benefits to which they are entitled by law. Petitioners challenge those unlawful final rules and respectfully petition this Court for review to vacate and/or set aside those rules as arbitrary, capricious, in excess of statutory authority, or otherwise unlawful.

August 14, 2025

Respectfully submitted,

By: _____ */s/ Kevin M. Gallagher*
      Kevin M. Gallagher
      *Principal Deputy Solicitor General*

31

JASON S. MIYARES
  *Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 371-0200 – Facsimile

*Counsel for the Commonwealth of
Virginia*

*/s/ Mary Grace Metcalfe*
Mary Grace Metcalfe
TROUTMAN PEPPER LOCKE LLP
875 Third Avenue
New York, NY 10022
(212) 704-6029
MaryGrace.Metcalfe@troutman.com

Timothy L. McHugh
Jeff P. Johnson
McKayla J. Riter
1001 Haxall Point
Richmond, VA 23219
(804) 697-1365
(804) 697-1480
(804) 697-1486
Tim.McHugh@troutman.com
Jeff.Johnson@troutman.com
McKayla.Riter@troutman.com

Misha Tseytlin
111 South Wacker Drive
Suite 4100
Chicago, IL 60606
(312) 759-5947
Misha.Tseytlin@troutman.com

Natalia A. Jacobo
11682 El Camino Real
Suite 400
San Diego, CA 92130
(213) 928-9821
Natalia.Jacobo@troutman.com

*Counsel for James Rudisill, Kassidy Perkins, Paul Yoon, Elizabeth Yoon, Toby Doran, Kenneth Bratland, and McKenna Bratland*

*/s/ Luke A. Schamel*
Luke A. Schamel
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

*Counsel for the Veterans of Foreign Wars of the United States*

*/s/ Todd C. Toral*
Todd C. Toral*
JENNER & BLOCK LLP
2029 Century Park East
Suite 1450
Los Angeles, CA 90067-2901
(213) 239-2294
ttoral@jenner.com

Steven J. Arango*
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 637-6348
sarango@jenner.com

33

*Counsel for Iraq and Afghanistan Veterans of America*

\*Applications for admission pending

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's CM/ECF system.

I further certify that I will cause a true and correct copy of the foregoing to be served upon the following:

> Danielle A. Runyan, Acting General Counsel
> U.S. Department of Veterans Affairs
> 810 Vermont Ave, N.W.
> Washington, D.C. 20420

*/s/ Kevin M. Gallagher*
Kevin M. Gallagher

# Exhibit 1

> **(I) 2019 23 September: Interim Procedural Advisory: CAVC Decision -- B.O. v. Wilkie**
> Article ID: 554400000130107

**Interim Procedural Advisory: CAVC Decision -- *B.O. v. Wilkie***

Updated Oct 10, 2019

**September 23, 2019**

**What Will Change:** On August 15, 2019, the Court of Appeals for Veterans Claims (CAVC) issued a panel decision in a case called *B.O. (a pseudonym) v. Robert Wilkie, Secretary of Veterans Affairs.* This case concerned whether a veteran with more than one period of qualifying service must relinquish or exhaust entitlement under the Montgomery GI Bill education program (chapter 30 benefits) before receiving education benefits under the Post-9/11 GI Bill program (chapter 33 benefits).

VA's position has always been that one period of qualifying service MUST be relinquished or exhausted. However, the majority opinion (i.e. the decision) ruled otherwise, finding both that

1. The governing statute by Congress is ambiguous and
2. VA's regulations implementing it did not resolve this ambiguity

This decision means that, contrary to current VA practice, a veteran with more than one period of qualifying service need not relinquish or exhaust entitlement under chapter 30 for benefits before receiving education benefits under chapter 33 benefits. The Court held that in situations where the claimant has more than one qualifying period of service, chapter 33 entitlement should not be limited to the months of entitlement remaining under chapter 30; rather the 48-month rule should be the only limitation on chapter 33 entitlement.

VA is likely to request a review of the case by the full Veterans Court and also to request for a stay of the decision's implementation pending such review.

**RPO Impact:** Chapter 33 claims will have to be reviewed for consideration under *B.O.*

v. *Wilkie.* This has the potential to slow timeliness down to ensure the claimants are provided the correct notice and entitlement.

**What RPO Action is Needed:** EDU is in the process of developing full procedures to correctly adjudicate claims under *B.O.* Until those procedures are finalized, impacted claims must be placed under control using the following required actions.

1. For **original** chapter 33 claims:

VCEs will have to carefully review for the following:

To be considered under B.O. v. Wilkie, the following must exist:

1. Claimant applies for chapter 33 benefits.
2. Claimant has more than one Period of Service (POS)
3. Claimant indicates relinquishment of chapter 30 benefits
4. Claimant has used some of original chapter 30 benefits.

When the VCE identifies an original chapter 33 claim which meets these criteria, the VCE should place in a new TIMS queue entitled BVW. In the TIMS facility code field, the VCE should insert BVW. The end product should be disp'd for 30 days from the date of action to O-BVW.

2. Chapter 33 **supplemental** claims. No special action is required at this time. Automation will not be paused.

This interim advisory will remain in effective from the date it is issued until permanent guidance is issued which either modifies or rescinds this document.

**Questions:** If you have any questions, please direct them to the Procedures Team at POLPROC.VBACO@va.gov

V/R

Procedures Team

You can view this article at:
https://vaww.vrm.km.va.gov/system/templates/selfservice/va_kanew/help/agent/locale/en-US/portal/554400000001048/content/554400000130107/I-2019-23-September-Interim-Procedural-Advisory-CAVC-Decision-BO-v-Wilkie

# Exhibit 2

---

**(J) 2019 02 October: Interim Procedural Advisory: CAVC Decision -- B.O. v. Wilkie -Updated**
Article ID: 554400000129880

---

**Interim Procedural Advisory: CAVC Decision --** *B.O. v. Wilkie* **-Updated October 2, 2019**          Updated Jun 03, 2020

**What Will Change:** The Interim Procedural Advisory issued on September 23, 2019

regarding the Court of Appeals for Veterans Claims (CAVC) panel decision on a case called *B.O. (a pseudonym) v. Robert Wilkie, Secretary of Veterans Affairs* remains in effect. This updated advisory is to provide additional clarification and support.


As a reminder, B.O. v. Wilkie concerns whether a veteran with **more** than one period of qualifying service must **relinquish or exhaust entitlement** under the **Montgomery GI Bill** education program (chapter 30 benefits) before receiving education benefits under the Post-9/11 GI Bill program (chapter 33 benefits).


Q1: What is considered more than one period of qualifying service?

A1: For the interpretation for this interim procedural advisory, more than one period of service, includes re-enlistments and call-ups. This decision means that, contrary to current VA practice, a veteran with more than one period of qualifying service need not relinquish or exhaust entitlement under chapter 30 for benefits before receiving education benefits under chapter 33 benefits.


Q2: Does the date August 1, 2011, which established the issue of same period of service, effect decisions associated with B.O. v. Wilkie?

A2: No, August 1, 2011 is not a factor in B.O. v. Wilkie claims.


Q3: What should be done with claims received through Appeals Modernization Act (AMA) as Higher Level Review, Reconsideration Supplemental Claims, etc.?

A3: Until a final determination on B.O. v. Wilkie has been issued, claims which fit the criteria, received through AMA process, should be deferred for decision. (Place in TIMS queue BVW for 30 days).


Q4: What if a claimant contacts Education Call Center (ECC), expresses hardship, and falls under B.O. v. Wilkie criteria?

A4: Until B.O. v. Wilkie procedures are finalized, Education Service has been advised there should be no new decisions made. However, if the ECC receives a hardship request, only then should you process the Certificate of Eligibility (COE) and/or issue payments in accordance with current procedures, notwithstanding B.O. v.

Wilkie. However, these claims should remain under TIMS control and placed in the BVW queue until final procedures has been issued.


Q5: Should VCEs (at this point) develop for reenlistments (when these are not apparent in the file)? For example, if service is shown from 2010 to 2016 (3-year term of enlistment), would we go to DPRIS to see if we can find reenlistment documents,

etc.? Or just process Ch33?


A5: As the advisory explains, if an original claim and meets the 4 criteria, place the claim in the BVW queue as instructed. If

a supplemental claim, process chapter 33 as usual.

**What RPO Action is Needed:** Education Service continues to work with General Counsel regarding the development of procedures to correctly adjudicate claims under B.O.

Until those procedures are finalized, the following actions are required.o

1. For **original** chapter 33 claims:

VCEs will have to carefully review for the following:

To be considered under B.O. v. Wilkie, the following must exist:

1. Claimant applies for chapter 33 benefits.
2. Claimant has more than one Period of Service (POS)
3. Claimant indicates relinquishment of chapter 30 benefits
4. Claimant has used some of original chapter 30 benefits.

B.O. v. Wilkie provides that the claimant who has more than one POS applies the first POS to the chapter 30 benefit and the subsequent POS's apply to chapter 33 benefits. This court case indicates the limitation to months of entitlement under chapter 33 is 48 months. Previously VA only allowed the chapter 30 entitlement transferred to be the remaining entitlement.

When the VCE identifies an original chapter 33 claim which meets the criteria for BO v. Wilkie, the VCE should place in a new TIMS queue entitled BVW. In the TIMS facility code field, the VCE should insert BVW. The end product should be disp'd for 30 days from the date of action to O-BVW.

2. Chapter 33 **supplemental** claims. No special action is required at this time. Automation will not be paused.

This interim advisory will remain in effective from the date it is issued until permanent guidance is issued which either modifies or rescinds this document.

**Questions:** If you have any questions, please direct them to the Procedures Team at POLPROC.VBACO@va.gov

V/R

Procedures Team

You can view this article at:
https://vaww.vrm.km.va.gov/system/templates/selfservice/va_kanew/help/agent/locale/en-US/portal/554400000001048/content/554400000129880/J-2019-02-October-Interim-Procedural-Advisory-CAVC-Decision-BO-v-Wilkie-Updated

# Exhibit 2

---

**(J) 2019 02 October: Interim Procedural Advisory: CAVC Decision -- B.O. v. Wilkie -Updated**
Article ID: 554400000129880

---

**Interim Procedural Advisory: CAVC Decision --** *B.O. v. Wilkie* **-Updated October 2, 2019**         Updated Jun 03, 2020

**What Will Change:** The Interim Procedural Advisory issued on September 23, 2019

regarding the Court of Appeals for Veterans Claims (CAVC) panel decision on a case called *B.O. (a pseudonym) v. Robert Wilkie, Secretary of Veterans Affairs* remains in effect. This updated advisory is to provide additional clarification and support.

As a reminder, B.O. v. Wilkie concerns whether a veteran with **more** than one period of qualifying service must **relinquish or exhaust entitlement** under the **Montgomery GI Bill** education program (chapter 30 benefits) before receiving education benefits under the Post-9/11 GI Bill program (chapter 33 benefits).

Q1: What is considered more than one period of qualifying service?

A1: For the interpretation for this interim procedural advisory, more than one period of service, includes re-enlistments and call-ups. This decision means that, contrary to current VA practice, a veteran with more than one period of qualifying service need not relinquish or exhaust entitlement under chapter 30 for benefits before receiving education benefits under chapter 33 benefits.

Q2: Does the date August 1, 2011, which established the issue of same period of service, effect decisions associated with B.O. v. Wilkie?

A2: No, August 1, 2011 is not a factor in B.O. v. Wilkie claims.

Q3: What should be done with claims received through Appeals Modernization Act (AMA) as Higher Level Review, Reconsideration Supplemental Claims, etc.?

A3: Until a final determination on B.O. v. Wilkie has been issued, claims which fit the criteria, received through AMA process, should be deferred for decision. (Place in TIMS queue BVW for 30 days).

Q4: What if a claimant contacts Education Call Center (ECC), expresses hardship, and falls under B.O. v. Wilkie criteria?

A4: Until B.O. v. Wilkie procedures are finalized, Education Service has been advised there should be no new decisions made. However, if the ECC receives a hardship request, only then should you process the Certificate of Eligibility (COE) and/or issue payments in accordance with current procedures, notwithstanding B.O. v.

Wilkie. However, these claims should remain under TIMS control and placed in the BVW queue until final procedures has been issued.

Q5: Should VCEs (at this point) develop for reenlistments (when these are not apparent in the file)? For example, if service is shown from 2010 to 2016 (3-year term of enlistment), would we go to DPRIS to see if we can find reenlistment documents,

etc.? Or just process Ch33?

A5: As the advisory explains, if an original claim and meets the 4 criteria, place the claim in the BVW queue as instructed. If

a supplemental claim, process chapter 33 as usual.

**What RPO Action is Needed:** Education Service continues to work with General Counsel regarding the development of procedures to correctly adjudicate claims under B.O.

Until those procedures are finalized, the following actions are required.o

1. For **original** chapter 33 claims:

VCEs will have to carefully review for the following:

To be considered under B.O. v. Wilkie, the following must exist:

1. Claimant applies for chapter 33 benefits.
2. Claimant has more than one Period of Service (POS)
3. Claimant indicates relinquishment of chapter 30 benefits
4. Claimant has used some of original chapter 30 benefits.

B.O. v. Wilkie provides that the claimant who has more than one POS applies the first POS to the chapter 30 benefit and the subsequent POS's apply to chapter 33 benefits. This court case indicates the limitation to months of entitlement under chapter 33 is 48 months. Previously VA only allowed the chapter 30 entitlement transferred to be the remaining entitlement.

When the VCE identifies an original chapter 33 claim which meets the criteria for BO v. Wilkie, the VCE should place in a new TIMS queue entitled BVW. In the TIMS facility code field, the VCE should insert BVW. The end product should be disp'd for 30 days from the date of action to O-BVW.

2. Chapter 33 **supplemental** claims. No special action is required at this time. Automation will not be paused.

This interim advisory will remain in effective from the date it is issued until permanent guidance is issued which either modifies or rescinds this document.

**Questions:** If you have any questions, please direct them to the Procedures Team at POLPROC.VBACO@va.gov

V/R

Procedures Team

You can view this article at:
https://vaww.vrm.km.va.gov/system/templates/selfservice/va_kanew/help/agent/locale/en-US/portal/554400000001048/content/554400000129880/J-2019-02-October-Interim-Procedural-Advisory-CAVC-Decision-BO-v-Wilkie-Updated

# Exhibit 4

Article ID: 554400000073583
**Part 3: Chapter 3 - Processing Applications for Benefits**

**Part 3: Chapter 3 - Processing Applications for Benefits**

3.01 General

**Subchapter 1. Basic Concepts**
3.02 Overview
3.03 Definitions
3.04 VA Responsibilities
3.05 Time Limits
3.06 Good Cause Consideration

**Subchapter 2. General Procedures**
3.07 Application Forms
3.08 Initial Actions in Claim Processing
3.09 Procedures to Review VA Form 22-1990
3.10 Elections
3.11 Specific Issues Regarding Verification of Service
3.12 Verification of Service - Servicepersons, Veterans, and Dependents
3.13 Development for Additional Required Information
3.14 Statutory Bars and Forfeiture of Benefits
3.15 Character of Discharge

**Subchapter 3. Miscellaneous Service Issues**
3.16 Service Academy Preparatory Schools and Service Academies
3.17 Deductible Time

**Subchapter 4. Training Under Prior Benefit Programs**
3.18 General
3.19 Computation for Training under Prior VA Benefit Programs

**Subchapter 5. Rules of Evidence**
3.20 Evidence Requested From Claimant

**Subchapter 6. Duty To Assist**
3.21 Background
3.22 Applying Duty to Assist
3.23 When Not to Apply Duty to Assist
3.24 Steps Taken in Duty to Assist
3.25 When Information Cannot be Obtained
3.26 Reasonable Doubt Rule
3.27 Primary and Secondary Evidence
3.28 Burden of Proof and the Weighing of Evidence
3.29 Photocopies
3.30 New and Relevant Evidence
3.31 Affidavits or Certifications in Support of Claim

**Figure**
3.01 Attachments for Alternative Elections
3.02 DTA Denial Letter Template

**3.01  GENERAL**

This chapter describes the application forms claimants must use to apply for the education benefits covered in this manual. It also provides procedures and reference material for certain issues that arise in application processing. To review procedures that are unique to a specific benefit, see that part of the manual.

Go to Top

**SUBCHAPTER I.  BASIC CONCEPTS**

**3.02  OVERVIEW**

Veteran Claims Examiners (VCEs) must observe certain basic rules which apply to claims and informal claims and the time limits for receipt of evidence. These rules are the same for all education benefits. An individual must file a claim for educational assistance with Veterans Administration (VA). The claim must be in the form prescribed by the Secretary. That list is provided in section 3.07 of this chapter.

Go to Top

**3.03  DEFINITIONS**

VCEs will use these definitions when processing education claims.

    **a. Formal Claim.** A claim is considered to be formal when the claimant (or his or her authorized representative) files the claim with VA, and--

        (1) it is on the proper form prescribed by the Secretary and

        (2) is a request for education assistance or an increase in educational assistance or an extension of the eligibility period for receiving educational assistance.

    A "proper form" includes VA Form 22-1990 (paper or electronic) or VA Form 22-5490 (paper or electronic) for original applications.

    **b. Informal Claim.** A VCE should consider an informal claim as any written communication from an individual (or an authorized representative) if it indicates intent to apply for educational assistance. Upon receipt of an informal claim, VA will provide an application form to the claimant. If VA receives the application form within one year, VA will consider the claim to have been filed on the date VA received the informal claim.

        (1) When VA requests evidence in connection with a claim and the claimant submits the evidence to VA after having abandoned the claim (see definition below), the claimant's submission of the evidence is an informal claim.

        (2) The act of enrolling in an approved school is not an informal claim.

        (3) VA will not consider a communication received from a service organization, an attorney, or an agent to be an informal claim if a valid power of attorney, executed by the claimant, is not in effect at the time the communication is written.

    **NOTE:** An unsigned application is NOT an informal claim. VCEs should refer to paragraph 3.09 for policies regarding these applications. VCEs should not confuse a "substantially complete" claim with an informal claim. A claim could be substantially complete, even without a signature. Remember, a signature is not a determining factor for a claim to be considered complete or substantially complete. If an application is <u>not signed</u>, but it is otherwise a complete or substantially complete claim, do not wait for a signature to take action on the claim.

    **c. Abandoned Claim.** A claim is abandoned if:

        (1) The claimant furnishes additional evidence in connection with a formal claim and the claimant

            (a) Does not furnish the evidence within one year of the date of the request; **and**

(b) Does not show good cause why the evidence could not have been submitted within one year of the date of the request;

**OR**

(2) VA requests the claimant file a formal claim after receiving an informal claim and

(a) VA does not receive the formal claim within one year of the date of request; **and**

(b) The claimant does not show good cause why he or she could not have filed the formal claim in sufficient time for VA to have received it within one year of the date of the request.

**NOTE:** The concept of an abandoned claim does not apply to service information or kickers received at a later time.

**d. Date of Claim.** The date of claim is the date on which a valid claim or application for educational assistance is filed with VA.

(1) The date of claim is the date VA received an informal claim if the informal claim had been filed and VA received a formal claim within one year of the date that VA requested it (or within such other time limit set by 38 CFR 21.1032).

(2) If a claim is abandoned, the date of claim is the date a new formal claim is received or the date of an informal claim which meets the requirements of subparagraph (1) above.

**EXAMPLE:** An informal claim is received on 01/03/15 (in this situation the claim was for benefits written on a napkin). The electronic form 22-V1990 was not received until 12/27/15 the date of claim would be December 27, 2015. However, for payment purposes, the date of the informal claim protects how far back VA can pay benefits to this claimant.

Go to Top

## 3.04  VA RESPONSIBILITIES

VA has certain responsibilities when an individual files a claim for education benefits (38 CFR 21.1031).

a. Furnishing Forms. VA will send any necessary claim forms to an individual when he or she files an informal claim for education benefits. VA will also furnish appropriate instructions and, if appropriate, a description of any supporting evidence required to complete the informal claim.

b. Requesting Additional Evidence. If the formal claim is incomplete or if VA requires additional evidence or information to make a determination on the claim, VA will notify the claimant of the evidence or information that VA needs to make such determination. This notification will include the one year time limit provision.

**NOTE:** In compliance with Duty To Assist, VCEs will review and request additional evidence within 5 working days the document (claim token) has been assigned to them. Diligence is required to ensure documents are reviewed in a timely manner.

Go to Top

## 3.05  TIME LIMITS

a. If a claimant's application is incomplete, the VCE will notify the claimant of the evidence necessary to complete the claim. Payment of education assistance will not be allowed if the evidence is not received within one year from the date of such notification.

b. Computation of Time Limit

(1) In computing the time limit for any action required of a claimant or beneficiary, including the filing of claims or evidence requested by VA, exclude the first day of the specified period, and include the last day (38 CFR 21.1033(f)). This rule is applicable in cases in which the time limit expires on a workday. When the time limit would

expire on a Saturday, Sunday, or holiday, include the next succeeding workday in the computation.

(2) The first day of the specified period referred to in subparagraph (1) will be the date of the letter of notification to the claimant or beneficiary which establishes a time limit.

Go to Top

## 3.06  GOOD CAUSE CONSIDERATION

When a claimant has been unable to provide additional evidence to complete his/her claim within the one year time frame, VA should consider the existence of good cause if the claimant provides the needed information after the one year.

a. Definition of "Good Cause". Examples of good cause include, but are not limited to extended illness, death in the immediate family, and documented inability to obtain evidence from a third party. The claimant must explain how the circumstances prevented him or her from acting within the time limit. The VCE should exercise care that inability to act for an entire year is demonstrated.

**EXAMPLE:** A claimant applies for Chapter 33 on August 1, 2013, with an enrollment certification beginning August 1, 2013. However, the claimant fails to submit a relinquishment for a non-Chapter 33 benefit. VA sends notice to the claimant requesting relinquishment of a non-Chapter 33 benefit and suspends the claim for 30 days. The claimant does not supply a relinquishment within the 30 days, but has a good-cause for extension which is granted for up to 1 year. The claimant then sends in relinquishment 14 months later on October 1, 2014. VA may pay back 1 year from the date of relinquishment, as far back as October 1, 2013, because the 12 month good-cause extension expired on August 1, 2014.

b. Evidence Received Without Claim for Good Cause Extension. If the claimant submits the evidence after the one year time limit but does not specifically request an extension of the one year time limit for good cause, apply the following procedures:

**EXAMPLE:** Veteran is currently enrolled and entitled to additional dependency allowance. The VCE should adjust the award to include the dependents from the date that the evidence was received. If no current action can be taken on the evidence, VCE should place a FLASH in the claimant's TIMS folder to alert the next VCE there is additional evidence for future award actions. VCE should notify the claimant of the action taken.

Insert the following paragraph into the development letter:

> The evidence we requested on (date) was not received within one year. We can consider this evidence as being timely filed only if you can show good cause for why you could not respond in a timely manner. Basically, you should state why you could not send this evidence within the one year time limitation set by law. You should state specifically what happened and when it happened. Upon your request for good cause extension and information concerning why you could not send the evidence within the one-year time limitation, we will consider extending the time limit by which the evidence should have been received. You should provide your request for an extension and your explanation within the next 30 days. It must be received within one year from the date of this letter to be considered for extension.

VCEs should place the claim token in AWAIT Mail for 30 days and extend the supplemental end product for 30 days.

If the evidence is received within 30 days, and the VCE can accept the reason the claimant says he could not respond within the original time frame, correct the award and send appropriate award letter.

If the VCE cannot accept the reason, VCE should PCLR the end product and send denial letter specifying why the good cause reason was not accepted.

If the evidence is not received within 30 days, the VCE should PCLR the end product and send a denial letter explaining the information requested was not received within 30 days and therefore the prior award action is complete. Attach a 4107 to this denial letter. Claimants can appeal the denial of a time limit extension independently from other issues.

c. Good Cause Extension Claims. VCEs should accept a claim for a good cause extension if the following elements are met:

(1) The requested evidence is received before or at the same time as the request for extension.

(2) The original time limit has expired. If a claimant requests an extension of time based on good cause before the original time limit has expired, The VCE should advise the claimant that the claim for extension will be considered after the evidence is submitted.

**NOTE:** The good cause explanation must always cover the entire period up to the date the requested evidence is received.

d. Good Cause Statement and Evidence. The VCE should accept a claimant's statement as to the facts alleged concerning the good cause without additional development unless there is contradictory evidence of record. A claimant does not have to submit evidence substantiating the statement.

e. Administrative Decision. If good cause has been claimed, VCEs should prepare an administrative decision on all claims which qualify for good cause extensions. (Refer to Part 3, Chapter 2). The discussion section of the decision must address whether good cause has been shown and whether the length of the extension requested is reasonable. This administrative decision is necessary whether the good cause is granted or not.

Go to Top

## SUBCHAPTER II.  GENERAL PROCEDURES

## 3.07 APPLICATION FORMS

**NOTE:** Photocopies of original claims are acceptable. This is especially important in certain situations such as when a claimant is overseas.

To make a formal claim for benefits, an individual must use the correct application form.

| Application Form | Benefit | Beneficiary |
|---|---|---|
| VA Form 22-1990, 22-1990e, 22-1990n or VONAPP 1990 | Chapters 30, 32, 33, 1606, National Call to Service and Section 903. | Any Veteran or Service Member, or Section 903 dependents wishing to apply for Education benefits |
| VA Form 22-1990t | Chapters 30, 32, 33, 1606, and Section 903 | Claimants that want to receive tutorial assistance |
| VA Form 22-1995 and VONAPP-1995 | Chapters 30, 32, 33, 1606, and Section 903 | Used by beneficiaries to request a change or program or training (Refer to Chapter 4 for additional information) |
| VA Form 22-5490 or VONAPP 5490 | Chapter 35 or Ch33 Fry Scholarship | This form is used by spouses and children to apply for benefits under Chapter 35 or Chapter 33 for the Master Gunnery Sergeant Fry Scholarship under Post 9/11 GI Bill. |
| VA Form 22-5495 or VONAPP 5495 | Chapter 35 or Ch33 Fry Scholarship | Used by beneficiaries to request a change or program or training (Refer to Chapter 4 for additional information). |
| VA Form 22-8889 | Section 901 | Veterans, Service members, and dependents who wish to apply for Section 901 under PL 96-342 |
| VA Form 22-0848 | Chapter 33 | Application for Rural Relocation Benefit under the Post 9/11 GI Bill |

| VA-Form 22-5281 | Chapter 32 | Participants who are requesting a refund of their Chapter 32 contributions. |

Go to Top

## 3.08 INITIAL ACTIONS IN CLAIM PROCESSING

**a. Duty to Assist.** VCEs must extend all reasonable assistance to claimants in meeting the evidentiary requirements necessary to establish their claims under the applicable laws and regulations. VCEs must give claimants every opportunity to establish entitlement to the benefits sought, to include complete procedural and appellate rights. VCEs must use plain language in any communication with claimants.

**b. Date-of-Receipt Stamp.** All paper mail should be date stamped upon receipt in the Regional Office (RO) mailroom.

(1) Do not affix stamps directly on original documents which are to be returned such as discharge certificates, court records and papers, marriage, birth and death certificates, divorce decrees and similar records. Make a copy of the document, date stamp the copy and prepare the original document for return to the sender.

(2) Do not routinely require the use of a date stamp in the Education Division, but, if an unstamped document is received in Education, the approved designated official should stamp it as soon as possible. This protects the date of claim for the claimant.

(3) The Education Officer or designee, not below the grade of Supervisory VCE (GS-13), may require the use of the receipt stamp to document unusual delays in the receipt of documents in the division.

**c. Initial Screening.** Review all applications, claims, correspondence and evidence immediately to determine if the claim is truly an Education related document. If not an Education document, follow local RPO procedures to ensure the document is delivered to the appropriate division or agency.

**d. Signature of Claimant.** With the exception of a child not of legal age applying for Dependent's Education Assistance (DEA) (Chapter 35) benefits, a signature is not required when applying for Education benefits. When using an electronic version of VA Form 22-1990, the submission electronically suffices for the signature. When a paper application is received, a signature will be required but it will not prohibit the determining of eligibility.

**e. Disposition of Claims.** If a formal claim is received, either a Certificate of Eligibility (COE) must be issued or an award must be authorized. A disallowance is considered an award.

**f. Recording End Products.** VCEs are entitled to an end product only after final action is taken on all pending issues on the claim. M22-3, Manpower Control and Utilization Education Activities, lists the end products for education claims processing.

Go to Top

## 3.09 PROCEDURES TO REVIEW VA FORM 22-1990

**NOTE:** A VA Form 22-1990 received electronically is presumed appropriately signed by virtue of submission.

**a. Unsigned Paper Application Procedures:**

(1) Unsigned application - claimant is eligible. The VCE should issue a Certification of Eligibility (COE) (use PCGL(Personal Computer Generated Letter) AWD(Award)-1) with appellate rights. In addition to other appropriate actions, the VCE should advise the claimant that VA can't award benefits until his or her signature is received. VCE should flash the claimant's TIMS folder that a signature is necessary before an award can be processed. VCEs should take the end product and finish the token. When additional documents reactivate the token, do the following:

A. If the signature is submitted prior to the receipt of a VA Form 22-1999, delete the Flash. No further action needs to be taken until VA Form 22-1999 is received. PCAN the end product and finish the token.

B. If a VA Form 22-1999 is received prior to receipt of the claimant's signature, but *within* 30 days of the date of the COE, control the claim until the signature is received, then process the claim. If the signature is not received within 30 days from the date of the COE, deny the claim and attach appellate rights. In the denial letter, be sure to include another request for the claimant's signature with the denial. Take the end product and finish the token.

C. If a VA Form 22-1999 is received prior to receipt of the claimant's signature but more than 30 days after the date of the COE, deny the claim and attach appellate rights. In the denial letter, be sure to include another request for the claimant's signature with the denial. Take the end product and finish the token.

D. If more VA Form 22-1999s are received after a claim has been denied (as above) and no signature has been received, no further action should be taken. PCAN the end product and finish the token.

(2) Unsigned application - development is needed to determine eligibility. VCEs must attempt to obtain the information through initial development (from Department of Defense (DoD), the school, Defense Finance and Accounting System (DFAS), etc.). Control the claim for receipt of the requested information or documentation.

A. If the initial development for necessary information required to make the eligibility determination isn't successful, apply Duty to Assist procedures, as appropriate. (Refer to subchapter 6 for additional information).

B. When developing for the information needed to make an eligibility determination, include a request for the claimant's signature in the development letter. VCEs should include in the letter a reminder that until his or her signature is received, VA can't award benefits even if the claimant's eligibility is established. This will prevent further delays when a VA Form 22-1999 is received.

C. If the information required to make the eligibility determination is received, but the signature hasn't been received, proceed as stated above.

(3) Unsigned application – claimant not eligible. If the claimant isn't eligible, disallow the claim in the system and issue the appropriate letter. Take the end product and finish the token.

**b. Type of Benefit.** VCEs must either allow or deny each benefit claimed on an application. In addition, if the beneficiary is not eligible for, eligibility ends or has ended under the benefit requested, the VCE should review eligibility under other benefits included on the application received. If eligible for another benefit, a Certificate of Eligibility (COE) should be issued, and/or award payment (if enrollment is on file and the term is payable). If the beneficiary is eligible for multiple benefits, the VCE should develop to the beneficiary for appropriate choice and finish the claim token (See Part 4, Chapter 1, 1.00(a)(3)). The VCE should not control the claim for development in this situation.

If the beneficiary is only eligible for a benefit found on a different application, the VCE should process the current application as a denial, develop for the correct application and close the claim. **The VCE cannot process a potential claim for a benefit if a different application has to be filed by the beneficiary.**

**EXAMPLE 1:** A beneficiary submits VA Form 22-1990 for chapter 30 benefits. Eligibility was granted for chapter 30 and the beneficiary began using entitlement. While using chapter 30 benefits for their Spring enrollment period, their entitlement exhausted at the end of (or during) the term. The beneficiary is now only eligible for chapter 33 benefits. Since the application for chapter 33 is the same application used for chapter 30 (VA Form 22-1990), the VCE should now issue a COE for chapter 33, and/or award payment if any enrollment period under chapter 30 was left unpaid.

**NOTE:** Chapter 30 and chapter 33 entitlement can be extended until the end of term, if exhaustion occurs during a term and the beneficiary has not used more than 48 months of combined benefits under multiple VA education programs.

Therefore, VCEs should always calculate total entitlement used (including any end of term extensions) when determining the "Prior VA Entitlement", upon processing eligibility from chapter 30, chapter 33, or chapter 1606 to the next eligible benefit, as appropriate.

**EXAMPLE 2:** A beneficiary submits VA Form 22-1990 for chapter 33 benefits. Student has already used 36 months under chapter 33 and relinquished chapter 1606. He has a few months of entitlement remaining under chapter 30. The VCE would deny the claim for chapter 33 as entitlement exhausted but send a COE with information regarding chapter 30. If VA Form 22-1999 has been received, payment may be authorized under chapter 30 in this scenario.

**EXAMPLE 3:** Beneficiary submits VA Form 22-5490 and applies for chapter 35. The VCE denies chapter 35, but notices that beneficiary is eligible for chapter 33 Transfer of Entitlement (TOE) benefits. The VCE should edit the chapter 35 denial letter to explain that possible chapter 33 TOE eligibility exists, and they should reapply, using VA Form 22-1990E (Application for Family Member to Use Transferred Benefits).

Go to
Top

## 3.10  ELECTIONS

There are two separate and distinct types of elections claimants must make.

A Period of Service (POS) Election is an election to point a period of service to one benefit instead of another.

An In lieu of (ILO) Election is an election to forfeit one benefit in order to qualify for Chapter 33. The ILO election has two distinct parts:

Benefit to forfeit and the Effective date of the forfeiture

These two types of elections have two different sets of rules for VCEs to follow to ensure the claimant makes the appropriate election.

   **a. Differences in Election types.**

   (1) POS election. A specific period(s) of service used towards establishing eligibility for a benefit. Once a period of service has been applied toward a specific benefit, that period of service may not be used again to establish eligibility for another benefit. A period of service beginning before August 1, 2011, may be used to establish eligibility under more than one benefit. **See Rudisill information in section below**.

   (2) ILO election. An ILO election is generally optional when the election would be advantageous. An ILO election may be required under chapter 33 benefits in coordination with chapter 30 in limited situations. **See Rudisill information in section below**.

   **b. Point of Irrevocability.**

   (1) POS Election. The issuance of the first payment makes this election irrevocable. A beneficiary may make a change in the election of benefits after a Certification of Eligibility (COE) has been issued provided NO payment has been released.

   (2) ILO Election. The issuance of the COE makes this election irrevocable. Payment is not a factor for an ILO election.

   **EXAMPLE:** A Service member applies for Chapter 30 benefits, receives a COE, then decides they should have applied for Chapter 33 benefits prior to receiving payment for benefits under Chapter 30 because they will not be able to convert later based on a single period of active duty service. Since this is an example of POS election, the beneficiary may make the change of elections since the payment has not been issued.

   **c. Availability of "alternative election" (38 USC 3327 (h); Section 405 of Public Law 114-315).**

   (1) POS election is NOT AVAILABLE for an alternative election.

   (2) ILO election. VA may elect on behalf of the service member or Veteran and may modify the effective date.  A TOE approval date cannot be modified.

   **d. Use of Alternative Elections .** VA has the authority to make an alternative election (forfeited benefit **and/or** effective date of forfeiture) on behalf of an individual that failed to make an election or submitted an election **on or after January 1, 2017** that was not in their best interest.

As a general rule, VA will not exercise this authority to override a valid election.  However, an alternative election will be appropriate under limited circumstances, or when required for coordination of chapter 33 and chapter 30 benefits. This authority eliminates the need to develop for valid benefit forfeiture or the need to gain prior authorization to alter the effective date of the benefit forfeiture.

**NOTE:**  If the Veteran is deceased and was eligible for more than one benefit other than chapter 33 at the time the transfer of entitlement was approved, special consideration will be required if the available transferred entitlement would be diminished (chapter 30) and/or the Veteran's eligibility included a kicker (chapter 30/1606).

**e. Processing Steps for Alternative Election.**

    See Rudisill information in section below.

**f. Disagreement with VA's alternative election.**

(1) If the beneficiary's response is timely (within 30 days of the claimant's receipt of VA's notice), the VCE should replace the alternative election with the election provided in the beneficiary's response. If the beneficiary insists on an election that VA has determined to be not in the best interest of the beneficiary, the VCE must process the claim in accordance with the beneficiary's request for benefits. The VCE does not have the authority to override a beneficiary's response disagreeing with VA's alternative election. If the claimant continues to insist on an election which is invalid, then the VCE will process accordingly, including but not limited, to denial of the claim.

(2) Although the beneficiary only has 30 days to disagree with the alternative election, VA will only enforce this limitation if benefits have already been paid based on VA's alternative election. In other words, so long as benefits have NOT been paid, the VCE will change the election VA made to the election requested by the beneficiary in his or her response regardless of how much time has passed. However once a payment is made based on the alternative election, VA will enforce the 30 day limitation.

VCEs should be accommodating towards the beneficiary in the enforcement of the limitation. If there is a question as to whether the beneficiary's response was received timely, the VCE should carefully review the timeline and consider any extenuating circumstances. When a reasonable argument can be made that the beneficiary had not received VA's notice or VA received a notice "shortly" after the 30 day period, the VCE should accept the request of the beneficiary. The VCE should be mindful that the 30 day period begins when the beneficiary "receives" the notification. Extra time should be allotted for delivery of the paper notification. The VCE should always document in the TIMS file in a NOTE with a clear explanation or justification with any request received after 30 days from the date of the original notification. Any notice to VA received after a payment has been made based on VA's alternative election and AFTER 45 days without an acceptable justification will be considered too late. A beneficiary who responds within one year from any VA decision maintain the right to appeal and may submit a notice of disagreement to appeal VA's decision.

**g. Additional Examples and Comments regarding Alternative Elections.**

(1) Modify TOE effective date. The VCE cannot change an effective date on an election when the election is connected to a transfer.

(2) Retroactive Changes. As previously stated, in general, a VCE should not make an alternative election after a claim has been adjudicated. However, provided that the original claim for Chapter 33 was submitted on or after January 1, 2017, the VCE may make an alternative election that is "clearly in the best interest of the individual" up until benefits have been paid. The VCE should not apply this provision once education benefits have been paid to an individual that provided an election. **Exception:** The alternative election should have been made when the claim was previously processed in order to ensure benefit coverage of the training. In this case, retroactively making the alternative election is considered a correction to previous processing even if the beneficiary has already been paid.

(3) <u>Reversing an alternative election and creating overpayment</u>. The VCE may choose an earlier effective date than the one originally elected by the beneficiary. However, an overpayment would result from a beneficiary choosing to get no benefits for the term instead of getting benefits for the term. This example is extremely rare. However, if a beneficiary does respond and requests such a change, it is very likely that the claimant may have failed to understand the explanation provided in the letter. Before processing such a change, the VCE should contact the beneficiary electronically and make one last effort to explain the impact of the beneficiary's choice. If the beneficiary still chooses this course of action, then the VCE should proceed with processing and releasing the debt. This is not considered to be administrative error because VA's decision to make the original payment was correct at the time and the debt was created due to a choice made by the claimant. If the beneficiary wishes to change his or her mind and agree with VA's alternative election, annotate the TIMS file accordingly and instruct the claimant to submit the change in writing (preferably through Ask VA).

**h. Other Election Examples.** As stated previously, there are specific times when an election is required on the beneficiary's application. Beneficiary's using an electronic version of VA Form 22-1990 must select a benefit. If the beneficiary has used a paper version of VA Form 22-1990, the VCE may have to assist the beneficiary with the decision. Remember an election is no longer required prior to paying benefits when no specific benefit is requested, and the claimant is eligible for multiple benefits based upon **different periods of service**.

(1) <u>No Benefit Checked and Not Eligible for any Benefits</u>

If a beneficiary does not check a specific benefit on the application form and is not eligible for any benefit, the VCE must deny each benefit to which the Veteran is not entitled. The VCE is entitled to an original end product for each disallowed claim.

**NOTE:** The VCE should only deny those benefits to which the beneficiary would have had potential eligibility. Typically a disallowance for Chapter 32 would no longer be necessary as the applicant would not have served during the appropriate time period.

(2) <u>No Benefit Checked and Eligible for Multiple Benefits</u>

If a beneficiary does not check a specific benefit on the application and is eligible for more than one benefit, and an required election is not received, the VCE will do the following:

(A) When POS or ILO does not apply award eligibility under all benefits entitled. Do not deny benefits not entitled.

(B) When a POS or ILO election applies, the VCE should send the claimant a development letter fully informing them of eligibility for all potential benefits and requesting an election.

(C) The VCE should control in AWAIT mail in TIMS for 30 days. If after 30 days no election is received, the VCE should deny the claim as failure to furnish and send the appropriate letter.

(3) <u>Beneficiary Selects Multiple Benefits and is Eligible for More than one Benefit</u>

Follow instruction for (2) above and deny any selected benefit not entitled.

(4) <u>Beneficiary Selects One Benefit but is not Eligible for that one but is Eligible for two or more others.</u>

If a beneficiary selects one benefit and is not eligible for it, but is eligible for two or more others, the VCE should deny the benefit for which the claimant applied. Follow instructions for (2) above.

**NOTE:** As a reminder, VCEs may only accept written confirmation for elections covered in section 3.10. Examples of a written confirmation include a letter, entry on an application, a Ask VA inquiry, or by other electronic means including email provided the election is complete, identifiable, and in response to a development request. Telephonic elections are not acceptable.

While section 3.10 concerns elections in general, this section does not apply to chapter 35. VCEs may accept chapter 35 elections telephonically. VA must provide written notice and acknowledgement.

**i. Rudisill.**

**Introduction**

On April 16, 2024, the Supreme Court of the United States issued its opinion on case 22-888, Rudisill v. McDonough, Secretary of Veterans Affairs. The case was previously heard by the United States Court of Appeals for Veterans Claims on May 2, 2018, and the United States Court of Appeals for the Federal Circuit on December 19, 2020. The case was formerly known as B.O. (a pseudonym) v. Wilkie.

The Supreme Court held that an election to receive Post-9/11 GI Bill (chapter 33) benefits under 38 U.S.C. § 3327 is only required when "coordination" of Montgomery GI Bill – Active Duty (chapter 30) and chapter 33 entitlement is necessary under § 3322(d).

Therefore, only beneficiaries with a single period of qualifying active-duty service which began prior to August 1, 2011, who have previously used entitlement under chapter 30, and remain eligible for chapter 30 benefits as of the date of their application for chapter 33, will be required to make an election under § 3327 to establish chapter 33 benefits.

All other beneficiaries, including those with a single period of qualifying active-duty service which began on or after August 1, 2011, may make a *voluntary* election under § 3327 to receive a chapter 1606 or 30 kicker under § 3316, and/or a refund of chapter 30 contributions under § 3327(f). A voluntary election may also be made to credit service that began prior to August 1, 2011, and which was previously used to establish chapter 30 eligibility, to increase the chapter 33 benefit level when a beneficiary has multiple periods of service. This voluntary election can be made at any time and the lack of said election is not a bar to eligibility under chapter 33.

**NOTE 1:** If the beneficiary served in a regular component and has a single period of service reported in the "Active Duty Service Periods" section of the Veterans Information Solution (VIS) report, VCE's must review the "Personnel Status" for conditional discharges due to immediate re-enlistment which are considered separate periods of service. See the System Advisory, "**VIS Updates Installed on December 1, 2020**", dated December 3, 2020, for more information on this functionality.

**NOTE 2:** The bar to duplication based on a single period of service beginning on or after August 1, 2011, detailed in § 3322(h)(1), remains unchanged. A beneficiary with a single qualifying period of active duty which began on or after August 1, 2011, can establish eligibility under chapter 30 *or* chapter 33 based on that period, but not both.

**NOTE 3:** When an election is required, the effective date of the election is up to one year prior to the date of claim of the application by a service member or Veteran, through the date claim (whatever is most advantageous) **or** on the approval date of transferred benefits ("Transfer Request Date" as displayed in VIS), when approved prior to an application submitted by the service member or Veteran.

**Claims Processing Scenarios**

*Veteran is eligible for chapter 33 and chapter 1606.*

An election to give up chapter 1606 benefits is no longer required to establish eligibility under chapter 33. The beneficiary may wish to voluntarily relinquish chapter 1606 benefits to receive a chapter 1606 kicker under chapter 33.

    1. **Veteran Relinquished chapter 1606**
        a. Veteran is eligible for a chapter 1606 kicker:
            i. Process claim with the relinquishment.

            ii. If chapter 1606 was previously used, enter the amount of entitlement used into DGI and check the "Eligible" checkbox. Add relinquishment and kicker data.

            iii. Add letter insert in "Attachment A – Ch1606 and Ch33, no Ch30" to the veteran's notification letter immediately following the introduction paragraph:
                1. Select the "Regarding Your Election" paragraph indicating that an election was received.

2. Select the "What We Did" paragraph indicating that the election was accepted.

    iv. Do not control the claim for a response from the beneficiary.

b. Veteran is *not* eligible for a chapter 1606 kicker:

    i. Process claim with **no** relinquishment.

    ii. If chapter 1606 was previously used, enter the amount of entitlement used into DGI, but do not check the "Eligible" checkbox.

    iii. Add letter insert in "Attachment A – Ch1606 and Ch33, no Ch30" to the veteran's notification letter immediately following the introduction paragraph:

        1. Select the "Regarding Your Election" paragraph indicating that an election was received.

        2. Select the "What We Did" paragraph indicating that an election was not made and no kicker exists.

    iv. Do not control the claim for a response from the beneficiary.

2. **Veteran Did Not Relinquish chapter 1606.**

a. Veteran is eligible for a chapter 1606 kicker:

    i. No alternative election is needed. Process claim with no relinquishment.

    ii. If chapter 1606 was previously used, enter the amount of entitlement used into DGI, but do not check the "Eligible" checkbox.

    iii. Add letter insert in "Attachment A – Ch1606 and Ch33, no Ch30" to the veteran's notification letter immediately following the introduction paragraph:

        1. Select the "Regarding Your Election" paragraph indicating that no election was received.

        2. Select the "What We Did" paragraph indicating that an election was not made and there is a kicker.

    iv. Do not control the claim for a response from the beneficiary.

b. Veteran is *not* eligible for a chapter 1606 kicker:

    i. No alternative election is needed. Process claim with no relinquishment.

    ii. If chapter 1606 was previously used, enter the amount of entitlement used into DGI, but do not check the "eligible" checkbox.

    iii. No letter insert is needed.

*Veteran is eligible for chapter 33 and chapter 30 and has a single period of service.*

An election to give up chapter 30 benefits is *only* required to establish eligibility under chapter 33 when there is only period of qualifying active duty service, that service began before August 1, 2011, and the veteran used chapter 30 benefits before the chapter 33 application.

The beneficiary may wish to voluntarily relinquish chapter 30 benefits to coordinate the payment of a chapter 30 kicker and/or receive a refund of their chapter 30 contributions under chapter 33.

1. **Veteran Relinquished chapter 30**

a. Veteran's election is required:

    i. Process claim with the relinquishment.

    ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI and check the "Eligible" checkbox. Add relinquishment and kicker data.

    iii. Add letter insert in "Attachment B – Ch30 and Ch33, One Period of Service" to the veteran's notification letter, immediately following the introduction paragraph:

        1. Select the "Regarding Your Election" paragraph indicating that an election was received.

        2. Select the "What We Did" paragraph indicating that the election was required and accepted.

b. Veteran's election is not required, but they are eligible for a chapter 30 kicker:

    i. Process claim with the relinquishment.

    ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI and check the "Eligible" checkbox. Add relinquishment and kicker data.

    iii. Add letter insert in "Attachment B – Ch30 and Ch33, One Period of Service" to the veteran's notification letter, immediately following the introduction paragraph:

        1. Select the "Regarding Your Election" paragraph indicating that an election was received.

        2. Select the "What We Did" paragraph indicating that the election was accepted and a kicker exists.

c. Veteran's election is not required, and they are *not* eligible for a chapter 30 kicker:

    i. Process claim with **no** relinquishment.

    ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI, but do not check the "Eligible" checkbox.

    iii. Add letter insert in "Attachment B – Ch30 and Ch33, One Period of Service" to the veteran's notification letter, immediately following the introduction paragraph:

        1. Select the "Regarding Your Election" paragraph indicating that an election was received.

        2. Select the "What We Did" paragraph indicating that an election was not accepted and no kicker exists.

2. **Veteran Did Not Relinquish chapter 30.**

a. Veteran's election is required:

    i. Process claim with an alternative election.

    ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI and check the "Eligible" checkbox. Add relinquishment and kicker data.

    iii. Replace the "What We Did" section of the letter with the language in "Attachment C – Updated Alternative Election Language."

b. No election is required, but veteran is eligible for a chapter 30 kicker:

    i. Process claim with no relinquishment. No alternative election is needed.

    ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI but do not check the "Eligible" checkbox.

    iii. Add letter insert in "Attachment B – Ch30 and Ch33, One Period of Service" to the veteran's notification letter, immediately following the introduction paragraph:

        1. Select the "Regarding Your Election" paragraph indicating that an election was not received.

        2. Select the "What We Did" paragraph indicating that an election was not received and kicker exists.

c. No election is required, and they are *not* eligible for a chapter 30 kicker:

    i. Process claim with no relinquishment. No alternative election is needed.

      ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI, but do not check the "eligible" checkbox.

      iii. No letter insert is needed.

*Veteran is eligible for chapter 33 and chapter 30 and has multiple periods of service.*

When a beneficiary has multiple periods of service, an election to relinquish chapter 30 is no longer required to establish chapter 33. The beneficiary may wish to voluntarily relinquish chapter 30 benefits to coordinate the payment of a chapter 30 kicker and/or receive a refund of their chapter 30 contributions under chapter 33.

1. **Veteran Relinquished chapter 30**
   a. Veteran's benefit level is increased by making an election and crediting all pre-8/1/11 service to chapter 33:
      i. Process claim with the relinquishment.
      ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI and check the "Eligible" checkbox. Add relinquishment and kicker data.
      iii. Add letter insert in "Attachment D – Ch30 and Ch33, Multiple Periods of Service" to the veteran's notification letter, immediately following the introduction paragraph:
         1. Select the "Regarding Your Election" paragraph indicating that an election was received.
         2. Select the "What We Did" paragraph indicating that the election was accepted due to increased benefit level.
   b. Veteran is eligible for a chapter 30 kicker:
      i. Process claim with the relinquishment.
      ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI and check the "Eligible" checkbox. Add relinquishment and kicker data.
      iii. Add letter insert in "Attachment D – Ch30 and Ch33, Multiple Periods of Service" to the veteran's notification letter, immediately following the introduction paragraph:
         1. Select the "Regarding Your Election" paragraph indicating that an election was received.
         2. Select the "What We Did" paragraph indicating that the election was accepted and a kicker exists.
   c. Veteran is 100% without the election and *not* eligible for a chapter 30 kicker:
      i. Process claim with **no** relinquishment.
      ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI, but do not check the "Eligible" checkbox.
      iii. Service which is not being credited towards chapter 33 eligibility must be entered into DGI as non-qualifying service with a reason of "Used for Other Benefit".
      iv. Add letter insert in "Attachment D – Ch30 and Ch33, Multiple Periods of Service" to the veteran's notification letter, immediately following the introduction paragraph:
         1. Select the "Regarding Your Election" paragraph indicating that an election was received.
         2. Select the "What We Did" paragraph indicating that an election was not accepted and no kicker exists.

2. **Veteran Did Not Relinquish chapter 30.**
   a. Veteran's benefit level would be increased by making an election and crediting all pre-8/1/11 service to chapter 33 **and/or** is eligible for a chapter 30 kicker:

      i. Process claim with **no** relinquishment.

     ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI, but do not check the "Eligible" checkbox.

   iii. Service which is not being credited towards chapter 33 eligibility must be entered into DGI as non-qualifying service with a reason of "Used for Other Benefit".

   iv. Add letter insert in "Attachment D – Ch30 and Ch33, Multiple Periods of Service" to the veteran's notification letter, immediately following the introduction paragraph:

        1. Select the "Regarding Your Election" paragraph indicating that an election was not received.

        2. Select the "What We Did" paragraph indicating that an election was not received and kicker exists or the benefit level could be increased.

  b. Veteran is 100% without the election and _not_ eligible for a chapter 30 kicker:

      i. Process claim with no relinquishment. No alternative election is needed.

     ii. If chapter 30 was previously used, enter the amount of entitlement used into DGI, but do not check the "eligible" checkbox.

   iii. Service which is not being credited towards chapter 33 eligibility must be entered into DGI as non-qualifying service with a reason of "Used for Other Benefit".

   iv. No letter insert is needed.

### _Veteran is eligible for chapter 33, chapter 30, and chapter 1606._

When a beneficiary is eligible for all three benefits, no election is required. No election will be made, even if provided on the application. The beneficiary may wish to voluntarily relinquish a benefit to coordinate the payment of a kicker and/or receive a refund of their chapter 30 contributions under chapter 33.

In these cases:

1. Process claim with **no** relinquishment.

2. If entitlement was previously used, enter the amount of entitlement used into DGI, but do not check the "Eligible" checkbox.

3. Service which is not being credited towards chapter 33 eligibility must be entered into DGI as non-qualifying service with a reason of "Used for Other Benefit".

4. Add letter insert in "Attachment E – Ch30, Ch1606, and Ch33" to the veteran's notification letter, immediately following the introduction paragraph:

  a. Select the appropriate "Regarding Your Election" paragraph indicating whether or not an election was received.

  b. Select all appropriate "What We Found" paragraph(s).

### _TOE Claims_

1. chapter 33 - If the request is for benefits under the Transfer of Entitlement (TOE) provision:

  a. Follow the scenario which is applicable to the veteran sponsor.
  b. Assume no election has been made, unless the veteran has applied for benefits in their own right.
  c. Ensure proper notification is provided to the veteran, as described above.

**NOTE:** When processing non-33 claims an ILO election is generally not required. Transferred benefits to dependents or any used entitlement must be accounted as prior used entitlement when establishing eligibility to account for use of more than one benefit limitations.

_Fry Claims_

If the request is for benefits under the Fry Scholarship provision:

1. If the beneficiary has served in the Armed Forces, and is eligible for a non-chapter 33 benefit other than chapter 35:
    a. An election to relinquish the non-chapter 35 benefit is not required. Do not develop for this election.
    b. The election between chapter 35 and Fry Scholarship detailed in § 3322(h)(2), is still required for deaths occurring on or after August 1, 2011.
2. If the beneficiary has not served in the Armed Forces:
    a. The election between chapter 35 and Fry Scholarship detailed in § 3322(h)(2), is still required for deaths occurring on or after August 1, 2011.


**NOTE: Letter inserts available in the attachments section below.**

Go to Top

## 3.11  SPECIFIC ISSUES REGARDING VERIFICATION OF SERVICE

**a. Determining Active Duty.** Determining what is or is not "active duty" can be a complex issue. The terms "active duty," "ACDUTRA" (Active Duty for Training), and "Selected Reserve" have very specific meanings previously defined in PART 01, GENERAL. CHAPTER 02, DEFINITIONS . The term "active duty" has its own definition for each benefit. VCEs should refer to the specific part of M22-4 for the definition of "active duty" regarding Chapter 30, Chapter 33, or Chapter 1606. The following paragraphs may clarify the effect of specific types of service.

**b. Full-time Duty in the Reserve or National Guard.**

In some instances full-time duty in the Reserve or National Guard may be considered active duty under Title 38. For Chapter 30, see Part 5 Chapter 1 - General . National Guard members and Reservists who have served a minimum of 90 days of qualifying service are eligible to received Chapter 33 benefits. For additional information regarding Chapter 33 benefits, refer to  Sub-Chapter 2. Veterans paragraph 2.01(c).

**(1) Duty Status of Reservists.** At the beginning of an enlistment in the Reserves, an individual is required to perform Initial Active Duty for Training (IADT) for a period of not less than 4 months. The remainder of the enlistment is spent as a member of the Ready Reserves.

**A. Active or Inactive Duty for Training.** Title 38 CFR 3.6 describes active and inactive duty for training. If a Reservist's only service is active or inactive duty for training, the Reservist must have died or sustained a disability during the period of training to be considered a Veteran. If the period of training did not result in death or disability, the Reservist is not a Veteran based on that service.

**B. Full-time Duty in the Uniformed Services.** Since the 1960's the Reserve components have had several programs such as the Active Guard Reserve (AGR) and the Active Duty Support (ADS) Program in which members serve full-time in operational or support positions but are never formally called to active duty. This type of service, whether it lasts one day or 3 years, is classified by the service departments as "active duty for training (ACDUTRA)."

The term "full-time duty in the uniformed services" is not defined in 38 U.S.C or 38 CFR. However, an opinion issued by the General Counsel on November 9, 1988, makes it clear that, despite the military's ACDUTRA classification, VA has the authority to declare certain types of service performed by Reservists to be "active duty" for the purposes of VA benefits. According to this opinion, Reservists meet the definition of active duty if the facts of record establish that the service was full-time and was for operational or support (as opposed to training) purposes.

Certain types of Reservist duty are generally **NOT** "full-time duty in the armed forces." These include the following:

(a) IADT (Except for Chapter 33 depending upon total aggregate service)

(b) Active Duty Training (ADT) **

** In rare situations, ADT is qualifying and is considered FT duty for Chapter 33. Refer to Part 12 Sub-Chapter 2. Veterans paragraph 2.01 Qualifying Service for additional information.

There are two other categories of Reservist duty which may or may not constitute "full-time duty in the armed forces" depending upon how it is defined for the specific benefit program. These categories are Active Duty for Special Work (ADSW) and Active Duty (AD). They generally imply that the Reservist is performing support duties rather than training. ADSW is used for periods of less than 140 days service and AD for longer periods.

Reservists mobilized under Title 10 under Section 688, 12301(a), 12301(d), 12301(g), 12302, or 12304 qualify as active duty service for the purpose of Chapter 33 regardless of the narrative reason or the type of duties being performed, although it may be deducted depending upon the total amount of aggregate service.

**NOTE:** Section 12301(d) of Title 10 was formerly Section 672(d) of Title 10. Some states still use the old categorization of 672(d) on active duty orders. VCEs should recognize Active Duty service under Section 672(d) of Title 10 as qualifying for Chapter 33 benefits if the service was on or after September 11, 2001.

**(2) National Guard Service (38 CFR 3.6(c) & (d) and 3.7(m))**

a. The Army National Guard and the Air National Guard operate full-time operational and support programs similar to the Ready Reserves. However, Section 101(22) of Title 38, U.S.C, provides separate definitions of "active duty for training" for Guard personnel and Reservists. While the definition for Reservists permits the interpretation that full-time duty **for purposes other than training** is active military, naval or air service, the definition for Guard personnel does **NOT** permit this interpretation. Therefore, full-time operational/support service performed by Guard personnel in ACDUTRA status does **NOT** qualify as active duty for purposes of VA benefits **UNLESS** the member or former member has a service-connected disability or injury that was incurred or aggravated during the ACDUTRA period. Full-time service in the National Guard for the purpose of organizing, administering, recruiting, instructing, or training may be qualifying. In addition, activations in support of a national emergency under Section 502(f) of Title 32 may be qualifying.

**A. Service under Title 10 U.S.C.** If the Guard unit or the member individually is "activated" under the authority of Title 10 U.S.C., members who report for active duty (service characterized as Federal Active Duty) generally have qualifying service for Title 38 purposes until deactivated. If an individual's orders specify activation to temporary duty under Title 10, further development regarding the purpose of the activation is generally not needed **unless** there is evidence in file showing the purpose of the activation was to train the individual. The order to active duty **MUST** state that service is under Title 10 U.S.C.

**B. Service under Title 32 U.S.C.** Full-time National Guard service is "active duty for training" under 38 U.S.C. 101(22)(C) if performed under 32 U.S.C. 316, 502, 503, 504 or 505. This is true regardless of whether the member is performing operational duty or is undergoing training. Operational duty includes, for example, AGR and ADS service. National Guard service does not meet the definition of "active military, naval, or air service" in 38 U.S.C. 101(22) unless the member or former member is service disabled and therefore subject to an exception outlined in 38 U.S.C. 101(24) or 106(b)(3). Determinations as to whether such service is qualifying will depend upon the definitions used for the specific benefit program.

**NOTE 1:** The terms AGR and ADS apply to Guard personnel as well as to Reservists who have served in these capacities.

**NOTE 2:** Since 1964 there has been authority under 32 U.S.C. 502(f) to assign National Guard members who provide full-time support to the Reserve components to full-time operational duty even though they are not activated.

**c. VA Responsibility.** It is VA's responsibility to determine eligibility to VA education benefits. By coordinating with the service departments, VA will make the final decision for claimant's eligibility.

**d. Requests for Additional Service Data.** In situations when the VCE may be unable to make an eligibility decision based on the information submitted from the claimant, additional development may be required. In those situations, VCEs must request clarification of the service data of record to what the claimant has submitted and to what is available in multiple verification systems including VIS, DPRIS, BDN, etc.

**NOTE:** Development should occur in DPRIS first and the claim will be suspended in TIMS for 24 hours. **VCEs should use this link:** https://www.dpris.dod.mil/. The initial request to DPRIS should be captured into TIMS. If the actual request cannot be captured, a NOTE should be created with the VCEs name and date of request to DPRIS. When the documentation in DPRIS is received, if the VCE can make the determination, they should process the claim.

If the information received from DPRIS (or if DPRIS cannot provide additional information), the VCE should develop further to all sources simultaneously (both the claimant and service department point of contact) in order to expedite the claim.

Go to Top

## 3.12  VERIFICATION OF SERVICE - SERVICEPERSONS, VETERANS, AND DEPENDENTS

**a. Verification of Service.** On May 29, 2017, VA issued the Department of Veteran Affairs' Memorandum which deemed VADIR (VA-DoD Identity Repository) the authoritative source for all active service periods effective January 1, 2015. Beginning in 2015, the Department of Defense (DoD) ceased generating paper DD Form(s) 214 and began issuing them electronically. As a result of this change, VA has directed all business lines to discontinue requesting Veterans to provide a copy of their DD Form 214 for service ending on or after January 1, 2015, and instead rely upon the service information electronically reported to VA. The VADIR information provided to the Defense Manpower Data Center (DMDC) from the service components to VA is organized for specific business needs in the **Veterans Information Solution (VIS)**. The VIS contains service and eligibility information consolidated for all VA Education benefits necessary for claims processing. Education Service will use VIS as the **primary authoritative source** for verifying service..

**b. VIS (Veterans Information Solution)**

**1. The VIS Education page** has been developed specifically for Education Service**.** This page contains service information organized under the following section headings:

- Profile
- Transfer of Entitlement
- Active Duty Service Periods
- Reserve & National Guard Active Duty
- Purple Heart Information
- Chapter 30 Eligibility Data
- Chapter 1606 Eligibility Data
- Kicker Information
- Training Exclusion Periods
- Excluded Obligated Periods of Service
- Military Service Academy Period
- $600 Additional Contribution
- REAP Eligibility Data
- NCS Eligibility Data

**2. The VIS Military History page** contains additional service information and certain Beneficiary Identification and Records Locator Subsystem (BIRLS) information that may be necessary for claims processing.

Information on the Military History page is organized under the following section headings:

- Profile
- Service Periods:
  - Active Duty Service Periods

- Guard/ Reserve Active Service (GRAS)
- National Guard and Reserve Service Periods
- Drill Pay Days (used by C&P only)
- Deployment Periods
- Special Pay Periods:
  - Combat Pay & Combat Tax Exclusion
  - Hazardous Duty Pay
- Military History *from* BIRLS

**c. Verification of Service and Documentation to Establish Eligibility.**  To verify service, the VCE must review information reported to VA for the appropriate benefit, match any service information provided by a claimant to DoD/DHS information reported to VA, and resolve discrepancies with the original source document(s) obtained through the Defense Personnel Records Information Retrieval System (DPRIS), the claimant, and when necessary through written verification from the service department.

Preservation of available data at the time a claim was processed, justifies claims processing actions, determinations, and also supports quality reviews.  All documentation regarding eligibility and development must be captured into the claimant's TIMS folder.

**1. Original Determinations.** The VIS Military History and Education screens will be captured into the claimant's TIMS folder for all service members, Veterans, and dependents regardless of the benefit requested.  Occasionally, a claimant may apply using the wrong application and could be denied benefits without a review for other potential eligibility.  Whenever a claimant is denied but has potential eligibility under another program, it is our duty to advise the claimant of potential eligibility and provide the appropriate application concurrent with denying eligibility to the benefit requested.  Additionally, service information in VIS may affect a dependent's eligibility under chapter 35; DEA (see M22-4, Part 7, Chapter 3) or chapter 33; Fry (see M22-4, Part 12) if a dependent has served or is currently on active duty.

**NOTE:** Evidence of other education benefits used must also be considered and captured into the file when found. (**Example:** A BIRLS Inquiry screen, "BINQ" using the claimant's Social Security Number (SSN), not entered in the file number field, but under the social security number field will discover chapter 35 benefits used by a claimant.)

**2. Supplemental Actions.** In addition to reviewing and considering any new information received in the claimant's TIMS folder since the claim was last manually processed, the VIS Military History and Education screens must be captured on each supplemental claim under all education benefits, except DEA/Fry cases unless also a service member.  The VCE and any reviewer or authorizer will ensure the service, eligibility, and entitlement information of record used for processing is accurate. VIS will be captured when there are no changes and when there are changes.  The VCE must update VA systems (including the Education Master Record for the current benefit being processed) as necessary as to ensure eligibility is accurate prior to processing any payments or notifying the claimant regarding eligibility.

**NOTE:** VCEs processing supplemental claims are responsible for ensuring all service information (not only new information) used to determine benefit payments are accurate based upon current information reported in VIS or elsewhere documented in the claimant's folder.

**d. Source Documents and Data Sources.** In addition to VADIR information available in the VIS and other VA systems, additional sources should be considered to help determine cumulative evidence. Data sources that are not in conflict and match information submitted to VA by a claimant on an application should be considered reliable.

Generally, there is no source document more creditable than a data source or vice versa.  Whenever source documents are questionable and conflict with reported information (e.g. DD Form 214, signed or dated prior to RAD), insufficiently documented (e.g. a DD Form 214 for a member of the Reserves or National Guard without an authority (i.e. title and section)) or an interpretable purpose (i.e. IADT, Operation Guardian Shield) and do not match the service information reported to VA in VIS, development is required.

**NOTE:** In some situations, Veterans' Benefits Management System (VBMS) may provide additional service information for claimants who may also have been approved for compensation or pension claims. VCEs can consider researching VBMS as appropriate.  VCEs must remember to capture into TIMS any service data found in VBMS which is used for determining eligibility.

**e.  Known VIS Exceptions Requiring Development.**  Selected Reserve (SR) full-time service periods reported in the VIS should be considered valid and authoritative.

Validation through DoD development is required of the following:

- Service period segments on the Education page with eligibility codes
    - '98' (Cannot determine qualifying period. Data quality issue in transaction.) or
    - '99' (Unknown/Not Applicable)
- Verification of service may be necessary when there is conflicting evidence on file which could impact eligibility or payments.

**f.  VIS Authoritative Limitations.** The service data in VIS is continuously being improved.  Any newly updated information in VIS for an earlier service period should be considered valid and authoritative unless there is other evidence on file which indicates reporting may be inaccurate or incomplete.  In such instances, development would be required.

**1. Information not reported:** If the VIS does not have exclusion periods reported, the absence of such information is not a confirmation.  When a kicker, College Loan Repayment Program (LRP), or any other exclusion is indicated on an application but not in VIS, further development using DPRIS, to the claimant, and when appropriate to the service, is necessary unless the indication on the application can be rationalized as not valid or irrelevant.  Not valid applies when other reference materials provide conditions for when the disclosure could not be possible.  Some examples include a non-prior service officer or member of the Air Force reporting an active duty kicker, and exclusions for a service academy or ROTC for an enlisted service member.

The following are examples when LRP is claimed and not valid, development will **NOT** be necessary:

- If the beneficiary entered active duty from high school, he or she has not been to college, the beneficiary could not be eligible for LRP.
- If the beneficiary is coded as 04 Ineligible/$00 paid in VIS.
- If the beneficiary is eligible under a category other than IA, IB, IC, IIA and IIB. The LRP bar does not apply to such beneficiaries.
- If the beneficiary has a kicker, he or she can't have the LRP.
- A beneficiary received an ROTC scholarship or attended a service academy.
- The Air Force did not offer LRP until May 5, 2000. Anyone who entered the Air Force prior to that date cannot be eligible for the LRP.
- The Marine Corps and the Coast Guard do not offer the LRP program.
- If the beneficiary was/is in the Army and entered active duty outside of the period between December 5, 2000 and March 3, 2003, not eligible for LRP. {Note: The Army has requested that any service members who entered on active duty between December 5, 2000 and March 3, 2003 will need to have an inquiry made if they indicate receipt of LRP.}

Irrelevant examples include when claimant is requesting buy-up when requesting chapter 33, a chapter 1606 kicker when no longer in the selected reserve, or an exclusion period for a claimant with more than 3 years of creditable service in addition to the exclusion period in question.

Development to confirm service periods or exclusion periods (including entry or skill level training) which have no effect on eligibility should be avoided.  Instead, the VCE should add a note to clearly document the justification in the file as to the specific reason(s) why development is unnecessary and process with the verified information on hand necessary to make a determination.  For chapter 33 claims, also indicate in the comments section of the Long Term Solution (LTS) the same detailed justification to inform a reviewer both for authorization and quality checks.

**2. Previous DoD responses.**   Updated information in VIS should be considered reliable.  In other words, if a previously captured VIS record did not contain newly reported information, or the Military History page contains a reported segment as erroneous and on the Education page the period has updated or been removed – use the new information in VIS without additional clarification.  However, a DoD response should not be dismissed without unmistakable evidence of new reporting as previously described or good cause.  Good cause examples include earlier DoD responses to development with "unable to verify" or USAR title 10 service periods not previously reported.  For the latter, new reporting of creditable service should be accepted without question since we have been informed USAR revised their policy for reporting.

**3. VIS delay in updating information**. The VIS as a data source is dependent on DoD employees updating the information.  There may times when an electronic DD Form 214 may be received as part of an application packet, but VIS has not been updated.

**Example:** A claimant submitted a DD Form 214 for the period January 15, 2019, through May 15, 2019.  The VCE is reviewing the claim well over 30 days after the DD214 release date, yet the VIS is still reporting the claimant on duty.

This is an example which indicates the VIS is incomplete, therefore, development is required per M22-4, Part 3, 3.13.

**g. Authorization for Eligibility Decisions**. Decisions involving changes in eligibility require at least 2 signatures (M22-4, Part 3, Chapter 1.19) and must be properly documented. (See Big Pay guidance in M22-4, Part 3, Chapter 1.20 for documentation requirements and when additional signatures must be in the file prior to releasing payments.)

Go to Top

## 3.13  DEVELOPMENT FOR ADDITIONAL REQUIRED INFORMATION

**a.** If an eligibility determination cannot be made after reviewing the Veterans Infomrataion Solution (VIS) which is the authoritative and primary source and when necessary soliciting information from DPRIS, VCEs should simultaneously develop to the claimant and DoD.

1. When developing to the claimant, VCEs should advise the claimant on the information under development with DoD and request supporting evidence of service from the claimant when approriate and necessary to make a decision.

2. When developing to DoD, VCEs should only develop for the following service related issues (when not available already):

- Service period dates
- Character of Service
- Separation Reason
- Title
- Section

**NOTE:** In all cases, when developing to DoD, VCE's must supply the period of service and the condition on which additional information or clarification is required. Ambiguous development to DoD such as "Verify all Chapter 33 qualifying service" is never permitted. In the request, the VCE should be as specific as possible. Remember, VA (i.e. the VCE) makes the eligibility decision for education benefits. The service departments will provide information as it is asked and they have no authority to determine if service is qualifying for Title 38 benefits.

**b. ADDITIONAL TERMS AND CONCEPTS.** In order for VCEs to properly interpret service information received from the different departments, the additional terms and concepts must be discussed.

1. The term "Entry Level and Skills Training" means the following:

- Army: Basic Combat Training and Advanced Individual Training (AIT) or One Station Unit Training (OSUT). Enlisted soldiers attend Basic Training (BCT). BCT is either combined with AIT (also known as OSUT) or AIT occurs at another location to earn a military occupational skill (MOS). Additional skill identifier or other

training should not be identified as training. (i.e., Airborne School, Defense Language Institute, Ranger or Special Forces Training…).

- Navy: Recruit Training (or Boot Camp) and Skill Training (or so-called "A" School). Enlisted Sailors attend Recruit Training or Boot Camp (RTC). Many attend advanced skill training (apprenticeship) or "A" school to earn a "rating". Others go directly into the fleet without additional training serving as an airman, fireman, or seaman.
- Air Force: Basic Military Training and Technical Training. Enlisted Airmen attend Basic Military Training (BMT). These Airmen attend technical training to earn their Air Force Specialty Code (AFSC) which is similar to a Navy "Rating" or the Army and Marines MOS job identification.
- Marine Corps: Recruit Training and Marine Corps Training (or School of Infantry Training). Enlistees enter Boot Camp. In Boot Camp, the individual will either attend the School of Infantry (SOI) or Marine Combat Training (MCT). Subsequent on-the-job skill training or MOS training should **not** be identified as training. This time is fully creditable under Chapter 33.
- Coast Guard: Basic Training and Skill Training (or so-called "A" School). Enlisted Guardians attend Basic Training which is similar to the Navy, where they attend "A" School to earn a rating. PL 111-377 added "A" School to the definition of entry level and skill training for Coast Guard.

  **NOTE:** Coast Guard Basic Training and Skill Training applies only to service which began on or after January 4, 2011. This Post-9/11 service when entered prior to January 4, 2011, is fully creditable and should not be identified as training under chapter 33.

2. Acronyms for some *initial training* performed by Officers:

- BOLC – Basic Officer Leaders Course (Army)
- DCOs – Direct Commission Officers
- OBC – Officer Basic Course
- OCS – Officer Candidate School
- ROTC – Reserve Officer Training Corps
- SMCs – Senior Military Colleges
- TBS – The Basic School (USMC)
- USAFA – United States Air Force Academy
- USCGA – United States Coast Guard Academy
- USNA – United States Naval Academy
- USMA – United States Military Academy
- WOBC – Warrant Officer Basic Course

Generally a VCE should not develop for any initial training for officers. Officers complete their training (or are considered trained) before commissioning. VA does not reduce an officer's qualifying active duty for entry level or skill training performed while on qualifying active duty.

List of Probable Scenarios, ID and Reason

| Scenario | ID | Reason |
|---|---|---|
| 30 continuous days of creditable service, seperated for a service connected disabilty | O | Enter initial entry and initial skills training into the Long Term Solution (LTS) if known, and remove if system does not calculate correct benefit level. Known issue: in certain instances LTS will not indicate 100% benefit level. |
| No honorable or creditable service | O | Enter initial entry and initial skills training into lts if known, do not develop. Eligibility will not change. |
| 30 months or more of creditable service | O | Enter initial entry and initial skills training into LTS if known, do not develop. Presumed to have been completed prior to 9/11/01. |
| Less than 30 months of creditable service with more than one year of service prior to 9/11/01. | O | Enter initial entry and initial skills training into LTS if known, do not develop. Presumed to have been completed prior to 9/11/01. |

| Scenario | ID | Reason |
|---|---|---|
| Any length of service and excluding first 3 years for Loan Repayment Plan (LRP) | O | Enter initial entry and initial skills training into LTS if known, do not develop. Benefit level will not change. |
| Less than 30 months of creditable service as an officer | N | Do not identify officer training, this is fully creditable |
| Less than 30 months of creditable service as an enlisted memeber | Y | Identify initial entry and skill level training and enter this data into LTS. Develop when not in block 12h of a DD214, not listed in the Veterans Information Solution (VIS) system or whenever uncertain. |

3. Block 12h of a DD214:

The VCE should enter dates identified as Entry Level and Skills Training into LTS as Training. If not indicated in VIS or on the DD Form 214, the VCE must develop to the service department. However, the VCE must be very specific and request verification for the period of initial entry or skill level training when the claimant is at or below the 80% benefit level with all Chapter 33 service included.

**NOTE:** Remember there is no need to develop when there is one year of active duty before September 11, 2001 or the claimant is an officer in any branch of service.

4. EST development. A VCE should develop to the claimant's service branch when Entry Level and Skills Training information either

- Cannot be found
- Is found but there are discrepancies in the data, or
- If data has changed or disappeared

When developing for Entry Level and Skills Training information, the request should list <u>exactly</u> the information needed.

**EXAMPLE:** When requesting Entry Level and Skills Training information for a claimant who was in the Army, the VCE would request the following:

- Service periods that the claimant was in Basic Combat Training
- Advanced Individual Training and,
- One Station Unit Training

5. Other Examples. As previously stated, all Reserve and National Guard required IADT is ordered under Title 10 USC 12301(d), meets the definition of active duty under Chapter 33.

Some portions of IADT may not need to be labelled "entry level and skill training" as only those specific courses codified in 38 USC 3301(2) are to be identified as training under Chapter 33.

Title 10 ADT, ADOS, and ADSW are performed under 12301(d) meets the definition of active duty under Chapter 33.

Title 32 (National Guard Only) ADT, ADOS and ADSW are **not** creditable service unless in support of a National Emergency and supported by federal funds under Section 502(f). This is a rare occurrence. VCEs should not enter service that does not meet the definition of "active duty" into the LTS.

**C. CONTROL FOR DOD VERIFICATION.** While VCEs will use the approved DoD development spreadsheet to ensure the appropriate question is submitted to the appropriate Point of Contact (POC), it is the VCE's responsibility to ensure they maintain control of the claim.

When a VCE has determined the DoD POC must be contacted, development is required to the claimant directly as well. The VCE should send the appropriate development letter explaining *specifically* what is needed and advise the claimant a request has been submitted to the service department as well. This letter should be explicit explaining a final decision cannot be made until this information is received. The claimant may have the documentation necessary to adjudicate the claim. The letter should explain how the claimant can submit the documentation. A copy of all development (letters, requests, etc.) should be placed in the claimant's TIMS folder and control in BDN and TIMS set for 45 days from the date of the letter. No end product is authorized for development.

As discussed in Subchapter 6, Duty to Assist (DOA) of this Chapter, service information found on DD Form 214s and other service documentation is considered to be under federal custody. Therefore, development must continue until the claimant supplies the information, the service department responds with the information requested OR the service department responds with a statement indicating the information is non-existent or cannot be obtained.

Repetitive development to the service departments will not expedite the claims. Once the VCE has requested the information to the service department, additional requests should not be routinely submitted.

At the time of development, as stated, the VCE should review all creditable service on file and issue a COE or award benefits based on any period of service for which development is not needed, if at all possible. If the award is unable to pay at the highest level claimed, the award letter must explain, specifically to the claimant what is required to perfect the claim. The VCE and Senior VCE are entitled to a 400 end product for the interim decision. ***However, the controlling end product (whether it is an original or supplemental) cannot be cleared until a final decision has been made.*** At the time of the interim decision, the VCE should extend the end product in BDN for 90 days from the original date of development. The claim should remain open in TIMS and placed in AWAIT Mail until 90 days from date of the original development to the service department.

The RPO must control the claim while a request is pending from the service department. Once the end product has matured to 90 days, if no final decision may be made, the claim information should be forwarded to the Operations team (VAVBAWAS/CO/222) for situational awareness that the service department has not responded. This email should include the claimant's name, the service branch information from which the information was requested (if National Guard, include the state), the last four digits of the Social Security number or identification number, and a summary of the missing information. VCEs must continue to diary the claim in BDN and TIMS until the Operations team provides additional guidance.

**CAUTION:** Remember, if the VCE can pay **ANY** part of the claimant's award, this must be done. Do not withhold any payments to any claimant while waiting on the service department to verify additional service.

**NOTE:** Additional guidance is forthcoming regarding proper DOD kicker development. VCEs should always pay basic eligibility to claimants and develop separately for kicker information. Until that is updated, control the development for kicker contracts when necessary, using a supplemental end product with the development to both the service department and the claimant.

If the VCE validates through the cumulative sources that the period of service is not qualifying, the VCE should prepare a disallowance through BDN or LTS and notify the Veteran. A notice of appeal and procedural rights will be enclosed.

If a Veteran previously filed an application as a serviceperson, a separate formal application is not required upon discharge. However, the VCE will request whatever information may be necessary to determine the person's eligibility as a Veteran such as a member-4 copy of DD Form 214.

Go to Top

## SUBCHAPTER III.  MISCELLANEOUS SERVICE ISSUES

## 3.14  STATUTORY BARS AND FORFEITURE OF BENEFITS

a. There are certain statutory bars which apply to all VA benefits regardless of the character of discharge.  Sections 5303, 6104, and 6105 of title 38 United States Code govern bars and forfeiture of benefits.

Sections 6104 and 6105: forfeiture for treason and for subversive activities, respectively, serves as a total bar to benefits. It is a forfeiture of all VA benefit eligibility regardless of reenlistment or length of service (i.e., periods of service are irrelevant). However, a statutory bar under section 5303 will apply only to the period of service from which discharged or dismissed for the separation reasons listed below:

- discharge of a conscientious objector who refused to perform military duties,
- discharge by reason of the sentence of a General Court Martial,
- resignation of an officer for the good of the service and desertion
- other than honorable discharge for AWOL exceeding 180 days unless there were compelling circumstances.

NOTE: Eligibility may be established if a Veteran with a statutory bar described in 38 USC 5303 has another qualifying period of service, including a conditional discharge for the purpose of reenlisting.

1. When denying benefits based upon 38 USC 5303, the reason for denial is not "insufficient service" or "character of discharge"; rather, it is "statutory bar to benefits by reason of discharge for (*insert reason*)."

2. When denying benefits based upon 38 USC 6104 or 38 USC 6105, the reason for denial is 'forfeiture of benefits by reason of discharge for (*insert either* "treason" *or* "subversive activities" - *as applicable*).'

References:

38 USC 5303 Certain bars to benefits

38 USC 6104 Forfeiture for treason

38 USC 6105 Forfeiture for subversive activities

Go to Top

## 3.15  CHARACTER OF DISCHARGE

**a. Chapter 32, Chapter 35, and Section 903.** For these benefits (if the claimant was on active duty) the claimant's discharge must be "under conditions other than dishonorable."

**b. Chapter 30 and Chapter 33.** For these benefits, only discharges that are specifically "honorable" are acceptable. However, conditional discharges are possible. Please refer to Part V or XII for specific rules. In addition, there are exceptions under Chapter 33 in which the character of discharge does not have to be honorable if discharged for a disability. Please refer to part XII for additional information.

Go to Top

## 3.16  Service Academy Preparatory Schools and Service Academies

**a. Preparatory Schools.** The Army, Navy, Coast Guard, and Air Force provide preparatory school training for qualified personnel who are candidates for appointment to one of the service academies. This training is provided at the U.S. Military Academy Preparatory School, the U.S. Naval Academy Preparatory School, U.S. Coast Guard Academy Preparatory School, and the U.S. Air Force Academy Preparatory School.

**b. Admission to Preparatory Schools.** Generally there are two distinct paths for admission to preparatory schools:

1. The cadet candidate (CC) arrives as an enlisted person serving on active duty in the Regular component. A CC who enters the preparatory school as an enlisted person serving on active duty in the Regular component is still considered a member of the Regular component and continuing with his or her active duty even while at the prep school. He or she is merely reassigned to the Prep School from his or her current unit as a permanent change of station.

2. The CC is admitted to the preparatory school from the Selected Reserves or directly from the public arena (e.g., recent high school graduate). Someone admitted from the public arena enlists as an "Invitational Reservist" solely for the purposes of attending the prep school. Both of these types of Reservists serve on active duty while at the prep school under 10 U.S.C. 12301(d) orders. This service is considered "active duty for training."

**c. Chapter 33:** Time spent in Service Academy Preparatory Schools qualifies for Chapter 33. This service is Active Duty under 38 USC 3301 (1) (A) or 38 USC 3311 (1)(B).

Training at a prep school is not excludable as time serving as a cadet or midshipman at a service academy. (See paragraph (e) below).

Training at a prep school is not excludable as "entry level and skill training" because it does not meet the definition of that term as defined in 38 USC 3301(2).

**d. Non-Chapter 33:** Time spent in Service Academy Preparatory Schools by itself is unlikely to be sufficient to establish eligibility unless pursuant to an enlistment and separated under a qualifying exception for not completing the initial term of service.

A CC who enters the preparatory school from active duty, is considered a member of the regular component and therefore is continuing with his active duty. In this situation, he or she is merely reassigned to the Prep School from his or her current unit.

A CC who enters the preparatory school from the Selected Reserves or directly from the public arena is considered to be serving on active duty for training. Eligibility criteria for Chapter 30 or 32/903 must exist from some other service to establish eligibility to these Title 38 benefits. Eligibility under Title 10, Chapters 1606 and 1607 may exist and is determined by the member's service department.

In all instances, eligibility rules specific to each benefit should be applied when determining potential eligibility.


**e. General Counsel (GC) Opinion.** In 1994, GC affirmed the previous decision that characterizations of an individual's service at the U.S. Air Force Academy Preparatory School for purposes of entitlement to Veterans' benefits depends upon the status in which the individual enters this school. Service by an individual attending this school as a reservist called to active duty for the sole purpose of attending this school constitutes "active duty for training" and not active duty. Service by an enlisted person on active duty who is reassigned to this school without a release from active duty constitutes a continuation of that enlisted person's active duty.

GC has ruled that assignment to a preparatory school is not equivalent to assignment to a service academy because a preparatory school has no connection with an academy.

**f. Service Academy.**

**1.** <u>Active Duty service while a cadet or midshipman</u>: Chapter 30, 32, 33, and Section 903 regulations require service as a cadet or midshipman at a service academy must be excluded from computation of periods of active duty.

**2.** <u>Active Duty service upon graduation from an academy</u>:

**Chapter 33:** Academy graduates may qualify for Ch. 33. However, the five years served immediately after graduation will be not creditable and should be excluded from any aggregate time in service calculation. Title10 USC 4348(a)(2)(B) for USMA, title 10 USC 6959(a)(2)(B) for United States Naval Academy, Title 14 USC 182(b)(2)(B) and title 10 USC 9348(a)(2)(B) for United States Air Force Academy, says that graduates "will serve on active duty for at least five years immediately after such appointment" and 38 U.S.C. 3311(d)(2) says that this time will not be used in calculating aggregate time for ch. 33 entitlement.

**EXAMPLE:** A West Point student graduates and is commissioned on May 27, 2003, and served through May 26, 2008. The individual's academy commitment ended on May 26, 2008. The five year excluded period runs from May 27, 2003 through May 26, 2008. The first date eligibility for a period of qualifying service may be counted is May 27, 2008.

<u>Special Rule for Cadets of the Coast Guard Academy</u>: The requirement under Chapter 33 to exclude the first five years of active duty service following commission should not apply to Coast Guard Academy graduates of the Class of 2014 or earlier. In general, the requirement to serve on active duty for five years immediately after appointment prevents Service Academy Graduates from accruing creditable service towards the Post-9/11 GI Bill until the obligation period has been served. This provision will now also apply to former cadets of the Coast Guard

Academy graduating in the Class of 2015 or later beginning upon their date of commission (the only way for exemption from the five year exclusion is if the person was originally a member of the Class of 2014 or earlier but, for some reason, ultimately graduated with a later class). This is due to the fact that the Coast Guard Academy Cadet pursuant to a commitment signed after January 4, 2011, is obligating service after the legislation became law and effective.

See  Part 12, Chapter 00: Index for information regarding Chapter 33, Information about Benefits, Excluded Service.

See Part 5 Chapter 1 - General for the effect of graduating from a service academy on Chapter 30 eligibility.

Go to Top

## 3.17  DEDUCTIBLE TIME

Two types of military service (not-on-duty time and non-creditable time) are not included as active duty for education benefit purposes. This information can be found on DD Form 214.

**a. Not-on-Duty Time.** Not-on-duty time does not count as active duty under Chapters 30, 32, 33, and Sections 901 and 903. Periods of service which constitute not-on-duty time are defined by 38 CFR 3.15 and include:

(1) Time lost on absence without leave (without pay).

(2) Time lost while under arrest (without acquittal).

(3) In desertion.

(4) Time lost while undergoing a sentence of court-martial.

**b. Non-creditable Service.** Non-creditable service does not count as active duty under Chapters 30, 32, 33, and sections 901 and 903. Periods of non-creditable service are:

(1) Periods while assigned by the service department to a civilian school for a course substantially the same as established courses offered to civilians. The term "civilian school" means any public or private school providing adult education, including colleges or universities, and schools providing business, trade, vocational, or technical training. It is not material that there were curricular deviations incident to the particular student's military assignments, or that a regular academic degree or certificate was not issued, as long as the course was one within the regularly prescribed program or curriculum of the school. A DD Form 214 will normally provide the necessary information.

**NOTE:** See  Part 5 Chapter 1 - General , for the effect that training at a "civilian school" has on Chapter 30 eligibility.

(2) Service under the provisions of Section 12103 (formerly Section 511(d) of Title 10) pursuant to an enlistment in the Army National Guard or the Air National Guard, or as a Reserve for service in the Army Reserve, Naval Reserve, Air Force Reserve, Marine Corps Reserve, or Coast Guard Reserve.

(3) Periods of military service in an excess leave status.

**NOTE 1:** A Serviceperson attending school in an excess leave status, if otherwise eligible, may be paid at the rates payable to Veterans including additional allowance for dependents. Excess leave is defined as leave without pay and is granted only by the service department under emergency or unusual circumstances. The service department places the individual in a "leave without pay" status; the Serviceperson pays the tuition and fees and agrees to extend the length of service on active duty. Education benefits may be authorized for the full period of enrollment certified by the school even though there may be a brief period of active duty during a holiday or during any other day the school was not in session which did not interrupt the continuity of pursuit of the course.

**NOTE 2:** There is an important distinction in service department programs in which the Serviceperson attends a civilian school while on excess leave without pay and other programs in which the Serviceperson attends a civilian school while on a temporary "duty assignment with full pay and allowances." In the latter instance, the student is considered to be on active duty and should be paid education benefits at the rates payable to Servicepersons unless the military is paying for the training.

(4) Periods of Service Not considered Active Duty for Chapter 33

- Was assigned to a civilian institution for a course of education which was substantially the same as established courses offered to civilians,
- Served as a cadet or midshipman at one of the service academies, or
- Served under the provisions of Section 12103(d) (initial skills and training) of Title 10 pursuant to an enlistment in the Army National Guard, Air National Guard or Reserve components.
- Was called up to active duty from a reserve component of the Armed Forces, Army National Guard or Air National Guard, under Title 10 and it was under a section other than 688, 12301(a), 12301(d), 12301(g), 12302, or 12304 or Section 712 of Title 14 for the USCG Reserve.
- Was called up to active duty under Title 32 that was NOT under Title 32 502(f) for the purpose of responding to a national emergency declared by the President and supported by Federal Funds.
- Served full time in the National Guard under Title 32 for a purpose other than organizing, administering, recruiting, instructing, or training.

Go to Top

### SUBCHAPTER IV.  TRAINING UNDER PRIOR BENEFIT PROGRAMS

### 3.18  GENERAL

**a. Basic Prior Training Determination.** The VCE must first determine the amount of prior training under other programs in all cases where prior training is indicated. No person may receive benefits exceeding a total of 48 months under Chapters 30, 32, 33, 1606 or 1607 or 81 months for individuals who use Chapter 35 with entitlement to other VA education programs by combining benefits under two or more benefit programs.

**NOTE 1:** Development is necessary <u>before</u> initially paying current benefits when the amount of prior training and the current award could exceed 48 months or 81 months.

**NOTE 2: Important Points for understanding the 81-month rule**

1. The extension does not apply to individuals who have **exhausted** 48 months of benefits **prior** to October 1, 2013 (i.e. it does not apply if the BDN No Pay Date is prior to October 2, 2013, or the LTS Entitlement Exhaust Date is **prior** to October 1, 2013).

2. Individuals who use non-35 benefits **cannot exceed** 48 months of entitlement between those non-35 sources.

**b. Prior Training Steps.** These general steps are to assist VCEs in identifying prior training information and determining the amount of any prior training a claimant may have taken.

(1) The VCE must review the claimant's application. Does he/she claim additional training under another VA education program? Look to see if he/she claims prior training under Chapter 35 under a different file number.

(2) Using BDN, the VCE should search for additional master records. Use the MINQ command to access Chapter 1606, 1607, 30, 31, 32, 33, and 34 master records. Remember, there could be additional prior training taken under Chapter 35 under a different claim number.

(3) Determine all prior VA training. VCEs must account for all prior VA training.

(4) Prior VA training must be entered into BDN/LTS to ensure entitlement does not exceed 48 or 81 months as appropriate. Specific instructions are in each part of M22-4 regarding the benefit type.

Go to Top

### 3.19 COMPUTATIONS FOR TRAINING UNDER PRIOR VA BENEFIT PROGRAMS

**a. Prior VA Training Computations.** All education, Chapters 30, 31, 32, 33, 34, 35, 1606, 1607, and Sections 901 and 903 should be reviewed. In most cases, determine the prior training by BDN screens or LTS.

**b. Procedures.** After obtaining all available records of the applicant's prior training under prior VA laws, determine the total amount of entitlement used. Enter this total amount of entitlement into BDN or LTS as prior training except when processing Chapter 32 benefits. BDN determines the current entitlement. For benefit specific procedures, see the following:

(1) Chapter 30. Review M21/M23 for any prior entitlement used.

(2) Chapter 31. Review M33/M34 for any prior entitlement used.

(3) Chapter 32. Review M26/M27 for any prior entitlement used.

(4) Chapter 33. Verify in both BDN **and** LTS for any prior entitlement used.

(5) Chapter 34. Review M25 for any prior entitlement used.

(6) Chapter 35. Review M21/M23 for prior entitlement used.

(7) Chapter 1606. Review M21/M23 for prior entitlement used.

(8) Chapter 1607. Review M21/M23 for prior entitlement used.

Go to Top

## SUBCHAPTER V. RULES OF EVIDENCE

### 3.20  EVIDENCE REQUESTED FROM CLAIMANT

**a. Complete Request.** Use BDN or LTS for development if it will produce a letter which clearly tells the claimant what evidence is needed; otherwise, send the appropriate PCGL development letter.

**b. Enclosures.** Enclose all necessary forms or website links when writing to a claimant.

**c. Email messages and Telephone usage.** Use of email messages and telephone development is strongly encouraged when a written response is not required. VCE must be certain to follow appropriate security and privacy issues when corresponding through email to non-VA personnel including applicants.

(1) Document all information received by telephone on VA Form 119, Report of Contact.

(2) Award and denial letters must include reference to any telephone evidence used in the decision. VCEs should include the date of the call and the person supplying the information.

**d. Notice of Time Limit.** The VCE should advise the claimant if they fail to furnish the evidence within the specified time limit it may result in the disallowance of the claim. Specify the time limit.

**e. Controls for Submission of Evidence**

(1) Unless otherwise specifically provided, establish a 30-day control for submission of evidence.

(2) If the evidence needed is not received within 30 days, disallow the claim for failure to prosecute. Notify the claimant of the reason for the disallowance and of the one-year time limit for submission of the evidence. Furnish notice of procedural and appellate rights.

(3) If the claimant furnishes some but not all requested evidence and the evidence submitted does not permit award action, do not disallow the claim for failure to prosecute until 30 days have elapsed from the date the evidence was requested. After 30 days, disallow the claim, advise the claimant specifically what essential evidence was not received and of the one-year time limit for submission of the evidence. Furnish notice of procedural and appellate rights.

(4) If the claimant furnishes part of the evidence before 30 days have elapsed and some benefits can be awarded, do not defer payment pending receipt of the rest of the evidence. Take award action. Inform the claimant of the evidence considered the reasons for the decision and that action on the remaining aspects of the claim has been deferred pending receipt of the other requested evidence. Enclose notice of procedural and appellate rights. **Maintain pending-issue control until final action is taken**. If denial of the additional benefits results from the

failure to furnish requested evidence, inform the claimant of the denial, outlining the evidence that was requested but not furnished and of the one-year time limit for submission of the evidence. Furnish notice of procedural and appellate rights.

(5) It is improper to deny a claim simultaneously with development of the same issue. A control with an accurate date of claim must be maintained as long as development is pending. If initial development raises new issues which must be resolved or if initial development failed to request essential evidence, extend the control for 30 days from the date of the most recent request for evidence.

(6) Grant an extension of a control for evidence if requested by the claimant or the claimant's authorized representative as long as a good faith effort is being made to furnish the requested evidence. An extension does not affect the statutory time limit for submission of evidence or the effective date of an award.

### f. Address Unknown

(1) If any correspondence to a claimant, including award letters or requests for evidence, is returned as undeliverable, review the file to ensure the current address was used.

(2) If a request for evidence essential to establish entitlement addressed to the claimant's last known address is returned unclaimed, do not extend the time limit for submitting the evidence. In this situation consider the claim abandoned after the expiration of one-year from the date of request. See 38 CFR 3.158(a).

Go to Top

## SUBCHAPTER VI.  DUTY TO ASSIST

**NOTE:** This subchapter covers the specifics of "Duty to Assist" (DTA) but is not all inclusive. VCEs may go above and beyond DTA in some cases, but must always fulfill the minimum level of DTA.

## 3.21 BACKGROUND

**a. Origin.** The Veterans Claims Assistance Act (VCAA) of 2000 requires VA to make reasonable efforts to assist a claimant in obtaining the evidence necessary to substantiate the claim. This includes any relevant records that the claimant identifies and authorizes VA to obtain. If attempting to obtain records from a Federal department or agency, we must continue our attempts unless it is reasonably certain such records do not exist or that further efforts to obtain the records would be futile.

**b. Decisions.** Decisions on VA benefit eligibility and entitlement are based on the evidence of record. Evidence consists of documents and information in any form provided by, or obtained for, a claimant. VA must fulfill its duty to assist by obtaining all necessary evidence before making a decision on a claim. VA is obligated to assist a claimant in developing all pertinent facts concerning a claim and render a decision granting every benefit that is supported by law. VA is also obligated to protect the interests of the Government.

**c. Identify.** Before requesting evidence, identify all issues, determine what additional evidence is needed, and ascertain the best sources for the evidence and initiate development. Request evidence from all sources simultaneously including the claimant, but *ensure* the evidence is needed before requesting it.

**d. Information.** Keep the claimant informed of the reason(s) for any excessive delay in the processing of his or her claim. Use any appropriate form of communication (i.e. telephone, letter or email message). Be mindful of privacy issues and security concerns. The VCE should ensure a copy of any development letter is placed in the claimant's TIMS folder. If in lieu of a locally produced letter, the VCE communicates by telephone or email to the claimant, documentation of the conversation should also be placed in the claimant's TIMS folder. Completing VA Form 119 is the best form to memorialize a telephonic conversation. As stated, if email is used, the VCE must ensure privacy and security concerns are followed.

**e. Burden of Proof.** While the burden of proof ultimately rests with the claimant, VA will make reasonable efforts to help the claimant obtain any evidence he or she specifically identifies, or any evidence which is reasonably suggested to exist which might enable the claimant to substantiate his or her claim. The claimant's certified statement is usually sufficient evidence to establish a point in issue. In some cases more is required. A certified statement is necessary to

ensure the claimant is the person providing the information. When the VCE speaks to a claimant on the telephone, ensure it is the claimant providing the information (or a designated representative). As a reminder, if the telephone is used, the VCE should use appropriate identification protocol (i.e. verify the claimant's address, last four digits of SSN, etc.) Do not change pertinent privacy information (i.e. direct deposit information, address change, etc.) without confirming the identity of the speaker.

The claimant's statements will be accepted as true in the absence of contradictory evidence. It is appropriate to request further evidence if there is a substantial reason to challenge a claimant's statement, i.e., something beyond mere suspicion or doubt.

Go to Top

## 3.22 APPLYING DUTY TO ASSIST

**a. Application** When information is needed, development must be done with Department of Defense (DoD), schools, Defense Finance and Accounting Service (DFAS), Veterans Information System (VIS), Defense Personnel Retrieval Image System (DPRIS), etc. DTA requires VA to make all reasonable attempts to assist a claimant in obtaining necessary evidence to substantiate his or her claim for education benefits. Therefore, if routine attempts to obtain the information are unsuccessful, VCEs must take additional steps to substantiate the claim by providing more specific information to the claimant on what information is needed, advising the claimant what he or she needs to do, and informing the claimant of any efforts VA will take to obtain the information. If the necessary information is still not received and the claim is denied based on the evidence of record, VCEs must inform the claimant what information VA was unable to obtain, the efforts VA made to obtain this information, and that the claimant is responsible for submitting any relevant information to reopen the claim.

Go to Top

## 3.23 WHEN NOT TO APPLY "DUTY TO ASSIST"

Duty to Assist (DTA) does not apply if it is clear there is no legal basis for the claim or if undisputed facts render the claimant ineligible for benefits. If there is no possibility that any additional information or assistance will affect the determination of a claimant's eligibility, DTA actions are not required.
**Examples of When DTA is NOT required (not an inclusive list):**

1. A VA Form 22-1990E is received requesting Chapter 33 TOE benefits for a child of a Navy Veteran. After researching in VIS the VCE notices the transferor did not transfer any entitlement to their spouse or dependent, then DTA doesn't apply and there's no need for further development.

2. If a Chapter 30 claimant serves a total of 18 months on active duty and receives a "General, Under Honorable Conditions" discharge, DTA doesn't apply. Appeal rights are required, but a determination on the claim can be made without requesting any additional information.

Go to Top

## 3.24  STEPS TAKEN APPLYING DUTY TO ASSIST

**A.** VCEs should be familiar with the difference between a formal and informal claim. VCEs should ensure an application received contains the following information:

(1) The claimant's name;

(2) The benefit claimed;

(3) His or her relationship to the Veteran, if applicable;

(4) Sufficient information for VA to verify the claimed service if applicable;

**NOTE:** While technically DTA doesn't apply if the chosen benefit isn't indicated on the application, the policy to assist the claimant with his or her generic request for benefits is still VA's standard procedure.

**B.** To fulfill DTA, VCEs must make the following reasonable efforts (if applicable) to help the claimant obtain the necessary information to substantiate his or her claim:

    1. When additional information is needed from a **Federal** agency—

The VCE must make as many requests as necessary to obtain the needed records or evidence. VA will stop attempting to obtain records if it is concluded the records do not exist or efforts to obtain the records would be futile.

**EXAMPLE:** A claimant's 30D screen shows "00 INELIGIBLE" and no deductions. The VCE has requested proof from the Army that the claimant declined MGIB upon entry on active duty. The Army informed us that they do not have a DD Form 2366 in their records for the claimant. Subsequent requests would be futile. (After allowing the claimant 30 days to submit any evidence in his or her possession, the VCE should make a determination based on the available evidence. The determination can be made earlier if the claimant provides a copy of the document. )

The claimant should cooperate fully with VA's efforts to obtain records from Federal agencies, providing enough information to identify and locate the claimant's records. Such information should include (but isn't limited to) the identity of the agency holding the records and the approximate time frame covered by the records. If required, the claimant must authorize release of the information to VA.

**NOTE:** It is paramount under DTA, the VCE cannot make a decision of record until the Federal agency has responded that the information is unavailable. This is important even if the claimant has responded he/she does not have the information. A statement from the Federal agency must be in the file that the information is unavailable before the final decision is made.

    2. When additional information is needed from a **non-Federal agency**—

VCEs must make all reasonable attempts to obtain needed records from non-Federal agencies. Generally this means one initial request and, if necessary, at least one follow-up request (unless the evidence requested doesn't exist or it's determined that follow-up efforts will be futile). VCEs should control the first request for 30 days and send the follow up email no earlier than the 31st day following the initial request. VCEs should remember to simultaneously develop to the claimant and advise him/her what is needed for the claim and to whom they are developing.

The claimant should cooperate fully with VA's efforts to obtain records from non-Federal agencies, providing enough information to identify and locate the claimant's records. Such information should include (but isn't limited to) a contact point in a company or agency holding the records and the approximate time frame covered by the records. If required, the claimant must authorize release of the information to VA.

If, after the second request to a non-Federal entity, information isn't available, the VCE make made a decision on the claim based on the available evidence. This is not a disallowance for failure to furnish.

If an additional source for the information is discovered, the VCE must request the evidence from that source, allow 30 days for a response, and, if needed, make at least one follow-up request. If a follow-up request is sent, the VCE must control the claim for an additional 30 days.

If a claimant subsequently submits evidence within one year of the date of the original request, the VCE must re-adjudicate the claim. If the claimant is found to be eligible, VA will award retroactive benefits based upon the date of the original claim.

**NOTE:** VA cannot pay any fees that might be charged for the release of requested information or records.

Go to Top

## 3.25  WHEN INFORMATION CANNOT BE OBTAINED

**a. Notification.** After development efforts are exhausted for the purposes of obtaining relevant records, a VCE must notify the claimant that VA is unable to obtain the record. VCEs must include the following information during the notification process:

    1. Identify the records VA is unable to obtain

2. Briefly describe the efforts made by VA to obtain such records

3. Explain that the VA will decide the claim based on the evidence of record but that the claimant may always provide records with relevant information to update their eligibility status at a later date

4. Notice that the claimant is ultimately responsible for obtaining the evidence. You should add the paragraph found in Figure 3.01 into the award or denial letter when a decision is rendered based on the evidence of record and edit the highlighted parts for what was requested and to whom VA sent to the request

**b. Denial action.** It is imperative VCEs deny the claim based on evidence of record. The VCE cannot deny the claim because of failure to furnish evidence which is available at another agency. The correct decision is to deny for an appropriate reason. The VCE should ensure the denial letter is suppressed in LTS or BDN and use the appropriate PCGL letter. This letter is clear in the reason for the denial and reiterates who was contacted to assist in gathering the needed information. (Refer to Figure 3.01 for an example)

**NOTE:** If the VCE can decide in the claimant's favor and award part of the request, he should. Do not deny the entire claim.

**EXAMPLE:** Claimant applies for Chapter 30 benefits and indicates on the application he is eligible for a kicker. He has not provided a copy of his kicker contract. After confirming with DOD, the VCE cannot confirm the kicker eligibility. VCE can establish eligibility to Chapter 30 benefits and awards appropriately. Confirmation cannot be received from DOD on the kicker information. The denial is only for the additional kicker amount.

Go to Top

## 3.26 REASONABLE DOUBT RULE

a. The reasonable doubt rule is found at 38 CFR 3.102. Every person involved in the processing of claims must be thoroughly familiar with this regulation.
b. It is understood that if there is a balance of evidence for and against the claim, the VCE should favor the claimant.

After obtaining all relevant evidence, the VCE must evaluate the evidence and determine if the evidence in favor of the position held by the claimant is of equal or greater weight than the evidence to the contrary. If the evidence supports the position of the claimant, the claim is allowed. If the evidence does not support the claimant, the claim is disallowed. If the evidence is approximately balanced, resolve doubt in favor of the claimant.

Go to Top

## 3.27 PRIMARY AND SECONDARY EVIDENCE

**a. Primary Evidence.** In most instances entitlement to VA benefits can be established by any evidence which is of sufficient weight to convince the VCE of the point in issue. However, for purposes of establishing certain events, e.g., marriage, child's relationship, divorce, or death, VA regulations require specific types of evidence.

(1) If there is conflicting information or a protest by an interested party, there may be only one acceptable form of proof of an event. For example, under 38 CFR 3.205(b) the only acceptable documentary proof of dissolution of a marriage (other than by death) is a certified copy or abstract of a final decree of divorce or annulment.

(2) In other instances, e.g., marriage and child's relationship, VA regulations specify primary and secondary forms of evidence. A copy of the public record of marriage, birth or adoption is considered to be primary evidence of marriage or the child's relationship. Normally, primary evidence of the event is required to establish marriage or the relationship of a child. However, under certain circumstances, secondary evidence can suffice to establish marriage or a child's relationship.

**b. Secondary Evidence.** Secondary evidence of an event is any evidence which does not qualify as primary evidence. Consider secondary evidence only after all attempts to obtain primary evidence have been unsuccessful and the claimant has given a satisfactory explanation why primary evidence is not available.

Acceptable reasons for unavailability of primary evidence include evidence the primary record was destroyed and no copy exists or evidence has shown no official documentary evidence of the event was ever prepared. The mere fact the claimant does not remember where the primary evidence is located is not an acceptable reason for resorting to secondary evidence.

NOTE: Any time a marriage or child's relationship has been "deemed valid" for another benefit in VA, it will be accepted as true for all Education benefits. Do not develop for proof of dependency if another station within VA has proven the relationship.

Go to Top

## 3.28  BURDEN OF PROOF AND THE WEIGHING OF EVIDENCE

Education Service has coordinated with Compensation Service to ensure VCEs understand how to develop for information on a claimant's burden of proof and the weighing of evidence. This includes responsibilities of VA and claimants for securing evidence and accepting entries a claimant makes on *VA Form 21-686c* as proof of an event, and evaluating and weighing evidence.

VA must make reasonable efforts to assist a claimant in securing evidence, but the claimant *always* has the initial burden of proof. This means that unless the claimant furnishes evidence on each element needed to establish the point at issue, the VCE must deny his/her claim.

**EXAMPLE:** A claimant alleging the existence of a deemed-valid marriage must meet the requirements in 38 CFR 3.52 to establish the marriage as valid for VA purposes. If the claimant fails to provide evidence showing he/she meets those requirements, the VCE must deny his/her claim. Nevertheless, the VCE may, because of its duty to assist, provide reasonable assistance to secure the evidence.

Except as noted in 38 CFR 3.204(a)(2), VA will accept the entries a claimant or beneficiary makes on *VA Form 22-1990 or any proper form* as sufficient proof of

- marriage
- dissolution of a marriage
- birth of a child
- introduction of a stepchild into a Veteran's family, or
- death of a dependent

***Note:*** Unless there are inconsistencies in a claimant's statement, the policy described in the above paragraph allows VCEs to establish the existence of a familial relationship between a Veteran and another individual *without* reviewing the claims folder. It is appropriate to request further evidence from a claimant if there is substantial reason to challenge his/her entries on VA Form 22-1990. (A substantial reason is something beyond mere suspicion or doubt.)

Once all procurable evidence is of record, the VCE must evaluate the competency, credibility, and persuasiveness of the evidence, and determine if the competent and credible evidence in favor of the claimant's position is of equal or greater weight than the evidence to the contrary.

Use the table below to determine whether or not a point is established.

| If scales weighing the evidence … | Then … |
|---|---|
| tip in favor of the claimant | the point is established. |
| tip against the claimant | the point is ***not*** established. |
| are approximately balanced | resolve reasonable doubt in favor of the claimant. |

### 3.29 PHOTOCOPIES

**a. General.** Copies or abstracts of public documents, e.g., marriage certificates, birth certificates, death certificates, are acceptable as evidence if VA is satisfied the copies are genuine and free from alteration or defect. Otherwise, VA may request a copy of the document certified over the signature and official seal of the person having custody of such record.

**b. Military Service.** Copies of original service documents are acceptable only if issued to the claimant by the service department or by a public custodian of records.

Go to Top

### 3.30 NEW AND RELEVANT EVIDENCE

**a.** A claimant must submit "new and relevant" evidence to reopen a previously disallowed claim.

(1) To qualify as "new", evidence, whether documentary, testimonial or in some other form, must be submitted to VA for the first time.

(2) A photocopy or other duplication of information already contained in a VA claims folder does not constitute new evidence since it was previously considered. In addition, information confirming a point already established should not be considered "new" evidence.

**b.** In order to be considered "relevant", the additional information must bear directly and substantially on the specific matter under consideration.

**c.** A determination by VA that information constitutes "new and relevant evidence" means the new information is sufficiently significant, either by itself or in connection with evidence already of record, that it must be considered in order to decide the merits of the claim fairly. It does not mean the evidence warrants a revision of a prior determination.

**d.** A decision not to reopen a claim because the evidence submitted is not new and relevant is an appealable decision. The claimant must be furnished notice of procedural and appellate rights.

**e.** If a previous decision has been made on a benefit and the factual basis remains unchanged, then the new claim should be treated as a duplicate claim. As such, the VCE should advise the Veteran/claimant that the previous decision (citing the date of the RPO's decision letter) was the final decision on that claim. Supplemental end product credit for benefits previously claimed and decided **will not** be taken. Issuing the same adjudicative decision also resets appellate rights, and not allowed since the prior decision did not change.

**Example:** Veteran was denied Chapter 30 eligibility in 2014 due to reaching his delimiting date. VA received an application on December 1, 2022, from the same Veteran applying for Chapter 30. VCE should advise the claimant of the previous denial decision, included in the letter back in 2014 and not take end product credit.

**NOTE:** The application should not be considered the submission of evidence. Subsequent applications without new and relevent evidence received following denied or claims with exhausted or expired eligibility should not receive a formal decision or denial in response. The appropriate informational letter explaining the claim was previously denied, entitlement exhausted, or beyond delimiting date should be sent without notice of procedural and appellate rights. Since these are not supplemental claims, supplemental claim work credit is not appropriate.

Go to Top

### 3.31 AFFIDAVITS OR CERTIFICATIONS IN SUPPORT OF CLAIM

**a. General.** If affidavits or certifications are required by VA regulations or procedures, the requirement may be satisfied by completing a VA form containing the certification statement. Enclose the appropriate VA form with the request for evidence.

**b. Use of VA Form 21-4138.** If available VA forms are not appropriate, an individual's signed statement on VA Form 21-4138, Statement in Support of Claim, or any other written communication with the appropriate certification, is acceptable.

**Additional information regarding the VCAA can be found on the below link:**

http://www.gpo.gov/fdsys/pkg/PLAW-106publ475/html/PLAW-106publ475.htm

BVA decisions regarding the Veterans Claims Assistance Act (VCAA):

http://www.bva.va.gov/docs/VLR_VOL3/6-GriffinAndJones-VCAA-TenYearsLaterPages284-321.pdf

http://www.gpo.gov/fdsys/pkg/USCODE-2011-title38/html/USCODE-2011-title38-partIV-chap51-subchapI-sec5103A.htm

Go to Top

---

### Figure 3.01 DTA Denial Letter Template

---

**DUTY TO ASSIST PARAGRAPH**

After a review of your claim for education benefits, VA needed additional information to assist your claim. The following information was requested and needed in order to assist your claim:
An attempt by the VA to obtain, additional evidence on your behalf was unsuccessful. VA requested records from Department of Defense (DoD), yourself, as well as [add additional requests] The VA has made all reasonable efforts to obtain the necessary information to substantiate your claim.

To further your claim for VA education benefits, you must send the evidence requested in the above paragraph. In that case, we'll review the evidence and notify you if our original decision has changed.

To further your claim for VA educational benefits, you must send the evidence requested in the above paragraph. In that case, we'll review the evidence and notify you if our original decision has changed.

Go to Top

---

SEE ATTACHMENT BELOW TO VIEW PREVIOUS VERSION OF THIS M22-4 CHAPTER
You can view this article at:
https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000073583/Part-3:-Chapter-3---Processing-Applications-for-Benefits

| Attachments |
| --- |
| Dated 4.21.19_Part 3 Chapter 3_3.08.docx |
| Dated 02.10.20 M22-4 Part 3 Chapter 3.12 Archive.pdf |
| Changed material to relevant on and in 3.30.docx |
| Dated 12.03.21 M22-4 Part 3 Chapter 3.09(b) Archive.docx |
| Dated 12.16.21 M22-4 Part 3 Chapter 3.10 Figure 3.01 (Archive).docx |
| Part 3_Chapter 3_3.10(d)(e) before 01.21.22 update.docx |
| Alternative Elections before the 07-14-23 update.pdf |
| 2024 RUDISILL.Attachment A 1606 and Ch33 NO Ch30.docx |
| 2024 RUDISILL.Attachment B - Ch30 and Ch33 One Period of Service.docx |
| 2024 RUDISILL.Attachment C - Updated Alternative Election Language.docx |
| 2024 RUDISILL.Attachment D Ch30 and Ch33 Multiple Periods of Service.docx |
| 2024 RUDISILL.Attachment E - 1606 Ch30 and Ch33.docx |

## 3.08 INITIAL ACTIONS IN CLAIM PROCESSING

**a. Duty to Assist.** VCEs must extend all reasonable assistance to claimants in meeting the evidentiary requirements necessary to establish their claims under the applicable laws and regulations. VCEs must give claimants every opportunity to establish entitlement to the benefits sought, to include complete procedural and appellate rights. VCEs must use plain language in any communication with Veterans. VCEs should ensure they thoroughly develop for information from *all* sources before making decisions affecting entitlement.

**b. Date-of-Receipt Stamp.** All paper mail should be date stamped on receipt in the Regional Office (RO) mailroom.

(1) Do not affix stamps directly on original documents which are to be returned such as discharge certificates, court records and papers, marriage, birth and death certificates, divorce decrees and similar records. Make a copy of the document, date stamp the copy and prepare the original document for return to the sender.

(2) Do not routinely require the use of a date stamp in the Education Division, but, if an unstamped document is received in Education, the approved designated official should stamp it as soon as possible. This protects the date of claim for the claimant.

(3) The Education Officer or designee, not below the grade of section chief, may require the use of the receipt stamp to document unusual delays in the receipt of documents in the division.

**c. Initial Screening.** Review all applications, claims, correspondence and evidence immediately to determine if the claim is truly an Education related document. If not an Education document, follow local RPO procedures to ensure the document is delivered to the appropriate division or agency.

**d. Signature of Claimant.** With the exception of a child not of legal age applying for Dependent's Education Assistance (DEA) (Chapter 35) benefits, a signature is not required when applying for Education benefits. When using an electronic version of VA Form 22-1990, the submission electronically suffices for the signature. When a paper application is received, a signature will be required but it will not prohibit the determining of eligibility.

**e. Disposition of Claims.** If a formal claim is received, either a Certificate of Eligiblity (COE) must be issued or an award must be authorized. A disallowance is considered an award.

**f. Recording End Products.** VCEs are entitled to an end product only after final action is taken on all pending issues on the claim. M22-3, Manpower Control and Utilization Education Activities, lists the end products for education claims processing.

Go to Top

**M22-4, Part 3,**

## 3.12 VERIFICATION OF SERVICE - SERVICEPERSONS, VETERANS, AND DEPENDENTS

**a. Verification of Service.** To verify service, the VCE must use the proper data sources for the appropriate benefit, match any service information provided by a claimant to DoD/DHS information reported to VA, and resolve discrepancies with an original source document(s) obtained through the Defense Personnel Records Information Retrieval System (DPRIS), the claimant, and when necessary through written verification from the service department.

    **b. Verification of Service and Documentation to Establish Eligibility.**

        **1. Original Determinations.** All information reviewed to verify eligibility including the Veterans Information System (VIS) for all Servicepersons, Veterans and Transfer of Entitlement (TOE) claimants must be captured into the claimant's TIMS folder. Data system screens or other evidence used that do not support eligibility must also be captured to support a denial (i.e. 30D screen indicating 04/Ineligible status for a Chapter 30 claim or a Chapter 33 claim to support not relinquishing Chapter 33). System screens (VIS, VID, 30D, and DoD) and source documents (DD214, Orders, DoD Response) must be placed into the claimant's TIMS folder.

        **NOTE:** Evidence of other Education benefits used must also be considered and captured into the file when found. (**Tip:** A BINQ VID, using the claimant's SSN, not entered in the file number field, but under the social security number field will discover Chapter 35 benefits used by a claimant.)

        **2. Supplemental Actions.** Each supplemental claim under all benefits (except Chapter 35/Fry) requires a review to ensure sufficient supporting service documentation is present in the file, if not, the VCE must add these documents along with any updated system information and ensure current eligibility is correct prior to processing any payments or notifying the claimant regarding eligibility. When VIS shows changes or no changes (no new service information) to eligibility, the VCE must still capture both the Military History and Education pages on every claim, including corrections. Additionally, when VIS or other service information reported from DoD/DHS has changed from the previous determination, the VCE must develop to DoD and the claimant for clarification. All documentation regarding eligibility and development must be captured into the claimant's TIMS folder.

**c. Source Documents and of Data Sources.** In addition to the primary (eligibility and service information) sources of data for each benefit, additional sources should be considered to help determine cumulative evidence. Data Sources that

are not in conflict and match information submitted to VA by a claimant on an application should be considered reliable.

**Generally**, there is little priority for ranking other than source documents over data sources. Whenever data sources are significantly discrepant or source documents are questionable, additional verification is required. Below is a list of additional sources.

- Certified Copy Member 4 of Veteran's DD Form 214 showing character of discharge or suitable alternative (i.e. *Service 2* copy retrieved from DPRIS)
- DD From 215 - Correction to DD Form 214, Certificate of Release or Discharge from Active Duty
- Official Orders
- Statement of Service signed by a Commanding Officer
- DoD Response from a Service Point of Contact
- Veterans Information System (VIS)
- BDN/BIRLS
  - VID Screen
  - LOC Screen
  - BDN 30D
  - BDN DOD
  - Education Master Records

**Generally**, the primary benefit eligibility source of data for each benefit is:

- Chapter 33: DD Form 214 and VIS [when] information not in conflict and matching other sources including the claimant's application for benefits
- Chapter 33 TOE: VIS
- Chapter 30: 30D Screen
- Chapter 1607: VIS
- Chapter 1606: DoD Screen
- Chapter 32: M26/M27 Screens

**NOTE:** There are Character of Service Codes strictly used in BDN.

### BIRLS CHARACTER OF SERVICE CODES

| Character of Service Codes strictly used in BDN | |
|---|---|
| **BIRLS ENTRY** | **DISCHARGE CERTIFICATE (DD214)** |
| HON | Honorable |
| UHC | General (Under Honorable Conditions; Not acceptable for Chapter 30 or 33) |
| OTH | Other Than Honorable |

| Character of Service Codes strictly used in BDN | |
|---|---|
| **BIRLS ENTRY** | **DISCHARGE CERTIFICATE (DD214)** |
| | (May also be shown on DD 214 as Unsuitable or Bad Conduct) |
| **DIS** | Dishonorable Discharge |
| **UNK** | Unknown |
| **HVA** | Honorable for VA purposes (not shown on DD 214); entered only after administrative decision made (Will not entitle Veteran to Chapter 30 or Chapter 33) |
| **DVA** | Dishonorable for VA purposes (not shown on DD 214); entered only after administrative decision made |

The VCE should depend on the primary source documents of service as the authoritative source in the event of conflicting evidence. However, a primary source still may be insufficient evidence to establish eligibility. **Example:** A DD Form 214 for a member of the Reserves or National Guard that does not indicate the active duty authority (i.e. Title and Section) or an interpretable purpose may require further matching to determine if service is creditable under Chapter 33.

**NOTE:** In some situations, Veterans' Benefits Management System (VBMS) may provide additional service information for claimant's who may also have been approved for compensation or pension claims. VCEs can consider researching VBMS as appropriate.

The below changes were completed on 01/12/21:

M22-4, Part 3, 3.30 outlines the definition and process for reviewing "new and material evidence." OAR recommends also including the "new and relevant" evidentiary standard.
In this section you just need to change the phrase "new and material" to "new and relevant"

## 3.09 PROCEDURES TO REVIEW PAPER VA FORM 22-1990

---

**NOTE:** A VA Form 22-1990 received electronically is presumed appropriately signed by virtue of submission. The procedures in this section primarily are to be followed when a paper application is received.

### a. Unsigned Application Procedures:

(1) <u>Unsigned application - claimant is eligible</u>. The VCE should issue a Certification of Eligibility (COE) (use PCGL(Personal Computer Generated Letter) AWD(Award)-1) with appellate rights. In addition to other appropriate actions, the VCE should advise the claimant that VA can't award benefits until his or her signature is received. VCE should flash the claimant's TIMS folder that a signature is necessary before an award can be processed. VCEs should take the end product and finish the token. When additional documents reactivate the token, do the following:

A. If the signature is submitted prior to the receipt of a VA Form 22-1999, delete the Flash. No further action needs to be taken until VA Form 22-1999 is received. PCAN the end product and finish the token.

B. If a VA Form 22-1999 is received prior to receipt of the claimant's signature, but *within* 30 days of the date of the COE, control the claim until the signature is received, then process the claim. If the signature is not received within 30 days from the date of the COE, deny the claim and attach appellate rights. In the denial letter, be sure to include another request for the claimant's signature with the denial. Take the end product and finish the token.

C. If a VA Form 22-1999 is received prior to receipt of the claimant's signature but more than 30 days after the date of the COE, deny the claim and attach appellate rights. In the denial letter, be sure to include another request for the claimant's signature with the denial. Take the end product and finish the token.

D. If more VA Form 22-1999s are received after a claim has been denied (as above) and no signature has been received, no further action should be taken. PCAN the end product and finish the token.

(2) <u>Unsigned application - development is needed to determine eligibility.</u> VCEs must attempt to obtain the information through initial development (from Department of Defense (DoD), the school, Defense Finance and Accounting System (DFAS), etc.). Control the claim for receipt of the requested information or documentation.

A. If the initial development for necessary information required to make the eligibility determination isn't successful, <u>apply Duty to Assist procedures</u>, as appropriate. (Refer to subchapter 6 for additional information).

B. When developing for the information needed to make an eligibility determination, include a request for the claimant's signature in the development letter. VCEs should include in the letter a reminder that until his or her signature is received, VA can't award benefits even if the claimant's eligibility is established. This will prevent further delays when a VA Form 22-1999 is received.

C. If the information required to make the eligibility determination is received, but the signature hasn't been received, proceed as stated above.

(3) <u>Unsigned application – claimant not eligible.</u> If the claimant isn't eligible, disallow the claim in Benefits Delivery Network/Long Term Solutions (BDN/LTS) and issue the appropriate letter. (Letter may be computer generated or PCGL). VA Form 4107 will automatically be included. Take the end product and finish the token.

**b. Type of Benefit.** VCEs must either allow or deny each benefit claimed on an application. In addition, the VCE should consider the possibility of eligibility to benefits not checked if this is to the advantage of the claimant. Claimants may not correctly identify or specify the benefit they are seeking. Remember that LTS/BDN will permit the processing of a denial of one benefit and not alert the VCE to the claimant's potential eligibility to one of the other benefits.

However, if the claimant is only eligible for a benefit found on a different application, the VCE should process the current application as a denial but develop for new application and close claim. VCE cannot process a benefit found on an application that is not currently on file.

**EXAMPLE:** Student submits VA Form 22-5490 and applies for Chapter 35. VCE denies Chapter 35, but notices that student is eligible for Chapter 33 Transfer of Entitlement (TOE). VCE should edit the Chapter 35 denial letter to explain that possible Chapter 33 TOE eligibility exists and they need to reapply, enclosing a VA Form 22-1990E.

In addition, if the claimant's eligibility ends or has ended under the benefit requested, the VCE should review eligibility under other benefits. If eligible for another benefit, a COE should be issued, or award payment. If the claimant is eligible for multiple benefits, the VCE should develop for appropriate choice and finish the claim token. No control for the election in this situation.

**EXAMPLE:** A student submits VA Form 22-1990 for Chapter 33 benefits. Student has already used 36 months under Chapter 33 and relinquished Chapter 1606. He has a few months of entitlement remaining under Chapter 30. VCE would deny the claim for Chapter 33 as entitlement exhausted but send COE with information regarding Chapter 30. If VA Form 22-1999 has been received, payment may be authorized under Chapter 30 in this scenario.

## FIGURE 3.01 ATTACHMENTS FOR ALTERNATIVE ELECTIONS

### Attachment – A "Alternative Election Letter Insert for Veteran"

In accordance with **Section 3327 (h) of Title 38, United States Code**, we have made an alternative election on your behalf to relinquish (enter benefit) effective (enter effective date) to establish eligibility for Post-9/11 GI Bill benefits. We did this because (enter clear explanation of reason). This election made on your behalf will be irrevocable after 30 days from the date of this letter. If you disagree with our actions, send us written notice within 30 days from the date you receive this letter to the address at the top of this letter or, you may notify VA electronically through the GI Bill website by clicking "**Submit a Question**."

### Attachment – B "Alternative Election Letter for TOE Transferor"

Dear (*insert name of transferor*)

This letter is to notify you that in accordance with **Section 3327 (h) of Title 38, United States Code**, we have made an alternative election on your behalf to relinquish (*enter benefit*) effective (*enter effective date*), the date you requested to Transfer Post-9/11 GI Bill benefits to your dependents with your service department. We did this because (enter clear explanation of reason). This election made on your behalf will be irrevocable after 30 days. If you disagree with our actions, send us written notice within 30 days from the date you receive this letter to the address at the top of this letter or, you may notify VA electronically through the GI Bill website by clicking "**Submit a Question**."

**d. Use of Alternative Elections (specifically limited).** On December 16, 2016, President Barack Obama signed H.R.6416, the Jeff Miller and Richard Blumenthal Veterans Health Care and Benefits Improvement Act of 2016, becoming Public Law 114-315. Section 405 of PL 114-315 provides VA the authority to make an alternative election (forfeited benefit and effective date of forfeiture) on behalf of an individual that failed to make an election or submitted an election that was clearly not in their best interest on or after January 1, 2017.

Limited to only the six (6) specific scenarios detailed below, this authority eliminates the need to develop for valid benefit forfeiture or the need to gain prior authorization to alter the effective date of the forfeiture.

As a general rule, VA will not exercise this authority to override a valid election. Applications received for Post-9/11 benefits with a valid election should be processed as requested with very few exceptions.

However, an alternative election will be appropriate in the following limited circumstances:

(1) Veteran fails to relinquish a benefit but is only eligible for one benefit besides Chapter 33

- **ACTION:** The VCE should forfeit the one benefit for which the Veteran is eligible;

(2) Veteran provides an invalid election (relinquishes a benefit for which he or she is not eligible) but is only eligible for one benefit besides Chapter 33

- **ACTION:** The VCE should forfeit the one benefit for which the Veteran is eligible;

(3) Veteran provides a valid election but fails to provide an effective date to relinquish

- **ACTION:** The VCE should choose an effective date, either the date of claim or the date the claimant indicates he or she started school whichever is earliest;

(4) Veteran provides a valid election with a valid effective date. The provided effective date is simply the date the claimant signed the application (basically a default effective date choice). The Veteran is currently in school but not receiving benefits under any VA educational benefit program. The choice of a default effective date prevents VA from paying benefits for the Veteran's current term. Consequently, the Veteran is left without benefit coverage under any program for his or her current term. However, had the

Veteran chosen a retroactive effective date, the Veteran would receive Chapter 33 benefits for the current term

- **ACTION:** The VCE should adjust the effective date to provide benefits for the term the Veteran was enrolled in at the time of the application;

**NOTE:** VCEs should pay for any periods that are recognized on or after January 1, 2017, which were previously denied for this election reason.

(5) Dependent applies for Chapter 33, Transfer of Entitlement (TOE) benefits and the Veterans Information Solution (VIS) indicates benefits transferred, but the transferor has not provided VA with a valid election, however, the transferor is only eligible for one benefit besides Chapter 33

- **ACTION:** The VCE should forfeit the one benefit for which the Veteran is eligible.

VA has determined that these are the only circumstances that constitute an election that is clearly against the interests of the individual or a failure to make an election. VCEs do not have independent discretion to make alternative elections under any other circumstances.

6) Dependent applies for Chapter 33, Transfer of Entitlement (TOE) benefits and the Veterans Information Solution (VIS) indicates benefits transferred, but the transferor has not provided VA with a valid election.  The Veteran no longer retains eligibility, (i.e. left selected reserves, is deceased, program eligibility ended) however, at the time of transfer the Veteran was eligible for more than one benefit besides Chapter 33.

- **ACTION:** The VCE should forfeit one benefit for which the Veteran was eligible.

**NOTE:**  If the Veteran is deceased and eligible for more than one benefit besides Chapter 33 at the time transfer of entitlement was approved, special consideration must be taken if one of the two or more benefits available to relinquish at the time of election was Chapter 30. The VCE will only relinquish Chapter 30 if the Veteran's eligibility included a kicker and available transferred entitlement would not be diminished.

## e. Processing Steps for Alternative Election.

(1) The VCE should review the claim thoroughly for eligibility under the Post-9/11 GI Bill as normal.

- If not eligible, the VCE should disallow the claim.

- If eligible but the election fits into one of the categories above, the VCE should adjust the election appropriately.

(2) If an alternative election is made, the VCE should edit the LTS generated letter or use PCGL to notify of an alternative election.

   (A) The VCE must modify the initial system generated COE or Award letter with a clear explanation of what election changes were made and why VA made an alternative election. **(See Attachment A: "Alternative Election Letter Insert for Veteran")**

   (B) On TOE claims, the VCE should send a locally produced letter to the transferor with a clear explanation of what election changes were made and why VA made an alternative election. Do not edit the dependent's notifications. **(See Attachment B: "Alternative Election Letter for TOE Transferor")**

   (C) The VCE should not develop for a missing election or correct a flawed relinquishment when any of the five conditions identified above are found. Instead, the VCE should make an alternative election on behalf of the individual. The VCE must update the LTS and BDN appropriately.

(3) Requirement to Notify by Electronic Means Whenever Possible. Public Law 114-315, Section 405 directs VA to notify the claimant by electronic means whenever possible. The requirement for electronic responses will be delayed until a practical solution is found in cooperation with the Business Process Development team. In the meantime, the VCE should continue to send paper notifications on all communication with the claimant.

## <u>2024 RUDISILL Attachment A – 1606 and Ch33 NO Ch30</u>

### Your Potential Eligibility Under Multiple Education Benefits

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows beneficiaries more flexibility in the coordination of their VA Education benefit programs.

Generally, an individual education benefit program includes 36 months of benefits. Beneficiaries who are eligible for multiple VA Education benefits are subject to a cap of 48 months of benefits paid under any combination of benefit programs.

### Regarding Your Election

In most cases, an election to give up benefits under another education benefit program is no longer needed to establish eligibility under the Post-9/11 GI Bill. A voluntary election to give up your benefits under the Montgomery GI Bill Selected Reserve may be considered when deciding how to coordinate your benefits. Please review the following information when making this decision.

{USE WHEN AN ELECTION WAS RECEIVED}

Your application included your election to give up your eligibility under the Montgomery GI Bill Selected Reserve, effective {insert date}. Based on your service records, this election was not required to establish your eligibility under the Post-9/11 GI Bill.

{USE WHEN NO ELECTION WAS RECEIVED}

Your application did not include an election to give up your eligibility under the Montgomery GI Bill Selected Reserve to establish your eligibility under the Post-9/11 GI Bill. Based on your service records, no election is required.

### What We Did

{USE WHEN ELECTION WAS ACCEPTED}

We have processed your election, so no Montgomery GI Bill Selected Reserve benefits can be paid after the effective date of your election.

As a result of your election, we can pay your Montgomery GI Bill Selected Reserve kicker under your Post-9/11 GI Bill benefits. **Note:** Your service branch determines your eligibility for a kicker, not VA. If you leave the Selected Reserve or your kicker eligibility ends, it will no longer be payable under any benefit.

Based on your service records, you are not required to give up a benefit to establish your eligibility under the Post-9/11 GI Bill. You may choose to revoke this election to give up your Montgomery GI Bill Selected Reserve benefits. This would allow you to retain eligibility under that benefit.

Revoking your election will affect your Post-9/11 GI Bill benefits as follows:

- You can use no more than 48 months of benefits under any combination of benefit programs.
- Your Montgomery GI Bill Selected Reserve kicker will not be paid with your Post-9/11 GI Bill benefits.  Your kicker can only be paid with your Montgomery GI Bill Selected Reserve benefits.
- If you leave the Selected Reserve, your eligibility for benefits under the Montgomery GI Bill Selected Reserve may end even if you have not used all of your benefits under that program.

**{USE WHEN ELECTION WAS NOT MADE & ELIGIBLE FOR 1606 KICKER}**

We have not made an election to give up benefits under any education program at this time to preserve your potential eligibility under the Montgomery GI Bill Selected Reserve.

Our records indicate that you may be eligible for a Montgomery GI Bill Selected Reserve Kicker.

You may wish to make a voluntary election to give up your Montgomery GI Bill Selected Reserve benefits. This can be done at any time. If you choose to give up that benefit, you can be paid for your Montgomery GI Bill Selected Reserve Kicker under the Post-9/11 GI Bill, beginning on your election date. If you choose to retain your Montgomery GI Bill Selected Reserve benefits, any eligible kickers will only be payable under that benefit.

**Note:** Your service branch determines your eligibility for a kicker, not VA. If you leave the Selected Reserve or your kicker eligibility ends, it will no longer be payable under any benefit.

**{USE WHEN ELECTION WAS NOT MADE & NO KICKER EXISTS}**

We have not made an election to give up benefits under any education program at this time to preserve your potential eligibility under the Montgomery GI Bill Selected Reserve. Your benefits under both programs will be limited to the 48-month cap for combining education benefits.

**Note:** Your service branch determines your eligibility for the Montgomery GI Bill Selected Reserve, not VA. If you leave the Selected Reserve your eligibility for that program will end even if you have remaining benefits.

## What You Can Do

If you wish to change the coordination of your benefits, send us written notice. If you need to make an election to give up your benefits under the Montgomery GI Bill Selected Reserve, please include a statement indicating that you would like to give up that benefit and the effective date of your election.

You may mail your request to the address at the top of this letter or, you may notify VA online through **Ask VA** at https://ask.va.gov.

## 2024 RUDISILL Attachment B – Ch30 and Ch33 One Period of Service

### Your Potential Eligibility Under Multiple Education Benefits

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows some beneficiaries more flexibility in the coordination of their VA Education benefit programs.

The new ruling allows beneficiaries with multiple periods of qualifying active duty service to potentially use individual periods of service to establish benefits under both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill. Our records indicate that you only have one period of qualifying active duty service.

Generally, an individual education benefit program includes 36 months of benefits. Beneficiaries who are eligible for multiple VA Education benefits are subject to a cap of 48 months of benefits paid under any combination of benefit programs. Additionally, if a beneficiary gives up eligibility for the Montgomery GI Bill Active Duty to establish their Post-9/11 GI Bill benefits, their initial Post-9/11 GI Bill benefits will be limited the amount of Montgomery GI Bill Active Duty benefits they had remaining on the effective date of their election.

### Regarding Your Election

In most cases, an election to give up benefits under another education benefit program is no longer needed to establish eligibility under the Post-9/11 GI Bill. A voluntary election to give up your benefits under the Montgomery GI Bill Active Duty may be considered when deciding how to coordinate your benefits. Please review the following information when making this decision.

{USE WHEN AN ELECTION WAS RECEIVED}

Your application included your election to give up your eligibility under the Montgomery GI Bill Active Duty, effective {insert date}.

{USE WHEN NO ELECTION WAS RECEIVED}

Your application did not include an election to give up your eligibility under the Montgomery GI Bill Active Duty to establish your eligibility under the Post-9/11 GI Bill. Based on your service records, no election is required.

### What We Did

{USE WHEN ELECTION WAS REQUIRED AND ACCEPTED}

We have processed your election, so no Montgomery GI Bill Active Duty benefits can be paid after effective date of your election.

As a result of your election, your benefits under the Post-9/11 GI Bill are affected as follows:

- Your Post-9/11 GI Bill benefits were established with {XX} months and {XX} days of original benefits, which is equal the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

**NOTE:** If your Montgomery GI Bill Active Duty benefits are expired or exhausted before establishing your Post-9/11 GI Bill benefits, no election will be needed.

Based on your service and VA Education records, this election was required to establish your eligibility under the Post-9/11 GI Bill. The election cannot be revoked if you would like your Post-9/11 GI Bill benefits to begin now. However, you are able to revoke your application for the Post-9/11 GI Bill until an election is no longer required.

To revoke your application and retain your Montgomery GI Bill Benefits, please send a statement within 30 days. Once you have been paid under the Post-9/11 GI Bill, revoking your application for that benefit may result in overpayments that must be recouped from your Montgomery GI Bill payments.

{USE WHEN ELECTION WAS NOT REQUIRED BUT ACCEPTED – CH30 KICKER EXISTS}

We have processed your election, so no Montgomery GI Bill Active Duty benefits can be paid after effective date of your election.

As a result of your election, your benefits under the Post-9/11 GI Bill are affected as follows:

- Your Post-9/11 GI Bill benefits were established with {XX} months and {XX} days of original benefits, which is equal to the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

Based on your service records, you are not required to give up a benefit to establish your eligibility under the Post-9/11 GI Bill, but we found that you are eligible for a kicker under the Montgomery GI Bill Active Duty.

You may choose to revoke this election to give up your Montgomery GI Bill Active Duty benefits. This would allow you to retain eligibility under that benefit.

Revoking your election will affect your Post-9/11 GI Bill benefits as follows:

- Your Post-9/11 GI Bill benefits will not be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits, but you can use no more than 48 months

of benefits under any combination of benefit programs.

- If you were eligible for a Montgomery GI Bill Active Duty kicker, your Montgomery GI Bill Active Duty kicker will not be paid with your Post-9/11 GI Bill benefits. Your kicker can only be paid with your Montgomery GI Bill Active Duty benefits.
- You will not be eligible for a refund of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

**NOTE:** No service that began on or after August 1, 2011, can be used to establish both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill. If you do not serve an additional period of qualifying active duty service, either through a reenlistment or call-up service in the Selected Reserves, you may be barred from using both benefits.

{USE WHEN ELECTION WAS NOT REQUIRED AND NOT ACCEPTED – NO KICKER EXISTS}

We have not made an election to give up benefits under any education program at this time to preserve your potential eligibility under the Montgomery GI Bill Active Duty.

Our records indicate that you may complete multiple periods of qualifying active duty service in the future, so you may be able to use benefits under multiple VA education programs. **NOTE:** No service that began on or after August 1, 2011, can be used to establish both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill. If you do not serve an additional period of qualifying active duty service, either through a reenlistment or call-up service in the Selected Reserves, you may be barred from using both benefits.

You may wish to give up your Montgomery GI Bill Active Duty benefits. This can be done at any time. If you choose to give up that benefit, your benefits under the Post-9/11 GI Bill are effected as follows:

- Your Post-9/11 GI Bill benefits will be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

If you complete multiple periods of qualifying active duty service and choose to retain both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill:

- Your benefits under both programs will be limited to the 48-month cap for combining education benefits.
- No Montgomery GI Bill Active Duty kicker can be paid under the Post-9/11 GI Bill.
- You will not be eligible for any refunds of your Montgomery GI Bill contributions.

**NOTE:** If you join the Selected Reserve, becoming eligible for a Montgomery GI Bill Selected Reserve kicker may result in additional considerations when deciding how to coordinate benefits between the three programs.

{USE WHEN ELECTION WAS NOT RECEIVED AND KICKER EXISTS}

We have not made an election to give up benefits under any education program at this time to preserve your potential eligibility under the Montgomery GI Bill Active Duty.

Our records indicate that you may complete multiple periods of qualifying active duty service in the future, so you may be able to use benefits under multiple VA education programs. **NOTE:** No service that began on or after August 1, 2011, can be used to establish both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill. If you do not serve an additional period of qualifying active duty service, either through a reenlistment or call-up service in the Selected Reserves, you may be barred from using both benefits.

Additionally, our records indicate that you may be eligible for a kicker under the Montgomery GI Bill Active Duty. You may wish to give up your Montgomery GI Bill Active Duty benefits. This can be done at any time. If you choose to give up that benefit, your benefits under the Post-9/11 GI Bill are effected as follows:

- Your Post-9/11 GI Bill benefits will be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

If you complete multiple periods of qualifying active duty service and choose to retain both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill:

- Your benefits under both programs will be limited to the 48-month cap for combining education benefits.
- No Montgomery GI Bill Active Duty kicker can be paid under the Post-9/11 GI Bill.
- You will not be eligible for any refunds of your Montgomery GI Bill contributions.

## What You Can Do

If you wish to change the coordination of your benefits, send us written notice. If you need to make an election to give up your benefits under the Montgomery GI Bill Active Duty or Selected Reserve, please include a statement indicating that you would like to give up that benefit and the effective date of your election.

You may mail your request to the address at the top of this letter or, you may notify VA online through **Ask VA** at https://ask.va.gov.

# **2024 RUDISILL Attachment C – Updated Alternative Election Language**

## What We Did

Our records indicate that you only have one period of qualifying active duty service, and that period of service began before August 1, 2011. You used this service period to establish your eligibility under the Montgomery GI Bill Active Duty.

This service can be used to establish the Post-9/11 GI Bill, but it requires an election for you to give up your remaining Montgomery GI Bill Active Duty benefits to establish your eligibility.

We have made an **election on your behalf to relinquish** the Montgomery GI Bill Active Duty effective {INSERT EFFECTIVE DATE OF ELECTION}, to establish eligibility for Post-9/11 GI Bill benefits. No Montgomery GI Bill Active Duty benefits can be paid after that date.

As a result of your election, your benefits under the Post-9/11 GI Bill are effected as follows:

- Your Post-9/11 GI Bill benefits were established with {XX} months and {XX} days of original benefits, which is equal the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

**NOTE:** If your Montgomery GI Bill Active Duty benefits are expired or exhausted before establishing your Post-9/11 GI Bill benefits, no election will be needed. In some cases, it is more advantageous revoke your application for the Post-9/11 GI Bill until an election is no longer required.

This election made on your behalf will be irrevocable after 30 days from the date of this letter. If you disagree with our actions, send us written notice within 30 days. You may mail your request to the address at the top of this letter or, you may notify VA online through **Ask VA** at https://ask.va.gov.

We made this election in accordance with Section 3327 (h) of Title 38, United States Code, which allows VA to make elections when an individual fails to make an election or makes an election that would negatively affect their benefits.

## <u>2024 RUDISILL Attachment D – Ch30 and Ch33 Multiple Periods of Service</u>

### Your Potential Eligibility Under Multiple Education Benefits

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows some beneficiaries more flexibility in the coordination of their VA Education benefit programs.

You have multiple periods of qualifying active duty service.

Service beginning before August 1, 2011, can be used to establish benefits under both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill.

Service beginning on or after August 1, 2011, cannot be used to establish both benefits, and if used for one benefit, it will be excluded from consideration when establishing the other benefit. This could bar you from benefits under one program or it could lower benefit level payable under the Post-9/11 GI Bill.

- **Example:** A beneficiary first entered active duty after August 1, 2011, and has two periods of qualifying service:  initial enlistment for 3 years; reenlistment for an additional 2 years.  They were paid under the Montgomery GI Bill Active Duty, based only on their first period of qualifying active duty service (initial enlistment for 3 years). That service cannot be used to establish or increase the benefit level payable under the Post-9/11 GI Bill. However, their additional service (reenlistment for 2 additional years) could be used to establish Post-9/11 GI Bill eligibility at the 80% benefit level.
- **Example:** A beneficiary has two periods of qualifying service, and they applied both periods towards the Post-9/11 GI Bill to qualify at the 100% benefit level.  Neither service period can be used to establish the Montgomery GI Bill Active Duty.

Generally, an individual education benefit program includes 36 months of benefits. Beneficiaries who are eligible for multiple VA Education benefits are subject to a cap of 48 months of benefits paid under any combination of benefit programs. Additionally, if a beneficiary gives up eligibility for the Montgomery GI Bill Active Duty to establish their Post-9/11 GI Bill benefits, their initial Post-9/11 GI Bill benefits will be limited the amount of Montgomery GI Bill Active Duty benefits they had remaining on the effective date of their election.

### Regarding Your Election

In most cases, an election to give up benefits under another education benefit program is no longer needed to establish eligibility under the Post-9/11 GI Bill. A voluntary election to give up your benefits under the Montgomery GI Bill Active Duty may be considered when deciding how to coordinate your benefits. Please review the following information when making this decision.

{USE WHEN AN ELECTION WAS RECEIVED}

Your application included your election to give up your eligibility under the Montgomery GI Bill Active Duty, effective {insert date}. Based on your service records, this election is not required.

{USE WHEN NO ELECTION WAS RECEIVED}

Your application did not include an election to give up your eligibility under the Montgomery GI Bill Active Duty to establish your eligibility under the Post-9/11 GI Bill. Based on your service records, no election is required.

## What We Did

{USE WHEN ELECTION WAS ACCEPTED DUE TO INCREASED BENEFIT LEVEL}

We have processed your voluntary election, so no Montgomery GI Bill Active Duty benefits can be paid after effective date of your election.

As a result of your election, your benefits under the Post-9/11 GI Bill are affected as follows:

- Your Post-9/11 GI Bill benefits were established with {XX} months and {XX} days of original benefits, which is equal the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- Your service beginning before August 1, 2011, was used to establish your Post-9/11 GI Bill benefits. This increased the benefit level payable under that program.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

Based on your service records, you are not required to give up a benefit to establish your eligibility under the Post-9/11 GI Bill. You may choose to revoke this election to give up your Montgomery GI Bill Active Duty benefits. This would allow you to retain eligibility under that benefit.

Revoking your election will affect your Post-9/11 GI Bill benefits as follows:

- Your Post-9/11 GI Bill benefits will not be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits, but you can use no more than 48 months of benefits under any combination of benefit programs.
- The service used to establish your Montgomery GI Bill Active Duty will be excluded from your Post-9/11 GI Bill record, and will decrease the benefit level payable.
- If you were eligible for a Montgomery GI Bill Active Duty kicker, your Montgomery GI Bill Active Duty kicker will not be paid with your Post-9/11 GI Bill benefits. Your kicker can only be paid with your Montgomery GI Bill Active Duty benefits.
- You will not be eligible for a refund of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

{USE WHEN ELECTION WAS ACCEPTED – CH30 KICKER EXISTS}

We have processed your voluntary election, so no Montgomery GI Bill Active Duty benefits can be paid after effective date of your election.

As a result of your election, your benefits under the Post-9/11 GI Bill are affected as follows:

- Your Post-9/11 GI Bill benefits were established with {XX} months and {XX} days of original benefits, which is equal the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

Based on your service records, you are not required to give up a benefit to establish your eligibility under the Post-9/11 GI Bill, but we found that you are eligible for a kicker under the Montgomery GI Bill Active Duty.  You must elect to forfeit Montgomery GI Bill eligibility to receive your Montgomery GI Bill Active Duty kicker payment with your Post-9/11 GI Bill.

You may choose to revoke this election to give up your Montgomery GI Bill Active Duty benefits. This would allow you to retain eligibility under that benefit.

Revoking your election will affect your Post-9/11 GI Bill benefits as follows:

- Your Post-9/11 GI Bill benefits will not be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits, but you can use no more than 48 months of benefits under any combination of benefit programs.
- The service used to establish your Montgomery GI Bill Active Duty will be excluded from your Post-9/11 GI Bill record, and may decrease the benefit level payable.
- If you were eligible for a Montgomery GI Bill Active Duty kicker, your Montgomery GI Bill Active Duty kicker will not be paid with your Post-9/11 GI Bill benefits. Your kicker can only be paid with your Montgomery GI Bill Active Duty benefits.
- You will not be eligible for a refund of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

**NOTE:** No service that began on or after August 1, 2011, can be used to establish both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill. If you do not serve an additional period of qualifying active duty service, either through a reenlistment or call-up service in the Selected Reserves, you may be barred from using both benefits.

{USE WHEN ELECTION WAS NOT ACCEPTED – NO KICKER EXISTS}

We have not made an election to give up benefits under any education program at this time to preserve your potential eligibility under the Montgomery GI Bill Active Duty.

Our records indicate that you have multiple periods of qualifying active duty service, so you

may be able to use benefits under multiple VA education programs. **NOTE:** No service that began on or after August 1, 2011, can be used to establish both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill.

You may wish to voluntarily give up your Montgomery GI Bill Active Duty benefits. This can be done at any time. If you choose to give up that benefit, your benefits under the Post-9/11 GI Bill are affected as follows:

- Your Post-9/11 GI Bill benefits will be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

If you choose to retain both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill:

- Your benefits under both programs will be limited to the 48-month cap for combining education benefits.
- No Montgomery GI Bill Active Duty kicker can be paid under the Post-9/11 GI Bill.
- You will not be eligible for any refunds of your Montgomery GI Bill contributions.

{USE WHEN ELECTION WAS NOT RECEIVED AND KICKER EXISTS OR BENEFIT LEVEL INCREASES WITH ELECTION}

We have not made an election to give up benefits under any education program at this time to preserve your potential eligibility under the Montgomery GI Bill Active Duty.

Our records indicate that you have completed multiple periods of qualifying active duty service, so you may be able to use benefits under multiple VA education programs.

Additionally, our records indicate that you may be eligible for a kicker under the Montgomery GI Bill Active Duty or that your benefit level under the Post-9/11 GI Bill may be increased by making an election. You may wish to voluntarily give up your Montgomery GI Bill Active Duty benefits. This can be done at any time. If you choose to give up that benefit, your benefits under the Post-9/11 GI Bill are affected as follows:

- Your Post-9/11 GI Bill benefits will be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- Any service beginning before August 1, 2011, can be used to establish your Post-9/11 GI Bill benefits. This may increase the benefit level payable under that program.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

If you choose to retain both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill:

- Your benefits under both programs will be limited to the 48-month cap for combining education benefits.
- The service used to establish your Montgomery GI Bill Active Duty will be excluded from your Post-9/11 GI Bill record.
- No Montgomery GI Bill Active Duty kicker can be paid under the Post-9/11 GI Bill.
- You will not be eligible for any refunds of your Montgomery GI Bill contributions.

## What You Can Do

If you wish to change the coordination of your benefits, send us written notice. If you need to make an election to give up your benefits under the Montgomery GI Bill Active Duty or Selected Reserve, please include a statement indicating that you would like to give up that benefit and the effective date of your election.

You may mail your request to the address at the top of this letter or, you may notify VA online through **Ask VA** at https://ask.va.gov.

## 2024 RUDISILL Attachment E – 1606, Ch30 and Ch33

### Your Potential Eligibility Under Multiple Education Benefits

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows beneficiaries more flexibility in the coordination of their VA Education benefit programs.

If you have multiple periods of qualifying active duty service, you may potentially use individual periods of service to establish benefits under both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill. Service beginning before August 1, 2011, can be used to establish benefits under both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill. Service beginning on or after August 1, 2011, cannot be used to establish both benefits. If a period of service is used for one benefit, it will be excluded from consideration when establishing the other benefit. This could bar you from benefits under one program or it could lower benefit level payable under the Post-9/11 GI Bill.

- **Example:** A beneficiary first entered active duty after August 1, 2011, and has two periods of qualifying service:  initial enlistment for 3 years; reenlistment for an additional 2 years.  They were paid under the Montgomery GI Bill Active Duty, based only on their first period of qualifying active duty service (initial enlistment for 3 years). That service cannot be used to establish or increase the benefit level payable under the Post-9/11 GI Bill. However, their additional service (reenlistment for 2 additional years) could be used to establish Post-9/11 GI Bill eligibility at the 80% benefit level.
- **Example:** A beneficiary has two periods of qualifying service, and applied both periods towards the Post-9/11 GI Bill to qualify at the 100% benefit level.  Neither service period can be used to establish the Montgomery GI Bill Active Duty.

Generally, an individual education benefit program includes 36 months of benefits. Beneficiaries who are eligible for multiple VA Education benefits are subject to a cap of 48 months of benefits paid under any combination of benefit programs. Additionally, if a beneficiary gives up eligibility for the Montgomery GI Bill Active Duty to establish their Post-9/11 GI Bill benefits, their initial Post-9/11 GI Bill benefits will be limited the amount of Montgomery GI Bill Active Duty benefits they had remaining on the effective date of their election.

### Regarding Your Election

In most cases, an election to give up benefits under another education benefit program is no longer needed to establish eligibility under the Post-9/11 GI Bill. A voluntary election to give up your benefits under the Montgomery GI Bill Active Duty or Montgomery GI Bill Selected Reserve may be considered when deciding how to coordinate your benefits. Please review the following information when making this decision.

[INSERT WHEN ELECTION WAS RECEIVED] Your application included your election to give up your eligibility under the Montgomery GI Bill {Active Duty/Selected Reserve},

effective {insert date}. Based on your service records, this election was not required to establish your eligibility under the Post-9/11 GI Bill.

[INSERT WHEN NO ELECTION WAS RECEIVED] Your application did not include an election to give up your eligibility under another VA Education Benefit to establish your eligibility under the Post-9/11 GI Bill. Based on your service records, no election is required.

## What We Found

Our records indicate that you are potentially eligible for the Montgomery GI Bill Active Duty, Montgomery GI Bill Selected Reserve, and the Post-9/11 GI Bill. Additionally, we have found the following information about your education benefits:

{USE TO SHOW AMOUNT OF CH30 BENEFITS REMAINING}

- You have {XX} months and {XX} days of benefits remaining under the Montgomery GI Bill Active Duty program.

{USE WHEN 1606 KICKER EXISTS}

- You have a kicker under the Montgomery GI Bill Selected Reserve.

{USE WHEN CH30 KICKER EXISTS}

- You have a kicker under the Montgomery GI Bill Active Duty.

{USE WHEN CH30 PRE-8/1/11 SERVICE WILL INCREASE BENEFIT LEVEL}

- You have service beginning before August 1, 2011, that can be used to establish your Post-9/11 GI Bill benefits by making an election to give up your Montgomery GI Bill Active Duty benefits. This may increase the benefit level payable under that program.

{USE WHEN CH30 REFUND MAY BE PAYABLE IF ELECTION IS MADE}

- You have made contributions into the Montgomery GI Bill Active Duty program that may be refundable if you elect to give up your Montgomery GI Bill Active Duty benefits.

## What We Did

We have not made an election to give up benefits under any education program at this time because you have multiple options for coordinating your benefits.

You may wish to make a voluntary election to give up your Montgomery GI Bill Selected Reserve benefits. This can be done at any time. If you choose to give up that benefit, you may be paid for Montgomery GI Bill Selected Reserve Kicker under the Post-9/11 GI Bill, if eligible. If you choose to retain your Montgomery GI Bill Selected Reserve benefits, any kickers associated with that benefit are only payable under that benefit.

OR

You may wish to give up your Montgomery GI Bill Active Duty benefits. This can be done at any time. If you choose to give up that benefit, your benefits under the Post-9/11 GI Bill are affected as follows:

- Your Post-9/11 GI Bill benefits will be limited to the amount of your remaining Montgomery GI Bill Active Duty benefits on the effective date of your election.
- Any service beginning before August 1, 2011, can be used to establish your Post-9/11 GI Bill benefits. This may increase the benefit level payable under that program.
- If you are eligible for a Montgomery GI Bill Active Duty kicker, it may be paid with your Post-9/11 GI Bill benefits.
- You may be eligible for a refund of some or all of the Montgomery GI Bill contributions you made when your Post-9/11 GI Bill benefits are exhausted.

If you choose to retain both the Montgomery GI Bill Active Duty and the Post-9/11 GI Bill:

- Your Post-9/11 GI Bill benefits will only be limited by the 48-month rule and not your remaining Montgomery GI Bill Active Duty benefits.
- The service used to establish your Montgomery GI Bill Active Duty will be excluded from your Post-9/11 GI Bill record.
- No Montgomery GI Bill Active Duty kicker can be paid under the Post-9/11 GI Bill.
- You will not be eligible for any refunds of your Montgomery GI Bill contributions.

You cannot give up more than one benefit to establish the Post-9/11 GI Bill. Additionally, you are not required to give up any benefits.

## What You Can Do

If you wish to change the coordination of your benefits, send us written notice. If you need to make an election to give up your benefits under either the Montgomery GI Bill Active Duty or Selected Reserve, please include which benefit you would like to give up and the effective date of your election.

You may mail your request to the address at the top of this letter or, you may notify VA online through **Ask VA** at https://ask.va.gov.

Article ID: 554400000073684
**Part 4: Chapter 13 - Miscellaneous Award Issues**

**Part 4: Chapter 13 - Miscellaneous Award Issues**

**Subchapter 1. Letters**

13.01 General

13.02 Dictated Letters

13.03 Generated Letters


**Subchapter 2. Entitlement Issues**

13.04 Charging Entitlement for Prior VA Training

13.05 Charging Entitlement in Overpayment Cases

13.06 Interruption to Conserve Entitlement

13.07 Entitlement Extension Based Upon Carr v. Wilkie Court Case

13.08 Adjudication Division Review for Indebtedness


**Subchapter 3. Verification of Accounts Receivable Before Authorization Award**

13.09 Definition of Indebtedness for Review Purposes

13.10 Referral to Finance Activity for Review and Action


**Subchapter 4. Incarcerated Claimant Actions**

13.11 Paying Education Benefits to Incarcerated Claimants

13.12 Development of Indebtedness for Review Purposes

13.13 Award Procedures for Incarcerated Claimants


**Subchapter 5. Due Process Considerations**

13.14 Due Process (Computer Matching Act)

13.15 Due Process (Notice in Adverse Action Cases)

13.16 Due Process and Predetermination Notice (Dependency Evidence Received From a Third Party)


**Subchapter 6. Miscellaneous Actions**

13.17 Payment Rates for OJT/Apprenticeship Training

13.18 Payment Rates for Reservists on Special Active Duty for Training

13.19 Multiple-Line Awards That Create Dropped Priors

13.20 Requests From SSI

13.21 Concurrent Overpayment and Underpayment of Benefits

13.22 Limited Payability

13.23 $1200.00 Refund Payable Under Chapter 33

13.24 Payments for the Career Intermission Program (CIP)


**Subchapter 7. Attorney Issues**

13.25 General

13.26 Entry of Power of Attorney Codes

13.27 Attorney Requests VA Not Communicate Directly With Claimant

13.28 Coordination for Power of Attorney Information


**Subchapter 8. Payment of Attorney Fees from Past-Due Benefits**

13.29 General

13.30 Attorney Fee Cases With an Existing Account Receivable

13.31 Chapter 30 Procedures

13.32 Chapter 32/Section 903  Procedures

13.33 Chapter 35 Procedures

13.34 Chapter 1606 Procedures

13.35 Section 901 Procedures


**Subchapter 9. Claims Processing During Emergency Situations**

13.36 General

13.37 School Reporting Actions

13.38 Claim Processing Actions

13.39 On the Job & Apprenticeship

13.40 Delimiting Date Extension

13.41 Entitlement Restoration


**Subchapter 10. Rudisill V. McDonough Claims Processing**

13.42 Supplemental Claims Review Per Rudisill V. McDonough Ruling

Figures

13.01 [BDN] Award (GAD Print) for Incarcerated Chapter 35 On-the-Job Training

13.02 Sample Attorney Development Letter

13.03 Notice of Termination due to Unsatisfactory Progress Letter

### SUBCHAPTER I.  LETTERS

Go to Top

## 13.01  GENERAL (See RPO Letter 22-05-03)

**a.  Quality Critical.**  The quality of VA's correspondence to claimants is of critical importance.  This subchapter covers certain issues that apply to all education benefit programs.  The procedures in M21-1, part III, chapter 11 and chapter 1, paragraph 1.02(g), also apply to education correspondence.  Other references dealing with correspondence in M22-4 are:

(1)  Computer-Generated Development Letters.  See Part 2: Chapter 7- Education Letters [paragraph 7.03].

(2)  Disallowance Letters.  See Part 3: Chapter 9 - Certificates of Eligibility and Disallowances, [paragraph 9.05].

(3)  Chapter 30 Letters.  See Part 5: Chapter 7 - Letters, [paragraph 7.06].

(4)  Chapter 32/Section 903 Letters.  See Part 6: Letters, [paragraph 6.04].

(5)  Chapter 35 Letters.  See Part 7: Chapter 6 - Letters, [paragraph 6.04].

(6)  Chapter [1606] Letters.  See Part 8: Chapter 7 - Letters .

(7)  Due-Process Notification Requirements.  See paragraph 13.15.

**b.  Returned Correspondence Requirements**

(1)  Never file without action correspondence for education benefits returned by the postal service as undeliverable.  Associate this mail with the claimant's folder.  Review BDN (Benefits Delivery Network) [records], including other benefits, for a more recent address.  If the claimant has a running education award, contact the school to determine continued school attendance and a current address.  [If the school reports the same address], reverse file the returned correspondence (with the returned envelope annotated by the postal service) in the claimant's folder, and annotate this correspondence that efforts to find a better address were not successful.  For chapters 32, 35, and [1606], set the general file pull indicator (Y).  For

chapter 30, insert an appropriate comment in the message line. Return the correspondence (with the returned envelope annotated by the postal service) to the claimant if a different address is obtained by any method and update the address in the master record if necessary.

(2) [Additional Review. If the review in subparagraph (1) does not show a different address, and the BDN review shows that the claimant is receiving chapter 30 or C&P benefits via EFT, take the following actions:

(i) Locate the form that the claimant used to authorize EFT payments (SF 1199). This form contains the bank's address. If this form is located, send the bank a dictated letter requesting the claimant's mailing address (see M21-1, part IV, chapter 31, addendum B). If the form is not located, continue according to subparagraph (b).

(ii) From the master record, determine the routing or bank number. Obtain the bank's mailing address using "The Financial Organization Master File" ("FOMF"). This file is received from the Federal Reserve Bank and is usually maintained in the Finance activity. Send the bank a dictated letter requesting the claimant's mailing address (see M21-1, part IV, chapter 31, addendum B).

*NOTE: The FOMF address can be the financial organization's headquarters or data processing center. The headquarters or data processing center may not have the claimant's mailing address if the claimant's account is with a branch or secondary location.*

(3) If a better address is not obtained, reverse file the correspondence as shown in subparagraph (1).]

Go to Top

## 13.02  DICTATED LETTERS

[**a.  General.**] Adjudicators will use dictated letters when an application for benefits is incomplete, and the claimant must submit additional information to complete his or her claim. Adjudicators will also use a dictated letter when the BDN generated letter would not communicate *all* information to the claimant and must be suppressed or when BDN generated letters are not available. All dictated letters must provide complete and accurate information. Include, if appropriate, due process requirements in adverse action cases as described in paragraph 13.15, [and part Part 3: Chapter 9 - Certificates of Eligibility and Disallowances , paragraph 9.04 for disallowances. Do not use words and phrases designed to spare a claimant's feelings in dictated letters. The use of some words or phrases may violate due process requirements. Adjudicators must ensure that dictated letters use the "plain language" prescribed by the President's memorandum of June 1, 1998. This memorandum requires that plain language documents have logical organization, easy to read features and use common, everyday words (except for any necessary technical terms), "you" and other pronouns, the active voice and short sentences].

[**b.  Dictated Letter.**] The term "dictated letter" is a generic term and encompasses all letters communicating information to a claimant other than computer generated letters. "Dictated letters" include letters by dictation, VA form letters (either preprinted or locally generated from word processing systems), VA forms, [and PCGL (Personal Computer Generated Letters). Instructions

concerning the PCGL system have been issued in Training Guide 22-98-1.  This training guide also has the text of letters issued by the PCGL system].  When development is necessary, include all matters requiring development in a single letter.

[**c.  Attachments.**]  Include the following items in dictated letters when necessary:

(1) When there is a time limit for submitting requested evidence, inform the claimant that failure to furnish evidence within the statutory limit (specifying the time) may result in denial of the claim or failure to pay additional benefits.

(2)  When the dictated letter replaces a BDN generated award or disallowance letter, attach VA Form 4107, Notice of Procedural and Appellate Rights, to the dictated letter.  [See Part 3: Chapter 9 - Certificates of Eligibility and Disallowances, subchapter II for disallowances, and paragraph 13.15 for due process notice in adverse action cases.]

Go to Top

## 13.03  GENERATED LETTERS

BDN generates letters informing claimants of awards and changes in education benefits for most award and termination transactions.  BDN also generates letters to inform claimants of denial of benefits in certain situations, of special or irregular conditions such as delinquent certifications, and for claims development.  See the cross-references listed in paragraph 13.01.

**a.  Suppression of Generated Letters.** There are instances when the adjudicator should suppress the generated letter and send a dictated letter.

(1)  Suppress the BDN generated letter if it does not completely inform the claimant of all pertinent information including required due process information.  See Part 2: Chapter 6 - BDN Processing - General, paragraph 6.08, for procedures on how to suppress the BDN generated award letter for other than chapter [1606] cases.  See Part 8: Chapter 4 - Award Processing and Other Authorization Issues, paragraph 4.04 for procedures on how to suppress the BDN generated award letter for chapter [1606] cases.

(2)  Suppress the BDN generated letter in the specific instances indicated in the letter chapters of parts V, VI, VII, and VIII.

**b.  Appeal Paragraph.**  Each generated letter, other than notices of delinquent certifications, contains a detailed explanation of how a claimant can appeal that decision.

Go to Top

## SUBCHAPTER II.  ENTITLEMENT ISSUES

This subchapter covers certain entitlement issues which may arise during claims processing.

## 13.04  CHARGING ENTITLEMENT FOR PRIOR VA TRAINING

To properly account for entitlement used under another education benefit, review the data entry instructions in the applicable benefit part.  For example, if a person applying for chapter [1606] benefits has used chapter 35 benefits, review the instructions in  Part 8: Chapter 4 - Award Processing and Other Authorization Issues, for completing the PR VA TRNG field on the [BDN] 350 screen, Chapter 106 Education Award.

This chapter and chapter 14, Tables, do not contain detailed procedures for charging entitlement in all situations.  For additional information for each benefit, see the following:

    **a.  Chapter 30.**   See Part 05, Chapter 30. Chapter 4 - Award Processing and Other Authorization Issues, [paragraph 4.15].

    **b.  Chapter 32 and Section 903.**   See  Part 6: Chapter 4 - Award Processing and Other Authorization Issues, [paragraph 4.19].

    **c.  Chapter 35.**   See Part 7: Chapter 4 - Award Processing and Other Authorization Issues, [paragraph 4.16].

    **d.  Chapter [1606].**   See Part 8: Chapter 4 - Award Processing and Other Authorization Issues part VIII, [paragraph 4.21].

Go to Top

## 13.05  CHARGING ENTITLEMENT IN OVERPAYMENT CASES

    **a.  General.**  (See 38 CFR [21.3045(i), 21.7076 (c), 21.7576(c).)  (For ease of reference, only the chapter 30 regulation is stated in this paragraph even though] the provisions in this paragraph apply to all education benefits described in this manual except for section 901.  Charge entitlement for an overpayment of education assistance in the following cases:  (See  Policy Advisory – Charging Entitlement in Waiver Cases dated 12/17/03).

    (1)  When formal notification is received that the debt is discharged in bankruptcy.

    (2)  When the Committee on Waivers and Compromises waives recovery of the overpayment.

    (3)  When the Committee on Waivers and Compromises (or other activity specified in 38 CFR 1.930) reaches a compromise and the claimant makes the final payment of a portion of the total debt.  The unpaid balance is subject to an entitlement charge.

    **b.  Entitlement Computation**

    (1)  An adjudicator will ensure that entitlement is charged appropriately in the above three instances.

    (2)  For the first two instances, the charge to entitlement will be at the appropriate rate (the monthly rate paid at the time the overpayment was created) for the elapsed period of the overpayment (based on training time and dependency status).

    EXAMPLE:  The Committee on Waivers and Compromises waives the recovery of an overpayment of education assistance allowance to the veteran in full-time training for the period September 10, 1991, to December 9, 1991.  The entitlement charge for the period is 3 months.

(3)  For compromise decisions (the third instance), adjudicators must compare the *amount of the compromise offer* with the *amount* of the interest, administrative costs of collection, court costs, and marshal fees.  The total of the interest, administrative costs of collection, court costs, and marshal fees is represented by the term "interest and other expenses."  (Currently, only chapter 35 beneficiaries are charged with interest and other expenses.)

(4)  If the overpayment is compromised and the *amount* of the *compromise offer* is *equal to or greater than* the *amount* of the interest and other expenses, the charge against entitlement is determined as follows (38 CFR 21.[7076(h)]):

    (i)  Subtract the interest and other fees from the accepted compromise offer.

    (ii)  Subtract the figure from subparagraph (a) above from the original debt amount (not counting interest and other expenses).

    (iii)  Divide the result of subparagraph (b) above by the original debt amount.  Drop all numbers after the fourth decimal place.

    (iv)  Multiply the figure from subparagraph (c) above by the amount of entitlement which represents the whole overpaid period(s).  Round to the second decimal place.

    (v)  When the computation results in a period of time other than a full month, convert the resulting fractional month to days using table 4 in paragraph 14.05.

EXAMPLE #1:  A chapter 35 claimant owes VA $1,212 as the result of having been overpaid in 1991 for 3 months and 0 days (3.00 entitlement) at the rate of $404 per month.  The debt has accrued $120 in interest for a total debt of $1,332.  The Committee on Waivers and Compromises accepts the claimant's compromise offer of $600.  As the amount of the *compromise offer* is equal to or greater than the *amount* of the interest and other expenses, the charge against entitlement is determined as shown in the following steps:

    Step 1.  Subtract the interest from the compromise offer.

        $600 - $120 =$480

    Step 2.  Subtract the result determined by step 1 from the original debt.

        $1,212 - $480 = $732

    Step 3.  Divide the balance determined by step 2 by the original debt.

        $732/1212 = .6039603

    Step 4.  Drop all numbers in the result determined by step 3

        after the fourth decimal place.

        .6039603 becomes .6039

    Step 5.  Multiply the figure determined by step 4 by the entitlement.

        .6039 X 3.00 = 1.811

    Step 6.  Round the figure determined by step 5 to the

        nearest second decimal place.

1.811 rounded gives 1.81

Step 7.  Convert the figure determined by step 6 back to months and days.

1.81 = 1 month and 25 days

Step 8.  Reduce or charge the eligible person's entitlement for

1 month and 25 days  in accordance with subparagraph d below.

(5) If the overpayment is compromised and the *amount* of the *compromise offer* is *less than* the *amount* of the interest and other expenses (or there are no such expenses), the charge against entitlement will be the full amount of the entitlement restored by the action which created the overpayment.

EXAMPLE #2:  The same facts as in example 1 above except the Committee on Waivers and Compromises accepts the claimant's compromise offer of $100.  As the amount of the *compromise offer* is less than the *amount* of the interest and other expenses, the charge against entitlement is the full amount of the entitlement restored.  In this example, this is 3 months.

**c.  Debiting Entitlement in Administrative Error Cases.**  If the adjudicator does not charge the overpayment to the claimant and determines that the overpayment is due to administrative error, *do not* restore the entitlement charge.  Therefore, do not take action to debit the entitlement.  An *exception* is in cases in which the claimant received benefits under two claim numbers.  When this occurs, reduce the entitlement in the retained file number (see subpar. d below).

**d.  Procedures for Debiting Entitlement.** The [BDN] award action which creates an overpayment also restores the entitlement charged *except* in certain chapter 35 correspondence cases.  See Part 7: Chapter 4 - Award Processing and Other Authorization Issues, for specific conditions for chapter 35 correspondence cases.  When notified that recovery of an overpayment has been waived, that the debt is uncollectible, that the debt is discharged in bankruptcy, or that a compromise offer was accepted, the Finance activity will send the notice to the appropriate activity for attachment to the claimant's folder and delivery to Adjudication.  Adjudication will take the following actions to ensure that entitlement is correctly charged in these cases:

(1)  [BDN] Processing

(i)  For chapter 30 cases, no action is necessary to debit entitlement.  Fiscal transactions, entered by the Finance activity to clear the overpayment, automatically charge the entitlement.

(ii)  For chapter 32 cases, no action is necessary to debit entitlement.  Fiscal transactions, entered by the Finance activity to clear the overpayment, automatically charge the entitlement.

(iii)  For chapter 35, use the CORR (Correction) command and go to the M23 (Education Master Record Eligibility and Entitlement Data) screen.  Enter the appropriate [BDN] code in the PRIOR VA TRNG field. (See Part 2: Chapter 9- Code Tables , for the [BDN] codes.)  Then, enter the number of months and days in PRIOR VA TRNG TIME.

*NOTE:  Do not use the Alternate Means of Input system described in* Part 7: Chapter 2 - BDN Processing.  *It cannot process the 02V transaction to field 386, PRIOR VA TRAINING INDICATOR.  [CHAIRS (Chapter 35 Alternate Input Replacement System) will replace this system.]*

(iv)  For chapter [1606] cases, no action is necessary to debit entitlement.  Fiscal transactions, entered by the Finance activity to clear the overpayment, automatically charge entitlement.

(2)  Cases Paid by Out-of-System Processing  (Part 4: Chapter 12 - Out-of-System Award Processing).  If entitlement is not maintained in a [BDN] record, manually compute the entitlement to be charged and advise Finance to update their records.

**e.  Chapter 35 Correspondence Cases.**  Adjudication can use one award action to create an overpayment in a chapter 35 correspondence case; that same action can also be used to subsequently restore entitlement.  See Part 7: Chapter 4 - Award Processing and Other Authorization Issues , for specific conditions.  If an adjudicator must charge entitlement, use the procedures described in subparagraph d.

Go to Top

## 13.06  INTERRUPTION TO CONSERVE ENTITLEMENT

A claimant may not interrupt a certified period of enrollment solely to conserve entitlement (38 CFR 21. [3045(j), [21.7076(d), and 21.7576(d)]).  An educational institution may not certify a period of enrollment for a part of a normal term, quarter, or semester if the claimant attends the entire term, quarter, or semester.

**NOTE**:  Effective for terms beginning on or after January 1, 2024, if an enrollment for the entire term has been reported and processed by VA at full value, the claimant can determine if they would be better served to not use their benefits at all for that term, or to have fewer credits reported.  The SCO will terminate the entire term indicating "withdrew prior to the first day" or report a reduction in credit hours effective prior to the first day of the term.  The claimant and/or training facility will be responsible for any debts created by this termination or reduction.

VA will charge entitlement for the entire period of certified enrollment, if the claimant is otherwise eligible for educational assistance, except when educational assistance is terminated under any of the following conditions:

**a**.  Enrollment is terminated;

**b.**  The claimant cancels his or her enrollment, and does not negotiate an educational assistance check for any part of the certified period of enrollment;

**c.**  The claimant interrupts his or her enrollment at the end of any term, quarter, or semester within the certified period of enrollment, and does not negotiate a check for the succeeding term, quarter, or semester;

**d.** The claimant requests interruption or cancellation for any break when a school was closed during a certified period of enrollment and VA continued payments under an established policy based upon an Executive Order of the President or an emergency situation.  Whether the claimant negotiated a check for educational assistance for the certified period is immaterial.  (For information concerning emergency school closings, see Part 9: Chapter 9 - Miscellaneous , [par. 9.19].)

Go to Top

## 13.07  ENTITLEMENT EXTENSION BASED UPON CARR V. WILKIE COURT CASE

*Section upated February 23, 2023. See attachments for previous version.*

**Beneficiaries Using their Own Entitlement**

On June 11, 2020, the United States Court of Appeals for the Federal Circuit issued a ruling in the Carr v Wilkie case. The ruling stated that Education Service (EDU) had not been processing end-of-term benefits under chapters 30 or 33 in accordance with 38 United States Code (U.S.C.) 3031(f) when a beneficiary's benefits expire by limitations set from the use of two or more separate benefit programs (38 U.S.C. 3695(a)). In accordance with this ruling, VA must apply an appropriate extension when benefits expire due to the "48-month rule" (or 81-month limitation of aggregate entitlement under 38 U.S.C. 3695(c)).

**NOTE**: Chapter 33 benefits include the Fry Scholarship beneficiaries. Edith Nourse Rogers STEM scholarship beneficiaries are also not affected. See the section below titled "Beneficiaries Using Transferred Entitlement" for more information about how this decision applies to Transfer of Entitlement (TOE) benefits.

EDU claims processing systems were previously programmed with the 48-month limitation as a "hard stop" and would not automatically extend end-of-term benefits beyond 48 months.  All awards which released a notification (i.e. decision letter) on or after June 11, 2019, must be reviewed and evaluated to determine if *Carr v. Wilkie* should be applied.  <u>If all notification decisions were processed before June 11, 2019, **DO NOT** review further or extend benefits.</u>

**a. Review Procedures.** (Due to current system programing work around procedures below will remain in effect until systems are reprogrammed.)

1. Once VCEs have determined an extension is appropriate, they must ensure the following rules are enforced which may not be managed by the job aid:

   - Training certified in semester or quarter hours may be extended to the end of the term. **NOTE:** Extensions may not exceed the length of a standard term.
   - Training certified on clock hours may be extended up to 84 days or to the end of the term whichever is first, if the beneficiary has completed a majority of the course (more than 50%) on the date entitlement exhausts.
   - Overlapping terms which begin after the original entitlement has exhausted may not be paid.

2. VCEs must determine the amount of additional entitlement needed to pay the extended period.

   a. Note the amount of entitlement remaining prior to entering the enrollment.

   b. Enter the enrollment into the 48-Month Extension Job Aid, available as an attachment on the Job Aids Page.

c. If the job aid indicates an extension is appropriate, delete enrollments from the system which exhausted entitlement before proceeding to steps 3a or 3b.

**b. Processing Procedures.**

The Chapter 33 Processing System (formerly knows as the Long Term Solution (LTS), now known as DGI) has been updated to automatically pay the extension when the 48-month rule is reached.

**1. Chapter 33 claims VCEs will do the following:**

a. Review the claim to see if manual processing of the 48-month rule was previously processed as follows:

1. Add a manual "Add Entitlement" award in the Long Term Solution (LTS) for the number of months and days necessary to pay the extension with no entitlement remaining (as determined in the job aid).

2. Review the Work Product Summary (WPS) page to ensure the LTS is paying the desired extension.

3. Remediate the manual award length if necessary due to system rounding. (LTS will sometimes require an extra day be added due to a fractional day of entitlement used.)

4. Capture the job aid into TIMS.

5. Route for authorization.

6. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the notification sent indicates no remaining entitlement.

7. Print and capture the LTS letter, as appropriate.

8. Ensure all end products have been cleared and close the TIMS folder after authorization.

b. If manual processing was not previously done, review the term being entered to ensure that the extension is being correctly applied when the 48-month rule is reached.

c. If manual processing was previously done, the user should:

1. Enter a manual award to charge entitlement in the same amount that was added manually in the previous work product.

2. Review the term that was manually extended to see if it is being automatically extended in the current work product.

i. There should be no net awards.

ii. If there are net awards, review the claim for potential overpayment and possible administrative error due to the manual extension and later system update.

3. Route for authorization.

4. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the notification sent indicates no remaining entitlement.

5. Manually upload or print and capture the letter, as appropriate.

6. Ensure all end products have been cleared and close the TIMS folder after authorization.

**2. Chapter 30 claims VCEs will follow the job aid output instructions to either CUM RESTORE an amount of entitlement or use 'X' type hours:**

    a. If the job aid indicates a **CUM RESTORE** amount do the following:

        1. CORR the M23 the amount of months and days displayed on the job aid.

        2. Enter the enrollment dates with end reason '61' after the no-pay date.

        3. The end reason 65 should system generate when dates have been entered correctly after 'GAD.'

        4. Adjust amount of the CUM RESTORE and repeat steps if necessary, typically due to system rounding.

        5. Capture the job aid into TIMS.

        6. Do not suppress the BDN letter.

        7. Route for authorization.

        8. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the system generated end reason '65' terminates the last award line.

        9. Capture the authorization screens close the TIMS folder after authorization.

    b. If the job aid indicates using **'X' type hours** do the following:

        1. Enter the begin date of the term, reentrance code '60' and the no-pay date, end reason code '61' with "X" type hours as indicated on the job aid.

        2. Enter the same date as the no-pay date above as the begin date, reentrance code '60' and the no-pay date for the end of the term, end reason code '61' .

        3. The end reason 65 should system generate when dates have been entered correctly after 'GAD.'

        4. Adjust dates if necessary, typically due to system rounding.

        5. Capture the job aid into TIMS.

        6. Suppress the BDN letter and prepare a PCGL letter (AWD-17), adding this paragraph:

            *Your education benefit payments were extended to the end of your current term or up to 12 weeks as allowed by law. (38 U.S.C. 3031(f)) As of (insert last date paid) you have exhausted all of your education benefit entitlement. (38 U.S.C. 3695)*

7. Route for authorization.

8. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the system generated end reason '65' terminates the last award line.

9. After authorization the PCGL letter should be printed and captured.

10. Capture the authorization screens close the TIMS folder after authorization.

## Beneficiaries Using Transferred Benefits

On February 19, 2021, the United States Court of Appeals for the Federal Circuit issued an additional ruling in the Carr v Wilkie case. The new ruling expanded the right to end-of-term benefits to beneficiaries using transferred benefits because they are entitled to the same benefits that the transferor would have received. VA must now apply an appropriate extension to a beneficiary using transferred benefits when the full amount of the transferor's original benefits are exhausted or when the 48-month or 81-month rule is reached for the transferor's benefits. The effective date of this ruling is February 19, 2021, so it applies to beneficiaries who exhaust benefits on or after that date.

**Note:** When a TOE dependent is granted an extension it counts towards the transferor's used entitlement when calculating their 48/81-month rule because the dependent is using benefits exactly as if the transferor was using them.

EDU claims processing systems were previously programmed with TOE entitlement exhaustion as a "hard stop" and would not automatically extend end-of-term benefits for any dependent.  With the March 6, 2023, system update, DGI is being programmed to allow the extension when the transferor's entitlement is exhausted regardless of who is using the entitlement when it exhausts. To track this, a new banner has been added that tracks family usage of TOE benefits.

Beneficiaries who exhausted their TOE benefits between February 19, 2021, and when the system was updated on March 6, 2023, may need to be reworked. If a VCE finds a claim for a beneficiary who exhausted TOE benefits during that time, they should review their claim for a potential end-of-term extension under their TOE benefits.

If it is found that the beneficiary is the last person in the family to exhaust the full amount of original benefits, and they exhausted their benefits after February 19, 2021, they are due an extension. The VCE should do the following:

a. Ensure that the beneficiary was not paid under any other Education Benefit during the end-of-term extension.

b. If they were paid under another benefit, such as chapter 35, the VCE should:

1. Create an overpayment under the non-TOE benefit for the period being extended under chapter 33 (the letter should be suppressed).

2. Have the debt moved to the beneficiary's chapter 33 record and ensure that it is set for immediate recoupment.

3. Ensure that payments due after the TOE entitlement extension continue for the non-TOE benefit.

4. The system generated letter should be modified by replacing the standard introduction paragraph with the following:

> *You are being granted an extension of benefits under the Post-9/11 GI Bill – Transfer of Entitlement program to the end of your current term or up to 12 weeks, as allowed by law. (38 U.S.C. 3031(f)) Previously your benefits under this program were stopped on the date that they were exhausted, [INSERT EXHAUSTION DATE], and no extension was granted. This letter explains what we did and what payments we are issuing.*

> *You were paid under [INSERT BENEFIT] from [INSERT START DATE] to [INSERT END DATE]. Training can only be paid under one education benefit program. We have created an overpayment under [INSERT BENEFIT], and this debt was moved to your Post-9/11 GI Bill – Transfer of Entitlement record. The payments listed below will used to recoup this debt, and you will receive the remaining amount.*

5. Open a work product for the beneficiary in DGI and ensure that the extension is being applied correctly.

6. Route for authorization.

7. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the notification sent indicates no remaining entitlement.

8. Manually upload or print and capture the letter, as appropriate.

9. Ensure all end products have been cleared and close the TIMS folder after authorization.

c. If the beneficiary was paid under another chapter 33 source, such as another TOE transferor, the VCE should:

1. VCE should route claim for appropriate DUAL TOE processing.

2. Entitlement source must be changed back to the source making the beneficiary eligible for the extension. VCE should follow current guidance on switching sources and should prevent debts from being established.

3. After the extension has been granted, the source must be changed back to the one being used by the beneficiary after benefits under the previous one were exhausted. This should require the beginning date of the second source to change to the date after the end-of-term extension. VCE should follow current guidance on switching sources and should prevent debts from being established.

4. Ensure that payments due after the TOE entitlement extension continue for the next entitlement source.

5. VCEs should suppress all system letters as appropriate and should ensure that the final Award 3 letter includes an accurate explanation of the extension and later effective date of the additional entitlement source.

6. Route for authorization when appropriate during the process.

7. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the notification sent indicates no remaining entitlement.

8. Manually upload or print and capture the letter, as appropriate.

9. Ensure all end products have been cleared and close the TIMS folder after authorization.

d. If the beneficiary was not paid under another benefit or source, the VCE should:

1. Open a work product for the beneficiary in DGI and ensure that the extension is being applied correctly.

2. Route for authorization.

3. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the notification sent indicates no remaining entitlement.

4. Allow the system generate award letter to be sent, as appropriate.

5. Ensure all end products have been cleared and close the TIMS folder after authorization.

Go to Top

## SUBCHAPTER III.  VERIFICATION OF ACCOUNTS RECEIVABLE BEFORE AWARD AUTHORIZATION

### 13.08  ADJUDICATION DIVISION REVIEW FOR INDEBTEDNESS

**a.  General.**  When Adjudication is preparing an original or reentrance award and is aware that an accounts receivable exists in a different payment system, notify the Finance activity for necessary debt collection action.

**b.  Required Review.**  When there is an indication that a record exists in a different system, check that record for the existence of an accounts receivable.  Such an indication may be the display of an SO2 Selection screen, a system message (see subpar. c(2) below), a writeout, or other evidence in the folder.  *Apply this procedure only when it is obvious that the additional record exists.  Do not routinely search for records in the different databases to look for accounts receivable.*

***c.  System Variation***

(1)  The chapters 30, 32/903, and [1606] systems do *not* check for the existence of accounts receivable in other systems.

(2)  The chapter 35 system will automatically check for the existence of a C&P record but not for other education records.  If [BDN] finds a C&P record, "C&P RECORD EXISTS - REVIEW FOR A/R" will show on the [BDN] award screen after GAD (Generate and Display) is entered.  This

message also shows on VA Form 22-8945, Education Award, after GAP (Generate and Print).  If the C&P record contains an accounts receivable, a second person must authorize the award.

[*NOTE:  Disregard the message "A/R EXISTS - DIARY FOR REPAYMENT".  BDN system changes have not been installed to prevent BDN from generating these messages.*]

Go to Top

## 13.09  DEFINITION OF INDEBTEDNESS FOR REVIEW PURPOSES

In determining whether a debt exists, only consider accounts receivable with the following deduction type codes: 10, 21, 22, 25, 26, 29-32, 41, 42, 44, 45, 47, 51-59, 60-65, 68 and 68C.  These codes include the pertinent codes for debts arising from C&P or education overpayments as well as codes for other government indebtedness transferred to VA records.

Go to Top

## 13.10  REFERRAL TO FINANCE ACTIVITY FOR REVIEW AND ACTION

**a.**  For cases requiring referral to Finance, the adjudicator will annotate the award document (e.g., VA Form 22-1997, Education Award, or VA Form 22-8945) to show "Debt Involved."  (Optionally, use a stamp.)  In addition, the adjudicator will prepare an OF (Optional Form) 41 with the "Action" block checked.  The subject will be "Review for Debt Collection," and the claimant's file number and payee number will be included.

**b.**  The authorizer will review VA Form 22-1997 or 22-8945.  If the award is correct, the authorizer will sign the OF 41 and forward the award for Finance activity review before final authorization action.

**c.**  The Finance activity will submit any necessary fiscal action and will control the case until the fiscal action has processed.  Finance will then return the case to the Adjudication Division for authorization of the award.

### SUBCHAPTER IV.  INCARCERATED CLAIMANT ACTIONS

Go to Top

## 13.11  PAYING EDUCATION BENEFITS TO INCARCERATED CLAIMANTS

This subchapter deals with the provisions of the law restricting the payment of education benefits to beneficiaries incarcerated for a *felony* conviction.  Beneficiaries *incarcerated for other than a felony* can receive full monthly benefits, if otherwise entitled.  Convicted felons residing in halfway houses or participating in work-release programs also can receive full monthly benefits.  All benefits, *except section 901*, are reduced when a claimant is incarcerated for a felony conviction.

**a. Provisions of Law.**  VA must consider each of the following principles:

(1)  VA can authorize *only* the costs of tuition, fees, and necessary books, equipment, and supplies to a claimant incarcerated for a *felony conviction*.

(2)  VA cannot make payments for tuition, fees, books, equipment, or supplies if another federal, state, or local program pays these costs in full.

(3)  If another government program pays only a part of the cost of tuition, fees, books, equipment, or supplies, VA can authorize the incarcerated claimant payment for the remaining part of the costs.

(4)  For chapter 30, category II veterans (see  Part 5 Chapter 1 - General, for definition), the monthly rate may not exceed the rate prescribed by law for a non-incarcerated veteran with *no* dependents.  For all other incarcerated claimants, the monthly rate may not exceed the rate prescribed by law for a person who is not incarcerated.  See subparagraph b to determine allowable costs.

(5)  Chapter 30 and chapter 35 claimants *pursuing training at less than half time* and chapter 30 servicepersons training at any rate may not receive reimbursement for books, equipment and supplies while incarcerated.  These persons may only receive reimbursement for tuition and fees.  (This restriction exists so that no one could receive more benefits while incarcerated than while not incarcerated.)

**b.  Allowable Costs.**  All claimed expenses must be certified by the school or training institution.

(1)  Charges certified for tuition, fees, books, equipment, or supplies cannot exceed the rates charged to similarly circumstanced non veterans.

(2)  Charges for tuition, fees, books, equipment, or supplies which are certified must be required for all students in the course, including non veterans.  If only incarcerated claimants who are in a particular program are required to pay these costs because of their entitlement to VA education benefits, then these costs are not reimbursable to a claimant convicted of a felony.

(3)  The same books, equipment, or supplies which have been paid for one enrollment period cannot again be paid for any subsequent period.  The only exceptions to this rule are consumable supplies such as pens, pencils, notebooks, and paper.

**c.  Identifying Incarcerated Claimants.**  Prison officials will use VA Form 21-4193, Notice to [Department of Veterans Affairs] of Veteran or Beneficiary Incarcerated in Penal Institution, to notify stations of incarcerated education claimants in prison for a felony conviction.  After receiving this completed form from prison officials for claimants on active duty or eligible for chapter [1606], verify continued eligibility with the service department contact point.  [Education Service periodically issues information concerning the names, addresses and telephone numbers of the service department contact points.]

Go to Top

## 13.12  DEVELOPMENT PROCEDURES FOR INCARCERATED CLAIMANTS

**a.  Development.**  When Adjudication receives notice that a claimant with a running award or pending claim is incarcerated for a felony conviction, request the following information, if not already of record:

(1)  The date the incarceration began,

(2)  Whether the claimant is incarcerated for a felony conviction, and

(3)  Whether the tuition and fees for the program are being paid by a federal, state, or local government program.

**b.  Certification from Schools**

(1)  Schools should show the incarceration of a claimant in the "Remarks" section of VA Form 22-1999, Enrollment Certification, or VA Form 22-1999b, Notice of Change in Student Status.

(2)  Schools should show the charges for books, equipment, and supplies in the "Remarks" section.

(i)  Schools should list books, equipment, and supplies individually showing the cost of each item.

(ii)  Schools do not have to list individually consumable supplies such as pens, pencils, notebooks, and paper which total under $10.

(3)  Schools should show the charges for tuition and fees in the designated area of the certification form.

(4)  The school should state whether the federal, state, or local government is paying all or part of the cost for tuition, fees, books, equipment, or supplies and the amounts paid.

[*NOTE:  RPOs can use a PCGL letter for this development to the school.*]

**c.  Receipt of Requested Evidence**.  After receipt of the requested information, adjust the claimant's award as explained in paragraph 13.13.

Go to Top

## 13.13  AWARD PROCEDURES FOR INCARCERATED CLAIMANTS

**a.  All Awards.**  All awards for incarcerated claimants require the following actions:

(1)  Annotate all copies of the award with "INCARCERATED CLAIMANT" to clearly show the incarceration of the claimant for a felony conviction.

(2)  Set the file pull indicator in the master record for chapters 32/903, 35, and [1606].  For chapter 30, enter "INCAR" in the message field.

NOTE:  The procedures which follow assume that [BDN] is used for normal (non-incarcerated) processing.  If out-of-system processing is used for normal processing, then continue out-of-system processing if the claimant becomes incarcerated.

**b.  Rate Based on Tuition and Fees.**  For cases in which the rate for non-incarcerated persons would be based on the amount of tuition and fees, use the same [BDN] award processing that would be used for non-incarcerated cases.  Enter the tuition and fees in CHARGES in the normal manner and [BDN] will generate the correct rate.  Cases where the rate is based on tuition and fees include the following:

(1)  Chapter 30 servicepersons and

(2)  Chapter 30 veterans and chapter 35 eligible persons training at less than 1/2 time.

**c.  Cases Where Rate Not Based on Tuition and Fees**.  Special procedures are required to pay incarcerated claimants who would receive statutory rates (i.e., rates defined by statute as opposed to rates based on tuition and fees) if they were not incarcerated.

(1)  For chapter 30, compute the monthly rate manually and enter "J"  in the OR (override) indicator on the award screen to override the [BDN] generated rate.

(2)  For chapter 32/903, prepare out-of-system awards per Part 4: Chapter 12 - Out-of-System Award Processing .  (This procedure applies to all chapter 32 incarcerated cases.)

(3)  For chapter 35 cases not requiring monthly verification of enrollment, enter awards on the 412 General Education Award screen using the "I" override indicator.  Enter the total amount payable for the enrollment period in CHARGES.  The system will accept the award as an independent study award and will generate the correct monthly rate.  For chapter 35 cases requiring monthly certification of training or verification of enrollment, apply the following:

(i)  Prepare the award normally except for entering the reduced monthly rate.

(ii)  Enter "D" in the OR (override) field.  This override will generate an erroneous legend, BALANCED BUDGET ACT ADJUSTMENT -FY 86, in the Remarks block on VA Form 22-8945.  Line through the legend and write "Incarcerated Claimant" in the block.  This indicator will not affect the generated award letter.

(iii)  For OJT (On-the-Job Training)/apprenticeship awards, show each scheduled 6-month-step line, even if the monthly rate remains the same.  (See fig. 13.01.)

(4)  For chapter [1606], prepare an out-of-system award.  (See Part 4: Chapter 12 - Out-of-System Award Processing.  This procedure applies to all chapter [1606] incarcerated cases.)

**d.  Awards That Pay for Books, Equipment, and Supplies**

(1)  Add the costs of allowable books, equipment, and supplies to the tuition and fee costs (if any).  Enter this total amount as "Total Charges" on the award.

(2)  In all cases, enter the training time based on the rate of pursuit (i.e., based on the number of credit or clock hours).  Always charge OJT/apprenticeship cases with full-time training.

**e.  Awards for Which Partial Tuition and Fees are Paid**.  When another federal, state, or local government program partially pays a claimant's tuition and fees, process awards as follows:

\(1)  Calculate the total cost of the course.  Include tuition, fees, books, equipment, and supplies.

*NOTE:  Do not include the costs of books, equipment, and supplies if the claimant is in service under chapter 30 or is under chapter 30 or 35 and is training less than half time.*

(2)  Subtract the amount paid by the other government program from the total cost of the course.

(3)  Calculate the institutional amount payable for the entire award period based on the claimant's training time.  For chapter 30 category II claimants, this is the rate without any dependents.  Multiply the number of months of attendance by the monthly rate.

(4)  Enter the lesser of the institutional amount from subparagraph 3 above or the result of subparagraph 2 above as the "Total Charges" on the award.

**f.  Awards Paying Minimal Benefits**.  Prior to entry of the education award, advise the incarcerated claimant entitled to only minimal education payments that entitlement charges are based on the rate of pursuit of the program and are not based on the amount of benefits paid.  Also, advise the claimant that it might be advantageous for him or her to conserve entitlement for later use by electing not to receive benefits at this time.  Include his or her delimiting date.

*NOTE:  Adjudicators should notify claimants when the rate payable is substantially less than the non-incarcerated rate payable for any given training time.*

412              GENERAL EDUCATION AWARD              05-22-92

FILE NUMBER 801 80 1801-10   END PRODUCT 250-CH35     NAME M C HAMME

REMAIN ENT 21.00       DELIM DATE 12-25-99       PAY STATUS

FACILITY 1-0-0001-13   OBJECTIVE 313   COURSE 313   TYPE TRNG G

CLEAR CONTROL              NO LUMP PAY             PRGM CHG

APP/OJT: STEP   MONTHS   DAYS       AWD LINE DISPLAY: ADD   DELETE

DEVELOP MITIGATING CIRCUMSTANCES?       POTENTIAL SCHOOL LIABILITY?

| EFFECTIVE |  | NO PAY |  | RATE | DEP | TNG | HRS | DY | ENT | TYP | CHARGES | S | O | WITH |
| DATE | RSN | DATE | RSN |  |  | TO TH | TME | T | NO | WK | CHG TNG |  | | T R HOLD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02-01-92 | 00 |  |  | 62.75 | 00/00 | 4 | C 40 | 5 | 4 |  | G |  |  | J |
| 08-01-92 | 77 |  |  | 62.75 | 00/00 | 4 | C 40 | 5 | 4 |  | G |  |  | J |
| 02-01-93 | 77 |  |  | 62.75 | 00/00 | 4 | C 40 | 5 | 4 |  | G |  |  | J |
| 08-01-93 | 77 | 02-01-94 | 67 | 62.75 | 00/00 | 4 | C 40 | 4 | 4 |  | G |  |  | J |

<u>NEXT SCREEN</u>

**Figure 13.01 [BDN] Award (GAD Print) for Incarcerated Chapter 35 On-the-Job Training**

Go to Top

**SUBCHAPTER V.  DUE PROCESS CONSIDERATIONS**

**13.14  DUE PROCESS (COMPUTER MATCHING ACT)**

**a.  Provisions.**  Public Law 100-203, The Computer Matching and Privacy Protection Act of 1988, provides that VA may not take adverse action to a benefit recipient based on information received by an agency from an automated system of another agency until both of the following take place:

(1)  VA notifies the recipient of the pending adverse action, and

(2)  The information received from the automated system is verified independently.

**b.  Applicability.**  This Act applies to chapter 30, chapter 32/903, and chapter [1606] educational assistance programs effective July 1, 1990, because VA can take adverse actions as a result of automated data received from Department of Defense.

**c.  Records Affected.**  This Act applies only to those records that are in an active payment status (master record status "A").  The provisions apply when VA receives an automated notice from DOD (Department of Defense) that would result in suspension, reduction, or termination of benefits. Automated notices include DMDC (Defense Manpower Data Center) changes to chapter 30 and chapter [1606] eligibility records.  These notices also include military finance center changes to chapter 32 bank records.

(1)  The Chapter 106 DOD Data Record screen, abbreviated "DOD", shows chapter [1606] eligibility data from DOD (the consolidated DMDC data base).  (See PART 02, COMPUTER PROCESSING. Chapter 05 - MASTER RECORD INQUIRY (CHAPTER [1606]).)  The Act applies to chapter [1606] records that change from "Eligible" to either "Ineligible" or "Eligibility Terminated."  See Part 8: Chapter 5 - Notice of Exception Processing , for a complete description of those changes.

(2)  The procedures apply to chapter 30 records if a RPO receives the following NOE (Notice of Exception) messages on a running award:

(i)  Message 6003 (status change from eligible to ineligible),

(ii)  Message 6050 (change to an RAD (Released from Active Duty) date more than 5 days greater than existing date),

(iii)  Message 6060 (added RSR (Released from Selected Reserve) date), or

(iv)  Message 6062 (change in education level to less than 12).

(3)  The procedures apply to chapter 32 records with NOE message 2951 - AWARD SUSPENDED FOR CONTRIBUTIONS ADJUSTMENT.  (Hines BDC (Benefits Delivery Center) generates only about 50 of these messages each year to running awards.)

**d.  Hines BDC Actions.**  Before the Computer Matching Act, Hines BDC suspended the benefit master record and issued the appropriate NOE message when processing one of the above changes.  Since the Computer Matching Act, Hines BDC automatically generates a pre-reduction notification letter to the claimant.  This letter affords claimants 10 days to disagree with the DOD information.  Hines BDC also sets a 10-day control for the pre-reduction notification period, leaves the master record running for the 10 days, and sets an indicator.  In the chapter 30 and 32

[BDN] systems, the M23 screens show a date in the DUE PROCESS SUSP DATE field. In the interim chapter [1606] system, a message shows on the 350 screen when an award is attempted. These messages show the date that the record will be suspended. Following the expiration of the 10-day control, Hines BDC will suspend the master record and generate the NOE message to the [RPO]. See subparagraph g below for information concerning letters in each benefit program.

**e. General Verification Principle.** If the claimant does not reply to the due process letter within the 10-day period, the change as reported by DOD is considered as verified. Likewise, if DOD does not respond within the 30 days specified in subparagraph f after being notified that the claimant disagrees with the change, the change is considered as being verified.

**f. Adjudication Procedures Upon Receipt of NOE Message**

(1) Upon receipt of one of the above NOE messages, reduce, or terminate benefits as appropriate. Additional controls are necessary *only* if the claimant disagrees within the 10-day period.

(2) If, *within the initial 10-day period*, the claimant disagrees with the prereduction DOD information, contact the appropriate military branch or component contact point. Verify the DOD information by telephone, letter, or facsimile. Accept the disagreement by telephone from the claimant. Properly document the claimant's disagreement with the prereduction information furnished by DOD on a VAF 119, Report of Contact. *DO NOT* reduce or terminate benefits until after resolution of the disagreement. See subparagraph h for continuing benefits. Do not consider this disagreement as a Notice of Disagreement (NOD). Extend the control on the pending end product code for an additional 30-day period.

(3) If DOD, by the end of the extended control period, does not change the DOD, 30D (Chapter 30 DOD Data Record), or chapter 32 bank record or otherwise notify VA that the original information was incorrect, reduce or terminate benefits. Notify the claimant that DOD did not reverse the original notification. If DOD submits evidence showing that the original notice was incorrect, advise the claimant and continue payment. Accept written notification from DOD if it shows that DOD is taking action to correct the appropriate automated record.

(4) If, *after the initial 10-day period*, the claimant disagrees with the DOD information, undertake DOD clarification development. However, do not defer reduction or termination of benefits.

**g. Letters.** See the following for the text of the prereduction notification letters that Hines BDC generates when VA receives potentially adverse DOD information:

(1) Chapter 30 System. See Part 5: Chapter 7 - Letters.

(2) Chapter 32 System. See Part VI Chapter 6  Letters.

(3) Chapter [1606] System. See  Part 8: Chapter 7 - Letters.

**h. Action During First 10 days.** If the claimant submits evidence showing continued entitlement within the first 10-day suspense period, take the following action:

(1) Chapters 30 and 32. Use the CORR command to zero out the DUE PROCESS field on the M23 screen. This eliminates the date and will prevent the record from going into suspense.

(2) Chapter [1606].  First, enter the chapter [1606] interim system using the CADJ (Claims Adjudication) command; then enter "COR" in the NEXT SCREEN FIELD on the 350 screen and press the ENTER key.  This clears the control.  An award cannot be done without this "COR" being entered first.  (This information is also shown on the screen message field.)  Next, process an award.  If the claimant has not made a change in enrollment, repeat the previous award lines for this necessary award and suppress the letter.  Award action is required to prevent the record being suspended.

Go to Top

## 13.15  DUE PROCESS — NOTICE IN ADVERSE ACTION CASES

**a.  Due Process Requirements.**  Section 115 of Public Law 101-237, the "Veterans' Benefits Amendments of 1989," added section 5104, Decisions and Notices of Decisions, to title 38, U.S. Code.  This section requires VA to notify claimants and their representatives timely of every VA decision affecting their eligibility and entitlement to benefits.  Each notice must include an explanation of the procedure to obtain a review of the decision.  When VA denies a benefit sought, the notice must also include a statement of the reason(s) for the decision, and a summary of the evidence used for the decision.  Section 5104 applies to decisions made after January 31, 1990.  [Also see  pt. III, paragraph 9.04 for due process requirements in disallowances.]

**b.  Programs Affected.**  This provision affects each of the education programs covered in this manual.  (See pt. I, [par. 1.01].)

**c.  Denial of a Benefit Sought**

(1) A "benefit sought" is *any* VA benefit for which a claimant applies.  This includes tutorial assistance, education loans, work study allowances, and education benefits (under the various chapters).

(2) VA must fully inform claimants and their representatives whenever VA denies a benefit sought in whole or in part.  VA personnel will very liberally interpret "denial of a benefit sought."

(3) *Any* adverse action falls under this interpretation.  An adverse action is any denial, *in whole or in part*, of a benefit sought *or* a reduction or termination of a previously granted benefit.

(4) In these instances, include the following in all notifications:

(i)  A statement of the reason(s) for the decision,

(ii)  A summary of the evidence on which VA based the decision, and

(iii)  Notice of procedural and appellate rights.

(5) The following actions fall under the provisions of section 5104:

(i)  Disallowances.  Include disallowances concerning basic eligibility factors, program approvals, or reentrances after unsatisfactory progress, etc.

*NOTE:  On program approval issues, do not use FL 22-89, Disallowance Letter—Course or Program Not Approved.  Notify claimants with dictated letters which contain the reason for the denial and the evidence used in making the decision.  (See pt. III, [par. 9.05], for examples with suggested wording for programs that are not approved and programs that are not approvable.)*

*(ii)  Reductions.  Include all award reductions, regardless of the reason for the reduction.*

*(iii)  Terminations.  Include all terminations such as voluntary withdrawals, unsatisfactory progress, and end of term if the new ending date is before the previous ending date.*

*[NOTE:  Suggested terminology for examples of reduction and termination letters (to include termination for unsatisfactory attendance, conduct, or progress) are contained in the PCGL (Personal Computer Generated Letter) system.]*

## d.  [BDN] Generated Letters

(1)  Chapter 30

(i)  Disallowance Letters.  The chapter 30 [BDN]-generated disallowance letters are sufficient in most instances to meet the requirements of the law.  If the adjudicator determines that a [BDN]-generated letter is not adequate, see subparagraph f.

(ii)  Reduction and Termination Letters.  The chapter 30 [BDN]-generated reduction and termination letters are sufficient in most instances to meet the requirements of the law.  If the adjudicator determines that a [BDN]-generated letter is not adequate, he or she should send a dictated letter.  Use the following procedures for reductions and terminations:

A.  Change Reason Codes 70 and 64.  Use change reason codes 70 and 64 when reducing or terminating benefits if the school's certifying official reports the change in enrollment.  These codes generate a specific paragraph on the award letter.  The paragraph states that the school's certifying official sent revised enrollment information.

B.  Change Reason Codes 7V and 6V.  Use change reason codes 7V and 6V, instead of change reason codes 70 and 64, when the claimant reports the change in enrollment.  These codes generate a specific paragraph on the award letter.  The paragraph states that adjustment action is based upon information furnished by the claimant.

C.  Follow the procedures in subparagraphs h and i for reductions and terminations involving potential mitigating circumstances.  Follow the procedures in subparagraph i for reductions and terminations involving the 6-credit exclusion rule.

D.  When updating the master record, [BDN] stores reason codes 7V and 6V.  Using these codes in reviewing master records, VA personnel can determine the source of the change and the paragraph(s) in the claimant's letter.

(2)  Chapter 32

(i) <u>Disallowance Letters</u>.  The chapter 32 [BDN]-generated disallowance letters are not sufficient to meet the due process notification requirements for the law.  ROs (Regional Offices) must dictate letters and suppress the [BDN]-generated disallowance letters.  See subparagraph f.

(ii) <u>Reduction and Termination Letters</u>.  The chapter 32 [BDN]-generated reduction and termination letters are not sufficient in all instances to meet the due process notification requirements of the law.  ROs must dictate letters and suppress the [BDN]-generated letters as specified below in subparagraph g when adjusting a running award where mitigating circumstances are not involved.

(3) <u>Chapter 35</u>

(i) <u>Disallowance Letters</u>.  [BDN] does not generate disallowance letters for chapter 35.  ROs must dictate letters on chapter 35 disallowances.  See subparagraph f.

(ii) <u>Reduction and Termination Letters</u>.  The chapter 35 [BDN]-generated reduction and termination letters are not sufficient in all instances to meet the due process notification requirements of the law.  ROs must dictate letters and suppress the [BDN]-generated letters as specified below in subparagraph g when adjusting a running award where mitigating circumstances are not involved.

(4) <u>Chapter [1606]</u>

(i) <u>Disallowance Letters</u>.  The Interim chapter [1606] system does not have [BDN]-generated disallowance letters.  See subparagraph f.

(ii) <u>Reduction and Termination Letters</u>.  The chapter [1606 BDN]-generated reduction and termination letters are sufficient in most instances to meet the requirements of the law.  If the adjudicator determines that a [BDN]-generated letter is not adequate, he or she should send a dictated letter.  Use the procedures specified for chapter 30 reductions and terminations shown in subparagraph (1) above.

**e.  Form and Pattern Letters.**  Carefully review existing local form letters or pattern letters to ensure they provide adequate due process for adverse actions.  If the form letter does not provide a full explanation of the evidence considered and the reason(s) for denial, reduction, or termination, use a dictated letter [or a PCGL letter when appropriate].  When using dictated letters (or pattern letters) for adverse actions, attach VA Form 4107.

**f.  Notification of Disallowances**

(1)  If [BDN] generated letters cannot be used, see the sample disallowance letters provided in part III, chapter 9.

(2)  See the following additional references for preparing disallowance letters:

(i) <u>Chapter 30</u>.  See part V, [paragraph 7.06].

(ii) <u>Chapter 32 and Section 903</u>.  See part VI, [paragraph 6.04].

(iii) <u>Chapter 35</u>.  None.

(iv) <u>Chapter [1606]</u>.  See part VIII, chapter 7.

(v)  Section 901.  See part III, [paragraph 11.15].  (VARO Waco issues all section 901 letters.)

(vi)  Antiterrorism Act.  See part III, chapter 12.  (VARO Baltimore issues all Antiterrorism Act letters.)

(3)  When processing a  disallowance for failure to prosecute, fully inform the claimant of the denial, the evidence necessary to reopen the claim, and the time limit for submitting the requested evidence.  Enclose VA Form 4107.

## g.  Notification of Reductions and Terminations Not Involving Mitigating Circumstances or Unsatisfactory Attendance, Conduct, or Progress

(1)  When a claimant reduces or terminates his or her training and mitigating circumstances are not a factor, suppress the [BDN]-generated amended award or termination letter, except in chapter 30 or [1606] cases.  (See ch. 11 regarding mitigating circumstances.)

(2)  Send a [PCGL letter for the suspended award or termination information].

(3)  If the claimant's school reported the reduction or termination, add the following paragraph to [this letter]:

"Your benefits have been (reduced or terminated) as shown above based upon a notice from your school's certifying official that you (reduced or terminated) your training on (date of reduction/termination).  VA is required by law to (reduce or terminate) your benefits on this date."

(4)  If the claimant reported the reduction or termination, add the following paragraph to this letter:

"Your benefits have been (reduced or terminated) as shown above based upon your notice that you (reduced or terminated) your training on (date of reduction/termination).  VA is required by law to (reduce or terminate) your benefits on this date."

(5)  Amended award or termination paragraphs for the different education programs can be found in the following references:

(i)  Chapter 30.  See part V, [paragraphs 7.09 and 7.10.

(ii)  Chapter 32 and Section 903.  See part VI, [paragraph 6.06.

(iii)  Chapter 35.  See part VII, [paragraph 6.08.

(iv)  Chapter [1606].  See part VIII, chapter 7.

(v)  Section 901.  See part III, chapter 11.  (NOTE:  All section 901 claims are handled by the Waco RO.  Waco will adjust its pattern letters to conform to the due process provision of the law.)

(vi)  Antiterrorism Act.  See part III, chapter 12.  (NOTE:  All Antiterrorism Act claims are handled by the Baltimore RO.  The Baltimore RO will ensure that any notification letters sent to claimants conform to the due process provision of the law.)

DEPARTMENT OF VETERANS AFFAIRS
Veterans Benefits Administration
Washington DC  20420

J. J. Veteran Student                                                           In Reply Refer to:
CSS
Westminster St, NW
Washington DC  20001

Dear Student:

Our regulations require that students maintain satisfactory attendance, conduct, and progress to continue receiving VA education benefits.  The school certifying official is required to notify VA when a student doesn't meet these requirements.  We stopped your educational assistance payments on *(Month-dd-yyyy)*, because we received school notification that your *(select one:*attendance, conduct, or progress in training) hasn't been satisfactory.  *(option if action creates an A/R:*  This created an overpayment of benefits.)

*(Select if action creates an overpayment)* **What You Need to Know About Your Overpayment**

Since you were paid for training after *(mm/dd/yy)*, you were overpaid.  This overpayment is a debt that you must repay.

Our Debt Management Center will send you detailed information about the amount of the debt and how to repay it.  They will also tell you about your rights regarding your debt.  If you have questions about your debt, please call our Debt Management Center toll-free at **1-800-827-0648**, or write to:

Debt Management Center (389)
Bishop Henry Whipple Federal Building
P. O. Box 11930
St. Paul, MN  55111-1930

**What You Can Do to Restart Your Benefits**

If you **re-enroll** in the **same program** and in the **same school,** we can start your payments when your school sends your enrollment information.

If you **enroll** in a **different program** or a **different school**, you must send us a completed *(option for DEA:*  VA Form 22-5495) *(option if not DEA:* VA Form 22-1995).  In addition, before we can pay benefits we need evidence to show that the cause of your unsatisfactory *(select one:* attendance, conduct, or progress in training) is not likely to recur.  Here are examples of the kinds of information that we may require:

- A written explanation of why you couldn't maintain satisfactory *(select one:* attendance, conduct, or progress in training).

- A written explanation of how you plan to overcome the problems causing your unsatisfactory *(select one:* attendance, conduct, or progress in training).

- A transcript of grades or evaluation of performance from your prior school or place of training.

- A copy of your official notice of acceptance into your proposed program.  This should include the school's evaluation of your prior training and experience.

- A copy of your counselor's recommendations if you have received counseling at school.

If you would like counseling assistance in choosing a new program, you may contact VA at 1-800-827-1000.  (For hearing impaired, dial 1-800-829-4833.)

**If You Have Questions Or Need Assistance**

If you have questions or need assistance, contact us.  See the "If You Need Help" enclosure for contact information.

If you disagree with us, you have the right to appeal our decision.  You must write and tell us why you disagree.  The enclosed VA Form 4107 explains your rights.

Sincerely,

Education Officer
Enclosure:

If You Need Help
VA Form 4107
*(option if DEA:* VA Form 22-5495)
*(option if not DEA:* VA Form 22-1995)

**Figure 13.04 Notice of Termination Due to Unsatisfactory Progress**

**h.  Notification of Reductions and Terminations Involving Potential Mitigating Circumstances**

(1)  [A BDN]-generated amended award or termination letter along with a development letter is sufficient notification to the claimant when developing for potential mitigating circumstances.  Do not suppress the [BDN]-generated letters.

(2)  Use the September 1990 version (or a later version) of VA Form Letter 22-899, Development Letter—Mitigating Circumstances, or the letter generated from the [BDN] 205 Education screen when developing for potential mitigating circumstances.  The [BDN] letter generated by the 205 screen is correct for all benefits.  However, for chapter [1606], use VA Form Letter 22-899 as the interim chapter [1606] system does not allow access to the 205 screen.

(3)  A dictated letter would rarely be used when developing for potential mitigating circumstances.  In the rare instance that a dictated letter would be required, make sure that the claimant is fully informed of the action(s) taken, the reason(s) for the action[(s)], the evidence

used in the initial determination, the evidence needed for a final determination, and [his or her] procedural and appellate rights.

(4)  If a claimant fails to furnish mitigating circumstances or submits unacceptable mitigating circumstances, take the necessary amended award or termination action.  *Do not* suppress the [BDN]-generated letter.

(5)  Send the claimant FL 22-899b, Disallowance of Mitigating Circumstances, informing him or her that a decision was made, the basis for the decision, and the evidence used in making the decision.

(6)  The [BDN]-generated reduction or termination letter and the FL 22-899b, when used together, satisfy the requirements of the law.

(7)  Send FL 22-899b in *all* instances when the claimant fails to furnish mitigating circumstances or submits unacceptable mitigating circumstances.

**i.  Notification of Reductions and Terminations Involving the 6-Credit Exclusion Rule.**  When the 6-credit exclusion applies, take the following action:

(1)  <u>Drop is 6 Credits or Less</u>.  Take the necessary amended award or termination action (as explained in [par. 11.22]) and let the [BDN]-generated letter issue.  Send the claimant FL 22-899c, Notice of First Withdrawal of Six (6) Credit Hours or Less.  The [BDN]-generated letter and the FL 22-899c, when used together, satisfy the requirements of the law.

(2)  <u>Drop is More Than 6 Credits</u>.  If more than 6 credits are dropped, follow the procedures in [paragraph 11.22].  Allow the [BDN]-generated letter(s) to issue for any award adjustments made.  ROs must follow the notification procedures described in [paragraph 11.22].  Those notification procedures satisfy the requirements of the law.

**j.  Notification of Terminations for Unsatisfactory Attendance, Conduct, or Progress**

(1)  The [BDN]-generated termination letter and the FL 22-337 (May 1990 or a later version), Termination of Benefit Payments Due to Unsatisfactory Attendance, Conduct, or Progress, when used together, are sufficient to meet the requirements of the law.

(2)  Whenever a claimant is terminated for unsatisfactory attendance, conduct, or progress, let the [BDN]-generated letter issue for all benefit programs.

(i)  Except for chapter 30 terminations, send the claimant the May 1990 (or a later version) of FL 22-337.

(ii)  For chapter 30 terminations, use termination reason code 62.  In chapter 30 cases, reason code 62 will generate the proper [BDN]-generated letter paragraph.  If the [BDN]-generated letter is suppressed, send the claimant FL 22-337 (May 1990) (or a later version) or a dictated letter.

(3)  If necessary, send the claimant a dictated letter.  Fully explain the reason(s) for the termination, the evidence that was used to make the determination, the evidence necessary to resume benefits, and the claimant's procedural and appellate rights.  See figure 13.04 for a sample letter to use for this purpose.

**k. Creation of Overpayments**

*[NOTE:  During normal processing, BDN allows a 30 day grace period before withholding overpayments from monthly payments.  This is another form of due process afforded the claimant.  The chapter 32 BDN system does not automatically honor the 30 day grace period.  Ensure that all claimants are afforded proper due process before withholding overpayments from monthly payments.]*

(1) <u>Adjudication Procedures</u>.  Whenever an award creates an overpayment and the adjudicator suppresses the chapter 32 [BDN]-generated award letter, send the claimant a dictated letter.  Then send the claim to the Finance activity.  This activity sends the first demand letter in these cases.  Refer the claimant's folder to the Finance activity on an OF 41, Routing and Transmittal Slip, which includes the claimant's name, claim number, and benefit type.

(2) <u>Finance Procedures</u>.  After receiving the claimant's folder, the Finance activity sends the claimant a demand letter, which includes the amount of the overpayment.  Finance will use FL 4-489 (First Demand Letter for All Debts including CH 31, Veterans Drawing Benefits, Interest Not Being Charged) if the claimant is receiving benefits.  Finance will use FL 4-490 (First Demand Letter for All Other Debts including CH 31, Veteran Not in Receipt of Benefits, Interest Not Being Charged) if the claimant is not receiving benefits.

**l. Filing of Locally Generated Letters.**  To ensure that offices follow the notification requirement of the law, hold the folder until receipt of the file copy of the locally generated letter.  Then file the copy in the claimant's folder and return the folder to storage.

Go to Top

## 13.16  DUE PROCESS AND PREDETERMINATION NOTICE (DEPENDENCY EVIDENCE RECEIVED FROM A THIRD PARTY)

Due process provisions require that a prereduction notice be issued in certain cases where there is a loss of dependency.  For procedures in these cases, see [M21-1, part IV, paragraph 9.07].

Go to Top

### SUBCHAPTER VI.  MISCELLANEOUS ACTIONS

## 13.17  PAYMENT RATES FOR OJT/APPRENTICESHIP TRAINING

**a. Rate Payable.**  The first 6-month-step rate is payable for any initial OJT training or apprenticeship program.  This step is payable regardless of the amount of credit that an institution allows for previous training or experience.  The first 6-month step rate is also payable for reentry into programs involving a different job.  The second or subsequent job must have a different objective and a distinct, separately approved training program.

**b. Prior Credit.**  Prior credit is not a factor in determining the rate of payment.  Use prior credit only to determine the length of the program for which benefits are payable.

**c.  First 6-Month-Step Rate Payable**.  Begin the award with the first 6-month step when one of the following exists:

(1)  Initial OJT entry with 6 months of credit granted for prior *related* training,

(2)  Initial OJT entry with 6 months of credit for *actual* experience,

(3)  Reentry OJT with a different job objective with the same employer who allows 6 months of credit, or

(4)  Reentry OJT with the same job objective with a different employer and *no credit* granted for prior training or experience.  [For change of program rules, see chapter 4].

**d.  Second or Subsequent 6-Month-Step Rates Payable**.  Begin the award with the second or subsequent 6-month step when one of the following conditions exists:

(1)  The claimant reenters an OJT program with the same job objective with a different employer after completing 6 months of training under the initial award and credit is granted for prior training.

(2)  The claimant reenters an OJT program with the same job objective with the same employer after completing 6 months of training at a different location.

*NOTE:  When the claimant reenters the same OJT program and the employer grants credit for prior training of less than 6 months, the first 6-month-step rate is payable only for the remainder of the first 6-month period.  This does not apply to initial or reentry OJT with different job objectives.*

Go to Top

## 13.18  PAYMENT RATES FOR RESERVISTS ON SPECIAL ACTIVE DUTY FOR TRAINING

Although a reservist is receiving pay and allowances while on a Special Active Duty for Training tour, pay him or her chapter 30 or 32/903 benefits as a veteran if the reservist has prior entitling service.

Go to Top

## 13.19  MULTIPLE-LINE AWARDS THAT CREATE DROPPED PRIORS

When [BDN] updates master records, a future date becomes the current award date, and the previous current award date becomes a prior award date.  This action may eventually cause the number of prior award dates to exceed the number that a system can store.

**a.  Chapter 30.**  A chapter 30 master record retains 16 prior award lines.  When the active master record exceeds 16 award lines, [BDN] transfers the earliest lines in excess of 16 to the M20 Chapter 30 Dropped Priors screen.  The M20 screen shows up to 4 dropped prior award lines at one time and stores up to 44 dropped prior award lines.  Adjust award lines shown on the M20 screen using out-of-system award procedures.  See subparagraph e for these procedures.

**b.  Chapter 32**.  A chapter 32 benefit record may have 15 prior dates, 1 current date, and 16 future dates.  [Do] not prepare an award with more than 16 dates whether prior or future.  Instead, prepare two different awards.  See subparagraph e for procedures for adjusting awards involving dropped priors.

(1)  If a master record contains 16 prior award segments, and a new award processes for which a payment is due, then [BDN] moves the incoming award line into the current award segment.  In this instance, [BDN] drops the prior award segment with the earliest dates from the master record.  When [BDN] deletes an award segment, it prints a NOE with reject message Code 8030 "INFO M/R AWARD LINES DELETED".  (See Part 6: Chapter 5 - Notice of Exception Processing.)

(2)  If an adjudicator submits an award which would create more than 16 future award segments, [BDN] rejects the award action and generates NOE message 2016, REJECT-OVER 16 AWARD LINES.

(i)  Upon receipt of [NOE message 2016], submit an adjusted award action that does not create future award lines.

(ii)  If legitimate award action periods require submission, then diary the case.  Submit the additional award periods later.

**c.  Chapter 35**

(1)  [BDN] allows an adjudicator to process a chapter 35 award with a maximum of 8 prior dates, 1 current date, and 16 future dates.  The only limitation is the total number of lines (12) available on the [BDN] award screens.  However, if an adjudicator prepares an award with more than 8 prior dates, [BDN] drops the earliest award dates.  [BDN] drops award dates into Dropped Priors until 8 dates remain.  See subparagraph e for award procedures for adjusting awards involving dropped priors.

(2)  Prepare an award with more than 8 prior dates in two or more stages.  Divide the award so that each stage has 8 or fewer prior dates.

(i)  Process and authorize the earliest award.

(ii)  Suppress the computer generated letter.  Send the claimant a dictated letter.  Explain that restrictions prevent complete enrollment processing, that VA is processing his or her enrollment in stages, and that this award represents the first stage.  (This may establish an accounts receivable as any later periods are not included in the first stage.)

(iii)  When [BDN] processes the first award and updates the master record, process the next earliest award in the same manner as the first.

(iv)  If the adjudicator needs more than two awards to process the enrollment effective dates, continue in this manner until [BDN] has processed all of the awards.

(v)  Send the claimant a dictated letter.  Summarize all of the award transactions.

**d.  Chapter [1606].**  In the chapter [1606] interim system, a [BDN] record only retains 12 award lines.  When the active master record exceeds 12 award lines, [BDN] drops the earliest lines.  Adjust award lines involving these dropped priors using out-of-system award procedures.  See subparagraph e for

these procedures.

**e. Out-of-System Awards for Periods Earlier Than the Earliest Date in the Master Record**

(1)  If it is necessary to amend a period that has been dropped from the master record, use the following procedures:

(i)  Prepare an out-of-system award in duplicate on VA Form 22-1997 for all affected periods earlier than the earliest date in the [BDN] record.  Do not enter the information on this award in [BDN].  Prepare the out-of-system award as described in chapter 12 and refer it to the local Finance activity.

(ii)  Prepare, if necessary, a second award beginning on or after the earliest date in the [BDN] record.  Enter this award in [BDN] using normal procedures.

(2)  If the out-of-system award results in <u>restored</u> entitlement, do the following:

(i)  Chapter 30          Process a CORR to the "CUM RESTORED" (Cumulative Entitlement Restored) field on the M23 screen.

(ii)  Chapter 32/903    Based on the out-of-system award, the Finance activity will process an 04E1 transaction which will restore entitlement.  No further action is necessary.

(iii)  Chapter 35         Flash the folder to show the entitlement to be restored. If [BDN] shows that entitlement is exhausted, continue payment and manually determine when entitlement is exhausted.

(iv)  Chapter [1606]     Call the St. Louis RO at [(314) [589-9811]. Have that office adjust the entitlement.

(3)  If the adjustment to the dropped priors results in an entitlement <u>charge</u>, take the following action to update the master record:

(i)  Chapter 30          Process a CORR to the "CUM REDUCED" (Cumulative Entitlement Reduced) field on the M23 screen.

(ii)  Chapter 32/903    Based on the out-of-system award, the Finance activity will process an 06A1 transaction which will debit entitlement and issue an appropriate payment.

(iii)  Chapter 35         Use the CORR command and go to the M23 screen. Enter the appropriate [BDN] code in the PRIOR VA TRNG field.  Then, enter the number of months and days in PRIOR VA TRNG TIME.

(iv)  Chapter [1606]     Call the St. Louis RO at [(314) [589-9811]. Have that office adjust the entitlement.

(4)  Refer the out-of-system award and the GAP'ed [BDN] award (if there is one) to the Finance activity.  After [taking appropriate action, Finance] will return the GAP'ed award to Adjudication for authorization.

(i)  If an accounts receivable will be created by the out-of-system award, the finance action must be processed before the GAP'ed award.

(ii)  If an adjustment is to be created by the out-of-system award and the GAP'ed award does not create or increase an accounts receivable, the one-time payment and the second award will be processed at the same time.

(5)  Authorize the second award, if there is one.  Always send the claimant a dictated letter and suppress any [BDN] generated letter.  Advise [the claimant] of the action taken.  If the total action (out-of-system and [BDN] award) will result in two checks, advise the claimant.

Go to Top

## 13.20  REQUESTS FROM SSI

**a.  General**.  The SSA-BSII (Social Security Administration, Bureau of Supplemental Security Income) administers the SSI (Supplemental Security Income) program.  SSA-BSII must determine SSI claimants' resources, including "income" from VA payments.  These payments include educational assistance.  VA replies to BSII inquiries must specify payment receipt dates, not effective dates.  VA replies must also distinguish between retroactive payments and recurring payments.

**b.  Instructions**.  M21-1, part III, paragraph 9.03, contains general instructions for answering SSA-BSII inquiries.

**c.  Veteran or Beneficiary.**  The amount that the adjudicator specifies in the reply is the rate payable, based on the rate of pursuit to a veteran without dependents or to the beneficiary.

**d.  Dependents**

(1)  The amount that the adjudicator specifies in the reply is the rate payable for each dependent, based on the rate of pursuit of the veteran or beneficiary.  Only a veteran can receive additional benefits for a dependent.  If the veteran does not receive any additional educational assistance for dependents (or a specific dependent), enter "$NONE" for the amount payable for the dependent(s).  If a SSI request is received for a beneficiary (such as a chapter 35 spouse or surviving spouse), also enter "$NONE" for the amount of educational assistance payable for the beneficiary's dependent(s).

(2)  Determine the amount attributable to each dependent as follows:

(i)  First, determine the additional amount paid on account of dependents by subtracting the rate payable, based on the rate of pursuit to the veteran if he or she had no dependents, from the rate payable, based on the rate of pursuit to the veteran with the additional allowance for his or her dependents.

(ii)  Next, divide the additional amount being paid on account of dependents by the total number of dependents, excluding the veteran.  The result is the amount attributable to each dependent.  If the additional amount does not divide evenly, attribute any extra penny or pennies to the spouse or to the oldest child when there is not a spouse.

Go to Top

**13.21  CONCURRENT OVERPAYMENT AND UNDERPAYMENT OF BENEFITS**

---

**a.  Purpose.**  (See M21-1, pt. IV, ch. 24, for general principles on determining whether factual circumstances are related or unrelated.)  When factual circumstances are unrelated, do not simultaneously process award adjustments when one adjustment creates an overpayment and another adjustment increases benefits.  This ensures that a beneficiary retains the right to dispute a debt, or seek waiver of the recovery of the debt.

**b.  Additional Education Procedures to Follow When Simultaneous Award Actions Are Permitted.**  Include or combine actions increasing and decreasing benefits on the same award.

(1) <u>Determining Whether Factual Circumstances Are Related</u>.  Administrative experience shows that training time adjustments relate only rarely to other reasons for adjustments.  If training time adjustments occur closely in time, these adjustments are more likely related than when considerable time intervenes between training time adjustments.

(2) <u>Unrelated Circumstances Which Require Separate Awards</u>.  Normally, consider certain types of adjustments as resulting from unrelated circumstances.  (Exception: consider circumstances related if an individual case has clear, compelling evidence showing a relation between circumstances.)  Do not process unrelated adjustments on the same award.  There is no obvious relation between the following:

(i)  Gains in the number of dependents and reductions in training time.

(ii)  Losses in the number of dependents and increases in training time.

(iii)  Adjustments in the amount of "kicker" payable under either chapter 30 or 32 and adjustments in training time.

(iv)  Two or more adjustments in training time occurring in different terms, quarters, or semesters.

(v)  A decrease in training time occurring in a drop period followed by an increase in training time occurring after the end of the drop period.

(3) <u>Related Circumstances Which Can Be Adjusted With a Single Award</u>.  Consider changes in training time occurring within a drop period to be the result of related factual circumstances unless there is clear, compelling evidence to the contrary.  Process simultaneous award adjustments when VA receives these changes at the same time.

(4) <u>Examples of Adjustments Based on the Factual Circumstances</u>

(i)  A compliance survey finds that a veteran dropped a 3-credit course on March 3, 1989.  He added a 4-credit course on February 28, 1992.  Neither the veteran nor his school had reported these changes before.  There is no evidence of record showing any relation between these adjustments.  Consider these adjustments as resulting from unrelated factual circumstances.  Process the award adjustments separately.

(ii)  A veteran reports that her school gave her a non punitive grade for a 3-credit course at the end of the fall semester 1990.  The school requires her to repeat the course in order to remove the non punitive grade.  She increased her credit-hour load from 9 to 12 on February 15, 1991.  She submits and VA accepts mitigating circumstances.  VA contacts her college.  The college verifies that the veteran's information is correct.  Although the two training time adjustments occurred in different semesters, the evidence of record shows that the adjustments have related factual circumstances.  Process a simultaneous award adjustment.

(iii)  A college's drop period begins on August 26 and ends on September 15.  A veteran drops a 3-credit course on August 28.  He adds a 3-credit course on September 5.  There is no evidence of record showing that the circumstances causing these training time changes are unrelated.  Consider the training time changes as resulting from related factual circumstances.  Process a simultaneous award adjustment.

(iv)  Take a separate end product code for cases requiring separate awards.

Go to Top

## 13.22  LIMITED PAYABILITY

**a.  General**.  The Competitive Equality Banking Act of 1987 changed the way that benefit checks are settled and reissued.

**b.  Negotiability of Checks.**  Before October, 1989, the Department of Treasury authorized and processed replacement checks to a claimant.  There was no time limit to when a check was negotiable.   Since October, 1989, Treasury checks are no longer negotiable more than one year after the date that the check is issued.

**c.  Inquiries.**  If an RO receives an inquiry involving a check that is more than one year old, refer that inquiry to the Finance activity.  Deliver any checks received in the RO in connection with a claim to the Agent Cashier.]

Go to Top

## 13.23  $1200.00 REFUND PAYABLE UNDER CHAPTER 33

Certain individuals who made an irrevocable election from chapter 30 to receive benefits under chapter 33, will receive a refund of their chapter 30 contributions of up to $1,200.00 when entitlement is exhausted under chapter 33.  Veterans Claims Examiner (VCE) procedures:

1.  Determine refund eligibility:

The beneficiary must meet all the requirements listed below.  If any do not apply, the beneficiary is not entitled to a refund, therefore, no further adjudicative action is required.

a. The beneficiary must have relinquished chapter 30 for chapter 33.

b. The beneficiary must have been eligible for chapter 30 under Category I.  If eligibility to chapter 30 was established under another chapter 30 Eligibility Category, a refund is not authorized.

c. The beneficiary must be the Veteran who made contributions toward chapter 30.

d. The beneficiary must be receiving a monthly housing allowance (MHA) on the day indicated in the chapter 33 Processing System (DGI) when entitlement exhausted.

e. Any entitlement transferred to dependents must have been used before the date indicated above.  (Requires the review of DGI records for all dependents who were transferred benefits).


2.  Determine if refund was previously issued:

The beneficiary must not have previously received the refund.  VCEs should review both DGI and BDN, per instructions listed below.  If the refund was previously issued, no further adjudicative action is required.

**a.  Review DGI:**  On the **Work Product Summary** screen, under **Miscellaneous Benefits**, review for refund already processed.  If DGI reflects that the refund was deleted, review earlier Work Products to ensure the refund was deleted prior to payment.


**b.  Review BDN:**  The refund may have been previously processed in BDN (DGI refund processing began July 8, 2024).  Review the chapter 33 BDN M21 screen for an "**X**" to the right of the **CH30 REFUND IND** field.  An "**X**" indicates the refund was paid.  See **Figure 13.04.**



*Figure 13.04:  BDN chapter 33 M21 screen reflecting that chapter 30 contributions were not refunded*

3.  Issue refund:

The chapter 30 contribution amount should be entered in DGI, if entitlement exhausts at the time of processing (even if the exhaust date is future).  If the exhaust date is future, DGI will set a future maturation date (first day of the month after the term ends) and DGI will release payment at that time.  To process the refund:

    a.  Locate the amount (not to exceed $1,200) of chapter 30 contributions on the Veterans Information Solution (VIS) **Education** tab, under **Chapter 30 Eligibility Data.**  See **Figure 13.05.**



*Figure 13.05:  VIS chapter 30 pay reduction amount reflecting $1,200*

    b.  Input the chapter 30 <u>contribution</u> amount in DGI to allow DGI to calculate (and if chapter 30 used, prorate) the refund amount due:

- DGI refund selection:  On the **Work Product Summary** screen, under **Miscellaneous Benefits**, choose **Add Benefit.**
- DGI entries and rules:  Chapter 04b: Chapter 33 Processing Screens in DGI Continued XII.i.4.14m(3).
- DGI calculations:  Chapter 33 Sub-Chapter 4.6 - Reimbursements, Fees, and Overpayments 6.01.
- **NOTE:  If chapter 30 was <u>never used</u> and <u>less than 36 months of chapter 30 entitlement remains</u>** (e.g. Veteran was released due to a hardship after 20 months of service and was eligible for 20 months of chapter 30 entitlement), DGI cannot calculate the refund unless the chapter 30 remaining reflects 36 months. Review and update when appropriate.
- Job Aid:  The **[$1200 Refund Job Aid](#)** is available for ad hoc calculations outside of DGI, but there is no requirement for usage/capture.

    c.  The DGI letter will include refund information.  See **Figure 13.06.**

**PAYMENTS MADE TO YOU**

| Type | Begin Date | End Date | Amount | Payment Processing Date |
|------|-----------|----------|--------|------------------------|
| Chapter 30 Contributions Refund | 01/16/2025 | 01/16/2025 | $1,200.00 | 01/16/2025 |

**We have reviewed your eligibility for a refund of your Montgomery GI Bill Active Duty contributions.**

Based on your eligibility information and the enrollment information we received, we are issuing the refund listed in the **Payment and Debts** section of this letter.

When we process the enrollment that will exhaust a student's remaining benefits, we schedule their refund for the first day of the month after their enrollment ends. Withdrawing from training can cause benefits to be restored, meaning no longer exhausted. This may cause the refund to be cancelled, or it could cause an overpayment if the refund was already issued. See the **REFERENCES** section below for more information about the calculation of Montgomery GI Bill Active Duty Refunds.

**Montgomery GI Bill Active Duty Refund:** (38 U.S.C. § 3327) Individuals who have made an irrevocable election to use Post-9/11 GI Bill by giving up their benefits under the Montgomery GI Bill Active Duty may be eligible for refund of their Montgomery GI Bill Active Duty contributions. To be eligible for a refund, the student must meet the following criteria:

- Must have had remaining benefits under the Montgomery GI Bill Active Duty at the time they gave up that benefit.
- Only individuals who actually made the contributions may receive the refund. Individuals receiving transferred benefits are not entitled to the Chapter 30 refund.
- Individuals must be receiving a housing allowance at the time they exhaust their remaining Post-9/11 GI Bill benefits to receive the refund.
- The amount of the refund will be equal to the number of months and days the individual had remaining under Chapter 30 divided by 36 months, multiplied by amount contributed.

*Figure 13.06:  Letter showing chapter 30 contributions refund amount, with qualifications*


<u>4.  Changes to refund eligibility:</u>

After the refund has been processed, changes may disqualify the beneficiary from receiving the refund.  To make the correction:

a.  If *changes in enrollment* (e.g. terminations or reductions) no longer qualify the beneficiary for the refund:

- On the **Work Product Summary** screen, under **Miscellaneous Benefits**, choose the **Correction** button next to the refund entry.

- When the entry pop-up appears, choose **Save**.

- The pop-up will then close.

- Check the open box next to the refund entry and select **Delete Benefit**, then select **Delete** again.

If the refund was already paid, a valid debt will be created and the DGI letter will reflect the debt amount.

If the refund was not paid (only a future maturation date was set), no debt will be created, but the DGI letter will need to be edited to explain why the beneficiary no longer qualifies for the refund.

b. If the chapter 30 election was reversed due to Rudisill supplemental reprocessing:

- Follow Rudisill supplemental reprocessing instructions (M22-4 Part 4 Chapter 13.42); no debt will be created.

5. <u>Authorization</u>:

Work products containing chapter 30 contribution refunds procedurally require second signature authorization following standard second signature procedures. No chapter 30 refund should be authorized with only one reviewer.

**References: 38 USC 3317(f) and 38 CFR 21.9645**

## 13.24 PAYMENTS FOR THE CAREER INTERMISSION PROGRAM (CIP)

The Career Intermission Program (CIP), created by **section 533 of Public Law 110-417**, extended by **section 531 of Public Law 112-81**, and modified by **section 522 of Public Law 112-239**, allows for an active duty service member of the armed forces to receive pay, allowances, and benefits while transferring to the Individual Ready Reserve (IRR), for up to three years. Upon completion of the program, the member may then return to active duty status where any period of participation in the program is not counted toward years of service in the armed forces.

**Due to current system limitations, a member of the armed forces that enters the CIP program will appear to be on active duty in the Veterans Information Solution (VIS).** This will prevent the beneficiary from receiving the Monthly Housing Allowance (MHA) to which they would otherwise be entitled due to being released from active duty. The Defense Manpower Data Center (DMDC) does not currently have a systematic way to identify the participants in CIP. Therefore, the steps below must be taken to ensure CIP participants receive the correct benefit payments under the Post-9/11 GI Bill (chapter 33) program.

Individuals participating in the CIP have been instructed by the Department of Defense to notify their School Certifying Official (SCO) of program participation. **The SCO will then report participation to VA using free text remarks when submitting enrollment information.** Remarks may vary, but a VCE should be

aware of potential remarks and **look for key words such as "CIP", "Career Intermission Program Participant", "CIP Participant", or "Student is in the CIP".** However, CIP participation **could also be reported to VA directly from the beneficiary.**

**1. If a DD form 214 is received from a beneficiary that documents the Career Intermission Program (CIP)** as the reason for separation:

a. This is considered **acceptable documentary evidence** of participation in the program. The VCE will process as if the beneficiary is not on active duty, based on the Release from Active Duty (RAD) date listed on the DD form 214.

**2. If the School Certifying Official (SCO) includes free text remarks on the Enrollment Certification** (VA Form 22-1999) reporting alleged CIP participation (claim will off-ramp from automation), the VCE will:

a. **Send an e-mail to their designated RPO DOD point-of-contact**, who will verify with DMDC if the beneficiary is a CIP participant.

b. **Once the participant is confirmed**, the claim should be processed as if the beneficiary is not on active duty, based on the Release from Active Duty (RAD) date provided by DMDC.

NOTE: Place a FLASH in the TIMS folder stating "Beneficiary is a Career Intermission Program (CIP) participant. Please watch for any change in VADIR service data."

c. **If DMDC states that the beneficiary is _not_ a CIP participant**, service should be input per VIS, following normal processing procedures.

Go to Top

## SUBCHAPTER VII.  POWER OF ATTORNEY ISSUES

### 13.25  GENERAL

M21-1, part III, chapter 12, contains general procedures (and exceptions to the procedures) for [POA] (Power of Attorney) actions for service organizations, agents, and licensed attorneys.

[*NOTE:  Do not communicate with a VA claimant or a claimant's attorney concerning a fee agreement between the claimant and the attorney.  Refer any questions to the District Counsel.  See paragraph 13.26 and M21-1, part III, paragraph 12.23.*]

Go to Top

## 13.26   ENTRY OF POWER OF ATTORNEY CODES

**a.  General**.   See M21-1, part III, paragraph 12.12, for updating BDN when a representative is appointed.

**b.  BIRLS**

(1)  For veterans and chapter 1606 claimants, the BIRLS (Beneficiary Identification and Records Locator Subsystem) VID (Veterans Identification Data) screen shows the claimant's power of attorney.   For chapter 35 claimants, the BIRLS BID (Beneficiary Identification Data) screen does not show the claimant's [POA].

(2)  To update the BIRLS [POA] field, use the BUPD (BIRLS Update) command and enter the three digit code for the new POA.  (See M21-1, pt. II, ch. 6, exh. B.)

**c.  Chapter 30 and 32 Processing**

(1)  The chapter 30 and 32 master records initially receive the [POA] from BIRLS.  After entering the power of attorney during CEST action, BDN copies this code to the 101 (Pending Issue Control Establishment) screen.  BDN then enters this code in the resulting master record.

(2)  To update the chapter 30 or 32 Hines [POA] field in the benefit master record, use the CORR (Correction) command and enter the two-digit code for the new [POA].  (See M21-1, pt. III, ch. 12, addendum C.)  Updating BIRLS will not update the benefit record.

**d.  Chapter 35 Processing**

(1)  The chapter 35 master record initially receives the [POA] from the pending issue.  During CEST action, the operator enters the [POA] on the 101 screen.  BDN then enters this code in the resulting master record.

(2)  To update the chapter 35 Hines [POA] field, use the CORR command and enter the two digit code for the new [POA]. (See M21-1, pt. III, ch. 12, addendum C.)

**e.  Chapter 1606 Processing**

(1)  The chapter 1606 master record initially receives the [POA] by award action.  The operator enters the [POA] on the 350 (Chapter 106 Education Award) screen.  BDN then enters this code in the resulting master record.

(2)  To update the chapter 1606 benefit record [POA] field, process an amended award and enter the two digit code for the new [POA].  (See M21-1, pt. III, ch. 12, addendum C.)

NOTE:  Except for chapter 1606, a PCHG (Pending Issue Change) to the [POA] field updates the PIF (Pending Issue File) which will later update the benefit master record; however, the PCHG command will not update the BIRLS [POA] field.  Use the BUPD command to update BIRLS with the new [POA] code [  ].

Go to Top

## 13.27   ATTORNEY REQUESTS VA NOT COMMUNICATE DIRECTLY WITH CLIENT

**a. General**.  These procedures <u>only</u> become effective if the private attorney's declaration of representation specifically concerns education benefits, or if the letter acknowledging the declaration of representation specifically includes education benefits.  See M21-1, part III, chapter 12, subchapter II, for procedures acknowledging a declaration of representation if one is received in connection with an education claim.  These M21-1 procedures also state the general procedures for private attorneys who represent VA claimants (<u>and very important exceptions to the general restriction on communicating directly to VA claimants when the attorney has requested exclusive contact</u>).

*NOTE:  Special procedures are given if the claimant is required to complete verifications of attendance or certifications of attendance as these must be mailed directly to the attorney.  Suggested text informs the attorney and claimant of the ramifications of sending the periodic certifications to the attorney for the claimant.  If the attorney (or the claimant) does not submit any protest concerning the delay caused by sending the certification to the attorney, accept the restrictive power of attorney and send all certifications to the attorney for the claimant.*

**b. Initial Review of Claim**.  These procedures can be "triggered" by one of a number of issues.  These include but are not limited to receiving information from a station handling a disability claim, the inability to process a claim when a security level 8 exists on a BIRLS or C&P record, or a power of attorney code 66 in the BIRLS or C&P record. After receiving information concerning the private attorney's declaration of representation, review the LOC (Location) or the NUM (Number) screen in BIRLS.  [If another RO has jurisdiction over a disability claim, contact that RO] to determine what the declaration states or what the other RO told the attorney in the acknowledgment letter.  If the LOC or NUM screen shows that [there is a] claims, chapter 30, or EDU (Education) folder, determine if a restrictive power of attorney applies  (see subpar. c(1)).  Then determine if the award involves certifications.  If not, apply subparagraph c.  If the claimant has filed an education claim, the attorney has filed a restrictive declaration of representation, <u>and</u> the award involves certifications, process as specified in subparagraph d.

**c. Education Procedures**

(1)  Compensation or pension claims use a POA [ ] code 66 to designate a private attorney who has requested exclusive contact.  Use of POA code 66 automatically suppresses all compensation and pension BDN letters.  For education claims, similar processing has not been installed.  POA code 66 does **not** suppress award or development letters in any of the education benefit systems.  Stations are not automatically prevented in education claims with a POA code 66 from sending development letters and issuing certifications direct to the claimant.

(2)  If the attorney's declaration of representation requests that VA not communicate with his or her client, [send] <u>all</u> communications [ ] directly to the attorney [ ].  Do not use BDN to send development letters to the claimant.  Process payments and letters as stated in subparagraph d only if certifications are involved.

**d. Special Procedures for Awards Involving Certifications**

(1)  <u>Letters to Attorney</u>

(i)  See M21-1, part III, chapter 12, addendum B, for guidelines for communicating with a private attorney acknowledging his or her declaration of representation.  These guidelines do not contain information concerning the impact of sending education certifications to the attorney rather than directly to the claimant.

(ii)  Contact the attorney when certifications are involved so that he or she knows the impact of sending certifications to the claimant through the attorney.  See figure [13.02] for suggested wording.  Either include this wording with the letter to the attorney acknowledging the declaration of representation or send the letter if this acknowledgment was previously sent by an RO having jurisdiction over a C&P claim.  If the attorney or the claimant submits written information revising the restriction(s) on the attorney's declaration of representation (such as allowing certifications being sent directly to the claimant), take appropriate action.

*NOTE:  Review the procedures in M21-1, part III, chapter 12, for guidelines for communicating with a private attorney.  Incorporate information concerning the impact of sending certifications to the attorney into one fully explanatory dictated letter; do not simply send a letter with the wording suggested in figure [13.02] if other paragraphs from M21-1 are applicable.*

(iii)  If the client or the private attorney modifies the representation in writing to allow VA to send certifications directly to the claimant, resume regular processing.  However, any development letters would still have to be sent to the attorney.  Flash the claimant's folder appropriately.

(2)  <u>Communications From Claimants</u>.  If an attorney had previously submitted a restrictive declaration (which precludes direct communication with the client) and the claimant is receiving benefits with certifications being sent to the claimant through the attorney and the claimant subsequently submits a letter, a VAI (Veterans Assistance Inquiry), or otherwise communicates information implying that certifications should be sent directly to the claimant, but does not submit a letter expressly stating that certifications should be sent to the claimant's address or submit a formal written modification of the representation with the communication, the individual receiving that communication should prepare a VA Form 119 (Report of Contact) stating the claimant's intention, or implication.  Associate the VA Form 119 with the claimant's communication with the folder.  Adjudication should call the claimant and explain the ramifications of sending certifications to the claimant through the attorney.  (M21-1, pt. III, par. 12.23b(4), allows responding to claimant initiated inquiries to the extent of the claimant's inquiry.  Such communication is restricted to information needed to answer the specific information requested by the claimant.)  If the claimant sends written information such as a letter expressly stating that certifications should be sent to the claimant, resume regular BDN processing (see subpar. e).

IN REPLY REFER TO:

FILE NUMBER:

We have noted your declaration of representation for (INSERT NAME) in education proceedings before VA and that this declaration requests that VA not communicate directly to the claimant. Your client is required by statute or regulation to complete and return a periodic school attendance certification before we can release payment of education benefits. Payment of education benefits will be delayed if, due to your representation, we must send you the periodic certification forms to verify the school attendance of (INSERT NAME). If you desire to have (INSERT HIS or HER) certifications sent directly to (INSERT HIS or HER) address, you must send us a revised declaration of representation. Alternatively, your client could write us a letter requesting us to send these certifications directly to (INSERT HIM or HER). If we receive such a letter from your client, we would send these certifications directly to (INSERT HIM or HER).

Adjudication Officer

**Figure [13.02].  Sample Attorney Development Letter**

(3)  <u>Adjudication Procedures if Certifications Are to Go to Attorney</u>

(i)  <u>Initial Chapter 30 Award</u>.  If the client files an initial claim for chapter 30 benefits, process a [BDN] award.  Let [BDN] generate an appropriate award letter.  Insert a message in the master record [stating] that the case concerns a private attorney. Immediately after [BDN] issues the award letter, suspend the award.  Manually control the case for all necessary actions, such as verifications.  Send all subsequent development actions or verifications to the veteran through the attorney.  Send VA Form 22-8979-1 at the appropriate time each month as [BDN] will not generate VA Form 22-8979 for suspended cases.  When the verification is received, process an amended award to include the certification to issue payment.  Suppress the [BDN] generated letter.  After processing the amended award, suspend the award again.  Continue this procedure [  ] as necessary until all actions are completed.

(ii)  <u>Running Chapter 30 Award</u>.  If the client has a running chapter 30 award at the time of receipt of the restricted declaration of representation, insert a message in the master record [stating] that the case concerns a private attorney.  Then suspend the award and process as in subparagraph (3)(a) above.

*NOTE:  [RPOs having TIMS (The Imaging System) should insert a "FLASH" message in TIMS to show that the individual record is a POA 66 case.  Other RPOs should insert such a message when TIMS is installed.]*

(iii)  <u>Initial Chapter 32 NCD Award</u>.  If the client files an initial claim for chapter 32 benefits based on NCD (Non-College Degree) training for which BDN would generate VA Form 22-8979 Student Verification Of Enrollment to the claimant, process a one day award with an effective date of the first day certified by the school.  Suppress the BDN generated letter and send a dictated letter to the veteran with a copy to the attorney.  Set the file pull indicator to "Y" (claim must be processed with folder) to ensure that no awards are processed without the folder.  Manually control the case for all necessary actions, such as certifications.  Send all subsequent development actions or certifications to the veteran through the attorney at the appropriate time each month.  The Finance activity should process all certifications with a 06A1 fiscal transaction which reduces entitlement and issues payment.

(iv)  <u>Running Chapter 32 NCD Award</u>.  If the client has a running chapter 32 NCD award, stop the award effective the date last paid.  This will prevent any computer generated information from being sent directly to the veteran.  If the award involves delinquent certification, contact the school to confirm school attendance and submit the necessary BDN certification transaction by a "quit" certification.  Suppress the BDN generated letter and send a dictated letter to the veteran with a copy to the attorney.  Set the file pull indicator to "Y" (claim must be processed with folder) to ensure that no awards are processed without the folder.  Manually control the case for all necessary actions, such as certifications.  Send all subsequent development letters and certifications to the attorney at the appropriate time each month.  The Finance activity should process all certifications with a 06A1 fiscal transaction to reduce entitlement and issue payment.

(v)  <u>Initial Chapter 35 NCD Award</u>.  If the client files an initial claim for chapter 35 benefits based on NCD training, process any award manually (out-of-system).  See paragraph 12.05.  Send appropriate dictated letters.  Control the case for all necessary actions, such as certifications.  Send all subsequent development actions or certifications to the [claimant] through the attorney at the appropriate time each month.  The Finance activity should process all certifications using a fiscal transaction to issue payment.  The Adjudication Division should manually keep a record of entitlement used (using the same procedures specified in par. 14.05).

(vi)  <u>Running Chapter 35 NCD Award</u>.  If the client has a running chapter 35 NCD award, stop the award effective the date last paid.  This will prevent any computer generated information from being sent directly to the claimant.  If the award involves delinquent certification, contact the school to confirm school attendance and submit the necessary certification with the award.  Suppress the BDN generated letter and send a dictated letter to the claimant with a copy to the attorney.  Set the file pull indicator to "Y" (claim must be processed with folder) to ensure that no awards are processed without the folder.  Manually control the case for all necessary actions, such as certifications.  Send all subsequent development actions or certifications to the [claimant] through the attorney at the appropriate time each month.  The Finance activity should process all certifications using a fiscal transaction to issues payment.  The Adjudication Division should manually keep a record of entitlement used (using the same procedures specified in paragraph 14.05).

(vii)  <u>Initial Chapter [1606] Award</u>.  If the [claimant] files an initial claim for chapter [1606] benefits based on NCD training, process any award out-of-system.  See paragraph 12.06.  The [RPO] must process a type "Z" master record.  Manually control the case for all necessary actions, such as certifications.  Send all subsequent development actions or certifications to the veteran through the attorney at the appropriate time each month.  The Finance activity at the St. Louis [RO] should process all certifications with a voucher payment to reduce entitlement and issue payment.

(viii)  <u>Running Chapter [1606] Award</u>.  If the [claimant] has a running chapter [1606] NCD award, stop the award effective the date last paid.  This will prevent any computer generated information from being sent directly to the claimant.  If the award involves delinquent certification, contact the school to confirm school attendance and submit the

necessary certification with the award.  Suppress the BDN generated letter and send a dictated letter to the claimant with a copy to the attorney.  Have the [education] coordinator request that VACO Education Procedures Staff purge the chapter [1606] master record.  After the record is purged, establish a type "Z" master record and process the award out of system.  Manually control the case for all necessary actions, such as certifications.  Send all subsequent development actions or certifications to the veteran through the attorney at the appropriate time each month.  The Finance activity at the St. Louis [RO] should process all certifications with a 06A fiscal transaction for voucher payment to reduce entitlement and issue payment.

(ix)  <u>Other Out-Of-System Awards</u>.  Many awards are paid out-of-system.  These include chapter 30 flight and other awards maintained on a personal computer at the RPOs.  All stations are cautioned to follow these procedures regardless of the method of paying benefits.

**e.  Procedures for BDN Awards When Restrictive Communication Is Removed**.  This issue can arise whenever a power of attorney is reviewed, regardless of the issue necessitating this review.  If, following the contact by Adjudication, the claimant sends a letter stating his or her desire to receive certifications at his or her address, or the attorney sends a revised declaration of representation that states certifications are to be sent directly to the claimant, Adjudication will process a normal BDN award.  (The claimant does not have to send a letter but could communicate this desire by another means such as a VAI.)  For those awards prepared under the special procedures in subparagraph d(3), stop the special procedures the date last paid and resume BDN processing from that date.  For chapter 35 awards paid out-of-system and for which entitlement was not charged, charge chapter 35 prior training for this entitlement as described in paragraph 13.05d(1)(c).

Go to Top

## 13.28  COORDINATION FOR POWER OF ATTORNEY INFORMATION

**a.  General**.  Currently, BDN generates extra copies of letters when a power of attorney code exists in the claimant's BDN record.  With consolidation of education processing, these copies for benefits other than chapter 30 are automatically sent to the RPO that processed the award.  The RPO is required to screen these letters and send them to the RO having jurisdiction over the claimant's mailing address.  That RO must then send the letters to the power of attorney.  [Pending BDN changes would automatically send the copies for the claimant's POA to the RO having jurisdiction over the claimant's address.  That RO would then forward those copies to the claimant's  POA.]  Until such time as these BDN changes are installed, RPOs and ROs must follow the manual sorting and distribution described in this paragraph.

**b.  RPO Referral of Power of Attorney Letter Copies**

(1)  RPOs will review incoming BDN letters for power of attorney mail.  RPOs will identify and forward power of attorney mail to the RO having jurisdiction over the claimant's mailing address.  Refer identified mail to the RO using an OF 41 stating the reason for the referral.

(2)  ROs will forward this mail to the respective power of attorney.

*NOTE:  Chapter 30 letters have the signature block of the RPO Adjudication Officer.  ROs should be able to identify this mail and forward it to the power of attorney.  ROs SHOULD NOT RETURN THIS MAIL TO THE RPO.*

## c.  Special Processing Required by the Leo Case

*NOTE:  These procedures are implemented due to the Court of Veterans Appeals decision in Leo v. Brown.  The Leo case requires that VA provide a copy of its decisions to a specific office or individual if one is named on the power of attorney.  In such cases, it is not sufficient to notify the service organization at the RO in the usual manner.*

(1)  When an RPO receives a power of attorney designation directly from the claimant or from the RO having jurisdiction over the claims folder, the RPO must review the document carefully. (See par. 13.25.)  If the power of attorney shows a specific individual or address (other than the [ROs] address), the RPO will apply subparagraph (4) below.

(2)  When an RPO receives an indication that a claimant has a service organization representative (e.g., a power of attorney code exists in BIRLS), the RPO will contact the RO having jurisdiction over the claims folder.  The RPO will ask the RO to review any [POA] designation in the claims folder [to determine if there is a POA for a] specific person or specific address for that representative.  The RPO will make a record of the contact on VA Form 119, Report of Contact, and place it in the claimant's folder.

(i)  If the RO states that the power of attorney contains a specific person or address, the RPO will record the specific person or address on the VA Form 119 and apply subparagraph (4) below.

(ii)  If the RO states that the [POA] contains only a general address (e.g., American Legion, any national service officer), the RPO will record the general address on the VA Form 119.  This will prevent further additional RO contact on this issue.

(3)  If the RPO receives an education claim after 2 or more years of inactivity, the RPO should review the claimant's BIRLS VID screen.  [If the information on the VID screen is different] than the education record, the RPO should ask the RO to review the power of attorney designation as described in subparagraph (2) above.

(4)  The RPO will take the following actions when the Leo case applies:

(i)  Enter the appropriate folder pull indicator in BDN for chapters 32, 35, and 1606 records.  [Insert "LEO" in the chapter 30 message line.]

(ii)  Prepare dictated letters in all such cases.  Send copies to the claimant, the service organization at the [RO], and to the specific address or person designated on the power of attorney.

Here are examples of when the Leo case applies or does not apply:

Example 1.  The veteran designated John Doe of the American Legion as representative. Send copies of the dictated letter to the claimant, the American Legion at the local office, and John Doe at the address shown on the power of attorney form.

Example 2.  The veteran designated a national service organization as representative but gave a specific address.  Send copies of the dictated letter to the claimant, the service organization at the local office, and the service organization at the specific address.

Example 3.  The veteran designated the American Legion but did not list a specific address.  Send copies of the dictated letter to the claimant and the American Legion at the local office.

Go to Top

## SUBCHAPTER VIII.  PAYMENT OF ATTORNEY FEES FROM PAST-DUE BENEFITS

## 13.29  GENERAL

Section 5904 of title 38, U.S. Code provides for payment of a representative's fee when the BVA (Board of Veterans' Appeals) renders an unfavorable decision and the claimant then hires an attorney or agent who continues to prosecute the appeal or files a reopened claim on the same issue.  If the representative prevails and VA grants retroactive benefits, VA in certain instances withholds a portion of the claimant's past-due benefits and pays this portion directly to an attorney.  Review M21-1, part III, chapter 12, for general procedures for the payment of attorney fees from past-due benefits.  See M21-1 for an overview of the payment process, when attorney fees are payable, actions when a fee agreement is received, award actions before referral to BVA, transferring folders to and from BVA, completion of the past-due worksheet, notification of the award of attorney fees, and inquiries or disagreements involving attorney fees.  This subchapter contains specific procedures to pay attorney fees when an education benefit is potentially payable as the past-due benefit.

Go to Top

## 13.30  ATTORNEY FEE CASES WITH AN EXISTING ACCOUNT RECEIVABLE

**a.  Payment to Attorney.**  When past-due benefits are payable from an account with an existing account receivable, the amount potentially due the attorney should be calculated based on 20 percent of the total amount of retroactive (past-due) benefits due the claimant.  However, any monies due the claimant, up to 100% of the amount due, must first be applied to the debt.  Subsequent payment to the attorney will be made from the balance of funds remaining after the debt has been liquidated.  See the examples below.

Example 1:  A veteran is awarded retroactive chapter 30 benefits in the amount of $2,000.00.  The amount potentially due the attorney is $400.00 (.20 x $2,000.00).  A review of the record reveals the veteran has a 59B receivable balance of $1,000.00.  Since 80 percent of the past-due benefits is sufficient to liquidate the overpayment, withhold $400.00 as payment potentially due the attorney.

Example 2:  Consider the same facts as in Example 1 above.  However, the veteran has a $1,700.00 30B receivable.  In this instance, the remaining 80 percent of the past-due benefits will not liquidate the receivable.  The additional $100.00 needed to fully liquidate the debt will be deducted from the amount potentially due the attorney, therefore, the 59B should be established for only $300.00.  Notify Adjudication that a portion of the amount due the attorney was applied to the receivable balance.  (See subpar. b.)

Example 3:  Consider the same facts as in Example 1 above.  However, the veteran has a $2,000.00 30B receivable.  In this instance, there will be no funds available for payment to the attorney.  Notify adjudication accordingly.  (See subpar. b.)

**b.  No Automatic Offset of Debt.**  If the claimant's master record does not have a deduction segment (e. g., 61C, 63C, 66C, etc.) that will allow for the automatic offset of a debt that exists in another benefit system, and the amount of the past-due benefits is sufficient to satisfy both the debt and also the amount for payment to the attorney, take the following actions:

(1)  Establish a 63C deduction segment.  The amount of the 63C should be equal to the total amount of funds available for payment to the attorney plus the amount of the debt.

(2)  Deposit the funds to suspense appropriation 36F3875 when received at the station.

(3)  Liquidate the debt in accordance with existing procedures.

(4)  Make payment to the attorney in accordance with the instructions outlined in this subchapter.

*NOTE 1:  In example 2, if the chapter 30 master record did not contain a 61C deduction segment, establish a 63C deduction segment for $2,000.  (The $2,000 represents the $1,700 to be applied to the veteran's debt and the $300 for the attorney.)*

*NOTE 2:  In example 3, if the chapter 30 master record did not contain a 61C deduction segment, establish a 61C deduction segment in order for the retroactive funds to be automatically applied to the 30B debt.  (The entire amount of the past-due benefits is to be applied to satisfy the debt with no funds available for payment to the attorney.)*

**c.  Notification.**  The adjudication division will be responsible for the preparation of correspondence to both the claimant and attorney.  The correspondence should provide an explanation of how the past-due benefits were distributed.

Go to Top

## 13.31 CHAPTER 30 PROCEDURES

### a.  Adjudication Actions

(1)  When attorney fees are potentially payable for a chapter 30 case, before sending the case to the BVA for a determination on the amount of attorney fees payable, Adjudication should prepare a VA Form 22-1997, in lieu of a BDN award for the period covering past-due benefits

and for any recurring chapter 30 benefits to which the claimant is entitled.  Twenty percent of any retroactive benefits due must be withheld pending a BVA decision in regard to the amount of attorney fees payable.

(2)  Adjudication will process an award to pay benefits for one day if no BDN master record exists.

(3)  Adjudication (chapter 30 unit) will use an [OF] 41 or local overprint to refer the chapter 30 folder and hard copy award to the Finance activity with the following statement:  "Please compute retroactive amount which will be generated by VA Form 22-1997, dated (enter date of hard copy award) and establish a 59B receivable equal to 20 percent of the retroactive amount due."

**b.  Finance Activity Actions**

(1)  The Finance activity will compute the total retroactive benefit and 20 percent of the total retroactive benefit, and write these amounts on the VA Form 22-1997, as follows: "Award will generate a $              retro payment.  A 59B deduction was established for $            ."  Initial and date the VA Form 22-1997.  Photocopy the award before returning the chapter 30 folder to Adjudication.  Keep the copy in a pending file until the agent cashier receives the funds.  Then forward the copy to the accounting activity.  The accounting activity will keep the copy in the suspense file until all funds have been disbursed.

(2)  Withholding of an amount equal to 20 percent of the retroactive benefits and establishment of the 59B deduction segment will be accomplished as follows:

(i)  Active Master Record.  The Finance activity will take the following actions:

A.  On the 101 ready screen, enter FIST (Fiscal Transaction) as the BDN command, the user's password, F15 as the screen number, the veteran's file number, 00 for the payee number, the veteran's stub name, and CH30 as the benefit.  Press the enter key.

B.  BDN shows the F15, Special Payments screen.  Tab to the 06B-ONE TIME PAYMENT-ESTABLISH A/R field and enter an X in this field.  Enter the payment amount in the PAYMT AMT field and the three-digit cost code in the COST CODE field.  (The cost code should be shown at the bottom left corner of the payment screen.  If there is no cost code shown, enter 011.)  Enter 59B in the CODE/CLASS field.  The deduction segment should be blank.  Complete the address segment to ensure the resulting check will be sent to the agent cashier.  The address segment should include information to assist the agent cashier to identify the payment (i. e., AC John Doe 123456789 ATTY FEES).

(ii)  Terminated Master Record.  This situation requires two separate fiscal transactions to establish a receivable and generate a payment to the agent cashier.  The two transactions can be processed simultaneously.  The Finance activity will take the following actions:

A.  On the 101 ready screen, enter FIST as the BDN command, the user's password, F25 as the screen number, the veteran's file number, 00 for the payee number, the veteran's stub name, and CH30 as the benefit.  Press the enter key.

B.  BDN shows the F25, Account Receivable Adjustment screen.  Tab to the 04E-ESTABLISH/INCREASE A/R field and enter an X in this field.  Enter 59B in the CODE/CLASS field.  Enter the receivable amount in the TRANS AMT field.  Enter the current date (month/year) in the DATE field.  Press the enter key.

*NOTE:  Any proceeds currently existing in the master record will be applied to a receivable introduced by an 04E transaction.  Take action to dispose of existing proceeds before entering an 04E action into BDN.*

C.  To generate a payment to the agent cashier, on the 101 ready screen, enter FIST as the BDN command, the user's password, F15 as the screen number, the veteran's file number, 00 for the payee number, the veteran's stub name, and CH30 as the benefit.  Press the enter key.

D.  BDN shows the F15, Special Payments screen.  Tab to the 06A-ONE TIME field and enter an X in this field.  Enter the payment amount in the PAYMT AMT field and the three-digit cost code in the COST CODE field.  (The cost code should be shown at the bottom left corner of the payment screen.  If there is no cost code shown, enter 011.)  Enter 59B in the CODE/CLASS field.  The deduction segment should be blank.  Complete the address segment to ensure the resulting check will be sent to the agent cashier.  The address segment should include information to assist the agent cashier to identify the payment (i. e., AC John Doe 123456789 ATTY FEES).

*NOTE:  After establishing financial transactions using the FIST command, approve them using the FAUT (Fiscal Authorization) command.  Suppress all fiscal letters when authorizing transactions utilizing FAUT.  When establishing the 59B receivable in the veterans master record, ensure that the collection letter indicator is set to "4" and the collection indicator is set to "3" prior to award authorization.*

(3)  The Finance activity should maintain control of the chapter 30 folder until it has been determined that all fiscal transactions have processed.  Ensure that the collection letter indicator is set to "4" and the collection code indicator is set to "3" before returning the record to Adjudication.  Use the CORR command to make any necessary changes to the collection letter and collection code indicators on the M01 Accounts Receivable screen.  The master record should also be reviewed to ensure that collection indicators have been set to allow for immediate offset from retroactive benefits due the claimant.  The chapter 30 folder should then be returned to the Adjudication Division (chapter 30 unit) for BDN award action.

(4)  Funds received by the agent cashier should remain on deposit in the station suspense account (36F3875) until BVA determines the amount of payment due the attorney.  After BVA makes a decision on payment of attorney fees, Adjudication will prepare a Past-Due Benefits Worksheet.  (See M21-1, pt. III, chapter 12, addendum 3.)  Based on the information furnished on the worksheet, Finance will compute the amount due the attorney and process a Standard Form 1047, Public Voucher for Refunds, to issue payment to the attorney and to disburse the balance of the remaining funds to the claimant.  However, no remaining funds should be released to the claimant unless specifically authorized by Adjudication.  See M21-1, part III, paragraphs 12.51 through 12.54.  If there are any questions on how to interpret the Past-Due Benefits Worksheet, request clarification from Adjudication.

## 13.32  CHAPTER 32/SECTION 903 PROCEDURES

### a.  Adjudication Actions

(1)  When attorney fees are potentially payable for a chapter 32/section 903 case, before sending the case to BVA for a determination on the amount of attorney fees payable, Adjudication should prepare a VA Form 22-1997 for the past-due benefits period and for any recurring chapter 32/section 903 benefits to which the claimant is entitled.  Twenty percent of any retroactive benefits due must be withheld pending a BVA decision in regard to the amount of attorney fees payable.

(2)  Adjudication will process an award to pay benefits for one day if no BDN master record exists.

(3)  Adjudication will use an [OF] 41 or local overprint to refer the claims folder and hard copy award to the Finance activity with the following statement:  "Please compute retroactive amount which will be generated by award of (underline enter date of hard copy award).  Generate a payment to the agent cashier and establish a 51/53B deduction segment for 20 percent of the retroactive amount due."  Send the education folder to the Finance activity for necessary action.

### b.  Finance Activity Actions

(1)  The Finance activity will compute the total retroactive benefit and 20 percent of the total retroactive benefit, and write these amounts on the VA Form 22-1997, as follows: "Award will generate a $            retro payment.  A 51B/53B deduction was established for $      ."  Initial and date the VA Form 22-1997.  Photocopy the award before returning the education folder to Adjudication.  Keep the copy in a pending file until the agent cashier receives the funds.  Then forward the copy to the accounting activity.  The accounting activity will keep the copy in the suspense file until all funds have been disbursed.

(2)  Withholding of an amount equal to 20 percent of the retroactive benefits and establishment of the 51B/53B deduction segment will be accomplished as follows:

(i)  Active Master Record.  The Finance activity will take the following actions:

A.  On the 101 ready screen, enter FIST as the BDN command, the user's password, F15 as the screen number, the veteran's file number, 00 for the payee number, the veteran's stub name, and either CH32 or 903 as the benefit.  Press the enter key.

B.  BDN shows the F10, Special Payments screen.  Tab to the 06B-ONE TIME PAYMENT-ESTABLISH A/R field and enter an X in this field.  Enter the payment amount in the PAYMT AMT field and the three-digit cost code in the COST CODE field.  (The cost code may be shown at the bottom left corner of the payment screen.)  Enter 51B/53B in the CODE/CLASS field.  The deduction segment should be blank.  Complete the address segment to ensure the resulting check will be sent to the agent cashier.  The address segment should include information to assist the agent cashier to identify the payment (i. e., AC John Doe 123456789 ATTY FEES).

(ii) <u>Terminated Master Record</u>.  This situation requires two separate fiscal transactions to establish a receivable and generate a payment to the agent cashier.  The two transactions can be processed simultaneously.  The Finance activity will take the following actions:

<u>A.</u>  On the 101 ready screen, enter FIST as the BDN command, the user's password, F20 as the screen number, the veteran's file number, 00 for the payee number, the veteran's stub name, and either CH32 or 903 as the benefit.  Press the enter key.

<u>B.</u>  BDN shows the F20, Account Receivable Adjustment screen.  Tab to the 04E-ADJ CODE 4 field and enter an X in this field.  Enter 51B/53B in the DED CODE/CLASS field.  Enter the receivable amount in the ADJ AMT field.  Press the enter key.

<u>C.</u>  To generate a payment to the agent cashier, on the 101 ready screen, enter FIST as the BDN command, the user's password, F10 as the screen number, the veteran's file number, 00 for the payee number, the veteran's stub name, and either CH32 or 903 as the benefit.  Press the enter key.

<u>D.</u>  BDN shows the F10, Special Payments screen.  Tab to the 06A-4.NONE field and enter an X in this field.  Enter the payment amount in the PAYMT AMT field and the three-digit cost code in the COST CODE field.  (The cost code should be shown at the bottom left corner of the payment screen.)  Complete the address segment to ensure the resulting check will be sent to the agent cashier.  The address segment should include information to assist the agent cashier to identify the payment (i. e., AC John Doe 123456789 ATTY FEES).

*NOTE:  Suppress all fiscal letters when authorizing transactions utilizing the FAUT command.*

(3)  The Finance activity should maintain control of the education folder until it has been determined that all fiscal transactions have processed.  The education folder should then be returned to the Adjudication Division for BDN award action.

(4)  Funds received by the agent cashier should remain on deposit in the station suspense account (36F3875) until BVA determines the amount of payment due the attorney.  After BVA makes a decision on payment of attorney fees, Adjudication will prepare a Past-Due Benefits Worksheet.  (See M21-1, pt. III, chapter 12, addendum 3.)  Based on the information furnished on the worksheet, Finance will compute the amount due the attorney and process a Standard Form 1047, Public Voucher for Refunds, to issue payment to the attorney and to disburse the balance of the remaining funds to the claimant.  However, no remaining funds should be released to the claimant unless specifically authorized by Adjudication.  See M21-1, part III, paragraphs 12.51 through 12.54.  If there are any questions on how to interpret the Past-Due Benefits Worksheet, request clarification from Adjudication.

Go to Top

## 13.33  CHAPTER 35 PROCEDURES

**a. Adjudication Actions**

(1)  When attorney fees are potentially payable for a chapter 35 case, before sending the case to BVA for a determination on the amount of attorney fees payable, Adjudication should prepare a VA Form 22-1997 for the past-due benefits period and for any recurring chapter 35 benefits to which the claimant is entitled.  Twenty percent of any retroactive benefits due must be withheld pending a BVA decision in regard to the amount of attorney fees payable.

(2)  Adjudication will use an OF 41 or local overprint to refer the DEA folder and hard copy award to the Finance activity with the following statement: "Please compute retroactive amount which will be generated by award of (enter date of hard copy award).  Generate a payment to the agent cashier and establish a 44B deduction segment for 20 percent of the retroactive amount due."

**b. Finance Activity Actions**

(1)  The Finance activity will compute the total retroactive benefit and 20 percent of the total retroactive benefit, and write these amounts on the VA Form 22-1997, as follows: "Award will generate a $            retro payment.  A 44B deduction was established for $  ."  Initial and date the VA Form 22-1997.  Photocopy the award before returning the DEA folder to Adjudication.  Keep the copy in a pending file until the agent cashier receives the funds.  Then forward the copy to the accounting activity.  The accounting activity will keep the copy in the suspense file until all funds have been disbursed.

(2)  Withholding of an amount equal to 20 percent of the retroactive benefits and establishment of the 51B/53B deduction segment will be accomplished as follows:

(i)  No Master Record.  The Finance activity will take the actions shown in subparagraph (c) below to establish a 44B receivable and generate a payment to the agent cashier.

(ii)  Active Master Record.  The Finance activity will take the following actions:

A.  On the 101 ready screen, enter FIST as the BDN command, the user's password, F15 as the screen number, the veteran's file number, the appropriate payee number (10, 41, 42, etc.) shown on the VA Form 22-1997 for the payee number, the payee's stub name, and  CH35 as the benefit.  Press the enter key.

B.  BDN shows the F15, Special Payments screen.  Tab to the 06B-ONE TIME PAYMENT-ESTABLISH A/R field and enter an X in this field.  Enter the payment amount in the PAYMT AMT field and the two-digit cost code in the COST CODE field.  (The cost code may be shown at the bottom left corner of the payment screen.)  Enter 44B in the CODE/CLASS field.  The deduction segment should be blank.  Complete the address segment to ensure the resulting check will be sent to the agent cashier.  The address segment should include information to assist the agent cashier to identify the payment (i. e., AC John Doe 123456789 ATTY FEES).

(iii)  Terminated Master Record.  This situation requires two separate fiscal transactions to establish a receivable and generate a payment to the agent cashier.  The two transactions can be processed simultaneously.  The Finance activity will take the following actions:

A. On the 101 ready screen, enter FIST as the BDN command, the user's password, F25 as the screen number, the veteran's file number, the appropriate payee number, the payee's stub name, and CH35 as the benefit. Press the enter key.

B. BDN shows the F25, Account Receivable Adjustment screen. Tab to the 04E-ESTABLISH/INCREASE A/R field and enter an X in this field. Enter 44B in the CODE/CLASS field. Enter the receivable amount in the TRANS AMT field, and the current date (month/year) in the DATE field. Press the enter key.

C. To generate a payment to the agent cashier, on the 101 ready screen, enter FIST as the BDN command, the user's password, F15 as the screen number, the veteran's file number, the appropriate payee number, the payee's stub name, and CH35 as the benefit. Press the enter key.

D. BDN shows the F15, Special Payments screen. Tab to the 06A-ONE TIME field and enter an X in this field. Enter the payment amount in the PAYMT AMT field and the two-digit cost code in the COST CODE field. (The cost code should be shown at the bottom left corner of the payment screen.) Complete the address segment to ensure the resulting check will be sent to the agent cashier. The address segment should include information to assist the agent cashier to identify the payment (i. e., AC John Doe 123456789 ATTY FEES).

NOTE: Suppress all fiscal letters when authorizing transactions utilizing the FAUT command.

(3) The Finance activity should maintain control of the DEA folder until it has been determined that all fiscal transactions have processed. The DEA folder should then be returned to the Adjudication Division for BDN award action.

(4) Funds received by the agent cashier should remain on deposit in the station suspense account (36F3875) until BVA determines the amount of payment due the attorney. After BVA makes a decision on payment of attorney fees, Adjudication will prepare a Past-Due Benefits Worksheet. (See M21-1, pt. III, chapter 12, addendum 3.) Based on the information furnished on the worksheet, Finance will compute the amount due the attorney and process a Standard Form 1047, Public Voucher for Refunds, to issue payment to the attorney and to disburse the balance of the remaining funds to the claimant. However, no remaining funds should be released to the claimant unless specifically authorized by Adjudication. See M21-1, part III, paragraphs 12.51 through 12.54. If there are any questions on how to interpret the Past-Due Benefits Worksheet, request clarification from Adjudication.

Go to Top

## 13.34  CHAPTER 1606 PROCEDURES

### a. Adjudication Actions

(1)  When attorney fees are potentially payable for a chapter 1606 case, before sending the case to BVA for a determination on the amount of attorney fees payable, Adjudication should prepare a VA Form 22-1997 for the past-due benefits period and for any recurring chapter 1606 benefits to which the claimant is entitled.  Twenty percent of any retroactive benefits due must be withheld pending a BVA decision in regard to the amount of attorney fees payable.

(2)  Adjudication will use an OF 41 or local overprint to refer the education folder and hard copy award to the Finance activity with the following statement:  "Please compute retroactive amount which will be generated by award of (underline enter date of hard copy award).  Also, compute 20 percent of the retroactive amount due".  Send the education folder to the Finance activity for necessary action after taking the following award action:

> (i)  No Master Record.  Process a BDN award covering both the past due benefits period and any future period for which payments are payable.  Complete the address segment to make payment to the agent cashier including information to assist the agent cashier to identify the payment (i. e., AC John Doe 123456789 ATTY FEES).  Diary the case to ensure that payment is made (after full file pass).  Check the TINQ (Treasury Inquiry) screen to ensure that payment has been made.  Then process another award to change the address to the current mailing address of the claimant.

> (ii)  Active Master Record.  Process a BDN award to change the address to the name of the agent cashier.  Complete the address segment to make payment to the agent cashier including information to assist the agent cashier to identify the payment  (i. e., AC John Doe 123456789 ATTY FEES).  Have this amended award cover any retroactive periods.  Diary the case to ensure that payment is made (after full file pass).  Check the TINQ (Treasury Inquiry) screen to ensure that payment has been made.  Then process another award to change the address to the current mailing address of the claimant.  Exercise care that this action does not interfere with the delivery of current benefits due the claimant.

> (iii)  Terminated Master Record.  Follow the procedures in subparagraph (a) above.

*NOTE:  See part VIII, chapter 4, for instructions on awards that require out-of-system processing.  The agent cashier should also receive all payments from any out-of-system awards.*

### b.  Finance Activity Actions

*(1)  The Finance activity will compute the total retroactive benefit and 20 percent of the total retroactive benefit, and write these amounts on the VA Form 22-1997, as follows: "Award will generate a $            retro payment.  A 51B/53B deduction was established for $    ."  Initial and date the VA Form 22-1997.  Photocopy the award before returning the education folder to Adjudication.  Keep the copy in a pending file until the agent cashier receives the funds.  Then forward the copy to the accounting activity.  The accounting activity will keep the copy in the suspense file until all funds have been disbursed.*

*(2)  The Finance activity should maintain control of the education folder until it has been determined that all fiscal transactions have processed.  The education folder should then be returned to the Adjudication Division for BDN award action.*

*(3)  Funds received by the agent cashier should remain on deposit in the station suspense account (36F3875) until BVA determines the amount of payment due the attorney.  After BVA makes a decision on payment of attorney fees, Adjudication will prepare a Past-Due Benefits Worksheet.  (See M21-1, pt. III, chapter 12, addendum 3.)  Based on the information furnished on the worksheet, Finance will compute the amount due the attorney and process a Standard Form 1047, Public Voucher for Refunds, to issue payment to the attorney and to disburse the balance of the remaining funds to the claimant.  However, no remaining funds should be released to the claimant unless specifically authorized by Adjudication.  See M21-1, part III, paragraphs 12.51 through 12.54.  If there are any questions on how to interpret the Past-Due Benefits Worksheet, request clarification from Adjudication.*

*Go to Top*

## 13.35  SECTION 901 PROCEDURES

### a.  Adjudication Actions

*(1)  When attorney fees are potentially payable for a section 901 case, before sending the case to BVA for a determination on the amount of attorney fees payable, Adjudication should prepare a VA Form 22-1997 for any recurring Section 901 benefits to which the claimant is entitled and forward the award to the Finance activity.  Twenty percent of any retroactive benefits due must be withheld pending a BVA decision regarding the amount of attorney fees payable.*

*(2)  Adjudication will use an OF 41 or local overprint to refer the folder and education award to the Finance activity with the following statement: "Please compute retroactive amount which will be generated by award of (<u>enter date of hard copy award</u>).  Also, compute 20 percent of the retroactive amount due."*

### b.  Finance Activity Actions

*(1)  The Finance activity will compute the total retroactive benefit and 20 percent of the total retroactive benefit, and write these amounts on the VA Form 22-1997, as follows: "Award will generate a $_____ retro payment.  20% of the retro amount is $_____."  Initial and date the VA Form 22-1997.  Photocopy the award before returning the claims folder to Adjudication.  Keep the copy in a pending file until the agent cashier receives the funds.  Then forward the copy to the accounting activity.  The accounting activity will keep the copy in the suspense file until all funds have been disbursed.*

*(2)  The Finance activity should maintain control of the claims folder until it has been determined that all fiscal transactions have processed.  The claims folder should then be returned to the Adjudication Division for BDN award action.*

*(3)  Funds received by the agent cashier should remain on deposit in the station suspense account (36F3875) until BVA determines the amount of payment due the attorney.  After BVA makes a decision on payment of attorney fees, Adjudication will prepare a Past-Due Benefits Worksheet.  (See M21-1, pt. III, chapter 12, addendum 3.)  Based on the information furnished on the worksheet, Finance will compute the amount due the attorney and process a Standard Form 1047, Public Voucher for Refunds, to issue payment to the attorney and to disburse the balance of the remaining*

*funds to the claimant. However, no remaining funds should be released to the claimant unless specifically authorized by Adjudication. See M21-1, part III, paragraphs 12.51 through 12.54. If there are any questions on how to interpret the Past-Due Benefits Worksheet, request clarification from Adjudication.*

*Go to Top*

---

## SUBCHAPTER IX. CLAIMS PROCESSING DURING EMERGENCY SITUATIONS

### 13.36  General

This subchapter deals with claims processing when a school or training establishment temporarily or permanently closes due to an emergency situation (i.e., natural disaster, pandemic, state government shutdown, strike, etc.). (See 38 U.S.C. §3601 - §3605,   38 U.S.C. 3680(a))

**a.**  By law, the term "emergency situation" indicates the—

(1)  President has declared an emergency; or

(2)  VA Secretary has determined an emergency under laws administered by the VA. VA must establish the beneficiary was negatively affected by the emergency. An emergency alone does not constitute payments.

**b.**  A may continue payments up to 28 calendar days (four weeks) or through to the end of the certified term, whichever is earlier, when a school temporarily/permanently closes due to an emergency situation. Payments include:

(1)  Monthly housing allowance under chapter 33

(2)  Subsistence allowance under chapters 30, 33, 35, and 1606

***Note***: *VA has no authority to issue payments for terms that would have begun during a temporary shutdown. In that scenario, VA will resume payments for training effective the date the beneficiary begins training after the school reopens.*

**c.**  Final award actions would include review for eligibility for extension of delimiting date and restored entitlement.

*Go to top*

---

### 13.37  School Reporting Actions

During an emergency closure, School Certifying Officials (SCO) and Certifying Officials (CO) will report the following to their State Approving Agency (SAA) and Education Liaison Representative (ELR):

**a.** All school closures, including those longer than 28 calendar days

**b.** Total number of closed days and all official breaks

**c.** Amended training periods (begin and end dates)

**d.** Reason for closure (i.e. natural disaster affected institution, state government shutdown, strike, etc.)

**e.** Closures at beginning of a certified enrollment period

***Note****: VA has no authority to begin payments when an institution is closed.*

**f.** Changes in modality (residence to distance)

**g.** Date facility reopens or when training resumes

If a beneficiary is unable to resume classes when the school reopens (or if they remained opened), VA would not be able to continue payments. When the beneficiary is no longer pursuing classes due to an emergency situation, the school will submit an enrollment certification reporting the termination as soon as possible. VA should be notified that termination is due to an established emergency situation.

Schools should notify their SAA and ELR if a program of education or training is negatively impacted by a declared emergency situation. This would include any truncated, delayed, relocated, canceled, partially canceled, converted from on-site to distance learning, or otherwise modified or made unavailable training programs.  Schools should follow additional guidance provided by VA, SAA, and ELR.

ELRs will report this information (including school name and facility code (FAC)) to the Chief Education Liaison Officer (CELO). The CELO will review and forward this information to the Education Service Operations Management team at VBACOEDUCATIONSERVICEFIELDOPERATIONS@va.gov. The team will prepare a list of beneficiaries currently enrolled at the facility and release it to the responsible Regional Processing Office (RPO) for immediate processing.

Go to top

---

### 13.38  Claim Processing Actions

Processors will review amended enrollment information and take the following action:

**a.** Permanent school closure: Route claim to RESTORATION queue for specialized processing.

**b.** Change in Type Training (residence to distance):

(1) Beginning of term: School certifies as residence hours with supporting remarks (for example, Call Center 119E or AVA contact). VCE will process as residence hours and beneficiary will be paid at the in-resident rate. No WEAMS approval needed for distance hours.

(2) Mid-Term: School should not report changes to VA.

(a) If reported under chapters 30, 35, or 1606, the VCE will make no adjustments.

(b) If reported under chapter 33, the VCE should delete the document from the Enrollment Manager (EM) inbox, suppress the payment letter, and authorize the work product. Beneficiary will continue to be paid for residence hours until the end of the enrollment period.

***NOTE***: *VCE is not entitled to an end product for clearing the EM inbox.*

**c.** Training modified or made unavailable (truncated, delayed, relocated, canceled, partially canceled, etc.): VCE will continue to pay the monthly amount payable before the change, for a maximum of 28 calendar days.

**d.** School remains open, beneficiary unable to complete training:  If the new enrollment information indicates beneficiary was terminated due to reasons beyond their control (i.e. mitigating circumstances have been provided) and school remained open (including after a period of being closed), VCE will process as normal and apply mitigating circumstances (see M22-4, Part 4, Chapter 11, Subchapter 3).

**e.** School reopened, but closed 28 calendar days or less, no change in term dates: If the new enrollment information indicates the school has been closed for 28 calendar days or less and term dates remain unchanged, no processing is necessary.

**f.**  School closes during term, remains closed:

**(1)** Chapter 30, 35, and 1606 Processing

**Step 1** FLASH TIMS appropriately and add "TCLOSED" to TIMS facility code field.

**Step 2** Stop claim with a no-pay date 28 days from the reported school closure date. Use BDN end reason code 39.

***Note***:  *If the enrollment period ends less than 28 days after the school closure date, no BDN adjustments are required.*

**Step 3** Add BDN STOP message: "STOP SCHOOL CLOSED (insert date and reason)" when possible and suppress the generated letter. Under chapter 35, put this in the message field (MSG) on the BDN 500 screen.

**Step 4** Release payments through stop date using CERT command, when applicable.

**Step 5** Send edited adverse action letter to beneficiary, clearly explaining the reason(s) benefits have been stopped.

*Note: Once VA receives notice indicating school has reopened, the VCE will resume payments for the enrollment period from the date the school reopens until the revised term end date. Training time will be based on the enrollment information originally reported, unless the school reports a reduction in training hours.*

**(2)** Chapter 33 Processing

**Step 1** FLASH TIMS appropriately and add "TCLOSED" to TIMS facility code field.

**Step 2** Add Stop Automation flag on DGI Biography page.

**Step 3** Work Product 1

- For IHLs, add an amendment terminating enrollment. VCE will extend effective date 4-weeks from date reported or to end of term, whichever is earlier. Authorize Work Product without payments, isolating tuition/fee and other debts.

- For NCD facilities, process as a leave of absence (LOA). Add an amendment terminating the enrollment. The VCE will extend effective date 4-weeks from date reported or to end of term, whichever is earlier. Authorize Work Product without payments, isolating tuition/fee debts.

**Step 4** Work Product 2

- Make no additional changes in DGI and authorize with automatic payments. This action will prevent additional erroneous housing payment from being released.

- Edit the beneficiary's payment letter to explain why benefits have been stopped. Remove references to tuition and fee debts which would not be established at this time.

*Note: Debts for MHA or Books and Supplies for NCD facilities paid after 28 calendar days should be manually established.*

**Step 5** Work Product 3. When notice is received indicating school has reopened:

- For IHLs, delete the amendment which terminated the enrollment.

- For NCD facilities, update (NCD interruption) amendment as necessary with additional non-payable days after 28 calendar days.

*Note: Once VA receives notice indicating school has reopened, VCE will resume payments at the same rate of training as originally reported from the date school reopens until the revised term ending date, unless the school reports a reduction in training hours.*

**Step 6** Edit original enrollment ending date, if necessary.

- Enter number of days school was closed, including the 4-week extension, as "vacation" days on the enrollment pop-up.

- If necessary, edit full-time measure to manipulate rate of pursuit (RoP).

- Verify any adjustments by ensuring the MHA payment amount is the same as paid before the school closure was reported.

*Note: This step does not apply to NCD facilities where LOA is used.*

**Step 7** Authorize without payments. Review the Payment Instruction for a generated tuition and fees payment that offsets the previously generated but not established tuition and fees debt.

**Step 8** Following local policy, request Finance process MHA payments due beginning from date school reopened through revised ending date.

*Note: Step 8 must be completed prior to Step 9.*

**Step 9** Work Product 4: Make no changes to DGI and authorize with automatic payments. This step will correct recurring payments and date last paid.

**Step 10** Edit DGI-generated letter as necessary and release.

**g.** School reopens, closed for 28 calendar days or less, term end date extended for 28 calendar days or less.

(1)  Clock hours. Contact SCO to verify any holiday breaks (7+ consecutive days) during the period of extension. Follow current procedures to recalculate the approved length of the course, excluding holiday breaks and the period of closure. Process the term date changes accordingly.

(2)  Chapter 30, 35, and 1606 Credit Hours. Extend the end date as reported, leave training time unchanged.

(3)  Chapter 33 Credit Hours. Extend the end date as reported. Verify MHA rate. If MHA rate changes, adjustments are needed to revert MHA rate to the original rate.

(a)  Term previously non-standard, still non-standard in length:  Compute amount of time end date was extended, add to **Vacation Days** field in DGI.

(b)  Term previously non-standard, now standard in length:  Adjust the full-time hours in DGI manually.

**Step 1**  Determine RoP of original non-standard length term prior to change.

**Step 2**  Use Credit Hour Equivalent (CHE) spreadsheet to convert the credit hours.

**Step 3**  Take the converted number and divide by the full-time hours in DGI for RoP.

**Step 4**  Divide the <u>unconverted</u> credit hours by the RoP.

**Step 5**  Update FT hours in DGI with the adjusted number.

***Example:***

Semester term was 08-15-24 to 10-30-24 (11 weeks, non-standard), 4 credit hours, full-time modifier 12 credit hours

School reports term extended to 12-10-24 (17 weeks, standard)

CHE worksheet converted 08-15-24 to 10-30-24 credit hours from 4 hours to 6.5 converted hours

6.5 converted hours / 12 FT = .54167 RoP (five decimals out)

4 hours / 0.54167 RoP = 7.38 revised full-time hours to input in DGI

***Note**: Standard semester term length is 15 to 19 weeks and Standard quarter term length is 10 to 13 weeks. Using Vacation Days field will not work in this scenario since DGI ignores this field when the term is standard length.*

**h.**  School reopens, closed for 28 calendar days or less, term end date extended for more than 28 calendar days.

(1) Clock hours. Contact SCO to verify any holiday breaks (7+ consecutive days) during the period of extension. Follow current procedures to recalculate the approved length of the course, excluding holiday breaks and closure period. Process the term date changes accordingly.

(2) Chapter 30, 35, and 1606 Credit Hours. Recalculate the term's training time, excluding the closure period. If the term is then non-standard in length, contact SCO to verify any holiday breaks (7+ consecutive days) during the period of extension for exclusion and recalculation. If the training time changes, process changes effective beginning of the term. If an overpayment is created, send an adverse action letter regarding the changes and amount of overpayment.

(3) Chapter 33 Credit Hours.

(a) Contact the SCO to verify if all official school breaks were reported (i.e. holiday breaks greater than 7 days) in addition to the school closure.

(b) Document the response in TIMS and reprocess the enrollment.

(c) Non-standard term. Add vacation days in DGI equal to the number of days for official breaks and the length of time the school was closed.

> *Note: As a result, RoP may be lower and the rate due for MHA could be less.*

(d) Non-standard to standard term. RoP will need to be recalculated for terms extended longer than the length of time a school is closed. Follow the steps below:

> **Step 1**  Calculate adjusted RoP using CHE spreadsheet. Enter dates school closed and holiday breaks on the job aid Holiday Break Dates section. Divide CHE result by full-time amount for program.
>
> Formula: CHE from worksheet / Full-time = Adjusted RoP
>
> **Step 2**  Calculate the adjusted full-time amount by dividing actual credit hours enrolled by the adjusted RoP.
>
> Formula: Credit Hours / Adjusted RoP = Adjusted full-time amount
>
> **Step 3**  Enter adjusted full-time amount in DGI.
>
> **Note**: *The resulting RoP may be lower and the rate due for MHA could be less.*
>
> **Step 4**  If changes result in an overpayment, advise the beneficiary of the changes to the length of the enrollment period reported by their school, circumstances for these changes, and amount of overpayment in an adverse action letter.

**i.** School reopens, closed for more than 28 calendar days, term dates extended 28 calendar days or less.

> **(1)** Chapters 30, 35, and 1606
>
> (a) If the term dates extend for more than 28 calendar days, contact the SCO to verify if in addition to the school closure there were any other official school breaks (i.e. holiday breaks greater than 7 days) during the period of extension.
>
> (b) Document the response in TIMS and reprocess the enrollment.
>
> - Clock hours. Follow the procedures to verify if the certified period is payable (e.g. length of course approved, excluding approved breaks and up to 28 calendar days extension).
>
> - Credit hours. Recalculate the term's training time excluding the length of time the school was closed and the number of days for official breaks when the

original term was non-standard length.

(c) If there is no change to training time, extend the ending date as certified.

(d) If the calculation results in a lower training time, process an adjustment effective at the beginning of the enrollment period.

(e) if changes result in an overpayment, include the reported changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

**NOTE**: *Audit worksheet used for calculating the overpayment should be captured into the TIMS record.*

**(2)** Chapter 33 (school closed for a period of more than 28 calendar days).

(a) If the term dates extend for a period greater than 28 calendar days, extend the ending date as reported.

(b) Contact the SCO to verify if in addition to the school closure there were any other official school breaks if not reported (i.e. holiday breaks greater than 7 days).

(c) Document the response in TIMS and reprocess the enrollment.

(d) Clock hours. Follow the procedures to verify if the certified period is payable (i.e., length of course approved).

(e) Credit hours

- Non-standard term. Add vacation days in DGI equal to the number of days for official breaks and the length of time the school was closed.

  **NOTE**: *As a result, RoP may be lower and the rate due for MHA could be less.*

- Non-standard to standard term. RoP will need to be recalculated for terms extended longer than the length of time a school is closed. Follow the steps below:

  **Step 1** Calculate the adjusted RoP using the CHE spreadsheet. Enter dates school closed and holiday breaks on the job aid Holiday Break Dates section. Divide CHE result by full-time amount for program.

  *Formula: CHE from worksheet / Full-time = Adjusted RoP*

  **Step 2** Calculate the adjusted full-time amount by dividing actual credit hours enrolled by the adjusted RoP.

  *Formula: Credit Hours / Adjusted RoP = Adjusted Fulltime amount*

  **Step 3** Enter adjusted full-time amount in DGI.

*Note: The resulting RoP may be lower and the rate due for MHA could be less.*

**Step 4**  If changes result in an overpayment, include the reported changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

**j.** School reopened, closed for more than 28 calendar days, term dates extended more than 28 calendar days.

**(1)** Chapters 30, 35, and 1606.

(a) If the term dates extend for a period of more than 28 calendar days, contact the SCO to verify if in addition to the school closure there were any other official school breaks (i.e. holiday breaks greater than 7 days).

(b) Document the response in TIMS and reprocess the enrollment.

- Clock hours. Follow the procedures to verify if the certified period is payable (e.g. length of course approved, excluding approved breaks and up to 28 calendar days extension).

- Credit hours. Recalculate the term's training time excluding the length of time the school was closed and the number of days for official breaks when the original term was non-standard length.

(c) If there is no change in training time, extend the ending date as certified.

(d) If the calculation results in a lower training time, process an adjustment effective at the beginning of the enrollment period.

(e) If changes result in an overpayment, include the reported changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

**(2)** Chapter 33

(a) If the term dates extend for a period greater than 28 calendar days, extend the ending date as reported.

(b) Contact the SCO to verify if in addition to the school closure there were any other official school breaks if not reported (i.e.  holiday breaks greater than 7 days).

(c) Document the response in TIMS and reprocess the enrollment.

(d) Clock hours. Follow the procedures to verify if the certified period is payable (i.e., length of course approved).

(e) Credit hours.

- Non-standard term. Add vacation days in DGI equal to the number of days for official breaks and the length of time the school was closed.

    *NOTE: As a result, RoP may be lower and MHA rate could be less.*

- Non-standard to standard term. RoP will need to be recalculated for terms extended longer than the length of time a school is closed. Follow the steps below:

    1. Calculate the adjusted RoP using the CHE spreadsheet. Enter school closure dates and holiday breaks on the job aid Holiday Break Dates section. Divide CHE result by full-time amount for program.

    *Formula: CHE from worksheet / Full-time = Adjusted RoP*

    2. Calculate the adjusted full-time amount by dividing the actual credit hours enrolled by the adjusted RoP.

    *Formula: Credit Hours / Adjusted RoP = Adjusted Fulltime amount*

    3. Enter adjusted full-time amount in DGI.

    *NOTE: The resulting RoP may be lower and the rate due for MHA could be less.*

    4. If changes result in an overpayment, include the reported changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

Go to top

## 13.39  On the Job & Apprenticeship

Some facilities may be forced to close or suspend OJT and APP training programs or to modify the conditions of training/work to a virtual or remote environment during a designated emergency situation. VA may continue apprenticeship/on-the-job training assistance allowance payments up to 28 calendar days or through to the end of the certified training period, whichever is earlier, when a beneficiary fails to complete 120 hours of training due to an emergency situation. Hours will be reduced in DGI or BDN and payment will be at the full-time rate of 120 hours or more.

**a.** Continued training, remote environment. Training may be converted from on-site (resident) training to virtual or remote training. Certifying Officials (CO) will continue to report hours for trainees who continue to train during the emergency situation. VCEs should continue to process these claims as usual. No additional action needed.

**b.** *Facility temporarily ceases operations.* COs will report temporary closures as individual trainee terminations. Trainees unable to continue training because their facility was forced to close due to the emergency situation may continue to receive benefit payments for up to 28 calendar days or until the facility reopens and training resumes (whichever is sooner).

> **Step 1**   Flash TIMS appropriately and add "TCLOSED" to TIMS facility code field.
>
> **Step 2**   Calculate adjusted termination date and adjust the award (reported termination date plus up to 28 calendar days).
>
> **Step 3**   For Chapter 33 claims, a separate Work Product will be required when processing a termination. Process the termination only, without CERTS updated, and authorize without payments.
>
> > a. Do not establish system generated books and supplies overpayment. These will not be collected, and this payment must not be reissued if a trainee resumes training during the same academic year.
> >
> > b. To prevent duplicate payments, books and supplies payment generated must not be paid – when reestablishing benefits, authorize the first Work Product with no payments.
>
> **Step 4**   VCEs should enter 120 hours for the month of closure (regardless of hours reported by the CO) and 120 hours through the termination date when it spans another month. The temporary closure policy allows the claimant to be authorized continued full payment for up to 4 weeks (28 days) or the resumption of the training, whichever is sooner.

**Example**: The facility reports the last day of attendance or termination as March 16. VCE should manually authorize the full housing payment through end of March and for the next 13 days in April. If not possible to cert through the revised termination date, control through the 28th day.

> **Step 5**   VCEs will edit the payment letter to include the reason reported on the termination. For example, "Your facility has reported they temporarily ceased operations due to a emergency situation. VA is authorized to extend payments 28 days from your last reported training day. This has been processed and you will receive…"

> **c.** Facility continues operations but stops an individual's training. COs will report the termination date. Trainees whose training program is suspended or are unable to continue training for any other reason cannot be paid after training stops. This includes situations where the trainee continues working at the facility but is no longer performing activities associated with the OJT/APP training plan.

> > **Step 1** Flash TIMS appropriately and add "TCLOSED" to TIMS facility code field.
> >
> > **Step 2** Continue to process these claims as usual except include new guidance above for terminations without establishing overpayments for books and supplies.
> >
> > **Step 3** Send the appropriate payment letter based on this action.

In all cases, benefit payments may resume when the trainee returns to a training status.

## 13.40  Delimiting Date Extension

Delimiting dates under chapters 30, 33 (including under transfer of entitlement (TOE) and Fry Scholarship), 35, and 1606 may be extended if VA determines beneficiaries were prevented from pursuing their individual chosen program of education due to a school closure (temporary or permanent) before the expiration of their previous delimiting date. This extension must be requested by the beneficiary.

*Note: If beneficiary does not have delimiting date, no action is required.*

*Note: Beneficiaries should be notified if their delimiting date has been extended under this provision.*

**a.** Chapters 30 and 1606**.** Calculate length of extension in days and input amount in DELIM DATE ADJ TYPE field and enter day after original delimiting date in the FROM field on BDN 310 screen. GAP and send for authorization.

**b.** Chapter 33

(1) Veteran/TOE Spouse

**Step 1** Calculate beneficiary's adjusted delimiting date by adding number of days equal to emergency situation or number of days until end of term, whichever is less, to the current delimiting date.
**Step 2** Open new DGI work product, enter adjusted delimiting date in CHAPTER 33 DELIMITING DATE OVERRIDE field, and send for authorization.
**Step 3** For TOE spouse, after authorization of Veteran's work product, open new DGI work product, verify delimiting date and entitlement, and send for authorization.

(2) TOE/FRY Child

**Step 1** Calculate beneficiary's adjusted delimiting date by adding number of days equal to emergency situation or number of days until end of term, whichever is less, to their date of birth.
**Step 2** Create new DGI work product, disassociate from VADIR, and enter adjusted date of birth in DATE OF BIRTH field on CLAIMANT BIOGRAPHY screen.
**Step 3** If extension crosses original delimiting date, only extend by number of unpaid days.
**Step 4** If necessary, verify date in DGI HIGH SCHOOL GRADUATION OR EQUIVALENT field to ensure updated date of birth does not impact chapter 33 payments. Adjust if necessary to prevent any overpayment.
**Step 5** Verify delimiting date and entitlement and send for authorization.

(3) FRY Spouse. If spouse has a delimiting date due to remarriage, adjust the Veteran's date of death by number of days equal to emergency situation.

**c.** Chapter 35

(1) Spouse.

(a) Enter days of emergency situation in PERIOD OF DISABLITY- DAYS field and enter the day after the current delimiting date in DATE ELECTED BY CLAIMANT field on BDN 311 screen.

(b) Repeat last award line on BDN 312 screen, GAP, and send for authorization.

(2) Child.

(a) Enter date emergency situation started in TIME LOST BEYOND CONTROL-BEGIN DATE field and enter date school reopened (up to a maximum of 28 calendar days) in END DATE field on BDN 311 screen.

(b) Repeat last award line on BDN 312 screen, GAP, and send for authorization.

Go to top

## 13.41  Entitlement Restoration

When a school is temporarily closed due to an emergency situation, VA will continue to pay benefits under chapters 30, 32, 33, 35, and 1606 through to the end of the term or 28 days, whichever is sooner. However, this educational assistance will not be charged against entitlement. Under these circumstances, beneficiaries would be eligible for restoration of benefits.

***Note:*** *Beneficiaries should be notified when entitlement has been restored under this provision.*

**a.** Chapter 30 and 1606

**Step 1** Calculate entitlement used in days using the RPO Worksheet Entitlement Calculator (up to end of term or 28 days, whichever is less)

**Step 2** CORR BDN M23 screen and enter number of restored days in CUM RESTORED field (up to 28 calendar days). Hit enter.

**b.** Chapter 33

**Step 1** Calculate entitlement used in days using the appropriate formula below:

<u>Enrollments – Tuition Payable</u>. Calculation is a two-part process. First, divide academic year tuition cap by 360 days, then multiply by benefit level (100%, 90%, etc.) to calculate daily rate. Next, multiply daily rate by charged tuition for entitlement used.

*Formula:*

- *Academic Year Tuition Cap / 360 days \* Benefit Level = Daily Rate*

- *Daily Rate \* Tuition = Charged Entitlement*

Example, academic year cap is $17500, benefit level is 100%, tuition payment is $1000:

- $17500 / 360 days \* 1.0 (100%) = $48.61111 per day

- $1000 / 48.61111 = 20.57 days (rounded to 20 days)


<u>Enrollments - MHA only, No Tuition</u>. Calculation is a two-part process. First, calculate rate of pursuit (RoP) for the term by dividing total number of credit hours enrolled by number of credit hours considered to be full time. Next, multiply RoP by payable days for entitlement used.

**NOTE:** *ECH calculator would be required to adjust RoP (enrolled credit hours) for non-standard terms.*

*Formula:*

- *Enrolled Credit Hours / Full-Time Modifier = Rate of Pursuit*

- *Days of Emergency Benefits Paid (up to 28) \* RoP = Charged Entitlement*

Example, enrolled in 7 credits, full time is 12 credits, 120 days in term, 28 days of emergency benefits paid:

- 7 credits / 12 credits = .58333 (not rounded)

- .58333 RoP \* 28 days = 16.33324 (rounded to 16 days)

**Step 2**

Open new DGI work product. Under MANUAL AWARDS on Work Product Summary screen, restore charged entitlement by opting to "Add Entitlement" in TYPE field, entering restored entitlement (up to 28 calendar days) in ENTITLEMENT field, and adding "Restored Entitlement – Emergency Situation" in DESCRIPTION field. Send for authorization.

**c.** Chapter 35

**Step 1**

Using the Credit Hour Equivalence Worksheet, Type in the beginning and end term dates.  Then adjust the total entitlement used to equal the amount of days the school was closed by subtracting days from the term's end date, ensuring the max amount is no more than 28 calendar days.

**Step 2**

On BDN 312 screen:

- Enter or reenter the term line using the start date for the term using begin reason 29 with no end date.

- Next enter correct training time,  "D" under hour type, and number of credits.

- Enter a 0 under entitlement charged followed by the correct training type.

- On the following line enter the date in which entitlement can be charged (use no pay date) followed by begin reason 29.

- Then enter the end date (no pay date) for the term with end reason code 39.

- Keep all other information the same except change the entitlement charge to equal training time and hour type back correct hour type (S,Q, or C).

Go to top

---

### SUBCHAPTER X. RUDISILL V. MCDONOUGH CLAIMS PROCESSING

13.42  Supplemental Claims Review Per Rudisill V. McDonough Ruling

**Election to Receive Post-9/11 GI Bill (PGIB) is Required When Coordination of Montgomery GI Bill (MGIB) & PGIB is Necessary**

On April 16, 2024, the Supreme Court of the United States issued its opinion on case 22-888, Rudisill v. McDonough, Secretary of Veterans Affairs. The case was previously heard by the United States Court of Appeals for Veterans Claims on May 2, 2018, and the United States Court of Appeals for the Federal Circuit on December 19, 2020. The case was formerly known as B.O. (a pseudonym) v. Wilkie.

*The Supreme Court held that an election to receive Post-9/11 GI Bill (PGIB/Chapter 33) benefits under 38 U.S.C. § 3327 is only required when "coordination" of Montgomery GI Bill – Active Duty (MGIB/Chapter 30) and PGIB entitlement is necessary under § 3322(d).*

Only beneficiaries with a single period of qualifying active-duty service which began prior to August 1, 2011, who have previously used entitlement under MGIB, and remain eligible for MGIB benefits as of the date of their application for PGIB, will be required to make an election under § 3327 to establish PGIB benefits.

All other beneficiaries, including those with a single period of qualifying active-duty service which began on or after August 1, 2011, may make a voluntary election under § 3327 to receive a Montgomery GI Bill – Selected Reserve (MGIB-SR/Chapter 1606) or MGIB kicker under § 3316, and/or a refund of MGIB contributions under § 3327(f). A voluntary election may also be made to credit service that began prior to August 1, 2011, previously used to establish MGIB, to increase the PGIB benefit level.  This voluntary election can be made at any time and the lack of said election is not a bar to eligibility under PGIB.

## A. Provisions

The Court's ruling invalidates VA's statutory interpretation that a Veteran who qualifies for both the MGIB and PGIB _based on multiple periods of service_ must forfeit eligibility for MGIB when they start using PGIB. It also invalidates VA's statutory interpretation that such a person's PGIB is limited to the months of entitlement remaining under MGIB.

- If a Veteran or service member _completed at least two periods of service_—one that qualifies for the Montgomery GI Bill (MGIB-Active Duty or MGIB/SR-Selected Reserve) and a separate period of service that qualifies for the Post-9/11 GI Bill (PGIB)—they may be able to receive additional GI Bill benefits due to the Rudisill decision.

The issue decided in the case _pertains to individuals with multiple periods of active-duty service_ who have used MGIB benefits and relinquished MGIB benefits for the PGIB, *and* whether their PGIB entitlement is limited to the remaining MGIB entitlement **or** the 48-month rule. **The Supreme Court found that the 48-month rule applies in this scenario.**

- Veterans who have _two or more distinct (separate) periods of service that qualifies them for **both** MGIB and PGIB may use benefits under both programs._ (All entitlement used under MGIB, MGIB-SR, and PGIB is calculated in/deducted from the 48-month entitlement maximum.)

The Secretary of Veterans Affairs has determined similarly circumstanced Veterans to Mr. Rudisill, who were previously required to relinquish their MGIB eligibility to establish PGIB eligibility, and who have requested to nullify their previous relinquishment (or had their previous relinquishment nullified by VA), are eligible for an extended MGIB and/or PGIB delimiting date under the authority of §3031(i).

- The purpose of this extension is to afford Veterans an opportunity to use restored benefits which were previously inaccessible or reduced.

## B. Applicability

*The new Rudisill interpretation changes how **multiple periods** of qualifying military service impacts benefits earned. This allows some beneficiaries more flexibility in the coordination of their VA Education benefit programs **when:***

1. *Multiple periods of qualifying active-duty service:*

Separate, distinct periods of service may qualify for **both** MGIB and PGIB benefits, no relinquishment is needed.

2. *One period of qualifying service – and that one period began <u>before</u> August 1, 2011:*

   If MGIB was used prior to PGIB, there was MGIB entitlement remaining at the time of PGIB application, and service was used to establish both MGIB and PGIB, then MGIB relinquishment is needed.

3. *Multiple periods of qualifying service – and at least one period began <u>before</u> August 1, 2011:*

   If MGIB was used prior to PGIB, there was MGIB entitlement remaining at the time of PGIB application, and service was used to establish both MGIB and PGIB, then MGIB relinquishment is needed.

4. *Service periods that began <u>on or after</u> August 1, 2011:*

   This service cannot be used to establish both MGIB and PGIB benefits.

5. *Kicker and MGIB contributions refund:*

   Relinquishment of MGIB is required to receive the MGIB kicker and/or contributions refund.  Relinquishment of MGIB-SR is needed to receive the MGIB-SR kicker.

6. Extension of MGIB or PGIB delimiting date:

   The purpose of this extension is to afford Veterans an opportunity to use restored benefits which were previously inaccessible or reduced.

For eligible Veterans who previously had to forfeit their MGIB benefits to use PGIB:

- If eligible for MGIB, VA will recalculate their MGIB delimiting date and return time after the election was made equal to the amount of time which would have been afforded them (had the benefit not been relinquished).

- For eligible Veterans whose *PGIB benefits were limited to the amount remaining under MGIB at the time of relinquishment,* VA will restore their remaining entitlement then recalculate their delimiting date and return time after the election was made equal to the amount of time which would have been afforded them (had the entitlement not previously expired).

- Both extensions will be calculated for a period equal in length to the time elapsed between the date of the original relinquishment and the relevant chapter's delimiting date or the date of issuance of the new Certificate of Eligibility (whichever is earlier), plus 90 days.

**C. VCE Review Procedures**

**AUTHORIZATION NOTE:**  Single signature authority is at the discretion of the Education Officer except where noted in M22-4, Part 3, Chapter 1, Sub-chapter 4, 1.19 Single Signature Authority. When service, eligibility, and/or entitlement is unchanged, a second signature is not required (e.g., "Rudisill N/A" – no re-enlistment, did not relinquish Chapter 30 MGIB-AD, no longer eligible for Chapter 1606 MGIB-SR, used 48 months, etc.).

VCEs should use the appropriate process flow detailed below when reviewing claims for re-adjudication.

(**NOTE**: For more information on uploading letters into DGI, see M22-4, Part 12, Chapter 6, Sub-chapter 12, 12.06 Letter Upload Functionality.)

## Veteran Relinquished MGIB-SR/Chapter 1606

### a. Veteran is no longer eligible for MGIB-SR <u>or</u> Veteran is still eligible for MGIB-SR and received an MGIB-SR kicker under PGIB:

1. Establish a Work Product in DGI with description, "#RUD". Do not enter additional text in the description field, as the field will be used for tracking purposes.

2. Do not remove the relinquishment.

3. Suppress the DGI-generated letter and remove the body, except for the salutation, Certificate of Eligibility section, and enclosures.

4. Open the "RUD1606 RETAINED LETTER" and paste into the DGI-generated letter.
   - Retain the enclosures generated by DGI, including the If You Need Help and appeal information.

5. Save the edited notification letter.

6. Capture a VA Form 119e with "Rudisill" included in the statement box into the TIMS folder. No other fields are required to be populated. Remark the document, "RUDISILL".

7. Route the claim for authorization, if appropriate, or authorize the Work Product and upload the edited notification letter to DGI.

### b. Veteran is still eligible for MGIB-SR, but has never received an MGIB-SR kicker under PGIB:

1. Establish a Work Product in DGI with description, "#RUD". Do not enter additional text in the description field, as the field will be used for tracking purposes.

2. Remove the relinquishment. (see INSTRUCTIONS FOR REMOVING BENEFIT RELINQUISHED attachment) You MUST re-input any/all entitlement used under MGIB-SR but DO NOT relinquish the benefit.

3. Suppress the DGI-generated letter and remove the body, except for the salutation, Certificate of Eligibility section, and enclosures.

4. Open the "RUD1606 REVERSED LETTER" and paste into the DGI-generated letter.
   - Retain the enclosures generated by DGI, including the If You Need Help and appeal information.

5. Save the edited notification letter.

6. Capture a VA Form 119e with "Rudisill" included in the statement box into the TIMS folder. No other fields are required to be populated. Remark the document, "RUDISILL".

7. Route the claim for authorization, if appropriate, or authorize the Work Product and upload the edited notification letter to DGI.

## Veteran Relinquished MGIB

1. **Capture VIS (service and reenlistment data)**.  Personnel status must be captured even if blank.

> *Review VIS for distinct enlistment periods, call-ups, and conditional discharges due to immediate re-enlistment. See the System Advisory, "VIS Updates Installed on December 1, 2020", dated December 3, 2020, for more information on how to view re-enlistment data in the VIS application.*

2. **Only one period of qualifying service – and that one period began before August 1, 2011?**

> If no, go to 3.

> If yes, and all below are true, election is required, go to 5a.  If any are not true, go to 4.

- MGIB was used before PGIB, and

- Eligible for MGIB at the time of PGIB application; and

- One period of qualifying service began before August 1, 2011; and

- That one period was used to establish MGIB and PGIB.

3. **Are there multiple periods of qualifying service – and at least one period began before August 1, 2011?**

> If no, go to 4.

> If yes, and all below are true, election is retained, go to 5b.  If any are not true, go to 4.

- MGIB was used before PGIB, and

- Eligible for MGIB at the time of PGIB application; and

- Same service that began before August 1, 2011, was used to establish both MGIB and PGIB. **

> *** How to check if service was used to establish both MGIB and PGIB:  In DGI, mark the shortest or most advantageous period of service, used to establish MGIB as "non-qualifying" "used for other benefit" to ascertain if service impacts PGIB eligibility.  If the PGIB benefit level changes or debts are created, the service was used to establish both MGIB and PGIB; change back to "qualifying".  ***

> *Example:*

> *08-01-07 to 07-31-09 (2-year enlistment)*

> *08-01-16 to 07-31-17 (1-year call-up)*

> *MGIB established based on 08-01-07 to 07-31-09 (2-year enlistment).*

> *PGIB established based on 08-01-07 to 07-31-09 and 08-01-16 to 07-31-17.*

*Marking 08-01-07 to 07-31-09 as "non-qualifying" would decrease PGIB benefit level.*

*Service that began prior to 08-01-11 was used to establish both MGIB and PGIB.*

4. **Review the following:**

    **a. Is Veteran eligible for a <u>kicker</u>?**  If yes, election is retained, go to 5b.

    **b. Is Veteran potentially <u>eligible</u> for the MGIB contribution <u>refund</u> once PGIB exhausts, and <u>eligible</u> for <u>MGIB</u>?**  If yes, election is <u>reversed</u>, go to 5c.

> *To check MGIB contribution refund eligibility, see <u>M22-4, Part XII, Sub-Chapter 4.6, 6.01</u>.  For example, the Veteran is not the last payee or did not make a MGIB contribution.*
>
> *To check MGIB eligibility:*
>
> > *Review if MGIB entitlement exhausted or 48 months of education benefits has exhausted.*
> >
> > *Service that began before August 1, 2011, that was first used to establish PGIB cannot be used to establish MGIB.  Service that began on or after August 1, 2011, that was used to establish PGIB cannot be used to establish MGIB.*
> >
> > *Qualifying length is 2 continuous years (2-year enlistment) or 3 continuous years (3 or more year enlistment).*
> >
> > *Exceptions:*
> >
> > > 1. COG (2-year enlistment) served 20 months.
> > > 2. COG (3 or more year enlistment) served 30 months.
> > > 3. EPTS, RIF, HDSP, CIWD, DIS served at least a month.
> > > 4. Category 3 Involuntary/Voluntary separation served at least a month.
> >
> > *Mark service needed to establish MGIB (does not have to be initial enlistment) - in DGI as "non-qualifying" "used for other benefit".  If the PGIB benefit level changes or debts are created, the service is required to establish PGIB and cannot be used to establish MGIB; change back to "qualifying".*

    **c.  Is Veteran potentially <u>eligible</u> for MGIB contribution <u>refund</u> once PGIB exhausts, but <u>not eligible</u> for <u>MGIB</u>?**  If yes, election is <u>retained</u>, go to 5b.

> *To check MGIB contribution refund eligibility, see <u>M22-4, Part XII, Sub-Chapter 4.6, 6.01</u>.  For example, the Veteran is not the last payee or did not make a MGIB contribution.*

*To check MGIB eligibility:*

*Review if MGIB entitlement exhausted or 48 months of education benefits has exhausted.*

*Service that began before August 1, 2011, that was first used to establish PGIB cannot be used to establish MGIB.  Service that began on or after August 1, 2011, that was used to establish PGIB cannot be used to establish MGIB.*

*Qualifying length is 2 continuous years (2-year enlistment) or 3 continuous years (3 or more year enlistment).  Exceptions:*

- COG (2-year enlistment) served 20 months.

- COG (3 or more year enlistment) served 30 months.

- EPTS, RIF, HDSP, CIWD, DIS served at least a month.

- Category 3 Involuntary/Voluntary separation served at least a month.

*Mark service needed to establish MGIB (does not have to be initial enlistment) - in DGI as "non-qualifying" "used for other benefit".  If the PGIB benefit level changes or debts are created, the service is required to establish PGIB and cannot be used to establish MGIB; change back to "qualifying".*

**d. Is Veteran not potentially eligible for MGIB contribution refund?**  Election is reversed, go to 5c.

*To check MGIB contribution refund eligibility, see M22-4, Part XII, Sub-Chapter 4.6, 6.01.  For example, the Veteran is not the last payee or did not make a MGIB contribution.*

**5. Re-adjudicate the previous relinquishment decision.**

**a. ELECTION REQUIRED**

1. Open a Work Product for the beneficiary with the description "#RUD".

2. Do not remove the relinquishment.

3. Suppress the DGI-generated letter and remove the body, except for the salutation, Certificate of Eligibility section, and enclosures.

4. Open the "RUD REQUIRED LETTER" and paste into the DGI-generated letter.
   - Retain the enclosures generated by DGI, including the If You Need Help and appeal information.

5.  Save the edited notification letter.

6.  Capture a VA Form 119e with "Rudisill" included in the statement box into the TIMS folder. No other fields are required to be populated. Remark the document, "RUDISILL".

7.  If an MGIB contribution refund is due but has not yet been paid due to these changes, issue the refund using existing procedures.

8.  Route the claim for authorization, if appropriate, or authorize the Work Product and upload the edited notification letter to DGI.

## b. ELECTION RETAINED

1. Open a Work Product for the beneficiary with the description "#RUD".

2. Do not remove the relinquishment.

3. Suppress the DGI-generated letter and remove the body, except for the salutation, Certificate of Eligibility section, and enclosures.

4. Open the "RUD30 RETAINED LETTER" and paste into the DGI-generated letter.
   - Retain the enclosures generated by DGI, including the If You Need Help and appeal information.

5. Save the edited notification letter.

6. Capture a VA Form 119e with "Rudisill" included in the statement box into the TIMS folder. No other fields are required to be populated. Remark the document, "RUDISILL".

7. If an MGIB contribution refund is due but has not yet been paid due to these changes, issue the refund using existing procedures.

8. Route the claim for authorization, if appropriate, or authorize the Work Product and upload the edited notification letter to DGI.

## c. ELECTION REVERSED

1. Open a Work Product for the beneficiary with the description "#RUD".

2. Remove the relinquishment. (see INSTRUCTIONS FOR REMOVING BENEFIT RELINQUISHED attachment) You MUST re-input the PGIB start date, and any/all entitlement used under MGIB but DO NOT relinquish the benefit. **NOTE**: If during review, it's determined that STEM WAS PAID, and the claimant is going to be awarded more PGIB, please route those claims to the **STEM Buffalo queue** with **RUDSTEM** in the facility code**.**

3. Suppress the DGI-generated letter and remove the body, except for the salutation, Certificate of Eligibility section, and enclosures.

4. Open the "RUD30 REVERSED LETTER" and paste into the DGI-generated letter.
   - Retain the enclosures generated by DGI, including the If You Need Help and appeal information.

5. If Veteran meets the basic requirements for MGIB eligibility:  process the MGIB delimiting date extension per section D. (Add required information to the MGIB COE letter)

6. If more PGIB entitlement is restored after removal of relinquishment:  process the PGIB delimiting date extension per section D. (Add required information to the PGIB DGI letter).

7. Ensure that the appeal rights and enclosures are correctly placed.

8. Save the edited notification letter.

9. Capture a VA Form 119e with "Rudisill" included in the statement box into the TIMS folder. No other fields are required to be populated. Remark the document, "RUDISILL".

10. Route the claim for authorization, if appropriate, or authorize the Work Product and upload the edited notification letter to DGI.

NOTE: If the MGIB contribution refund has already been paid, VA will not create a debt for the previously refunded amount and it is not an Administrative Error.

## Rudisill Request Issues:

1. **Working RPO list:**
   - If previously denied due to <u>delimiting date or entitlement exhaust</u>: Follow applicable review steps in *Section C. VCE Review Procedures*.
   - If previously denied due to <u>service</u> (still not eligible): Place a note in TIMS stating: "Reviewed for Rudisill and still not eligible, NAN", create no action WP in DGI with "#RUD" as the description for tracking purposes, and suppress DGI letters.

2. **VA Form 22-1995R:**

   - Follow *Procedural Advisory: Streamlining*.

## TOE Claims

If the request is for benefits under the Transfer of Entitlement (TOE) provision:

1. **TOE (Spouse or Dependent)**

   a. Follow the scenario which is applicable to the veteran sponsor.

   b. After re-adjudication of the relinquishment, if there is additional entitlement available to the Veteran:
      i. Review the current TOE allocations in DGI, compare the DGI value to the current allocations on the veteran's VIS report, and adjust DGI accordingly.
         1. If a TOE beneficiary gains additional entitlement because of the Veteran re-adjudication, open a Work Product for the beneficiary with the description "#RUD". Authorize additional benefits and/or issue a COE to the beneficiary, as applicable.
         2. If a TOE beneficiary does not gain additional entitlement, a beneficiary Work Product is not necessary.

   c. Ensure proper notification is provided to the veteran, as described in the relevant section of the Veteran procedures.

## D. Extended Delimiting Date Procedures

VA Secretarial authority to extend delimiting dates under 38 USC 3031(i) for Rudisill expires on October 1, 2030. Individuals required to file a Rudisill review claim, filing after October 1, 2030, may use benefits according to normal delimiting date (time limit) calculations.

VCEs should use the appropriate process flow detailed below when extending a delimiting date under MGIB and/or PGIB:

**MGIB Extensions:**

1. Ensure MGIB was relinquished and subsequently the relinquishment was revoked (reversed).

2. Ensure service data entered on the Benefits Delivery Network (BDN) 310 screen is accurate as of the processing date, including the addition of any qualifying active-duty period of 90 days or greater in length. **NOTE:** Follow guidance as detailed in step 4 (below) when the length of extension *is capped at 120 months.*

3. Using the attached job aid, calculate the extended delimiting date.
   a. Ensure that the delimiting date displayed on the 310 screen, after adjustment in step 2, is entered into the job aid. **Note:** The decision date (current date) may not match the date the COE is issued, as authorization may be delayed.

   b. Review TIMS for unpaid enrollment(s) that fall between the original MGIB Delimiting Date and Date of Decision:
      - Determine payable periods. If payable, the earliest payable date will then become the start date/beginning date for correct calculation of the allowable delimiting date extension.

      - Populate additional/required fields in the job aid. (i.e. input the beginning date of the unpaid enrollment term OR the applicable date to resume payments for previously interrupted/unpaid training).

   c. Capture the completed job aid to the TIMS folder.

4. Enter the values from the "BDN 310 Screen Entry" section of the job aid into the appropriate fields on the 310 screen. Press Enter twice to exit the 310 screen and enter the 30M screen.

**NOTE:** When the length of extension on the Job Aid *is capped at 120 months* (even if the current delimiting date prior to extension is in the future) the final RAD date requires manipulation to reflect '10 years and 1 day prior to' the "From Date" entered in the "Delim Date Adj" section of the 310 screen (as reflected in the Job Aid). ***see QUICK GUIDE attachment for visual instructions***

**REMINDER: When the extension is capped at 120 months the 312 screen must be carefully reviewed *prior to authorization* to ensure that no debts for prior enrollment are created because of this RAD change. If debts are created, you must still add the 120 months and enter the "From Date" as instructed. However, DO NOT change the original RAD, instead allow BDN to calculate the extended delimiting date (even if it does not match the final JOB AID date) then Flash the file as follows:**

"Correct Delimiting Date is XX-XX-XXXX (as reflected in the Job Aid). DO NOT pay after this date. Suppress letters upon authorization. Manual Letters are required for all (current and future) awards with corrected delimiting date."

**Note:** (The details in this NOTE are not related to the instructions for manipulation of the RAD date (due to the 120 month maximum) as detailed above). Due to BDN's ability to internalize Gregorian calendar dates (leap years and 365-day year), the adjusted delimiting date may differ from the date provided in the Job

Aid.  If, after inputting the allowable months/days of the extension in BDN, the resulting date differs from the Job Aid's, accept BDN's adjusted delimiting date.

5. In the NEXT SCREEN field of the 30M screen, enter "COE".

6. On the COE screen, issue a generic COE by entering "X" in the "PRGM/SCHOOL NOT SPECIFIED" field.

7. On the COE screen, press the F10 key, then hold the Shift key and press the Tab key twice to the COE free-text field.

8. In the COE screen free text field, enter the following text: "Your eligibility period has been extended due to the Rudisill v. McDonough decision. (Authority of 38 USC 3031(i))".
   - If claimant has unpaid enrollment(s) in the TIMS file, that fall between the original MGIB Delimiting Date and Date of Decision, the COE letter should be edited only as directed above. Additional notification regarding the amended extension start date and payment for these periods are detailed in step #11.

9. After successful entry, proceed with authorization according to local procedures.

10. If the MGIB delimiting date prior to the extension was a past date, and the re-adjudication was not due to having a claim decided on or after August 15, 2018, (last action taken in claimant's file was **prior to** August 15, 2018**)** a period of non-payment exists.
    - Flash the TIMS folder to indicate dates of "non-pay ability". (Any time between the MGIB delimiting date *prior to extension* and the *issuance of the new COE* is a non-payable period.)
    - Authorizer will CORR and add a STOP to the message field of the MGIB BDN Master Record, indicating the non-payable period.

11. If enrollments are on file *and payable*, process using a separate supplemental End Product.
    - If claimant has unpaid enrollment(s) in the TIMS file, that fall between the original MGIB Delimiting Date and Date of Decision: Process these enrollments in BDN and allow BDN award letter to release but DO NOT certify/release payments. **NOTE:** if debts were incorrectly created because of the RAD date manipulation (due to 120-month maximum extension) as detailed in #4 FLASH, an additional, separate work product may be needed to complete all required actions.

**PGIB Extensions:**

1. Ensure service data entered on the "Service Data" screen is accurate as of the processing date per VIS. This includes the addition of any qualifying active-duty period of 90 days or greater in length.

2. Evaluate for applicability of extension:
   - The extension is only applicable to Veterans who gain additional PGIB entitlement because of Rudisill.
   - This adjustment does not apply when no additional PGIB entitlement is granted or to records which do not have a delimiting date.
   - If the extension is applicable, proceed to step 3.

3. Using the attached job aid, calculate the extended delimiting date.

- Ensure the delimiting date displayed in DGI after adjustment in step 1 is entered into the job aid. **Note:** The decision date (current date) may not match the date the COE is issued, as authorization may be delayed.

- Capture the completed job aid to the TIMS folder.

4. On the "Entitlement & Kickers" screen, enter the calculated date from step 3 into the "Chapter 33 Delimiting Date Override" field. Click Submit.

5. If retroactive/unpaid enrollment (after the original delimiting date) exists in TIMS or DGI (review TIMS because enrollments may have been removed from DGI) add payable periods to DGI.

6. On the "Work Product Summary" screen,
    - Select the "Allow Manual Letters Upload" option.

    - Download and edit the letter.

    - Immediately following the complete line "You have until … ", add the following text: "Your eligibility period has been extended and additional entitlement granted due to the Rudisill v. McDonough decision. (Authority of 38 USC 3031(i))

7. Save the edited letter as a PDF and follow local procedures for manual upload.

8. Proceed with authorization and manual letter upload according to local procedures.

9. If the PGIB delimiting date prior to the extension was a past date, and the re-adjudication was not due to having a claim decided on or after August 15, 2018, (last action taken in claimant's file was **prior to** August 15, 2018) a period of non-payment exists.
    - Flash the TIMS folder to indicate dates of "non-pay ability". (Any time between the PGIB delimiting date *prior to extension* and the *issuance of the new COE* is a non-payable period.)

    - Additionally, the authorizer is required to check the stop automation checkbox on the "Claimant Bio" screen and indicate the non-payable period.

10. If the Veteran is approved for Transfer of Entitlement (TOE) and has transferred entitlement to a spouse, the spouse is entitled to the same extension as the Veteran. TOE children are not entitled to a delimiting date extension under this authority.
    - Open a TOE Work Product for the spouse.

    - Repeat steps 4 through 8.

**Reminder:** End dates previously reported in VIS for all TOE dependents should be removed as part of routine processing. If previously reported end dates are present, they should be removed during this review. End dates not reported on VIS, i.e. end dates entered to facilitate dual source processing, should not be removed.

**Work Credit:** Follow local guidance.

Go to top

You can view this article at:

https://knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000073684/Part-4-Chapter-13-Miscellaneous-Award-Issues

**Attachments**

Entitlement Extension Based Upon Carr v Wilkie Court Case before the 02-23-23 update.pdf

SUBCHAPTER IX_Emergency Situations_Published word doc.docx

Rudisill DD Extension Job Aid v.4.2.xlsm

QUICK GUIDE for 120 Month Maximum MGIB Rudisill Del Date Ext.pdf

INSTRUCTIONS FOR REMOVING BENEFIT RELINQUISHED IN DGI .pdf

INSTRUCTIONS FOR REMOVING BENEFIT RELINQUISHED IN DGI WHEN MGIB REFUND ALREADY PAID.pdf

RUD1606 REVERSED LETTER.docx

RUD1606 RETAINED LETTER.docx

RUD REQUIRED ELECTION.docx

RUD30 REVERSED LETTER.docx

RUD30 RETAINED LETTER.docx

## 13.07  ENTITLEMENT EXTENSION BASED UPON CARR V. WILKIE COURT CASE

On June 11, 2020 (*Carr v. Wilkie*) by the United States Court of Appeals for the Federal Circuit ruled Education Service (EDU) had not been processing end-of-term benefits under chapters 30 or 33 in accordance with 38 United States Code (U.S.C.) 3031(f) when a beneficiary's benefits expire by limitations set from the use of two or more separate benefit programs (38 U.S.C. 3695(a)). In accordance with this ruling, VA must also apply an appropriate extension when benefits expire due to the "48-month rule" (or 81-month limitation of aggregate entitlement under 38 U.S.C. 3695(c)).

**NOTE**: Chapter 33 benefits include the Fry Scholarship beneficiaries, however this ruling does not impact Transfer of Entitlement (ToE) benefits.  For transferees utilizing ToE benefits, transferred entitlement is not counted against a 48-month or 81-month cap. Edith Nourse Rogers STEM scholarship beneficiaries are also not affected.

EDU claims processing systems are currently programmed with the 48-month limitation as a "hard stop" and will not automatically extend end-of-term benefits beyond 48 months.  All awards which released a notification (i.e. decision letter) on or after June 11, 2019, must be reviewed and evaluated to determine if *Carr v. Wilkie* should be applied.  If all notification decisions were processed before June 11, 2019, **DO NOT** review further or extend benefits.

**a. Review Procedures.** (Due to current system programing work around procedures below will remain in effect until systems are reprogrammed.)

> 1. Once VCEs have determined an extension is appropriate, they must ensure the following rules are enforced which may not be managed by the job aid:
>
> - Training certified in semester or quarter hours may be extended to the end of the term. **NOTE:** Extensions may not exceed the length of a standard term.
> - Training certified on clock hours may be extended up to 84 days or to the end of the term whichever is first, if the beneficiary has completed a majority of the course (more than 50%) on the date entitlement exhausts.
> - Overlapping terms which begin after the original entitlement has exhausted may not be paid.
>
> 2. VCEs must determine the amount of additional entitlement needed to pay the extended period.
>
>> a. Note the amount of entitlement remaining prior to entering the enrollment.
>>
>> b. Enter the enrollment into the 48-Month Extension Job Aid, available as an attachment on the **Job Aids Page**.

c. If the job aid indicates an extension is appropriate, delete enrollments from the system which exhausted entitlement before proceeding to steps 3a or 3b.

**b. Processing Procedures.** (Due to current system programing work around procedures below will remain in effect until systems are reprogrammed.)

### 1. Chapter 33 claims VCEs will do the following:

a.  Add a manual "Add Entitlement" award in the Long Term Solution (LTS) for the number of months and days necessary to pay the extension with no entitlement remaining (as determined in the job aid).

b.  Review the Work Product Summary (WPS) page to ensure the LTS is paying the desired extension.

c. Remediate the manual award length if necessary due to system rounding. (LTS will sometimes require an extra day be added due to a fractional day of entitlement used.)

d. Capture the job aid into TIMS.

e. Route for authorization.

f. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the notification sent indicates no remaining entitlement.

g. Print and capture the LTS letter, as appropriate.

h. Ensure all end products have been cleared and close the TIMS folder after authorization.

### 2. Chapter 30 claims VCEs will follow the job aid output instructions to either CUM RESTORE an amount of entitlement or use 'X' type hours:

a. If the job aid indicates a **CUM RESTORE** amount do the following:

1. CORR the M23 the amount of months and days displayed on the job aid.

2. Enter the enrollment dates with end reason '61' after the no-pay date.

3.  The end reason 65 should system generate when dates have been entered correctly after 'GAD.'

4. Adjust amount of the CUM RESTORE and repeat steps if necessary, typically due to system rounding.

5. Capture the job aid into TIMS.

6. Do not suppress the BDN letter.

7. Route for authorization.

8. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the system generated end reason '65' terminates the last award line.

9. Capture the authorization screens close the TIMS folder after authorization.

b. If the job aid indicates using **'X' type hours** do the following:

1. Enter the begin date of the term, reentrance code '60' and the no-pay date, end reason code '61' with "X" type hours as indicated on the job aid.

2. Enter the same date as the no-pay date above as the begin date, reentrance code '60' and the no-pay date for the end of the term, end reason code '61' .

3. The end reason 65 should system generate when dates have been entered correctly after 'GAD.'

4. Adjust dates if necessary, typically due to system rounding.

5. Capture the job aid into TIMS.

6. Suppress the BDN letter and prepare a PCGL letter (AWD-17), adding this paragraph:

*Your education benefit payments were extended to the end of your current term or up to 12 weeks as allowed by law. (38 U.S.C. 3031(f)) As of (insert last date paid) you have exhausted all of your education benefit entitlement. (38 U.S.C. 3695)*

7. Route for authorization.

8. The authorizer will review the previous steps were performed correctly, ensuring the system is paying the extension correctly and the system generated end reason '65' terminates the last award line.

9. After authorization the PCGL letter should be printed and captured.

10. Capture the authorization screens close the TIMS folder after authorization.

## SUBCHAPTER IX. CLAIMS PROCESSING DURING EMERGENCY SITUATIONS

### 13.36  General

This subchapter deals with claims processing when a school or training establishment temporarily or permanently closes due to an emergency situation (i.e., natural disaster, pandemic, state government shutdown, strike, etc.). (See 38 U.S.C. §3601 - §3605,  38 U.S.C. 3680(a))

    a.    By law, the term "emergency situation" indicates the—

    (1)    President has declared an emergency; or

    (2)    VA Secretary has determined an emergency under laws administered by the VA. VA must establish the beneficiary was negatively affected by the emergency. An emergency alone does not constitute payments.

    b.    VA may continue payments up to 28 calendar days (four weeks) or through to the end of the certified term, whichever is earlier, when a school temporarily/permanently closes due to an emergency situation. Payments include:

    (1)    Monthly housing allowance under chapter 33

    (2)    Subsistence allowance under chapters 30, 33, 35, and 1606

***Note****: VA has no authority to issue payments for terms that would have begun during a temporary shutdown. In that scenario, VA will resume payments for training effective the date the beneficiary begins training after the school reopens.*

    c.    Final award actions would include review for eligibility for extension of delimiting date and restored entitlement.

### 13.37  School Reporting Actions

During an emergency closure, School Certifying Officials (SCO) and Certifying Officials (CO) will report the following to their State Approving Agency (SAA) and Education Liaison Representative (ELR):

    a.    All school closures, including those longer than 28 calendar days

    b.    Total number of closed days and all official breaks

    c.    Amended training periods (begin and end dates)

    d.    Reason for closure (i.e. natural disaster affected institution, state government shutdown, strike, etc.)

    e.    Closures at beginning of a certified enrollment period

***Note****: VA has no authority to begin payments when an institution is closed.*

f.    Changes in modality (residence to distance)

g.    Date facility reopens or when training resumes

If a beneficiary is unable to resume classes when the school reopens (or if they remained opened), VA would not be able to continue payments. When the beneficiary is no longer pursuing classes due to an emergency situation, the school will submit an enrollment certification reporting the termination as soon as possible. VA should be notified that termination is due to an established emergency situation.

Schools should notify their SAA and ELR if a program of education or training is negatively impacted by a declared emergency situation. This would include any truncated, delayed, relocated, canceled, partially canceled, converted from on-site to distance learning, or otherwise modified or made unavailable training programs.  Schools should follow additional guidance provided by VA, SAA, and ELR.

ELRs will report this information (including school name and facility code (FAC)) to the Chief Education Liaison Officer (CELO). The CELO will review and forward this information to the Education Service Operations Management team at VBACOEDUCATIONSERVICEFIELDOPERATIONS@va.gov. The team will prepare a list of beneficiaries currently enrolled at the facility and release it to the responsible Regional Processing Office (RPO) for immediate processing.

## 13.38  Claim Processing Actions

Processors will review amended enrollment information and take the following action:

a.    **Permanent school closure**. Route claim to RESTORATION queue for specialized processing.

b.    **Change in Type Training (residence to distance)**

(1)    Beginning of term. School certifies as residence hours with supporting remarks (for example, Call Center 119E or AVA contact). VCE will process as residence hours and beneficiary will be paid at the in-resident rate. No WEAMS approval needed for distance hours.

(2)    Mid-Term. School should not report changes to VA.

(a)    If reported under chapters 30, 35, or 1606, the VCE will make no adjustments.

(b)    If reported under chapter 33, the VCE should delete the document from the Enrollment Manager (EM) inbox, suppress the payment letter, and authorize the work product. Beneficiary will continue to be paid for residence hours until the end of the enrollment period.

***NOTE***: *VCE is not entitled to an end product for clearing the EM inbox.*

c.    **Training modified or made unavailable (truncated, delayed, relocated, canceled, partially canceled, etc.).** VCE will continue to pay the monthly amount payable before the change, for a maximum of 28 calendar days.

d.    School remains open, beneficiary unable to complete training. If the new enrollment information indicates beneficiary was terminated due to reasons beyond their control (i.e. mitigating circumstances have been provided) and school remained open (including after a period of being closed), VCE will process as normal and apply mitigating circumstances (see M22-4, Part 4, Chapter 11, Subchapter 3).

e.    School reopened, but closed 28 calendar days or less, no change in term dates. If the new enrollment information indicates the school has been closed for 28 calendar days or less and term dates remain unchanged, no processing is necessary.

f.    School closes during term, remains closed.

(1)    Chapter 30, 35, and 1606 Processing

**Step 1**    FLASH TIMS appropriately and add "TCLOSED" to TIMS facility code field.

**Step 2**    Stop claim with a no-pay date 28 days from the reported school closure date. Use BDN end reason code 39.

***Note***:  *If the enrollment period ends less than 28 days after the school closure date, no BDN adjustments are required.*

**Step 3**    Add BDN STOP message: "STOP SCHOOL CLOSED (insert date and reason)" when possible and suppress the generated letter. Under chapter 35, put this in the message field (MSG) on the BDN 500 screen.

**Step 4**    Release payments through stop date using CERT command, when applicable.

**Step 5**    Send edited adverse action letter to beneficiary, clearly explaining the reason(s) benefits have been stopped.

***Note****: Once VA receives notice indicating school has reopened, the VCE will resume payments for the enrollment period from the date the school reopens until the revised term end date. Training time will be based on the enrollment information originally reported, unless the school reports a reduction in training hours.*

(2)    Chapter 33 Processing

**Step 1**    FLASH TIMS appropriately and add "TCLOSED" to TIMS facility code field.

**Step 2**    Add Stop Automation flag on DGI Biography page.

**Step 3**    Work Product 1

•  For IHLs, add an amendment terminating enrollment. VCE will extend effective date 4-weeks from date reported or to end of term, whichever is earlier. Authorize Work Product without payments, isolating tuition/fee and other debts.

- For NCD facilities, process as a leave of absence (LOA). Add an amendment terminating the enrollment. The VCE will extend effective date 4-weeks from date reported or to end of term, whichever is earlier. Authorize Work Product without payments, isolating tuition/fee debts.

**Step 4**  Work Product 2

- Make no additional changes in DGI and authorize with automatic payments. This action will prevent additional erroneous housing payment from being released.

- Edit the beneficiary's payment letter to explain why benefits have been stopped. Remove references to tuition and fee debts which would not be established at this time.

*Note: Debts for MHA or Books and Supplies for NCD facilities paid after 28 calendar days should be manually established.*

**Step 5**  Work Product 3. When notice is received indicating school has reopened:

- For IHLs, delete the amendment which terminated the enrollment.

- For NCD facilities, update (NCD interruption) amendment as necessary with additional non-payable days after 28 calendar days.

*Note: Once VA receives notice indicating school has reopened, VCE will resume payments at the same rate of training as originally reported from the date school reopens until the revised term ending date, unless the school reports a reduction in training hours.*

**Step 6**  Edit original enrollment ending date, if necessary.

- Enter number of days school was closed, including the 4-week extension, as "vacation" days on the enrollment pop-up.

- If necessary, edit full-time measure to manipulate rate of pursuit (RoP).

- Verify any adjustments by ensuring the MHA payment amount is the same as paid before the school closure was reported.

*Note: This step does not apply to NCD facilities where LOA is used.*

**Step 7**  Authorize without payments. Review the Payment Instruction for a generated tuition and fees payment that offsets the previously generated but not established tuition and fees debt.

**Step 8**  Following local policy, request Finance process MHA payments due beginning from date school reopened through revised ending date.

*Note: Step 8 must be completed prior to Step 9.*

**Step 9**   Work Product 4: Make no changes to DGI and authorize with automatic payments. This step will correct recurring payments and date last paid.

**Step 10**   Edit DGI-generated letter as necessary and release.

g.   School reopens, closed for 28 calendar days or less, term end date extended for 28 calendar days or less.

(1)   Clock hours. Contact SCO to verify any holiday breaks (7+ consecutive days) during the period of extension. Follow current procedures to recalculate the approved length of the course, excluding holiday breaks and the period of closure. Process the term date changes accordingly.

(2)   Chapter 30, 35, and 1606 Credit Hours. Extend the end date as reported, leave training time unchanged.

(3)   Chapter 33 Credit Hours. Extend the end date as reported. Verify MHA rate. If MHA rate changes, adjustments are needed to revert MHA rate to the original rate.

(a)   Term previously non-standard, still non-standard in length:  Compute amount of time end date was extended, add to **Vacation Days** field in DGI.

(b)   Term previously non-standard, now standard in length:  Adjust the full-time hours in DGI manually.

**Step 1**   Determine RoP of original non-standard length term prior to change.

**Step 2**   Use Credit Hour Equivalent (CHE) spreadsheet to convert the credit hours.

**Step 3**   Take the converted number and divide by the full-time hours in DGI for RoP.

**Step 4**   Divide the <u>unconverted</u> credit hours by the RoP.

**Step 5**   Update **FT hours** in DGI with the adjusted number.

*Example:*

Semester term was 08-15-24 to 10-30-24 (11 weeks, non-standard), 4 credit hours, full-time modifier 12 credit hours

School reports term extended to 12-10-24 (17 weeks, standard)

CHE worksheet converted 08-15-24 to 10-30-24 credit hours from 4 hours to 6.5 converted hours

6.5 converted hours / 12 FT = .54167 RoP (five decimals out)

4 hours / 0.54167 RoP = 7.38 revised full-time hours to input in DGI

**Note**: *Standard semester term length is 15 to 19 weeks and Standard quarter term length is 10 to 13 weeks. Using Vacation Days field will not work in this scenario since DGI ignores this field when the term is standard length.*

h.    School reopens, closed for 28 calendar days or less, term end date extended for more than 28 calendar days.

(1)    Clock hours. Contact SCO to verify any holiday breaks (7+ consecutive days) during the period of extension. Follow current procedures to recalculate the approved length of the course, excluding holiday breaks and closure period. Process the term date changes accordingly.

(2)    Chapter 30, 35, and 1606 Credit Hours. Recalculate the term's training time, excluding the closure period. If the term is then non-standard in length, contact SCO to verify any holiday breaks (7+ consecutive days) during the period of extension for exclusion and recalculation. If the training time changes, process changes effective beginning of the term. If an overpayment is created, send an adverse action letter regarding the changes and amount of overpayment.

(3)    Chapter 33 Credit Hours.

(a)    Contact the SCO to verify if all official school breaks were reported (i.e. holiday breaks greater than 7 days) in addition to the school closure.

(b)    Document the response in TIMS and reprocess the enrollment.

(c)    Non-standard term. Add vacation days in DGI equal to the number of days for official breaks and the length of time the school was closed.

**Note:** *As a result, RoP may be lower and the rate due for MHA could be less.*

(d)    Non-standard to standard term. RoP will need to be recalculated for terms extended longer than the length of time a school is closed. Follow the steps below:

**Step 1**    Calculate adjusted RoP using CHE spreadsheet. Enter dates school closed and holiday breaks on the job aid Holiday Break Dates section. Divide CHE result by full-time amount for program.

Formula: CHE from worksheet / Full-time = Adjusted RoP

**Step 2**    Calculate the adjusted full-time amount by dividing actual credit hours enrolled by the adjusted RoP.

Formula: Credit Hours / Adjusted RoP = Adjusted full-time amount

**Step 3**    Enter adjusted full-time amount in DGI.

**Note**: *The resulting RoP may be lower and the rate due for MHA could be*

*less.*

**Step 4**    If changes result in an overpayment, advise the beneficiary of the changes to the length of the enrollment period reported by their school, circumstances for these changes, and amount of overpayment in an adverse action letter.

i.    School reopens, closed for more than 28 calendar days, term dates extended 28 calendar days or less.

(1)    Chapters 30, 35, and 1606

(a)    If the term dates extend for more than 28 calendar days, contact the SCO to verify if in addition to the school closure there were any other official school breaks (i.e. holiday breaks greater than 7 days) during the period of extension.

(b)    Document the response in TIMS and reprocess the enrollment.

- Clock hours. Follow the procedures to verify if the certified period is payable (e.g. length of course approved, excluding approved breaks and up to 28 calendar days extension.

- Credit hours. Recalculate the term's training time excluding the length of time the school was closed and the number of days for official breaks when the original term was non-standard length.

(c)    If there is no change to training time, extend the ending date as certified.

(d)    If the calculation results in a lower training time, process an adjustment effective at the beginning of the enrollment period.

(e)    If changes result in an overpayment, include the reported changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

**NOTE**: *Audit worksheet used for calculating the overpayment should be captured into the TIMS record.*

(2)    Chapter 33 (school closed for a period of more than 28 calendar days).

(a)    If the term dates extend for a period greater than 28 calendar days, extend the ending date as reported.

(b)    Contact the SCO to verify if in addition to the school closure there were any other official school breaks if not reported (i.e. holiday breaks greater than 7 days).

(c)    Document the response in TIMS and reprocess the enrollment.

(d)    Clock hours. Follow the procedures to verify if the certified period is payable (i.e., length of course approved).

(e)    Credit hours

- Non-standard term. Add vacation days in DGI equal to the number of days for official breaks and the length of time the school was closed.

**NOTE**: *As a result, RoP may be lower and the rate due for MHA could be less.*

- Non-standard to standard term. RoP will need to be recalculated for terms extended longer than the length of time a school is closed. Follow the steps below:

**Step 1**    Calculate the adjusted RoP using the CHE spreadsheet. Enter dates school closed and holiday breaks on the job aid Holiday Break Dates section. Divide CHE result by full-time amount for program.

*Formula: CHE from worksheet / Full-time = Adjusted RoP*

**Step 2**    Calculate the adjusted full-time amount by dividing actual credit hours enrolled by the adjusted RoP.

*Formula: Credit Hours / Adjusted RoP = Adjusted Fulltime amount*

**Step 3**    Enter adjusted full-time amount in DGI.

**Note**: *The resulting RoP may be lower and the rate due for MHA could be less.*

**Step 4**    If changes result in an overpayment, include the reported changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

j.    School reopened, closed for more than 28 calendar days, term dates extended more than 28 calendar days.

(1)    Chapters 30, 35, and 1606.

(a)    If the term dates extend for a period of more than 28 calendar days, contact the SCO to verify if in addition to the school closure there were any other official school breaks (i.e. holiday breaks greater than 7 days).

(b)    Document the response in TIMS and reprocess the enrollment.

- Clock hours. Follow the procedures to verify if the certified period is payable (e.g. length of course approved, excluding approved breaks and up to 28 calendar days extension).

- Credit hours. Recalculate the term's training time excluding the length of time the school was closed and the number of days for official breaks when the original term was non-standard length.

(c)    If there is no change in training time, extend the ending date as certified.

(d)    If the calculation results in a lower training time, process an adjustment effective at the beginning of the enrollment period.

(e)    If changes result in an overpayment, include the reported changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

(2)    Chapter 33

(a)    If the term dates extend for a period greater than 28 calendar days, extend the ending date as reported.

(b)    Contact the SCO to verify if in addition to the school closure there were any other official school breaks if not reported (i.e. holiday breaks greater than 7 days).

(c)    Document the response in TIMS and reprocess the enrollment.

(d)    Clock hours. Follow the procedures to verify if the certified period is payable (i.e., length of course approved).

(e)    Credit hours.

- Non-standard term. Add vacation days in DGI equal to the number of days for official breaks and the length of time the school was closed.

***NOTE***: As a result, RoP may be lower and MHA rate could be less.

- Non-standard to standard term. RoP will need to be recalculated for terms extended longer than the length of time a school is closed. Follow the steps below:

**Step 1**    Calculate the adjusted RoP using the CHE spreadsheet. Enter school closure dates and holiday breaks on the job aid Holiday Break Dates section. Divide CHE result by full-time amount for program.

*Formula: CHE from worksheet / Full-time = Adjusted RoP*

**Step 2**    Calculate the adjusted full-time amount by dividing the actual credit hours enrolled by the adjusted RoP.

*Formula: Credit Hours / Adjusted RoP = Adjusted Fulltime amount*

**Step 3**    Enter adjusted full-time amount in DGI.

***NOTE***: The resulting RoP may be lower and the rate due for MHA could be less.

**Step 4**    If changes result in an overpayment, include the reported

changes to the length of the enrollment period, circumstances for these changes, and amount of overpayment in an edited adverse action letter.

## 13.39  On the Job & Apprenticeship

Some facilities may be forced to close or suspend OJT and APP training programs or to modify the conditions of training/work to a virtual or remote environment during a designated emergency situation. VA may continue apprenticeship/on-the-job training assistance allowance payments up to 28 calendar days or through to the end of the certified training period, whichever is earlier, when a beneficiary fails to complete 120 hours of training due to an emergency situation. Hours will be reduced in DGI or BDN and payment will be at the full-time rate of 120 hours or more.

   a.   Continued training, remote environment. Training may be converted from on-site (resident) training to virtual or remote training. Certifying Officials (CO) will continue to report hours for trainees who continue to train during the emergency situation. VCEs should continue to process these claims as usual. No additional action needed.

   b.   Facility temporarily ceases operations. COs will report temporary closures as individual trainee terminations. Trainees unable to continue training because their facility was forced to close due to the emergency situation may continue to receive benefit payments for up to 28 calendar days or until the facility reopens and training resumes (whichever is sooner).

   **Step 1**    Flash TIMS appropriately and add "TCLOSED" to TIMS facility code field.

   **Step 2**    Calculate adjusted termination date and adjust the award (reported termination date plus up to 28 calendar days).

   **Step 3**    For Chapter 33 claims, a separate Work Product will be required when processing a termination.

   •   Process the termination only, without CERTS updated, and authorize without payments.

   •   Do not establish system generated books and supplies overpayment. These will not be collected, and this payment must not be reissued if a trainee resumes training during the same academic year.

   •   To prevent duplicate payments, books and supplies payment generated must not be paid – when reestablishing benefits, authorize the first Work Product with no payments.

   **Step 4**    VCEs should enter 120 hours for the month of closure (regardless of hours reported by the CO) and 120 hours through the termination date when it spans another month. The temporary closure policy allows the claimant to be authorized continued full payment for up to 4 weeks (28 days) or the resumption of the training, whichever is sooner.

**Example**: The facility reports the last day of attendance or termination as March 16. VCE should manually authorize the full housing payment through end of March and for the next 13 days in April. If not possible to cert through the revised termination date, control through the

28th day.

**Step 5** VCEs will edit the payment letter to include the reason reported on the termination. For example, "Your facility has reported they temporarily ceased operations due to a emergency situation. VA is authorized to extend payments 28 days from your last reported training day. This has been processed and you will receive…"

c.    Facility continues operations but stops an individual's training. COs will report the termination date. Trainees whose training program is suspended or are unable to continue training for any other reason cannot be paid after training stops. This includes situations where the trainee continues working at the facility but is no longer performing activities associated with the OJT/APP training plan.

**Step 1** Flash TIMS appropriately and add "TCLOSED" to TIMS facility code field.

**Step 2** Continue to process these claims as usual except include new guidance above for terminations without establishing overpayments for books and supplies.

**Step 3** Send the appropriate payment letter based on this action.

In all cases, benefit payments may resume when the trainee returns to a training status.

## 13.40  Delimiting Date Extension

Delimiting dates under chapters 30, 33 (including under transfer of entitlement (TOE) and Fry Scholarship), 35, and 1606 may be extended if VA determines beneficiaries were prevented from pursuing their individual chosen program of education due to a school closure (temporary or permanent) before the expiration of their previous delimiting date. This extension must be requested by the beneficiary.

***Note***: *If beneficiary does not have delimiting date, no action is required.*

***Note***: *Beneficiaries should be notified if their delimiting date has been extended under this provision.*

a.    Chapters 30 and 1606. Calculate length of extension in days and input amount in DELIM DATE ADJ TYPE field and enter day after original delimiting date in the FROM field on BDN 310 screen. GAP and send for authorization.

b.    Chapter 33

(1)    Veteran/TOE Spouse

**Step 1** Calculate beneficiary's adjusted delimiting date by adding number of days equal to emergency situation or number of days until end of term, whichever is less, to the current delimiting date.

**Step 2** Open new DGI work product, enter adjusted delimiting date in CHAPTER 33 DELIMITING DATE OVERRIDE field, and send for authorization.

**Step 3**   For TOE spouse, after authorization of Veteran's work product, open new DGI work product, verify delimiting date and entitlement, and send for authorization.

(2)   TOE/FRY Child

**Step 1**   Calculate beneficiary's adjusted delimiting date by adding number of days equal to emergency situation or number of days until end of term, whichever is less, to their date of birth.

**Step 2**   Create new DGI work product, disassociate from VADIR, and enter adjusted date of birth in DATE OF BIRTH field on CLAIMANT BIOGRAPHY screen.

**Step 3**   If extension crosses original delimiting date, only extend by number of unpaid days.

**Step 4**   If necessary, verify date in DGI HIGH SCHOOL GRADUATION OR EQUIVALENT field to ensure updated date of birth does not impact chapter 33 payments. Adjust if necessary to prevent any overpayment.

**Step 5**   Verify delimiting date and entitlement and send for authorization.

(3)   FRY Spouse. If spouse has a delimiting date due to remarriage, adjust the Veteran's date of death by number of days equal to emergency situation.

c.   Chapter 35

(1)   Spouse.

(a)   Enter days of emergency situation in PERIOD OF DISABLITY- DAYS field and enter the day after the current delimiting date in DATE ELECTED BY CLAIMANT field on BDN 311 screen.

(b)   Repeat last award line on BDN 312 screen, GAP, and send for authorization.

(2)   Child.

(a)   Enter date emergency situation started in TIME LOST BEYOND CONTROL- BEGIN DATE field and enter date school reopened (up to a maximum of 28 calendar days) in END DATE field on BDN 311 screen.

(b)   Repeat last award line on BDN 312 screen, GAP, and send for authorization.

## 13.41   Entitlement Restoration

When a school is temporarily closed due to an emergency situation, VA will continue to pay benefits under chapters 30, 32, 33, 35, and 1606 through to the end of the term or 28 days, whichever is sooner. However, this educational assistance will not be charged against entitlement. Under these circumstances, beneficiaries would be eligible for restoration of benefits.

***Note****: Beneficiaries should be notified when entitlement has been restored under this provision.*

   a.   Chapters 30 and 1606

      **Step 1**   Calculate entitlement used in days using the RPO Worksheet Entitlement Calculator (up to end of term or 28 days, whichever is less)

      **Step 2**   CORR BDN M23 screen and enter number of restored days in CUM RESTORED field (up to 28 calendar days). Hit enter.

   b.   Chapter 33

      **Step 1**   Calculate entitlement used in days using the appropriate formula below:

          <u>Enrollments – Tuition Payable</u>. Calculation is a two-part process. First, divide academic year tuition cap by 360 days, then multiply by benefit level (100%, 90%, etc.) to calculate daily rate. Next, multiply daily rate by charged tuition for entitlement used.

          *Formula:*

- *Academic Year Tuition Cap / 360 days * Benefit Level = Daily Rate*

- *Daily Rate * Tuition = Charged Entitlement*

          Example, academic year cap is $17500, benefit level is 100%, tuition payment is $1000:

- $17500 / 360 days * 1.0 (100%) = $48.61111 per day

- $1000 / 48.61111 = 20.57 days (rounded to 20 days)

          <u>Enrollments - MHA only, No Tuition</u>. Calculation is a two-part process. First, calculate rate of pursuit (RoP) for the term by dividing total number of credit hours enrolled by number of credit hours considered to be full time. Next, multiply RoP by payable days for entitlement used.

          **NOTE:**  *ECH calculator would be required to adjust RoP (enrolled credit hours) for non-standard terms.*

          *Formula:*

- *Enrolled Credit Hours / Full-Time Modifier = Rate of Pursuit*

- *Days of Emergency Benefits Paid (up to 28) * RoP = Charged Entitlement*

          Example, enrolled in 7 credits, full time is 12 credits, 120 days in term, 28 days of emergency benefits paid:

- 7 credits / 12 credits = .58333 (not rounded)

- .58333 RoP * 28 days = 16.33324 (rounded to 16 days)

**Step 2**    Open new DGI work product. Under MANUAL AWARDS on Work Product Summary screen, restore charged entitlement by opting to "Add Entitlement" in TYPE field, entering restored entitlement (up to 28 calendar days) in ENTITLEMENT field, and adding "Restored Entitlement – Emergency Situation" in DESCRIPTION field. Send for authorization.

c.    Chapter 35

**Step 1**    Using the Credit Hour Equivalence Worksheet,

Type in the beginning and end term dates.  Then adjust the total entitlement used to equal the amount of days the school was closed by subtracting days from the term's end date, ensuring the max amount is no more than 28 calendar days.

**Step 2**    On BDN 312 screen:

- Enter or reenter the term line using the start date for term using begin reason 29 with no end date.

- Next enter correct training time,  "D" under hour type, and number of credits.

- Enter a 0 under entitlement charged followed by the correct training type.

- On the following line enter the date in which entitlement can be charged (use no pay date) followed by begin reason 29.

- Then enter the end date (no pay date) for the term with end reason code 39.

- Keep all other information the same except change the entitlement charge to equal training time and hour type back correct hour type (S,Q, or C).

## Rudisill Delimiting Date Extension Job Aid

**CLEAR**

### Chapter 30 (MGIB) Delimiting Date Calculator

#### Required Entries

| Chapter 30 (MGIB) Delimiting Date | |
|---|---|

| Chapter 33 (PGIB) Election Date | |
|---|---|

| Date of Decision | |
|---|---|

| Is there a payable enrollment period **after** Chapter 30 (MGIB) Delimiting Date but **befor**e Date of Decision? | |
|---|---|

| If Yes, Input earliest date payable between MGIB DD & Date of Decision | |
|---|---|

#### TOTAL TIME LOST CALCULATIONS

| Date of Decision | |
|---|---|
| Subtract Chapter 33 Election Date | |
| Subtract Active Duty Days | 0 |
| Add 90 days | 90 |
| TOTAL DAYS | |

#### Active Duty Optional Entries

Only enter Qualifying active duty service of 90 or more continuous days between
1/0/1900     and     1/0/1900

**Excluded Active Duty Periods**

| # | Begin Date | End Date | Total Days |
|---|---|---|---|
| 1 | | | 0 |
| 2 | | | 0 |
| 3 | | | 0 |
| 4 | | | 0 |
| 5 | | | 0 |
| 6 | | | 0 |
| 7 | | | 0 |
| 8 | | | 0 |
| 9 | | | 0 |
| 10 | | | 0 |

#### Answer Key

| Less than (<) 120 month extension | Greater than (>) or Equal to (=) 120 month extension |
|---|---|
| #VALUE! | #VALUE! |

| Less than (<) 120 month DD | | Greater than (>) or Equal to (=) 120 months DD | |
|---|---|---|---|
| Adjusted MGIB DD | #VALUE! | Adjusted MGIB DD | #VALUE! |

| Less than (<) 120 month BDN 310 Screen Entry | | Greater than (>) or Equal to (=) 120 months BDN 310 Entry | |
|---|---|---|---|
| Months | #VALUE! | Months | #VALUE! |
| Days | #VALUE! | Days | #VALUE! |
| From Date | #VALUE! | From Date | #VALUE! |

### Job Aid Instructions

**Step 1:** Enter Chapter 30 (MGIB) Delimiting Date, Chapter 33 (PGIB) Election Date, and Date of Decision.  Date format must be XX-XX-XXXX or XX/XX/XXXX.

**Step 2:** Enter qualifying active duty service periods of 90 or more continuous days between Chapter 33 (PGIB) Election Date and Chapter 30 (MGIB) Delimiting Date or Date of Decision (whichever is earlier). If the begin date or end date of the service period are outside the dates specified above, only enter dates from the period of service that fall between eligible dates. See "Active Duty Optional Entries".

**Step 3:** If there is an unpaid enrollment period **after** Chapter 30 (MGIB) Delimiting Date but **before** Date of Decision, enter "YES". Then enter the earliest date payable in the space following.  If no unpaid enrollment exists, enter "NO".

**Step 4:** Adjust BDN 310 screen based on the month(s), day(s), and "From Date" listed under BDN 310 Screen Entry.

**Step 5:** If after entering the correct information into the Job Aid and into BDN, the Adjusted MGIB DD does not match up with BDN 310 Delimiting Date, see **Note 5**.

### Notes on Job Aid

**Note 1:** This Job Aid is to be used for Chapter 30 extensions when MGIB was relinquished and later revoked.

**Note 2:** Children are not eligible for a Delimiting Date extension.  This Job Aid is only for Veterans and spouses.

**Note 3:**  If claim was last worked before August 15, 2018, no payments can be made  between the original Chapter 30 Delimiting Date and Date of Decision.

**Note 4:**  Maxium amount of extension is 120 months.  If extension is greater than 120 months, only enter 120 into BDN 310 screen.

**Note 5:** Due to BDN using a 360 day calender year, if the extension of months/days input into BDN 310 screen do not result in the job aid's adjusted delimiting date, use the delimiting date that populates in BDN.



# Rudisill Delimiting Date Extension Job Aid

**CLEAR**

## Chapter 33 (PGIB) Delimiting Date Calculator

### Required Entries

| | |
|---|---|
| Chapter 33 (PGIB) Delimiting Date | |

| | |
|---|---|
| Chapter 33 (PGIB) Election Date | |

| | |
|---|---|
| Date of Decision | |

### TOTAL TIME LOST CALCULATIONS

| | |
|---|---|
| Date of Decision | |
| Subtract Chapter 33 Election Date | |
| Subtract Active Duty Days | 0 |
| Add 90 days | 90 |
| TOTAL DAYS | |

### Active Duty Optional Entries

Only enter Qualifying active duty service of
90 or more continuous days between
1/0/1900          and          1/0/1900

| Excluded Active Duty Periods | | | |
|---|---|---|---|
| # | Begin Date | End Date | Total Days |
| 1 | | | 0 |
| 2 | | | 0 |
| 3 | | | 0 |
| 4 | | | 0 |
| 5 | | | 0 |
| 6 | | | 0 |
| 7 | | | 0 |
| 8 | | | 0 |
| 9 | | | 0 |
| 10 | | | 0 |

### Answer Key

| Less than (<) 180 month extension |
|---|
| #VALUE! |

| Greater than (>) or Equal to (=) 180 month extension |
|---|
| #VALUE! |

| < 180 Months Adjusted PGIB DD | #VALUE! |
|---|---|

| > or = 180 months Adjusted PGIB DD | #VALUE! |
|---|---|

## Job Aid Instructions

**Step 1:** Enter Chapter 33 (PGIB) Delimiting Date, Chapter 33 (PGIB) Election Date, and Date of Decision.  Date format must be XX-XX-XXXX or XX/XX/XXXX.

**Step 2:** Enter qualifying active duty service periods of 90 or more continuous days between  Chapter 33 (PGIB) Election Date and Chapter 33 (PGIB) Delimiting Date or Date of Decision (whichever is earlier). If the begin date or end date of the service period are outside the dates specified above, only enter dates from the period of service that fall between eligible dates. See "Active Duty Optional Entries".

**Step 3:** Adjust DGI under "Entitlement & Kickers" screen enter the adjusted PGIB Delimiting Date from Job Aid into "Chapter 33 Delimiting Date Override" field.

## Notes on Job Aid

**Note 1:** This Job Aid is to be used for Chapter 33 extensions when additional entitlement award due to Rudisill and PGIB Delimiting Date exists.

**Note 2:** Children are not eligible for Delimiting Date extensions.  This Job Aid is only for Veterans and spouses.

**Note 3:**  If claim was last worked before August 15, 2018, no payments can be made between the original Chapter 33 Delimiting Date and Date of Decision.

**Note 4:**  Maxium amount of extension is 180 months.  If extension is greater than 180 months, only extend by 180 months.





## QUICK GUIDE: MGIB Rudisill Delimiting Date Extension for 120 Month Maximum allowable

See SNIPPETS below for visual guidance when the length of Rudisill MGIB Del Date Ext exceeds the 120 month maximum:

**1) BDN MGIB 310 screen prior to Rudisill review and/or extension:**



**2) JOB AID: When the length of extension on the Job Aid is capped at 120 months** (even if the current delimiting date prior to extension is in the future) the final RAD date requires manipulation to reflect '10 years and 1 day prior to' the "From Date" entered in the "Delim Date Adj" section of the 310 screen (as reflected in the Job Aid)



3) **BDN MGIB 310 screen when the length of extension on the Job Aid is capped at 120 months** *and* **both periods of service were added.**  BDN calculated 10 years from 6-24-20 *PLUS* 120 months (10 years) from 1-26-25 as input (per the Job Aid).  **This is INCORRECT.**



4) **BDN MGIB 310 screen when the length of extension on the Job Aid is capped at 120 months** (even if the current delimiting date prior to extension is in the future) ***the final RAD date requires manipulation to reflect '10 years and 1 day prior to' the "From Date" entered in the "Delim Date Adj" section of the 310 screen (as reflected in the Job Aid)***



**IMPORTANT POTENTIAL DEBT REMINDER:**

When the extension is capped at 120 months ***the 312 screen must be carefully reviewed prior to authorization to ensure that no debts for prior enrollment are created because of this RAD change.*** If debts are created, you must still add the 120 months and enter the "From Date" as instructed.  However, DO NOT change the original RAD, instead allow BDN to calculate the extended delimiting date (even if it does not match the final JOB AID date) then FLASH the file as follows:

"Correct Delimiting Date is XX-XX-XXXX (as reflected in the Job Aid).  DO NOT pay after this date.  Suppress letters upon authorization.  Manual Letters are required for all (current and future) awards with corrected delimiting date."

## INSTRUCTIONS FOR REMOVING BENEFIT RELINQUISHED IN DGI
(The following example is for removal of MGIB.  Follow the same steps for removal of MGIB-SR.)

REMINDER: VCE must manually reinput Chapter 33 Start Date in step #5 prior to authorization

1) Go to the Entitlement Used tab and check the box to the left of Chapter 30 (MGIB).



2) Once the box is checked go to the far right and choose "Delete".



3) Once complete the Entitlement Used, Benefit Relinquished, and Chapter 33 Start date will be blank.



4) Next, you must *reinput* ALL Chapter 30 entitlement used. But **DO NOT** check the 'Eligible' box.



5) **VCE must manually reinput Chapter 33 Start Date**. Once all actions are complete, the record should correctly update as seen below; Chapter 30 used is now correctly reflected in DGI as shown below.



**INSTRUCTIONS FOR REMOVING BENEFIT RELINQUISHED IN DGI <span style="color:red">WHEN MGIB REFUND ALREADY PAID</span>**

(This example is for removal of MGIB Relinquishment *when MGIB Refund has already been paid.*)

If these steps are not followed the following Validation error banner will appear:



**<mark>REMINDER: VCE must manually reinput Chapter 33 Start Date in step #7 prior to authorization</mark>**

1) Go to WPS screen.  Under Miscellaneous Benefits, choose Correction to the Refund of Chapter 30 contributions. When Add/Edit Miscellaneous Benefits box appears DO NOT change information listed, but you must select SAVE. (i.e. as shown below $1200.00 would be unchanged).



2) After SAVE has been selected, under Miscellaneous Benefits check the box to the left of the Refund of Chapter 30 Contributions entry. Then select Delete Benefit.



3) Go to the Entitlement Used tab and check the box to the left of Chapter 30 (MGIB).



4) Once the box is checked go to the far right and choose "Delete".



5) Once complete the Entitlement Used, Benefit Relinquished, and Chapter 33 Start date will be blank.



6) Next, you must **reinput** ALL Chapter 30 entitlement used. But **DO NOT** check the 'Eligible' box.



7) <mark>VCE must manually reinput Chapter 33 Start Date</mark>. Once all actions are complete, the record should correctly update as seen below; Chapter 30 used is now correctly reflected in DGI as shown below.



8) Once the benefit has been reentered, go to WPS screen under Lump Sum Payments. There will be a 71B debt for the amount of CH30 Contributions refunded.



| Lump Sum Payments | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Type of Payment | Cost Code | Code/Class | Term Begin Date | Term End Date | Facility Code | Payment Amount | CH30 Kickers | CH1606 Kickers | Payment Action | Maturation |
| CH30 Contributions Refund | 3N2A | 71B | 01/01/2025 | 01/01/2025 | --- | ($1,200.00) | | | Send now | 01/08/2025 |

9) Also, on the WPS screen, the Refunded of CH30 Contributions Status will show Deleted.

| Miscellaneous Benefits | | | | | |
|---|---|---|---|---|---|
| Date | Type | | Description | Amount Claimed | Status |
| 01/08/2025 | Refund of CH30 Contributions | | CH30 Contributions Refund | $1,200.00 | Deleted |

10) On the final step, make sure to select **Authorize with No Payments.** Do not choose Authorize with Automatic Payments because debts will be created.



| Payments and Authorization | |
|---|---|
| Date Last Paid | 08/21/2015 |
| Debt Collection Indicator | 1 |
| Verification Date | 12/11/2024 |
| MHA/Kicker Paid Through Date | 12/11/2024 |
| Service Information Verified Through Date | 09/30/2024 |

○ Authorize and Pay Automatically
○ Authorize with No Payments

Submit       AUTHORIZE WITH AUTOMATIC PAYMENTS

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows beneficiaries more flexibility in the use of their VA Education benefit programs when entitled to more than one benefit, or when they are eligible to make a choice between the use of two or more benefits.

**NOTE**: *Individual education benefit programs include 36 months of entitlement. Generally, beneficiaries who qualify for multiple VA Education benefits are subject to a cap of 48 months of entitlement paid under any combination of benefit programs.*

We have performed a review of your claim to determine how the changes may apply to you. This letter provides information about what we did on your claim, your options for coordinating your benefits, and how to contact us.

## What Our Records Show

You elected to relinquish your benefits under the Montgomery GI Bill - Selected Reserve (MGIB-SR) to establish eligibility under the Post-9/11 GI Bill (PGIB). Based on your service records, this election was not required to establish eligibility under PGIB. Revoking your election would restore your eligibility to benefits under MGIB-SR.

**NOTE**: *Your service branch determines MGIB-SR eligibility, not VA. If you leave the Selected Reserve/Guard, your eligibility under MGIB-SR may end.*

## What We Did

We have reversed your election under MGIB-SR and restored your eligibility to benefits under MGIB-SR. VA will issue a separate Certificate of Eligibility (COE) letter with additional information regarding your MGIB-SR eligibility.

## What You Should Do

If you disagree with this decision and wish to relinquish MGIB-SR for PGIB, you may notify VA online through Ask VA at https://ask.va.gov or mail your request to the address at the top of this letter.

## Your Right to Seek Additional Review

If you disagree with our decision, you have one year from the date of this letter to request an additional review. For more information, please see the enclosed VA Form 20-0998, Your Rights to Seek Further Review of Our Decision. It explains your options for an additional review. You may also learn more about the appeal process at https://www.va.gov/decision-reviews/.

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows beneficiaries more flexibility in the use of their VA Education benefit programs when entitled to more than one benefit, or when they are eligible to make a choice between the use of two or more benefits.

**NOTE**: *Individual education benefit programs include 36 months of entitlement. Generally, beneficiaries who qualify for multiple VA Education benefits are subject to a cap of 48 months of entitlement paid under any combination of benefit programs.*

We have performed a review of your claim to determine how the changes may apply to you. This letter provides information about what we did on your claim, your options for coordinating your benefits, and how to contact us.

## What Our Records Show

Our records show you elected to relinquish eligibility under Montgomery GI Bill Selected Reserve (MGIB-SR) to receive benefits under Post-9/11 GI Bill (PGIB). Revoking this election could potentially restore eligibility under MGIB-SR.

**NOTE:** *Your service branch determines MGIB-SR eligibility, not VA. If you leave the Selected Reserve/Guard, your eligibility under MGIB-SR may end.*

## What We Did

We have retained your election under MGIB-SR.  Reasons for retaining an election generally fall under three categories:

- Election was not required to establish eligibility under PGIB but was required to allow payment of the MGIB-SR kicker under PGIB. If you revoke your MGIB-SR election, you will not be required to repay the MGIB-SR kicker paid under PGIB, but you will no longer receive MGIB-SR kicker payments under PGIB.

- Election to relinquish Montgomery GI Bill (MGIB) was required to establish eligibility under PGIB but the election does not limit original PGIB entitlement to the amount remaining under MGIB and allows the highest possible benefit level payable under PGIB. If you revoke your MGIB-SR election, you will be required to relinquish MGIB which could negatively affect your PGIB benefits and cause debts.

- Election was not required to establish eligibility under PGIB, but service records indicate no current eligibility under MGIB-SR and revoking the election would not result in any additional benefits under any benefit program.

## What You Should Do

If you disagree and wish to revoke your election, you may notify VA online through Ask VA at https://ask.va.gov or mail your request to the address at the top of this letter.

## Your Right to Seek Additional Review

If you disagree with our decision, you have one year from the date of this letter to request an additional review. For more information, please see the enclosed VA Form 20-0998, Your Rights to Seek Further Review of Our Decision. It explains your options for an additional review. You may also learn more about the appeal process at https://www.va.gov/decision-reviews/.

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327(h) of Title 38, United States Code. The new interpretation allows beneficiaries more flexibility in the use of their VA Education benefit programs when entitled to more than one benefit, or when they are eligible to make a choice between the use of two or more benefits.

We have performed a review of your claim to determine how the changes may apply to you. This letter provides information about what we did on your claim, your options for coordinating your benefits, and how to contact us.

## Regarding Your Election

Our records indicate that you only have one period of qualifying active-duty service at this time. That service began before August 1, 2011, and you used some of your Montgomery GI Bill Active Duty (MGIB) benefits before you applied for the Post-9/11 GI Bill (PGIB).

You chose to give up MGIB to receive benefits under PGIB.  However, this election limited your PGIB benefits to the amount of entitlement you had remaining under MGIB.

Because you only have one period of service, the new interpretation does not apply to your situation. You are _required_ to give up your MGIB benefits to establish your PGIB benefits.

## What We Did

We have <u>retained</u> your election to give up MGIB.  You do not need to take any further action.

## Your Right to Seek Additional Review

If you disagree with our decision, you have one year from the date of this letter to request an additional review. For more information, please see the enclosed VA Form 20-0998, Your Rights to Seek Further Review of Our Decision. It explains your options for an additional review. You may also learn more about the appeal process at https://www.va.gov/decision-reviews/.

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows beneficiaries more flexibility in the use of their VA Education benefit programs when entitled to more than one benefit, or when they are eligible to make a choice between the use of two or more benefits.

**NOTE**: *Individual education benefit programs include 36 months of entitlement. Generally, beneficiaries who qualify for multiple VA Education benefits are subject to a cap of 48 months of entitlement paid under any combination of benefit programs.*

We have performed a review of your claim to determine how the changes may apply to you. This letter provides information about what we did on your claim, your options for coordinating your benefits, and how to contact us.

## How Benefits Could be Impacted

### Multiple Periods of Qualifying Service

Individual periods of service may be used to establish eligibility under both the Montgomery GI Bill - Active Duty (MGIB) and Post-9/11 GI Bill (PGIB). However, a single period of service beginning on or after August 1, 2011, cannot be used to establish benefits and could be a bar to benefits under one program or it could lower the benefit level payable under PGIB. If a period of service is used for one benefit, it will be excluded from consideration when considering eligibility under the other benefit.

### One Period of Qualifying Service Beginning before August 1, 2011

If service began before August 1, 2011, and MGIB benefits were not used before applying for PGIB, an election to relinquish MGIB is not necessary to establish eligibility under PGIB. However, additional periods of service must be completed to establish eligibility under multiple benefits. Eligibility to multiple benefits could be established through a reenlistment or Selected Reserve/Guard call-up or mobilization.

### One Period of Qualifying Service Beginning on/After August 1, 2011

If service began on or after August 1, 2011, an election to relinquish MGIB is not necessary to establish eligibility under PGIB. However, additional periods of service must be completed to establish eligibility under multiple benefits. Eligibility to multiple benefits could be established through a reenlistment or Selected Reserve/Guard call-up or mobilization.

## What Our Records Show

Our records show you elected to relinquish eligibility under MGIB to receive benefits under PGIB.

## What We Did

We have reversed your election under MGIB.  When a beneficiary elects to give up eligibility under MGIB, the reason for reversing an election generally falls under one of the four categories below:

- **MGIB Extension Granted.** Election was not required to establish eligibility under PGIB.  As a result, the election under MGIB is revoked and eligibility under MGIB is restored.  VA will issue a separate Certificate of Eligibility (COE) letter detailing restored entitlement and new delimiting date under MGIB.

- **MGIB Extension Granted/MGIB Refund Previously Paid.**  Election was not required to establish eligibility under PGIB. As a result, the election under MGIB is revoked and eligibility under MGIB is restored.  VA will issue a separate Certificate of Eligibility (COE) letter detailing restored entitlement and new delimiting date under MGIB.

  ***NOTE***: *An MGIB election is required to receive a refund of MGIB contributions when PGIB is exhausted. In cases where the refund was processed prior to this decision, debts will not be established for the amount paid.*

- **MGIB Extension Granted/No Refund Paid.**  Election was not required to establish eligibility under PGIB. As a result, the election under MGIB is revoked and eligibility under MGIB is restored.  VA will issue a separate Certificate of Eligibility (COE) letter detailing restored entitlement and new delimiting date under MGIB.

  ***NOTE***: *If you fall under this category and wish to receive a refund of your MGIB contribution (up to $1200) when your PGIB entitlement exhausts, see the election option under **What You Should Do** below.*

- **Not Eligible MGIB.** No eligibility under MGIB and election was not required to establish eligibility under PGIB.  As a result, the election under MGIB is revoked.


## What You Should Do

If you disagree with this decision and wish to relinquish MGIB for PGIB, you may notify VA online through Ask VA at https://ask.va.gov or mail your request to the address at the top of this letter.

### Option for MGIB Refund in Lieu of Restored Entitlement [ONLY]

If you wish to receive a refund of your MGIB contribution (up to $1200) when your PGIB entitlement exhausts rather than use restored entitlement under MGIB, you must submit a signed request online through **Ask VA** at https://ask.va.gov or mail to the address at the top of this letter.

Please use the following to submit for this option:

_____

**[Initials]**     I choose to receive a proportional refund of my MGIB contributions (up to $1200) when I exhaust my entitlement under PGIB. I understand that by choosing to receive a proportional refund of my MGIB contributions I am forfeiting my eligibility to use benefits (restored entitlement) under MGIB.

_____          _____

Printed Name                              Signature

## Your Right to Seek Additional Review

If you disagree with our decision, you have one year from the date of this letter to request an additional review. For more information, please see the enclosed VA Form 20-0998, Your Rights to Seek Further Review of Our Decision. It explains your options for an additional review. You may also learn more about the appeal process at https://www.va.gov/decision-reviews/.

A recent decision made by the United States Supreme Court has changed VA's interpretation of Section 3327 (h) of Title 38, United States Code. The new interpretation allows beneficiaries more flexibility in the use of their VA Education benefit programs when entitled to more than one benefit, or when they are eligible to make a choice between the use of two or more benefits.

**NOTE**: *Individual education benefit programs include 36 months of entitlement. Generally, beneficiaries who qualify for multiple VA Education benefits are subject to a cap of 48 months of entitlement paid under any combination of benefit programs.*

We have performed a review of your claim to determine how the changes may apply to you. This letter provides information about what we did on your claim, your options for coordinating your benefits, and how to contact us.

## How Benefits Could be Impacted

### Multiple Periods of Qualifying Service

Individual periods of service may be used to establish eligibility under both the Montgomery GI Bill - Active Duty (MGIB) and Post-9/11 GI Bill (PGIB).  However, a single period of service beginning on or after August 1, 2011, cannot be used to establish benefits and could be a bar to benefits under one program or it could lower the benefit level payable under PGIB. If a period of service is used for one benefit, it will be excluded from consideration when considering eligibility under the other benefit.

### One Period of Qualifying Service Beginning before August 1, 2011

If service began before August 1, 2011, and MGIB benefits were not used before applying for PGIB, an election to relinquish MGIB is not necessary to establish eligibility under PGIB. However, additional periods of service must be completed to establish eligibility under multiple benefits. Eligibility to multiple benefits could be established through a reenlistment or Selected Reserve/Guard call-up or mobilization.

### One Period of Qualifying Service Beginning on/After August 1, 2011

If service began on or after August 1, 2011, an election to relinquish MGIB is not necessary to establish eligibility under PGIB.  However, additional periods of service must be completed to establish eligibility under multiple benefits. Eligibility to multiple benefits could be established through a reenlistment or Selected Reserve/Guard call-up or mobilization.

## What Our Records Show

Our records show you elected to relinquish eligibility under MGIB to receive benefits under PGIB.

## What We Did

We have retained your election under MGIB.  Reasons for retaining an election generally fall under three categories:

- **Potential Overpayment.** Paid under PGIB at a higher benefit level because MGIB was relinquished, and all qualifying service was applied to PGIB. However, if the election is revoked and additional service is used to establish eligibility under MGIB, previous payments for training under PGIB would be reduced and overpayments would then be established for the difference in payable rates.

- **Reduction in Benefit Level.** Paid under PGIB at a higher benefit level because MGIB was relinquished, and all qualifying service was applied to PGIB. However, if the election is revoked and additional service is used to establish eligibility under MGIB, the benefit level under PGIB would be reduced but no overpayment would result.

- **MGIB Kicker.**  Election was not required to establish eligibility under PGIB but was required to allow payment of the MGIB kicker under PGIB.  If the election is revoked, collection of the MGIB-SR kicker paid under PGIB would not be required but it will no longer be paid under PGIB.

## What You Should Do

If you disagree and wish to revoke your election, you may notify VA online through Ask VA at https://ask.va.gov or mail your request to the address at the top of this letter.

## Your Right to Seek Additional Review

If you disagree with our decision, you have one year from the date of this letter to request an additional review. For more information, please see the enclosed VA Form 20-0998, Your Rights to Seek Further Review of Our Decision. It explains your options for an additional review. You may also learn more about the appeal process at https://www.va.gov/decision-reviews/.